**KELLER BENVENUTTI KIM LLP**
JANE KIM (Cal. Bar No. 298192)
(jkim@kbkllp.com)
JEREMY V. RICHARDS (Cal. Bar No. 102300)
(jrichards@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Proposed Attorneys for Debtors and
Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>TRINITAS FARMING, LLC, *et al.*,[1]<br><br>                       Debtors. | Case No. 24-50210 (___) (Lead Case)<br><br>Chapter 11<br><br>(Joint Administration Requested)<br><br>**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V) SETTING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**<br><br>Date: February 21, 2024<br>Time: 10:00 a.m. (Pacific Time)<br>Place: **Tele/Videoconference Appearances Only**<br>United States Bankruptcy Court<br>280 South First Street<br>San Jose, California 95113-3099 |

[1]     The last four digits of Trinitas Farming, LLC's tax identification number are 8883. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.donlinrecano.com/trinitas. The Debtors' service address is 1414 East F Street A-102, Oakdale, California 95361.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

# **Table of Contents**

INTRODUCTORY STATEMENT ................................................................................. 1

REQUIRED DISCLOSURES ..................................................................................... 5

CERTIFICATION ........................................................................................................ 7

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 8

I.   JURISDICTION AND VENUE ...................................................................... 8

II.  BACKGROUND ............................................................................................... 8

    A.   General Background ............................................................................. 8

    B.   Trinitas Farming's Secured and Unsecured Debt ........................... 9

    C.   Need for DIP Financing ..................................................................... 10

III. ARGUMENT .................................................................................................. 12

    A.   The Court Should Approve the DIP Loan. ...................................... 12

    B.   The Motion Reflects the Debtors' Sound Business Judgment ............................. 13

        1.   The DIP Loan Is Necessary and Appropriate for the Continued Operation of the Debtors' Businesses and Preservation of Their Estates and Is in Their Best Interests. ...................... 14

        2.   The DIP Loan Was Negotiated in Good Faith and at Arm's Length, Its Terms Are Fair, Reasonable and Adequate, and Debtors Could Not Obtain Credit Available on More Favorable Terms. ........................ 14

    C.   The Interim Orders Should be Granted. ........................................... 15

        1.   The Court Should Conduct Preliminary Expedited Hearings. ................. 15

        2.   The Debtors Require Immediate Access to the DIP Loan. ...................... 16

    D.   The DIP Lenders Are Good Faith Lenders Under Section 364(e) ...................... 18

    E.   The Scope of the Carve Out is Appropriate. .......................................... 18

    F.   The Automatic Stay Should be Modified on a Limited Basis. ........................ 19

IV.  RESERVATION OF RIGHTS ....................................................................... 19

V.   REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY ............................ 19

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

**TABLE OF AUTHORITIES**

**CASES**

*Blue Earth, Inc. et al.*
    Case No. 16-30296 (Bankr. N.D. Cal. Apr. 29, 2016) ........................................ 15

*In re Aeropostale, Inc.*
    Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 06, 2016) ................................ 19

*In re Ames Dep't Stores*
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ..................................................... 13, 14, 18

*In re Breitburn Energy Partners LP, et al.*
    Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. May 23, 2016) .............................. 17

*In re Capitol Station 65, LLC*
    No. 17-23627-B-11, 2018 WL 333863 (Bankr. E.D. Cal. Jan. 8, 2018) ............... 14

*In re Eastman Kodak Co., et al.*
    Case No. 12-10202 (MEW) (Bankr. S.D.N.Y. Jan. 20, 2012) ............................ 17

*In re Farmland Indus., Inc.*
    294 B.R. 855 (Bankr. W.D. Mo. 2003) ................................................................ 13

*In re Fleetwood Enterprises, Inc., et al.*
    Case No. 09-14254-MJ (Bankr. C.D. Cal. Mar. 31, 2009) ............................ 17, 19

*In re Gardens Reg'l Hosp.*
    No. 2:16-BK-17463-ER, 2017 WL 7101146 (Bankr. C.D. Cal. July 28, 2016) ......... 13, 17, 19

*In re Los Angeles Dodgers LLC*
    457 B.R. 308 (Bankr. D. Del. 2011) .................................................................... 13

*In re Newzoom, Inc.*
    Case No. 15-31141 (Bankr. N.D. Cal. Oct. 15, 2015) ......................................... 15

*In re Rdio, Inc.*
    Case No. 15-31430 (Bankr. N.D. Cal. Dec. 10, 2015) ......................................... 15

*In re Reading Tube Indus.*
    72 B.R. 329 (Bankr. E.D. Pa. 1987) .................................................................... 14

*In re Republic Airways Holdings Inc.*
    No. 16-10429 (SHL), 2016 WL 2616717 (Bankr. S.D.N.Y. May 3, 2016) ............ 13

*In re Seriosa*
    Case No. 2:16-BK-14276-RK, 2016 WL 3478953 (Bankr. C.D. Cal. June 20, 2016) ........... 16

*In re Simasko Prod. Co.*
    47 B.R. 444 (D. Colo. 1985) ............................................................................... 13

*In re Snowshoe Co.*
    789 F.2d 1085 (4th Cir. 1986) ............................................................................ 14

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

*In re Sterling Mining Co.*
  No. 09-20178-TLM, 2009 WL 2514167 (Bankr. D. Idaho Aug. 14, 2009) ............................ 13

*In re SunEdison, Inc.*
  Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Apr. 26, 2016) ........................................... 17, 19

*In re The Great Atl. & Pac.Tea Co., Inc.*
  Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) ............................................ 17

*In re Toys ''R'' Us, Inc.*
  Case No. 17-34665 (Bankr. E.D. Va. Sep. 20, 2017) ....................................................... 15

## **STATUTES**

11 U.S.C. § 363 ..................................................................................................................... 16

11 U.S.C. § 364 .............................................................................................................. passim

11 U.S.C. § 503 ..................................................................................................................... 12

28 U.S.C. § 1334 ..................................................................................................................... 8

28 U.S.C. § 1408 ..................................................................................................................... 8

28 U.S.C. § 1409 ..................................................................................................................... 8

28 U.S.C. §§ 157 ..................................................................................................................... 8

## **RULES**

Fed R. Bankr. P. 2002 .......................................................................................................... 20

Fed R. Bankr. P. 6004 .......................................................................................................... 20

Fed. R. Bankr. P. 4001 ............................................................................................... 15, 16, 17

Fed. R. Bankr. P. 6003 ................................................................................................... 17, 19

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

Trinitas Farming, LLC ("TF"), together with Trinitas Advantaged Agriculture Partners IV, LP ("TAAP IV"), and certain of their affiliates (collectively, the "Debtor Farm Subsidiaries," and, collectively with TF and TAAP IV, "Trinitas Farming," the "Company," or the "Debtors") who are debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), move this Court (the "Motion") pursuant to sections 105, 361, 362, 363, 364 (c), 364(d), 364(e), 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"),[2] Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1 and 4001-1 of the Bankruptcy Local Rules for the Northern District of California (the "Bankruptcy Local Rules"), and this Court's Guidelines for Cash Collateral and Financing Motions and Stipulations (the "Guidelines'), for entry of an interim order, in substantially the form attached hereto as **Exhibit A**, and a second interim order and a final order in similar form, authorizing them to obtain $30 million of secured, superpriority postpetition financing on the terms detailed herein.[3]  The interim orders sought by the Debtors also approve the immediate borrowing and use of $1 million of financing for the first week (the "Initial Draw"), and a supplemental $5.5 million of financing (the "Second Draw") (for a total of $6.5 million), on the terms described herein, in order to enable them to continue operating their businesses between the Petition Date (as such term is defined below) and a final hearing on this Motion (the "Interim Period").

In support of the relief requested herein, the Debtors submit the *Declaration of Kirk Hoiberg in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

## INTRODUCTORY STATEMENT

By this Motion, the Debtors request entry of interim and final orders granting the Debtors authority to obtain postpetition financing and to use cash collateral (a) for working capital and

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

---

[2]    Unless otherwise indicated, all statutory references are to the Bankruptcy Code.

[3]    The Interim Order submitted herewith is for the emergency one-week period for which relief is currently being sought. The longer-term interim order will be submitted in advance of the second interim hearing on this Motion.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

general corporate purposes during the Chapter 11 Cases, and (b) for payment of retained professionals' fees and expenses and interest, payments, and expenses associated with the entry into the DIP Credit Agreement and the other documents executed in connection therewith.

The proposed orders seek, among other things, the following relief:

(1) **Authorizing DIP Loan** – authorizing the Borrower to obtain postpetition financing pursuant to a senior secured delayed draw term loan facility (the "<u>DIP Loan</u>") in an aggregate principal amount of up to $30,000,000 on the terms and conditions set forth in the Term Sheet for Debtor-in-Possession Financing attached hereto as **Exhibit B** (the "<u>Term Sheet</u>")[4] by and among the Debtors, Rabo AgriFinance, LLC ("<u>Rabo Ag</u>"), and such other entities as may later join as lenders (collectively, the "<u>DIP Lenders</u>"), and Rabo Ag in its capacity as the Administrative Agent (the "<u>DIP Agent</u>"), which shall include the following:

(a) <u>Interest Rates</u>: One-Month Term SOFR + 8.00%, adjusted monthly and payable in arrears; upon an Event of Default, two percent (2.00%) per annum in addition to the then-current interest rate, payable upon demand.[5]

(b) <u>Fees</u>: A fee in the amount of one and one-half percent (1.5%) of the amount of each advance.

(c) <u>Interest Only Payments</u>: The Debtors will make monthly interest payments to the Lender until the Termination Date.

(d) <u>Liens and Superiority Claims</u> – Subject to the Carve-Out and limitations on recourse to Excluded Property, to secure the DIP Obligations the Debtors will grant to the DIP Agent for the benefit of the DIP Lenders allowed superpriority administrative claims pursuant to section 364 (c)(1); liens on and security interests in all DIP Collateral (as defined below), pursuant to sections 364(c)(2) and 364(c)(3); and priming liens on and security interests in all Collateral, subject and junior to Permitted Third Party Liens, pursuant to section 364(d)(1).

(e) <u>Carve-Out</u>. The DIP Lenders' Collateral, Liens & Priority, and the prepetition secured parties' adequate protection liens and claims, shall be subject and subordinate to payment of (a) the Professional fees incurred, but not in excess of amounts therefor provided in the applicable Approved

---

[4] Capitalized terms used herein but not otherwise defined herein shall have the meaning given to them in the Term Sheet. The Debtors and the DIP Lenders are working on a definitive form of loan and security agreement (the "<u>DIP Credit Agreement</u>") which, once completed and executed, will be filed and will supersede the Term Sheet. The Term Sheet states that it is non-binding, but Rabo Ag has agreed to advance the Initial Draw of $1 million on the basis of the Term Sheet.

[5] The one-month SOFR rate is currently approximately 5.3% and under the DIP Loan, will adjust monthly, on the first of each month.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

Budget, prior to the earliest of (i) an Event of Default (as defined in the DIP Credit Agreement), (ii) the termination of the DIP Loan, or (iii) the maturity date of the DIP Loan (the earliest, the "<u>Carve-Out Date</u>"); (b) the sum of $150,000 for payment of Professionals' costs and expenses incurred after the Carve-Out Date; (c) fees and expenses of a chapter 7 trustee in an amount not to exceed $75,000; and (d) statutory fees of the United States Trustee (collectively, the "<u>Carve-Out</u>").

(f)    <u>Excluded Property</u>: No security interest or lien securing the DIP Obligations shall attach to the avoidance actions under chapter 5 ("<u>Excluded Property</u>"), nor shall proceeds of the Excluded Property be applied to the DIP Lenders' priority claims.

(g)    <u>Milestones</u>: The Debtors shall immediately identify Brokers(s) and meet certain milestones, including: (i) by March 30, 2024, obtain an order approving employment of the Broker(s), file a motion seeking approval of bidding procedures (the "<u>Bidding Procedures</u>"), and commence the Sale Process; (ii) by no later than April 30, 2024, obtain an order approving the Bidding Procedures (the "<u>Bidding Procedures Order</u>"); (iii) by May 31, 2024, conduct an auction of a portion of the Debtors' assets (the "<u>Initial Auction</u>"); (iv) by June 14, 2024, hold a hearing (the "Initial Sale Hearing") regarding approval of the sale pursuant to section 363 of all or a portion of the Debtors' non-cash assets (the "<u>Assets</u>") with entry of an order approving a sale acceptable to the DIP Lenders (an "<u>Acceptable Sale</u>") within three days thereafter; and (v) conduct additional auctions by December 31, 2024, and March 31, 2025, such that by April 30, 2025, one or more Acceptable Sales shall have closed that are acceptable to the DIP Lenders. Further details regarding the required terms of the sales are set forth in the Term Sheet.

(h)    <u>Termination Date</u>: The term of the DIP Loan commences upon entry of the Interim DIP Order and continues through the earliest to occur of (a) April 30, 2025; (b) an Event of Default as defined in the DIP Credit Agreement; (c) ten (10) days after the occurrence of the effective date of any plan of reorganization (a "<u>Plan</u>"); (d) the failure of the Final DIP Order to be entered within thirty (30) days after filing of the filing of the Debtors' motion for approval of the DIP Loan (the "<u>DIP Motion</u>"), unless otherwise agreed in writing by DIP Lenders; and (e) the closing of the sale(s) of substantially all of the Debtors' assets (the earliest of the foregoing to occur is the "<u>Termination Date</u>").

(i)    <u>Events of Default</u>: Typical of loan agreements, including failure to adhere to reporting requirements; defaults under covenants; appointment of a bankruptcy trustee, examiner, or receiver; dismissal or conversion of the Bankruptcy Case; material non-compliance with the DIP Orders; entry of an order amending, staying, revoking, or reversing the DIP Orders; allowance of a claim under section 506(c); filing a Plan or disclosure statement not approved by the DIP Lenders or that does not provide for repayment in cash on the effective date of the entirety of the DIP Loan and

repayment in cash or reinstatement of the balance of the remaining pre-petition secured obligations; payment of certain prepetition claims; entry of an order granting stay relief in respect of any Collateral; granting any superpriority claim that is *pari passu* with or senior to those of the DIP Lenders; and pursuit of a sale that is not an Acceptable Sale or failure to promptly obtain bankruptcy court approval of an Acceptable Sale.

    (j)    <u>Representations, Warranties, Covenants, Indemnity and Other Provisions.</u> The DIP Documents shall include other customary provisions including, without limitation, representations and warranties, affirmative and negative covenants, and provisions relating to indemnification, confidentiality, and assignments/participations, and compliance with an approved budget, subject to agreed variances.

(2)    **Payment of Fees and Expenses** – authorizing the Debtors to pay all fees, costs and expenses due pursuant to the DIP Credit Agreement.

(3)    **Adequate Protection** – The only secured parties known to the Debtors to be affected by this Motion, including parties with an interest in cash collateral, are Rabo Ag, as agent for certain lenders. Subject to the Carve-Out, the DIP Lenders' Collateral, Liens & Priority, and limitations on recourse to Excluded Property, such parties will receive, as and for adequate protection of their interests in the Debtors' assets, adequate protection liens on all collateral; superpriority claims pursuant to 507(b); waiver of marshalling, section 506(c), and section 552(b) equity of the cases exception (as of petition date); accrued interest on prepetition obligations at the contractual default rate; written financial reporting and other periodic reporting; and other customary legal protections.[6]

(4)    **Stay Relief** – vacating or modifying the automatic stay imposed by section 362 as necessary to effectuate the terms and provisions of the Interim Orders or Final Order, as applicable; and to allow for the exercise of certain remedies after providing five (5) days' written notice to certain parties.

(5)    **Schedule Further Interim and Final Hearing** – scheduling a further interim hearing one week after the initial interim hearing to consider entry of a further order approving the DIP Credit Agreement on an interim basis, and setting a final hearing (the "<u>Final Hearing</u>") to consider entry of the Final Order granting the relief requested in this Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion.

(6)    **Waiver of Stay** – waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Orders and providing for the immediate effectiveness of the Interim Orders or Final Order, as applicable.

---

[6]    The weighted average of the contractual default rate on the pre-petition debt is approximately 12.5%.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

**REQUIRED DISCLOSURES**

As required by the Guidelines, the Debtors provide the following statement regarding the proposed financing.

| Disclosure Item | Detail | Reference[7] |
|---|---|---|
| Granting of Lien or Priority | First priority priming lien and other liens under sections 364 (c) and (d) on substantially all of the Debtor's assets, subject only to (a) and limitations on recourse to Excluded Property, (b) Permitted Third Party Liens, and (c) the Carve-Out. | Term Sheet: DIP Lenders' Collateral, Liens & Priority |
| Adequate Protection | Subject to the Carve-Out, the DIP Lenders' Collateral, Liens & Priority, and limitations on recourse to Excluded Property, certain liens, superpriority claims, accrual of interest at the default rate, waiver of certain rights, reporting and other protections. | Term Sheet: Adequate Protection for Prepetition Secured Parties. |
| A Determination With Respect to the Validity, Perfection, Priority or Amount of a Pre-Petition Claim, or any Lien Securing Such Claim | The Debtors are waiving any and all such challenges to the pre-petition lenders' claims and security interests and are waiving all defenses, counterclaim and defenses with respect to same. Section 8 of the proposed interim order provides a challenge for a committee, trustee or other party in interest for a period equal to the later of 75 days after entry of the Interim Order or 60 days after the appointment of a committee, to challenge the Debtors' stipulations and waivers. | Interim Order, ¶ 6. |
| Relief from Stay | Stay modified to allow exercise of remedies, provided that prior to the exercise of any enforcement or liquidation remedies against the Collateral, the DIP Agent shall be required to provide five (5) days' written notice to the Debtors, their bankruptcy counsel, the prepetition trustee, the United States Trustee for the Northern District of California, and any Official Committee of Unsecured Creditors and its counsel. | Term Sheet: Events of Default and Remedies |

---

[7]     The following references are to the Term Sheet. The Required Disclosures will be updated upon the filing of the DIP Credit Agreement.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

| | | |
|---|---|---|
| Waiver of Plan and Credit Rights | Debtors' right to propose a plan limited to a Plan or disclosure statement that "is approved by the DIP Lenders" or "provides for repayment in cash on the effective date of the entirety of the DIP Loan and repayment in cash or reinstatement of the balance of the remaining pre-petition secured debts."<br><br>Debtors prohibited from obtaining credit secured by a "superpriority claim that is *pari passu* with or senior to those of the DIP Lenders." | Term Sheet: Events of Default and Remedies |
| Waiver and Releases of Claims | Waiver of marshalling, section 506(c), and section 552(b) equity of the cases exception for prepetition secured indebtedness.<br><br>"[A]llowance of a claim under section 506(c) of the Bankruptcy Code" constitutes an Event of Default. | Term Sheet: Adequate Protection for Prepetition Secured Parties<br><br>Term Sheet: Events of Default and Remedies |
| Indemnity | Provided to DIP Lenders. | Term Sheet: Other Provisions |
| Liens on Avoidance and Related Claims and Proceeds | Excluded Property is not included in the lien or security benefits. | Term Sheet: DIP Lenders' Collateral, Liens & Priority |
| Carve-Out | Carve-Out defined as (a) the Professional fees incurred, but not in excess of amounts therefor provided in the applicable Approved Budget, prior to the earliest of (i) an Event of Default, (ii) the termination of the DIP Loan, or (iii) the maturity date of the DIP Loan; (b) the sum of $150,000 for payment of Professionals' costs and expenses incurred after the Carve-Out Date; (c) fees and expenses of a chapter 7 trustee in an amount not to exceed $75,000; and (d) statutory fees of the United States Trustee. | Term Sheet: Carve-Out<br><br>Term Sheet: Adequate Protection for Prepetition Secured Parties |

**CERTIFICATION**

The undersigned proposed counsel for the Debtors has read the Motion; to the best of my knowledge, information, and belief, formed after reasonable inquiry, the terms of the relief sought in the Motion are in conformity with the Court's Guidelines for Cash Collateral and Financing Motions and Stipulations, except as set forth herein. I understand and have advised the Debtors that the Court may grant appropriate relief under Bankruptcy Rule 9024 if the Court determines that a material element of the Motion was not adequately disclosed in the Introductory Statement.

By: */s/ Jane Kim*
Jane Kim

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION AND VENUE

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) the Bankruptcy Local Rules. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. § 1408 and 1409.

## II. BACKGROUND[8]

### A. General Background

On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California, thereby commencing the Chapter 11 Cases. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108. No trustee or examiner has been appointed in these Chapter 11 Cases.

Debtor TAAP IV is an investment vehicle that was organized by Trinitas Partners in 2015 to acquire, develop, cultivate, and operate primarily almond ranches in the Central Valley of California. TAAP IV owns, and through its subsidiary, Debtor TF, operates 17 almond ranches, each of which is held by a separate Debtor Farm Subsidiary, covering 7,856 planted acres in Solano, Contra Costa, San Joaquin, Fresno, and Tulare Counties.

Because of, among other reasons, Trinitas Partners' significant experience and expertise in managing agricultural investments and operations, the Debtor Farm Subsidiaries' superior water rights, the relatively young age of the almond orchards (which makes the orchards more valuable for long-term growth), advantages in the Debtors' cost-of-production, and the Debtors' sustainability practices, the Debtors were well-positioned to become profitable ventures.

However, as discussed in the First Day Declaration, high interest rates impacting the Debtors' cost of debt servicing, the substantial capital needed to support early phase almond

---

[8] The facts and circumstances supporting this Motion are set forth in First Day Declaration, which declaration is incorporated by reference herein. Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration or the Term Sheet, as context requires.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

orchards and the concomitant rising cost of capital, and sustained, record-low almond prices all contributed to Trinitas Farming's serious liquidity constraints. The Debtors were unable to raise necessary capital, either through investments from TAAP IV's current limited partners and outside investors, or from potential sales of portions of the Debtors' portfolio to interested prospective purchasers. Ultimately, as described in the First Day Declaration, the Debtors, after discussions with their limited partners and their prepetition secured lender, Rabo Ag, determined that it was in the best interests of the Debtors and their creditors to file these Chapter 11 Cases, to facilitate a managed sale process with debtor-in-possession financing support provided by Rabo Ag.

### B. Trinitas Farming's Secured and Unsecured Debt

On or about November 15, 2022, TAAP IV entered into a loan agreement with Rabo Ag, as administrative agent and lender, to provide TAAP IV with a term loan of up to $130 million (the "Term Loan") and delayed draw loans (the "Delayed Draw Loans" and, with the Term Loan, the "Prepetition Loan") of up to $38 million, all upon the terms and conditions set forth in the Loan Agreement dated as of November 15, 2022. As of the Petition Date, the Term Loan had been fully disbursed, and $31 million of Delayed Term Loans were outstanding.

All of the Debtor Farm Subsidiaries (collectively, the "Guarantors") guaranteed repayment of the Loan pursuant to the Loan Agreement. Repayment of the Loan is secured by deeds of trust and fixture filings recorded against title to all of the Guarantors' real property. The Loan is also secured by a validly perfected lien in and to TAAP IV's and all of the Guarantors' other assets. (The Loan Agreement, the foregoing deeds of trust and all of the other documents entered into in relation to the Loan are hereinafter referred to collectively as the "Loan Documents"). TAAP IV and the Guarantors (collectively, the "Borrowers") also executed an Environmental Indemnity in favor of Rabo Ag and the Lenders.

On or about May 30, 2023, Rabo Ag executed a Waiver to Loan Agreement (the "Waiver"), pursuant to which it waived the following defaults under the Loan Agreement: Borrower's failure to timely deliver audited financial statements for the year ending December 31, 2022; and Borrower's failure to comply with the Current Ratio covenant of the Loan Agreement (Section 6.13.1) for the year ending December 31, 2022.

**Keller Benvenutti Kim LLP**
425 Market Street, 26th Floor
San Francisco, California 94611

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

On or about February 6, 2024, Rabo Ag served Borrower and Guarantors with a Notice of Default and Imposition of Default Interest Under Loan Documents (the "Notice of Default").  The Notice of Default asserted an Event of Default under Section 9.1.12 of the Loan Agreement (impairment of ability to repay Loan as a result of a Material Adverse Effect) and a further Event of Default under Section 6.13.3(a) (requiring a 60% loan to value ratio with respect to outstanding loans).  Pursuant to the Notice of Default, Rabo Ag imposed the Default Rate with respect to the Term Loan and the Delayed Draw Loans, with a reservation of its other rights and remedies.

As of the Petition Date, the Loan balance was approximately $159 million in principal, plus approximately $1.8 million in interest (including default interest but excluding certain fees and costs) as of the Petition Date.

Separately, WL Olives owes approximately $2 million to American Agcredit, FLCA "AmAg"), secured by a first priority lien and deed of trust encumbering the Olive JV's olive growing real estate.  Neither WL Olives nor the Olive JV are Debtors, but Debtor TAAP IV is a guarantor of WL Olives' obligation to AmAg.

In addition to the foregoing obligations, the Debtors (principally Trinitas Farming) owe approximately $27 million of general unsecured debt, principally related to operations and related accounts payable.  Of this amount, approximately $7.56 million is owed to Pomona Farming under the Farm Services Agreement.

### C.    Need for DIP Financing

As noted above, on or about February 6, 2024, Rabo Ag issued a Notice of Default and ceased funding the Debtors' operations. The Debtors and Rabo Ag were already in negotiations for Rabo Ag to finance the Debtors' operations in a chapter 11 proceeding, to provide for the continued development of the orchards, the continued operation of the Debtors' farming business and the orderly sale and disposition of its assets. Those negotiations, which were conducted at arm's length and required the resolution of numerous issues, culminated in an agreement, the material terms of which are set forth in the Term Sheet. It is the intent of the parties to further memorialize their agreement in a formal DIP Credit Agreement, but they were unable to do so prior to the Petition Date. The parties expect the DIP Credit Agreement to be executed within the

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

next several days and will submit it to the Court for approval, together with a longer-term interim financing budget, at a second interim hearing, which the Debtors request be set for on or about February 28, 2024, at the Court's convenience. In the meantime, the Debtors seek approval of an interim order which will provide for funding an Initial Draw of $1 million in accordance with the budget attached hereto as **Exhibit C** (as the same is further updated and amended, the "Budget"). The Debtors will present a longer-term interim budget at the continued interim hearing on this Motion.

The material terms and conditions of the DIP Loan are set forth above in this Motion and are, in the Debtors' opinion and that of its financial advisor, Arch + Beam Global LLC ("Arch + Beam"), fair and reasonable under all of the relevant circumstances. After Rabo Ag indicated that it would be willing to provide debtor-in-possession financing, and while the terms of the proposed DIP facility were being negotiated, Arch + Beam, at the Debtors' direction, reached out to 9 potential third-party DIP lenders, to see if the Debtors could find comparable or better terms for debtor-in-possession financing from a lender other than Rabo Ag. The potential lenders to whom Arch + Beam reached out included a diverse range of commercial banks, specialty asset-based lenders, and investment funds known to Arch + Beam. Eight of the potential lenders passed on the opportunity because they were not willing to lend on agriculture assets at this time or to provide DIP funds on a junior secured basis or to prime a prepetition secured lender without the secured lender's consent. The ninth potential lender would only consider lending at a rate that was substantially higher than the interest rate under the DIP Loan. In other words, none of the parties Arch + Beam contacted was willing to provide DIP funds at comparable or better terms than the terms of the DIP Loan. As a result of these efforts, the Debtors concluded that they would not be able to obtain financing on terms more favorable than those negotiated with Rabo Ag, and that they certainly would not be able to obtain such financing without affording the lender a priming lien on the assets securing the prepetition loan from Rabo Ag.

The Debtors have an urgent need for funding to maintain the continuity of their operations and the going concern of their business and assets. The Debtors enter these Chapter 11 Cases with almost no cash, during a critical period in the almond-growing season, when the Debtors must

incur substantial costs to support the cultivation, pollination and fertilization of the crop, as well as general and administrative expenses. As the Budget indicates, the Debtors need approximately $1 million of liquidity to fund their operations during the first week of the Chapter 11 Cases, while the parties finalize definitive documentation of the DIP Loan. The Debtors' funding needs for the first five weeks of the Chapter 11 Cases total nearly $6.5 million. The cost of irrigation, fertilizers, chemicals, and pollination alone—without which the Debtors will not be able to support their almond orchards—exceeds $520,000 during the first week of the Chapter 11 Cases and $2.2 million during the first five weeks of the postpetition period. The remainder of the Debtors' funding needs for the first five weeks of the Chapter 11 Cases includes other costs and expenses necessary to preserve the value of the orchards and the crop and maintain the Debtors' operations and administer these Chapter 11 Cases. Any disruption of operations during the pollinating and growing season could severely and adversely impact the quality, yields, and value of this year's crop and, accordingly, the value of the Debtors' business and assets.

## III.  **ARGUMENT**

### A.  **The Court Should Approve the DIP Loan.**

The Debtors request authorization under section 364 (c) and (d) to grant the DIP Lenders three types of protections: (a) superpriority administrative claims pursuant to section 364(c)(1) (*see* Term Sheet:  DIP Lenders' Collateral, Liens & Priority); (b) senior liens on Debtors' unencumbered assets pursuant to section 364(c)(2) (*id.*); (c) junior liens on Debtors' assets that are subject to a lien pursuant to section 364(c)(3) (*id.*); and (d) priming liens, subject to Permitted Third Party Liens, pursuant to section 364(d)(1). The Debtors have satisfied the requirements to obtain credit on these terms.

Under section 364(c), a debtor may grant superpriority administrative claims and incur secured debt if the court determines that the debtor was "unable to obtain unsecured credit allowable under section 503(b)(1) . . . as an administrative expense." § 364(c). Similarly, under section 364(d)(1), which governs the incurrence of postpetition debt secured by senior or "priming" liens, the court may, after notice and a hearing, "authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

only if – (A) the trustee is unable to obtain credit otherwise; and (B) there is adequate protection

of the interest of the holder of the lien on the property of the estate on which such senior or equal

lien is proposed to be granted." 364(d)(1). Courts evaluating requests for financing under section

364 consider whether certain factors are met, including that: (1) the proposed financing is an

exercise of the debtor's sound and reasonable business judgment; (2) the financing agreement was

negotiated in good faith and at arm's length; (3) no alternative financing is available on any other

basis; (4) the terms of the transaction are fair, reasonable, and adequate, given the circumstances

of the borrower and the proposed lender; (5) the financing is necessary, essential, and appropriate

for the continued operation of the Debtors' businesses and the preservation of their estates; and (6)

the financing is in the best interests of the estate and its creditors. *See In re Gardens Reg'l Hosp.*,

No. 2:16-BK-17463-ER, 2017 WL 7101146, at *4 (Bankr. C.D. Cal. July 28, 2016) (approving

postpetition financing under § 364(c) based on these factors); *In re Sterling Mining Co.*, No. 09-

20178-TLM, 2009 WL 2514167, at *3 (Bankr. D. Idaho Aug. 14, 2009); *see also In re Farmland

Indus., Inc.*, 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003) (discussing factors applied by

bankruptcy courts across jurisdictions). Each of these factors is satisfied here.

**B.    The Motion Reflects the Debtors' Sound Business Judgment.**

In evaluating proposed DIP financing under Section 364, courts generally defer to the

business judgment of the debtor. *See In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL),

2016 WL 2616717, at *10–11 (Bankr. S.D.N.Y. May 3, 2016); *In re Ames Dep't Stores*, 115 B.R.

34, 40 (Bankr. S.D.N.Y. 1990). Courts presume that debtors make financing decisions "on an

informed basis, in good faith, and in the honest belief that the action taken was in the best interests

of the company." *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *see

also In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("The discretion to act with regard

to business planning activities is at the heart of the debtor's power."). Courts will not "second-

guess a business decision, so long as corporate management exercised a minimum level of care in

arriving of the decision". *In re Los Angeles Dodgers LLC*, 457 B.R. at 313; *see also In re Simasko

Prod. Co.*, 47 B.R. at 449 ("business judgments should be left to the board room and not to this

Court").

Here, the evidence demonstrates that immediate access to capital is essential to the maintenance of the Debtors' assets, that the terms of the DIP Loan are fair and reasonable, and that the DIP Loan was negotiated in good faith.

### 1. The DIP Loan Is Necessary and Appropriate for the Continued Operation of the Debtors' Businesses and Preservation of Their Estates and Is in Their Best Interests.

Here, the need for financing is readily demonstrable. As indicated in the Budget, the Debtors must purchase essential farm inputs (*e.g.*, pollination, chemicals, and fertilizer). As set forth above and in the First Day Declaration, without access to capital to make continuing purchases of these inputs, the Debtors' harvest will be materially impacted—thus adversely impacting the value of their business and assets.

As described in the First Day Declaration, absent ready access to the liquidity necessary to sustain the ongoing maintenance of the Debtors' orchards, their value would deteriorate precipitously. It is therefore in the best interest of all parties that the Debtors obtain immediate financing in order to preserve the value of the Debtors' estates.

### 2. The DIP Loan Was Negotiated in Good Faith and at Arm's Length, Its Terms Are Fair, Reasonable and Adequate, and Debtors Could Not Obtain Credit Available on More Favorable Terms.

A debtor is not required to seek alternative financing from every possible lender before it may grant administrative expense claims or incur secured debt. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (more favorable credit unavailable where debtor contacted lenders in the "immediate geographic area" and they would not extend unsecured credit); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). Rather, the debtor need only demonstrate that it made a "reasonable effort" to obtain unsecured credit from other lenders. *In re Ames Dep't Stores*, 115 B.R. at 40 (Bankr. S.D.N.Y. 1990) (citing cases); *In re Capitol Station 65, LLC*, No. 17-23627-B-11, 2018 WL 333863, at *12 (Bankr. E.D. Cal. Jan. 8, 2018).

The Debtors engaged in a competitive and thorough marketing process to obtain the most favorable postpetition financing available. As more fully described above and in the First Day Declaration, the Debtors' marketing process and the negotiations of the terms of the DIP Loan, were carried out in good faith and at arm's length through sophisticated and experienced legal and

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

financial advisors. Based on an evaluation of all reasonably available options, the DIP Loan represents the best financing available to the Debtors.

As noted above and in the First Day Declaration, given the Debtors' financial circumstances and credit profile, financing was not available except for secured indebtedness or alternative forms of capital that would have been unduly expensive or dilutive.

Finally, as described more fully above, the Debtors were unable to obtain financing without agreeing to provide the DIP Lenders with the protections set forth in the Term Sheet. The Debtors submit that approving such terms is appropriate under the circumstances because (a) the DIP Lenders were unwilling to credit without such terms; and (b) the terms of the DIP Loan are generally favorable to the Debtors and their estates. Indeed, as set forth in the Required Disclosures above, the DIP Lenders' requirements are generally in compliance with the Guidelines. Provisions similar to the enumerated terms at issue here are frequently approved in this district. *See, e.g., Blue Earth, Inc. et al.*, Case No. 16-30296 (Bankr. N.D. Cal. Apr. 29, 2016) [Docket No. 116]; *In re Newzoom, Inc.*, Case No. 15-31141 (Bankr. N.D. Cal. Oct. 15, 2015) [Docket No. 153]; *In re Rdio, Inc.*, Case No. 15-31430 (Bankr. N.D. Cal. Dec. 10, 2015) [Docket No. 122], and in large chapter 11 cases elsewhere, *see, e.g., In re Toys ''R'' Us, Inc.*, Case No. 17-34665 (Bankr. E.D. Va. Sep. 20, 2017) [Docket No. 98].

For the foregoing reasons, the Debtors submit that the DIP Loan was negotiated at arm's length and in good faith, that its terms are fair, reasonable and adequate, and that the DIP Loan represents the best financing available to the Debtors under the circumstances.

### C. The Interim Orders Should be Granted.

#### 1. The Court Should Conduct Preliminary Expedited Hearings.

Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain financing may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is authorized to conduct preliminary expedited hearings on a motion to access a DIP facility to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. Pursuant to Bankruptcy Rule 4001(c), the Debtors request that the Court conduct two expedited preliminary hearings on the Motion—one for the Initial Draw, and the

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

second for the Second Draw—and (i) authorize the Debtors to obtain DIP Financing in order to maintain and finance their ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (ii) schedule a Final Hearing on the relief requested herein. Absent authorization from the Court to access the DIP Loans on an interim basis pending a Final Hearing, the Debtors and their creditors will be immediately and irreparably harmed. As set forth above, the Debtors' ability to access the DIP Loan on the terms described herein is critical to their ability to operate their business.

*__The DIP Lenders and the Debtors have not yet completed negotiation of the final and comprehensive DIP Credit Agreement.__* Accordingly, the Debtors hereby request authority to borrow the Initial Draw of $1 million against the Term Sheet immediately to fund the Debtors' first week of postpetition operations, and the Debtors further request that the Court set a second interim hearing within a week thereafter (after the DIP Credit Agreement is negotiated and completed) to approve the Second Draw and allow access to the remaining $5.5 million that the Debtors need on an interim basis, pending a Final Hearing on the Motion.

Accordingly, an Interim Order should be granted based on the Term Sheet, and, after submission of the DIP Credit Agreement, a further Interim Order should be granted pending the Final Hearing.

## 2. The Debtors Require Immediate Access to the DIP Loan.

The Court may grant interim relief in respect of a motion filed pursuant to section 363 (c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Seriosa*, Case No. 2:16-BK-14276-RK, 2016 WL 3478953, at *1 (Bankr. C.D. Cal. June 20, 2016).

As set forth in the First Day Declaration, and as further detailed above, the Debtors have an immediate need for access to financing to continue the operation of their business, procure critical farm supplies and services from vendors and suppliers and otherwise satisfy their working

capital and operational needs, all of which is required to preserve and maintain the Debtors' value for the benefit of all parties in interest.

The importance of a debtor's ability to access debtor-in-possession financing facilities to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this and other circuits in similar circumstances. *See, e.g., In re Fleetwood Enterprises, Inc., et al.*, Case No. 09-14254-MJ (Bankr. C.D. Cal. Mar. 31, 2009) [Docket No. 183] (approving postpetition financing and modifying the automatic stay where, "[w]ithout the DIP Financing, the Debtors' operations would be discontinued or severely disrupted, and the Debtors would be unable to pay operating expenses, including expenses for necessary inventory and labor, and to operate their businesses in an orderly manner, thereby severely impairing their ability to reorganize"); *In re Gardens Reg'l Hosp.*, 2017 WL 7101146 at *12 (Bankr. C.D. Cal. July 28, 2016); *In re Breitburn Energy Partners LP, et al.*, Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. May 23, 2016) [Docket No.73] (order approving postpetition financing on an interim basis); *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Apr. 26, 2016) [Docket No. 87] (same); *In re The Great Atl. & Pac.Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88] (order approving postpetition financing on an interim basis); *In re Eastman Kodak Co., et al.*, Case No. 12-10202 (MEW) (Bankr. S.D.N.Y. Jan. 20, 2012) [Docket No. 54] (same).

As set forth in the First Day Declaration, access to the DIP Loan during the Interim Period will provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these Chapter 11 Cases. Specifically, the DIP Loan will allow the Debtors to continue to fund pollination across their orchards, purchase and apply chemicals and fertilizers necessary to the orchards, and compensate the contractors, vendors and professionals that oversee the Debtors' daily operations.

Accordingly, for the reasons set forth above, entry of an Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2) as well as Bankruptcy Rule 6003(b).

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

**D.** **The DIP Lenders Are Good Faith Lenders Under Section 364(e).**

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

As explained in detail herein and in the First Day Declaration, the DIP Loan is the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms pursuant to which the Debtors could obtain postpetition financing. All negotiations regarding the DIP Loan were conducted in good faith and on an arm's length basis. The terms and conditions of the DIP Loan are fair and reasonable, and the proceeds of the DIP Loan will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**E.** **The Scope of the Carve Out is Appropriate.**

The DIP Liens are subject to the Carve-Out. Without the Carve-Out, the Debtors and other parties-in-interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted. *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties-in-interest of possible rights and

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

powers. Additionally, the Carve-Out ensures that assets will be available for the payment of fees of the Clerk of the Court, the Office of the United States Trustee for the Northern District of California, and fees and expenses of professionals retained in these Chapter 11 Cases.

**F.    The Automatic Stay Should be Modified on a Limited Basis.**

The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the DIP Liens and, subject to a five-day notice period, permit the DIP Agent to enforce its remedies under the DIP Credit Agreement as against the Debtors. Stay modifications of this kind are ordinary and standard features for DIP financing, and in the Debtors' business judgment, they are reasonable and fair under the present circumstances. *See, e.g., In re Gardens Reg'l Hosp.*, No. 2:16-BK-17463-ER, 2017 WL 7101146 (Bankr. C.D. Cal. Jul. 28, 2016); *In re Fleetwood Enterprises, Inc., et al.*, Case No. 09-14254-MJ (Bankr. C.D. Cal. Apr. 1, 2009) [Docket No. 183]; *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Apr. 26, 2016) [Docket No. 87]; *In re Aeropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 06, 2016) [Docket No. 99].

**IV.    RESERVATION OF RIGHTS**

Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

**V.    REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY**

Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. To the extent Rule 6003 is applicable, the Debtors must be permitted to

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

immediately deploy funds on hand and proceeds of the DIP Loan to operate their businesses; a stay would vitiate the benefit of an Interim Order. Similarly, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). Because the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors, cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Tracy Hope Davis and Gregory Powell); (ii) the parties listed on the Debtors' consolidated list of thirty (30) largest unsecured creditors in these Chapter 11 Cases; (iii) First Republic Bank (now J.P. Morgan Chase Bank, N.A.); (iv) the Debtors' secured lender Rabo Ag; (v) taxing authorities for those counties in which the Debtors hold real property; (vi) parties that have asserted, or, to the Debtors' knowledge, may assert liens against the Debtors; and (vii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. No previous request for the relief sought herein has been made by the Debtors to this or any other court. Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

**WHEREFORE**, the Debtors respectfully request that the Court enter an interim order, substantially in the form attached hereto as **Exhibit A**, and such other and further relief as the Court may deem just and appropriate.

Dated: February 19, 2024                      **KELLER BENVENUTTI KIM LLP**


By: */s/ Jane Kim*
     Jane Kim
*Proposed Attorneys for Debtors and Debtors in Possession*

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>EXHIBIT A</u>**

**(Proposed Interim Order)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KELLER BENVENUTTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

## EXHIBIT B

**(Term Sheet)**

**<u>EXHIBIT C</u>**

**(Budget)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94611

1

**<u>EXHIBIT A</u>**

2

**(Proposed Interim Order)**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal Bar. No. 194116)
(tkeller@kbkllp.com)
JANE KIM (Cal. Bar No. 298192)
(jkim@kbkllp.com)
JEREMY V. RICHARDS (Cal. Bar. No. 102300)
(jrichards@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Proposed Attorneys for Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re:<br><br>TRINITAS FARMING, LLC, et al.,[1]<br><br>Debtors. | Case No. 24-50210 (___) (Lead Case)<br><br>Chapter 11<br><br>(Joint Administration Requested)<br><br>**[PROPOSED] INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V) SETTING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**<br><br>Date: February 21, 2024<br>Time: 10:00 a.m. (Pacific Time)<br>Place: **Tele/Videoconference Appearances Only**<br>United States Bankruptcy Court<br>280 South First Street<br>San Jose, California 95113-3099 |

---

[1] The last four digits of Trinitas Farming, LLC's tax identification number are 8883. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.donlinrecano.com/trinitas. The Debtors' service address is 1414 East F Street A-102, Oakdale, California 95361.

Upon the emergency motion (the "Motion")[2] of Trinitas Farming, LLC, and the following affiliates: Trinitas Advantaged Agriculture Partners IV, LP; Dixon East LLC; Turf Ranch LLC; Rasmussen LLC; Johl LLC; Chiala LLC; Hall Ranch LLC; Porterville LLC; Tule River Ranch, LLC; Dinuba Ranch, LLC; Jeffrey Ranch, LLC; Toor Ranch, LLC; Lamb Ranch, LLC; Fry Road, LLC; Adobe Ranch, LLC; Marucci Ranch, LLC; Ratto Ranch, LLC; and Phelps Ranch, LLC, each of whom is a debtor and debtor-in-possession in the above-captioned chapter 11 cases (each individually a "Debtor" and collectively the "Debtors") pursuant to sections 105, 361, 362, 363, 364, 364(d), 364(e), 503, and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1, 4001-1, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Local Rules"), and this Court's Guidelines for Cash Collateral and Financing Motions and Stipulations (the "Guidelines') requesting, among other things:

(i)        authorization for the Debtors to obtain postpetition financing pursuant to the DIP Facility (as defined below), consisting of a senior secured superpriority delayed draw term loan facility (the "DIP Facility"), on the terms and conditions substantially in the form filed in Term Sheet attached as Exhibit B to the Motion (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "Term Sheet," together with any other related agreements, documents, security agreements, pledge agreements, or intercreditor agreements, including this Interim Order and the DIP Credit Agreement (once finalized by DIP Lenders and Debtors and approved by this Court) and the Final Order (each as defined below), collectively, the "DIP Documents"), by and among the Debtors, Rabo AgriFinance, LLC. ("Rabo Ag"), as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and as a lender along with such other entities as may join (individually a "DIP Lender" and collectively the "DIP Lenders," and, together with the DIP

---

[2]        Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the First Day Declaration, as applicable.

Agent, the "DIP Lenders"), consisting of a new money delayed draw term loan facility in an aggregate principal amount of up to $30,000,000 (the "DIP Facility," the commitments under the DIP Facility, the "DIP Commitments," and the loans made under the New Money DIP Facility, the "DIP Loans"), pursuant to which, (1) upon entry of this order (this "Interim Order") and satisfaction or waiver of the other conditions set forth herein and in the Term Sheet, the Debtors shall be entitled to draw on the DIP Commitments, in a single advance, the aggregate total of $1,000,000 (the "Initial Draw") as set forth in the Approved Budget (as defined below), which advance shall be subject to the terms and conditions of the DIP Credit Agreement, which it is contemplated will be approved at a further interim hearing on the Motion to be held on or about February 28, 2024, when the Debtors will seek entry of a further Second Interim Order approving further advances of up to $5,500,000 ( the "Second Interim Order") to be made in accordance with the DIP Credit Agreement and the other DIP Documents; and (2) following entry of the Final Order and satisfaction or waiver of the other conditions set forth therein and in the DIP Documents, make further advances for a total of up to $30 million, all in accordance with the DIP Documents, in the form of weekly draws of the DIP Commitments as set forth in the Approved Budget (as defined below);

(ii)     authorization for the Debtors to execute, deliver, and enter into the DIP Documents (including the Term Sheet but excluding the DIP Credit Agreement, for which the Debtors will seek approval in the Second Interim Order), and to perform all of the Debtors' obligations thereunder, and such other and further acts as may be required in connection with the DIP Documents;

(iii)     authorization for the Debtors to pay the principal, interest, fees, expenses and other amounts payable to the DIP Lenders pursuant to and in accordance with the DIP Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, backstop fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the respective DIP Lenders (including the reasonable fees, expenses and other charges of each of the DIP Lenders' attorneys, advisors, accountants, and other

consultants), any obligations in respect of indemnity claims, whether contingent or absolute, in each case, to the extent constituting obligations of the Debtors of any kind under the DIP Documents (such obligations, the "DIP Obligations");

(iv) authorization for the Debtors, immediately upon entry of this Interim Order, to use proceeds of the DIP Facility (collectively, the "DIP Loan Proceeds") as expressly provided in the DIP Documents and solely in accordance with this Interim Order and the Approved Budget (as defined below), subject to permitted variances and other exclusions set forth in the DIP Documents and this Interim Order, to: (a) pay costs, fees, and expenses related to the above-referenced cases (the "Chapter 11 Cases"), including professional fees, and in connection with the DIP Facility, including, without limitation, payment of interest, fees, and expenses owed to the DIP Lenders and the DIP Agent; (b) grant the adequate protections of the Prepetition Obligations (as defined below) as provided for in this Interim Order; and (c) provide financing for working capital and general corporate purposes (including capital expenditures) of the Debtors;

(v) the grant and approval of superpriority administrative expense claim status in these Chapter 11 Cases, pursuant to sections 364(c)(1), 503(b)(1) and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Lenders, in respect of all DIP Obligations, subject only to the Carve-Out (as defined below);

(vi) authorization to grant the DIP Lenders valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including, without limitation, all property constituting Prepetition Collateral (as defined below), and any Cash Collateral (as such term is defined in section 363(a) of the Bankruptcy Code and further defined below), to secure the DIP Obligations, which DIP Liens shall be subject only to Permitted Third Party Liens (as defined below) and the Carve-Out;

(vii) authorization for the Debtors to use, among other things, solely in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Documents and this Interim Order) and the limitations provided herein and in the DIP Documents, any Cash Collateral in which any of the Prepetition Lenders (as defined below) may have an

interest, and the granting of adequate protection solely to the extent of any postpetition diminution in the value of their respective interests in the Prepetition Collateral ("Diminution in Value"), including, without limitation, as a result of (a) the incurrence of the DIP Obligations, (b) the Debtors' use of Cash Collateral, (c) the subordination of the Prepetition Obligations to the Carve-Out, (d) any other diminution in value of the Prepetition Collateral arising from the  Debtors' use, sale, or disposition of such Prepetition Collateral or the proceeds thereof, (e) the priming of the Prepetition Liens (as defined below) by the DIP Liens on the Prepetition Collateral, and (f) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

(viii)    the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Documents to the extent hereinafter set forth;

(ix)    subject to entry of the Final Order granting such relief, a waiver of (a) any rights of the Debtors' and their Estates' (as defined below) ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and the Prepetition Collateral; (b) any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code; and (c) any rights of the Debtors under the equitable doctrine of marshaling or any other similar doctrine with respect to any DIP Collateral or Prepetition Collateral;

(x)    the Court's waiver of any applicable stay (including under Bankruptcy Rules 4001(a)(3) and 6004) and providing for immediate effectiveness of this Interim Order;

(xi)    the scheduling of (a) a further interim hearing (the "Supplemental Interim Hearing") on or about February 28, 2024, to consider and approve further interim relief, and (b) a final hearing on the Motion (the "Final Hearing") to consider entry of a final order granting the relief requested in the Motion on a final basis (the "Final Order"), and approving the form of notice with respect to the Final Hearing; and

(xii)    granting the Debtors such other and further relief as is just and proper, to the extent such other and further relief is not inconsistent with the express terms of this Order.

The initial hearing on the Motion having been held by the Court on February 21, 2024 (the *"*Interim Hearing*"*), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the Declaration of Kirk Hoiberg in Support of Chapter 11 Petitions and First Day Motions (ECF No. [XX]) (the "First Day Declaration"); any exhibits filed in connection with the foregoing, the filings and pleadings filed in these Chapter 11 Cases, and evidence presented at the Interim Hearing, the Court having found that the interim relief requested in the Motion is fair and reasonable and is in the best interests of the Debtors, the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates"), their stakeholders and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation and maintenance of the Debtors' business; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Supplemental Interim Hearing and the Final Hearing; and appropriate and adequate notice of the Motion, the interim relief requested therein, and the Interim Hearing (the "Notice") having been given under the circumstances; and the Notice having been served by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules on: (a) the Office of the United States Trustee for the Northern District of California (the "U.S. Trustee"); (b) the Internal Revenue Service; (c) the United States Securities and Exchange Commission; (d) counsel to the DIP Agent; (e) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien in the Debtors' assets; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"); and the opportunity for the Interim Hearing on the Motion having been appropriate in connection with the Motion and no other notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A. <u>Petition Date</u>. On February 19, 2024 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate and maintain their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No examiner has been appointed in these Chapter 11 Cases.

B. <u>Jurisdiction and Venue</u>. The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 and Bankruptcy Local Rules 2002-1, 4001-1, and 9013-1.

C. <u>Notice</u>. The Notice was given in the manner described in the Motion. Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing, and the relief granted under this Interim Order constitutes due and sufficient notice thereof.

D. <u>Parties' Acknowledgments, Agreements, and Stipulations</u>. In requesting the DIP Facility and use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lenders and the Prepetition Lenders for agreeing to provide, or consent to, the DIP Facility, access to Cash Collateral, and subordination of the Prepetition Liens, as provided herein, and as a

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

condition to providing financing under the DIP Facility and consenting to the use of Cash Collateral as set forth herein, subject to the rights of the parties-in-interest (other than the Debtors) set forth in paragraph 13 of this Interim Order and subject to entry of the Second Interim Order, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree as follows:

(i)     Prepetition Loans.

(a)     On or about November 15, 2022, TAAP IV entered into a loan agreement (the "Loan Agreement") with Rabo Ag, as administrative agent and lender, to provide TAAP IV with a term loan of up to $130 million (the "Term Loan") and delayed draw loans (the "Delayed Draw Loans") of up to $38 million, all upon the terms and conditions set forth therein (the "Loan"). Subsequently, Rabo Ag assigned to Compeer Financial, FLCA, $15 million of Delayed Draw Loan commitment, and assigned to AgAmerica Lending LLC a further $15 million of its Delayed Draw Loan commitment, which AgAmerica Lending subsequently assigned to Federal Agricultural Mortgage Corporation (the foregoing collectively referred to herein as the "Prepetition Lenders"). As of the Petition Date, the Term Loan had been fully disbursed, and $29 million of Delayed Draw Loans were outstanding. The Farm Subsidiaries (collectively in this capacity, the "Guarantors") guaranteed repayment of the Loan pursuant to the Loan Agreement. Repayment of the Loan is secured by deeds of trust and fixture filings recorded against title to all of the Guarantors' real property. The Loan is also secured by a validly perfected lien in and to all of the Guarantors' other assets ("Prepetition Collateral," and, such security interests and liens on the Prepetition Collateral, the "Prepetition Liens"). The Loan Agreement, the forgoing deeds of trust and all of the other documents entered into in relation to the Loan are hereinafter referred to collectively as the "Prepetition Loan Documents." As of the Petition Date, the Loan balance was $160,826,263.90, comprising the following: $130 million of principal drawn on the Term Loan, plus $1,448,055.56 of interest; and $29 million of Delayed Draw Loans, plus $378,208.33 of accrued interest (including default interest but excluding certain fees and costs) (the "Prepetition Debt") without defense, challenge, objection, claim, counterclaim, or offset of any kind.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

(b)    <u>Prepetition Collateral</u>.  To secure the Prepetition Obligations, the Debtors entered into certain guaranty and collateral agreements and certain other security documents governing the Prepetition Lenders' security interests in the Prepetition Collateral (such agreements, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and deeds of trust, the "<u>Prepetition Collateral Documents</u>"). Pursuant to the Prepetition Collateral Documents, the Debtors granted to the Prepetition Lenders, the Prepetition Liens on the Prepetition Collateral.

(c)    <u>Prepetition Debt</u>.  The Prepetition Debt owing to the Prepetition Lenders constitutes the legal, valid, and binding obligation of the Debtors, enforceable against them in accordance with its terms, and neither the Prepetition Debt nor any portion thereof owing to the Prepetition Lenders is subject to avoidance, recharacterization, attack, effect, reduction, set-off, offset, counterclaim, cross-claim, recoupment, rejection, defenses, disallowance, impairment, recovery, subordination (whether equitable, contractual, or otherwise), or any other claim or challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any Successor Cases (as defined below).

(d)    <u>Prepetition Liens</u>.  The Prepetition Liens granted to the Prepetition Lenders: (1) constitute legal, valid, binding, enforceable, and properly perfected security interests in and liens on the Prepetition Collateral, (2) were granted to, or for the benefit of, the Prepetition Lenders for fair consideration and reasonably equivalent value, and (3) are not subject to any defense, counterclaim, recharacterization, subordination (whether equitable, contractual, or otherwise), avoidance, recovery, attack, recoupment, rejection, reduction, set-off, disallowance, impairment, counterclaim, cross-claim, defense or claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(ii)    <u>No Challenges/Claims</u>.  No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or the Prepetition Debt exist, and neither the Prepetition Liens nor the Prepetition Debt, or any portion of either of the foregoing,

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable, contractual, or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors and their Estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Prepetition Lenders or any of their respective members, shareholders, affiliates, agents, attorneys, advisors, professionals, officers, directors or employees related to the respective Prepetition Loan Documents, the Prepetition Debt, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553 (inclusive), or 558 of the Bankruptcy Code or applicable state law equivalents. The Prepetition Debt constitutes allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(iii)    <u>Indemnity</u>.  Each of the DIP Lenders and the Prepetition Lenders has acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by it in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Prepetition Adequate Protection Liens (as defined below), any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, pursuant to the terms of the Prepetition Documents, each of the Prepetition Lenders and the DIP Lenders shall be and hereby is indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto; *provided*, that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct.  No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this paragraph D(iii), in the

**KELLER BENVENUTTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

Prepetition Documents, or in the DIP Documents, to the Debtors' obligation to indemnify and/or hold harmless the Prepetition Lenders or the DIP Lenders, as the case may be.

        (iv)    <u>Release</u>.  Subject to paragraph 13 of this Interim Order, the Debtors and their Estates, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries, and assigns have agreed to provide releases to each of the Released Parties (as defined below) as provided in paragraph 30 of this Interim Order.

        (v)    <u>Cash Collateral</u>.  The Debtors admit, stipulate, acknowledge, and agree that all of the cash of the Debtors, wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtors, whether as Prepetition Collateral, as income, proceeds, products, rents, issues, or profits of Prepetition Collateral, or otherwise, constitutes "cash collateral" of the Prepetition Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").

        E.    <u>Findings Regarding the Postpetition Financing and Use of Cash Collateral</u>.

        (i)    <u>Request for Postpetition Financing</u>.  The Debtors have requested from each of the DIP Lenders, and the DIP Lenders are willing, subject to the terms of this Interim Order, the Term Sheet and, at the Supplemental Interim Hearing, satisfaction of the conditions set forth in the DIP Credit Agreement, to extend the DIP Loans on the terms and conditions set forth in this Interim Order and the other DIP Documents.

        (ii)    <u>Need for Postpetition Financing and Use of Cash Collateral</u>.  The Debtors do not have sufficient liquidity, including Cash Collateral, to operate and maintain their business in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their respective vendors, suppliers, and customers, to pay their employees, to pay certain fees and expenses as set forth herein, and to otherwise fund their operations and other efforts and activities is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of their Estates for the benefit of all creditors and other stakeholders of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

Lenders and the use of Cash Collateral as set forth in this Interim Order and the Term Sheet is vital to the preservation and maintenance of the going concern value of the Debtors. Accordingly, the Debtors have an immediate need to obtain the postpetition financing and to use Cash Collateral as set forth in this Interim Order to, among other things, permit the orderly continuation of the operation and maintenance of their businesses, minimize the disruption to their business operations and other efforts and activities, and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors and other stakeholders of the Estates.

(iii) <u>No Credit Available on More Favorable Terms</u>. The Debtors have established that they are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, or liens on property of the Estates not subject to a lien pursuant to sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. As the Debtors assert in the Motion and the First Day Declaration and as demonstrated at the Interim Hearing, the Debtors would not be able to obtain the necessary postpetition financing on more favorable terms than the financing offered by each of the DIP Lenders pursuant to the DIP Documents. The financing offered by each of the DIP Lenders pursuant to the DIP Documents also obviates the need for a further priming fight between the Debtors and the Prepetition Lenders and the costs and risks associated therewith. In light of the foregoing, the Debtors have reasonably and properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to the Debtors at this time under all of the circumstances of these Chapter 11 Cases, and is therefore in the best interests of the Debtors, their Estates, and all of their stakeholders.

(iv) <u>Approved Budget</u>.

(a) The Debtors has prepared and delivered to the DIP Agent and the DIP Lenders an initial budget, a copy of which is attached to the Motion as <u>Exhibit C</u>, and which the DIP Lenders have accepted as an Approved Budget. For purposes hereof: "<u>Approved Budget</u>" (1) means a budget consisting of a 13-week cash flow forecast, setting forth, among other things,

the Debtors' cash, revenue, cash flow, and net operating cash flow, trade payables, ordinary course expenses, total expenses, capital expenditures, vendor disbursements, working capital, and fees and expenses of the DIP Facility and these Chapter 11 Cases during such 13-week period that Debtors are authorized to use proceeds of the DIP Loan, which, solely for the purposes of the one-week interim period covered by this order, shall be Exhibit "C" to the Motion (subject to permitted variances as set forth in the Term Sheet); (2) as to budgets subsequently presented to the DIP Lenders, (i) will be in a form satisfactory to the DIP Lenders (*i.e.*, shall be in the form of Exhibit C to the Motion, with variances as requested or approved by the DIP Lenders), (ii) will commence on the Petition Date, and (iii) will have been approved by the Debtors and the DIP Lenders. The Approved Budget shall be revised on a six-week cycle (*i.e.*, every six weeks a new 13-week cash flow forecast will be delivered, and variances will be calculated on a cumulative basis based on that six-week period) ("Budgetary Compliance Period"). Each budget delivered at the request of the DIP Lenders thereafter shall be acceptable to the Debtors and the DIP Lenders, such consent not to be unreasonably withheld (it being understood that if the DIP Lenders do not approve such updated budget within five (5) business days after the delivery thereof, the then-existing Approved Budget shall continue to constitute the applicable Approved Budget and shall continue to be effective, including for testing purposes, until such time as an update or amendment to the Approved Budget is approved by the DIP Lenders.)

(b) The Debtors shall maintain a cumulative ledger of line items appearing in the Approved Budget (the "Performance Ledger"). Variance covenants comparing the Performance Ledger to the Approved Budget will be tested weekly, calculated on a cumulative basis from the beginning date of the six-week Budgetary Compliance Period coinciding with the first six weeks included in such Approved Budget ("Cumulative Basis"), requiring (i) the unfavorable variance (as compared to the Approved Budget) of the net of the aggregate receipts and disbursements of the Debtors not to exceed ten percent (10%) on a Cumulative Basis, and (ii) the unfavorable variance (as compared to the Approved Budget) of the aggregate operating disbursements, excluding professional fees and expenses and adequate protection claims, made by

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

the Debtors not to exceed ten percent (10%) on a Cumulative Basis. As used in this Interim Order, "Permitted Variances" means (i) all favorable variances, and (ii) any unfavorable variance permitted in the budget variance covenant.

(c) As a condition to draws under the DIP Loan, the Liquidity (which term shall be defined in the DIP Credit Agreement) of the Debtors shall not at any time exceed One Million Five Hundred Thousand Dollars ($1,500,000) inclusive of funds in the Segregated Account (as defined below), but excluding funds in the Professional Fees Account (as defined below) and any account holding adequate assurance deposits for utility companies, and subject to the provisions of the DIP Documents relating to the disposition of the proceeds of sales of assets of the Estates.

(d) The DIP Lenders are relying upon the Debtors' agreement to comply with the terms set forth in the Term Sheet, the DIP Credit Agreement (once approved), the Approved Budget, this Interim Order, and other DIP Documents in determining to enter into the postpetition financing arrangements provided for herein and to consent to the Debtors' use of Cash Collateral as set forth herein.

(v) Certain Conditions to the DIP Facility. The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things: (a) upon delivery of the Term Sheet (and, thereafter, the DIP Credit Agreement), the Debtors obtaining Court approval to enter into the DIP Documents and to incur all of the obligations thereunder, and to confer upon the DIP Lenders all applicable rights, powers, and remedies thereunder and under this Interim Order; (b) the Debtors obtaining Court approval of and compliance with the Milestones (each as defined in the Term Sheet), which are hereby approved in all respects; (c) the provision of adequate protection of the Prepetition Lenders interests in the Prepetition Collateral pursuant to sections 361, 363, and 364 of the Bankruptcy Code; (d) the DIP Lenders being granted, as security for the prompt payment of the DIP Obligations, perfected security interests in and liens upon substantially all property and assets of the Debtors, including, without limitation, a valid and perfected security interest in and lien upon all of the following now existing or hereafter arising or acquired property

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

and assets: (1) all property and assets comprising Prepetition Collateral, and (2) all property and assets comprising DIP Collateral; and (e) the DIP Lenders being granted, pursuant to section 364 of the Bankruptcy Code, superpriority administrative expense claims as set forth in this Interim Order on account of the DIP Obligations, which claims shall be subject to the Carve-Out.

(vi)     <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.  Any credit extended, loans made, and other financial accommodations extended to the Debtors by the DIP Lenders, including, without limitation, pursuant to this Interim Order, have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Facility, the DIP Liens, and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(vii)     <u>Sections 506(c) and 552(b)</u>.  The Debtors have agreed as a condition to obtaining financing under the DIP Facility and the use of Cash Collateral as set forth in this Interim Order that as a material inducement to the DIP Lenders to agree to provide the DIP Facility and the Prepetition Lenders' consent to the use of Cash Collateral as set forth in this Interim Order, and in exchange for (a) the DIP Lenders' willingness to provide the DIP Facility to the extent set forth herein, (b) the DIP Lenders' and the Prepetition Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and (c) the consensual use of Cash Collateral consistent with the Approved Budget, the terms of the DIP Credit Agreement, and the terms of this Interim Order, each of the DIP Lenders and the Prepetition Lenders are, subject to entry of the Final Order granting such relief, entitled to receive a waiver of (a) any rights of the Debtors' and their Estates ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and the Prepetition Collateral; (b) any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code; and (c) any rights of the Debtors under the

equitable doctrine of marshaling or any other similar doctrine with respect to any DIP Collateral or Prepetition Collateral.

(viii)  <u>Good Cause</u>.  Good cause has been shown for the entry of this Interim Order.  The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (a) minimize disruption to the Debtors' business, on-going operations and other applicable activities and efforts, (b) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors and other stakeholders, and (c) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.  The terms of the DIP Facility and this Interim Order are fair and reasonable, reflect the Debtors' exercise of their business judgment, and are supported by reasonably equivalent value and fair consideration.  The DIP Facility and this Interim Order are the product of reasonable, arms'-length, good faith negotiations between the Debtors, the DIP Lenders, and the Prepetition Lenders, all of whom are commercially sophisticated parties represented by counsel.

(ix)  <u>Adequate Protection</u>.  The Prepetition Lenders are entitled, pursuant to sections 361, 362, 363, 364, and 507(b) of the Bankruptcy Code, to receive adequate protection against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral), as set forth in this Interim Order.

(x)  <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and for waiver of any otherwise applicable stay (including under Bankruptcy Rules 4001(a)(3) and 6004) of the effectiveness of this Interim Order.  Absent immediate entry and effectiveness of this Interim Order, the Debtors' businesses, properties, and their Estates will be immediately and irreparably harmed.

(xi)  <u>Interim Hearing</u>.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to the Notice Parties (as hereafter defined).  The Debtors have made

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

reasonable efforts to afford the best notice possible under the circumstances to parties affected, or potentially affected by the relief granted herein, and no other notice is required for the relief to be granted in this Interim Order.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**I.**     ***Authorization and Conditions to Financing and Use of Cash Collateral.***

1.     <u>Motion Granted</u>.  The Motion is granted on an interim basis to the extent provided in this Interim Order.  Any objections to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2.     <u>Authorization of DIP Financing and Use of Cash Collateral</u>.  The Debtors are hereby authorized to (i) borrow under the DIP Facility and use Cash Collateral during the period commencing on the date of this Interim Order through and including the earlier to occur of (x) the date of entry of the Second Interim Order, and (y) the occurrence of a DIP Termination Event (as defined below), solely in accordance with, and for the purposes permitted by, this Interim Order, the Term Sheet, and the Approved Budget, and (ii) pay all interest, costs, fees, and other amounts and obligations accrued or accruing under the DIP Credit Agreement and the Term Sheet, all pursuant to the terms and conditions of this Interim Order, the Approved Budget, and the Term Sheet.

3.     <u>Financing Documents</u>.

(a)     *Authorization*.  The Debtors are hereby authorized to enter into, execute, deliver, and perform all obligations under the Term Sheet.  No obligation, payment, transfer, or grant of security hereunder or, once approved, under the DIP Credit Agreement and DIP Documents, shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or foreign law (including, without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act,

**KELLER BENVENUTTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

Uniform Voidable Transactions Act, Uniform Fraudulent Conveyance Act, or similar statute or foreign law), or be subject to any defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule, or regulation by any person or entity.

(b)  *Approval; Evidence of Borrowing Arrangements*.  All terms, conditions, and covenants set forth in the Term Sheet are approved and shall be binding on the Debtors.  All such terms, conditions, and covenants shall be sufficient and conclusive evidence of (i) the borrowing arrangements by and among the Debtors, the DIP Agent, and the DIP Lenders, and (ii) the Debtors' agreement to comply with all the terms, conditions, and covenants of the Term Sheet for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees, and other expenses, including, without limitation, all of the DIP Agent's and each DIP Lender's closing, arranger, and administrative fees, consultant fees, professional fees, attorney's fees and legal expenses, to the extent set forth in the Term Sheet.  Upon approval and effectiveness thereof, the DIP Credit Agreement and DIP Documents shall evidence the DIP Obligations, which DIP Documents and DIP Obligations shall be valid, binding, and enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee appointed in these Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of these Chapter 11 Cases (the "Successor Cases"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the Term Sheet.

(c)  *Payment of DIP Fees and Other Expenses*.  Any and all fees and expenses payable pursuant to the Term Sheet and the Approved Budget, including the commitment fee described in the Term Sheet (collectively, any and all such fees and expenses, the "DIP Fees"), are hereby approved, and the Debtors are hereby authorized and directed to pay, in cash and on a current basis through automatic draws under the DIP Facility and application of the proceeds of such automatic draws to the payment thereof (which draws, for the avoidance of doubt, may be

effected irrespective of whether or not the conditions precedent to draws have been satisfied), all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Agent and the DIP Lenders incurred at any time, as provided by this Interim Order and the Term Sheet. The DIP Fees shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever. Subject to the Approved Budget, the Debtors are further authorized to reimburse DIP Lenders all of their reasonable and necessary fees and expenses, including, without limitation, attorneys' and consultants' fees, costs, and expenses (consisting of all reasonable fees and expenses of Fennemore Craig, P.C. and Focus Management Group, LLC (together, the "DIP Lender Professionals") incurred (i) in connection with the negotiation and preparation of this DIP Loan and the DIP Documents, and (ii) in connection with the Bankruptcy Case ("DIP Lender Expenses"). The DIP Lender Expenses shall be added to the principal amount of the DIP Loan, shall be treated as disbursements and reduce remaining availability under the DIP Facility, and shall be part of the DIP Obligations until paid in full, whether prior to or at maturity, *provided*, that the DIP Lender Professionals shall provide to the Debtors, the Committee (if appointed), and the U.S. Trustee their invoices by the fifteenth day for the previous monthly period for which fees and costs are requested (the "Invoiced Fees"). The Debtors, the Committee, and the U.S. Trustee may object to any portion of the Invoiced Fees (the "Disputed Invoiced Fees") within ten (10) days of receipt of the Invoiced Fees by filing with the Court a motion or other pleading, on at least ten (10) business days' prior written notice to the submitting party of any hearing on such motion or other pleadings, setting forth the specific objections to the Disputed Invoiced Fees.

(d)      *Amendments to DIP Documents*.  The terms and conditions of the Term Sheet are approved by this Court, the Debtors and the DIP Lenders may make amendments, modifications, or supplements to the Term Sheet (and, upon approval, any DIP Document), and the DIP Agent may waive any provisions in the DIP Documents, without further approval of the Court; *provided*, that any such amendments, modifications, or supplements to any DIP Documents that operate to increase the aggregate commitments, the rate of interest payable thereunder (other

than the application of default interest), or existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee) other than as currently provided in the DIP Documents (collectively, the "Material DIP Amendments"), shall be filed with the Court, and the Debtors shall provide prior written notice of the Material DIP Amendment to (i) counsel to the DIP Agent; (ii) counsel to the Official Committee of Unsecured Creditors (the "Committee"), if and when a Committee is formed; and (iii) the U.S. Trustee; *provided*, *further*, that the consent of the foregoing parties will not be necessary to effectuate any such amendment, modification or supplement, except that any Material DIP Amendment that is subject to an objection filed within three (3) business days following receipt of such Material DIP Amendment must be approved by the Court. For the avoidance of doubt, the Debtors must receive written consent as to any Material DIP Amendment prior to filing notice thereof with the Court from the DIP Lenders for any amendment, modification, supplement, or waiver that materially adversely affects any rights of any Prepetition Lenders hereunder or the treatment of the Prepetition Debts hereunder.

4.  Continuation of Prepetition Procedures. Except to the extent expressly set forth in the Prepetition Documents, the Term Sheet, or in "first day" orders, the all prepetition practices and procedures for the collection and disbursement of proceeds of the Prepetition Collateral shall continue.

(a)  *Segregated Account*. Notwithstanding the foregoing, except as otherwise specified in the Term Sheet, the proceeds of the DIP Loans when made shall be funded or credited to a non-interest bearing account in the name of the DIP Agent and subject to the sole dominion and control of the DIP Agent and subject to the liens securing the DIP Loan (the "Segregated Account"). The Debtors may, subject to conditions precedent specified in the Term Sheet, withdraw or apply funds from the Segregated Account, not more frequently than once per week, solely to pay (x) one or more disbursements set forth in the then effective Approved Budget (subject to the Permitted Variances thereto), (y) any fees or other amounts due and payable to the DIP Lenders or the DIP Agent and not otherwise satisfied by automatic draw under the DIP Facility

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

and application as provided in the DIP Documents, or (z) such other amounts that are due and payable under the DIP Documents, including to the Professional Fees Account (as defined below). For the avoidance of doubt, the DIP Loans shall be outstanding and accrue interest at the rate set forth in the Term Sheet notwithstanding that the proceeds thereof may be held in the Segregated Account.

5. <u>Indemnification</u>. The Debtors are authorized to indemnify and hold harmless the DIP Agent, each DIP Lender, and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, in accordance with, and subject to, the Term Sheet.

**II.** ***Postpetition Liens; Superiority Administrative Claim Status.***

6. <u>Postpetition Liens</u>.

(a) *Postpetition DIP Liens*. To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Lenders of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the Debtors or the DIP Agent of any mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents or instruments, any notation of certificates of title for a titled good or the possession or control by the DIP Agent of, or over, any DIP Collateral, the following security interests and liens are hereby granted to the DIP Agent, for the benefit of itself and the respective DIP Lenders (all property identified in clauses (i)–(iv) below being collectively referred to as the "<u>DIP Collateral</u>"), subject only to payment of the Carve-Out and Permitted Third Party

Liens[4] (all such liens and security interests granted to the DIP Agent, for the benefit of itself and the DIP Lenders, pursuant to this Interim Order and the Term Sheet, the "DIP Liens").

(i) <u>Liens on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible pre- and postpetition real or personal property of the Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents and profits thereof, that, on or as of the Petition Date or permitted by section 546(b) of the Bankruptcy Code, is not subject to a valid, perfected and non-avoidable lien, including any property or assets that are not subject to the liens and security interests created under the Prepetition Collateral Documents under any of the Prepetition Documents.  Notwithstanding the foregoing, no security interest or lien securing the DIP Loans, nor any priority claim granted hereunder, shall attach to Excluded Property, or the proceeds of same.

(ii) <u>Liens Priming Certain Prepetition Lenders' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out and Permitted Third Party Liens, a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien upon all pre- and postpetition property of the Debtors, regardless of where located, regardless of whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected, which security interest and lien shall prime the Prepetition Liens.

(iii) <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid,

---

[4]  For purposes of this Interim Order, "***Permitted Third Party Liens***" shall mean (i) any liens that are senior by operation of law (including liens securing the repayment of real property taxes and any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens; (ii) any liens permitted under the Prepetition Documents; and (iii) any valid, perfected, and non-avoidable mechanics' liens and fixture filings in existence as of the Petition Date.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all pre- and postpetition property of the Debtors that, on or as of the Petition Date, is subject to valid, perfected and non-avoidable senior liens or valid and non-avoidable senior liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (including mechanics' liens and fixture filings), in each case other than the Prepetition Liens; *provided*, that nothing in the foregoing shall limit the rights of the DIP Lenders under the DIP Documents to the extent such liens are not permitted thereunder.

(iv)     <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be (A) subject or subordinate to or made *pari passu* with (1) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code, (2) unless otherwise provided for in the Term Sheet or in this Interim Order, or unless otherwise required by applicable non-bankruptcy law, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (3) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (B) subordinated to or made *pari passu* with any other lien or security interest granted by the Debtors under section 363 or 364 of the Bankruptcy Code.

(b)     *DIP Lien Priority in DIP Collateral*.  The DIP Liens on the DIP Collateral securing the DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; *provided*, *however*, that the DIP Liens shall be subject to the Carve-Out and Permitted Third Party Liens and shall not extend to the Excluded Property (or the proceeds thereof).

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

(c)     *Postpetition Lien Perfection*.  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, the Prepetition Adequate Protection Liens, and the other security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) party to a control agreement or other depository account consisting of DIP Collateral, or requirement to register liens on any certificates of title (a "Perfection Act").  Notwithstanding the foregoing, if the DIP Lenders or the Prepetition Lenders, as applicable, shall, in their sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then the DIP Lenders or the Prepetition Lenders, as applicable, are authorized to perform such Perfection Act, and the Debtors are authorized and directed to perform such Perfection Act to the extent necessary or required by this Interim Order, the other DIP Documents, or the Prepetition Documents, which Perfection Act or Perfection Acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such Perfection Act in accordance with applicable law.  The DIP Lenders or the Prepetition Lenders, as applicable, may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law.  Should the DIP Lenders or the Prepetition Lenders, as applicable, so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

(d)     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Interim Order (including the DIP Liens and the Prepetition Adequate Protection Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of the Court; *provided*, *however*, that nothing herein shall excuse the Debtors from payment of any local or recording fees or taxes, if any, required in connection with such liens. By virtue of the terms of this Interim Order, to the extent that the DIP Lenders or the Prepetition Lenders, as applicable, have filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the name of the Debtors, such filings shall be deemed to properly perfect the liens and security interests granted and confirmed by this Interim Order without further action by the DIP Lenders or the Prepetition Lenders, as applicable.

(e)     Except as provided in this Interim Order, the DIP Liens, the DIP Superpriority Claims, the Prepetition Adequate Protection Liens, and the Prepetition Adequate Protection Claims (as defined below) (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted by the Debtors in these Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their Estates, any trustee, or any other estate representative appointed or elected in these Chapter 11 Cases or any Successor Cases and/or upon the dismissal of these Chapter 11 Cases or any Successor Cases; (B) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise; and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.

7.     <u>DIP Loan Superpriority Administrative Expenses</u>.  Subject only to the Carve-Out and the provisions of the Term Sheet relating to Excluded Property, on account of all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the Term Sheet, or

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

otherwise, the DIP Agent, for the benefit of itself and the DIP Lenders, is granted an allowed superpriority administrative expense claim against the Debtors pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims against the Debtors of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order granting such relief), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (the "DIP Superpriority Claims").

8. Carve-Out.

(a) Generally. As used in this Interim Order, the "Carve-Out" means (a) fees and expenses incurred by professionals retained by the Debtors or the Committee (hereafter, a "Professional"), but not in excess of amounts therefor provided in the applicable Approved Budget, prior to the earliest of (i) an Event of Default (as described in the Term Sheet), (ii) the termination of the DIP Facility, and (iii) the maturity date of the DIP Facility (the earliest of the foregoing being the "Carve-Out Date"); (b) the sum of $150,000 for payment of such Professionals' costs and expenses incurred after the Carve-Out Date; (c) fees and expenses of a chapter 7 trustee in an amount not to exceed $75,000; and (d) statutory fees of the United States Trustee.

(b) Other Priority Matters.

(i) For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the Term Sheet, or the Prepetition Documents, the Carve-Out shall be senior to the DIP Obligations, the Prepetition Obligations, and any other claims arising under or in connection with the Term Sheet or the Prepetition Documents (and any and all security interests and liens securing such claims), the DIP Superpriority Claims, the liens and claims

securing the DIP Facility, the Prepetition Adequate Protection Liens, the Prepetition Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, the Prepetition Adequate Protection Claims, or the Prepetition Obligations.

(ii)     For the avoidance of doubt, until the indefeasible payment in full in cash of the DIP Obligations occurs or the DIP Facility is otherwise terminated, this Interim Order shall remain in full force and effect, including with respect to the Debtors' use of Cash Collateral, the Carve-Out, and all related provisions in respect thereof, and the Prepetition Lenders shall assume any rights and obligations that the DIP Agent previously had with respect to the Carve-Out.

(iii)     Debtors are authorized to fund a separate segregated account consisting of those amounts set forth in the Approved Budget for the payment of fees and expenses of Professionals retained in these Chapter 11 Cases (the "Professional Fees Account"). All funds in the Professional Fees Account shall be considered amounts available to apply against the Carve-Out.

(c)     No Direct Obligation to Pay Allowed Professional Fees. None of the DIP Lenders or the Prepetition Lenders shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional incurred in connection with these Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order, the Final Order, or otherwise shall be construed to obligate any of the DIP Lenders or the Prepetition Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     Reservation of Rights. Nothing herein shall be construed to impair the right or ability of any party to object to the fees, expenses, reimbursement or other compensation described with respect to these Carve-Out provisions.

9.     Adequate Protection for the Prepetition Lenders.

(a)    *Adequate Protection for Prepetition Lenders*.  The Prepetition Lenders are entitled, pursuant to sections 361, 363(e), 364(d)(1), 503(b), 507(a), and 507(b) of the Bankruptcy Code and effective as of the Petition Date, to adequate protection of their respective interests in the Prepetition Collateral, including any Cash Collateral, in an amount equal to the aggregate Diminution in Value of the Prepetition Lenders' interests in the Prepetition Collateral from and after the Petition Date.  On account of such adequate protection and solely to the extent of any Diminution in Value, the Prepetition Lenders are hereby granted the following, in each case subject to the Carve-Out (collectively, the "Adequate Protection Obligations"):

(i)    Prepetition Adequate Protection Liens.  Effective and perfected upon the date of this Interim Order and without the necessity of any Perfection Act, valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Prepetition Adequate Protection Liens"), subject and subordinate only to the Carve-Out, the Permitted Third Party Liens, and the DIP Liens.

(ii)    Adequate Protection Payments.  All interest on the Prepetition Debt, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, which interest shall accrue at the default rate as set forth in the Prepetition Documents and be payable in-kind in arrears on a monthly basis on the last business day of each month by being capitalized.

(iii)    Adequate Protection Superpriority Claims.  Allowed superpriority administrative expense claims against the Debtors pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "Prepetition Adequate Protection Claims"), with priority (subject and subordinate only to the Carve-Out and the DIP Superpriority Claims) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 365, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.  The Prepetition Adequate

Protection Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors other than the proceeds of Excluded Property (which, for the avoidance of doubt, shall not be applied to satisfy any Prepetition Adequate Protection Claims), subject to the Carve-Out, the Permitted Liens, the DIP Obligations, and the DIP Superpriority Claims.

(b)  *Reporting*.  The Debtors shall timely provide the Prepetition Lenders with (i) reasonable access to the Debtors' real property, management, books, and records required under the Prepetition Documents, all as provided in the Prepetition Loan Documents, and (ii) copies of all financial reporting provided to the DIP Agent and DIP Lenders pursuant to the DIP Documents substantially simultaneously with such delivery to the DIP Lenders.

(c)  <u>Reservation of Rights Regarding Adequate Protection</u>.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Lenders; *provided*, that the Prepetition Lenders may request further or different adequate protection, and the Debtors or any other party in interest with standing may contest any such request.

**III.**  ***Default; Waivers; Rights and Remedies; Relief from Stay.***

10.  <u>DIP Termination Events</u>.  The occurrence of an event of default or the "Termination Date" under and as defined in the Term Sheet shall constitute a "DIP Termination Event" hereunder (each, a "<u>DIP Termination Event</u>"), unless waived in writing by the applicable DIP Lenders.

11.  <u>Rights and Remedies upon a DIP Termination Event</u>.

(a)  Immediately upon the occurrence and during the continuation of a DIP Termination Event, the DIP Agent may: (i) declare all DIP Obligations owing under the DIP Documents to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors; (ii) terminate, reduce, or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains (including provision of any letters of credit); (iii) terminate the DIP Facility

**KELLER BENVENUTTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

and any DIP Documents as to any future liability or obligation of the DIP Lenders thereunder, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) terminate and/or revoke the Debtors' rights, if any, under this Interim Order and the Term Sheet to use any Cash Collateral; (v) invoke the right to charge interest at the default rate under the Term Sheet; (vi) freeze monies or balances in the Debtors' accounts (but subject to the Carve-Out); (vii) otherwise enforce any and all rights against the DIP Collateral in the possession of the applicable DIP Agent, including, without limitation, disposition of the DIP Collateral solely for application towards the Carve-Out and the DIP Obligations in accordance with their respective priorities; and (viii) take any other actions or exercise any other rights or remedies with respect to the DIP Collateral permitted under this Interim Order, the Term Sheet, or applicable law; *provided*, that prior to the exercise of any right in clauses (vii) and (viii) of this paragraph, the DIP Agent shall be required to provide five (5) days' written notice to the Debtors, counsel to the Debtors, counsel to the DIP Lenders, the Committee, counsel to the Committee, and the U.S. Trustee (the "<u>DIP Remedies Notice Parties</u>") of the DIP Agent's intent to exercise its rights and remedies (the "<u>DIP Remedies Notice Period</u>").

(b)     Upon the occurrence and during the continuation of a DIP Termination Event:

(i)     the Debtors reserve the right to contest any termination or revocation of their use of Cash Collateral and to seek the Court's approval to use Cash Collateral, and the DIP Agent reserves its respective rights to oppose any such request; and

(ii)     the DIP Agent shall not receive immediate relief from the automatic stay to foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations, or occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral.  The DIP Agent may only receive relief from the automatic stay with respect to the foregoing enforcement actions following the filing a motion with the Court and a Court order granting relief from the

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

1    stay under section 362 of the Bankruptcy Code.  The Debtors and all other parties in

2    interest reserve the right to oppose any such request for relief from the stay.

3         (c)    The Debtors (i) shall reasonably cooperate with the DIP Agent in its

4    exercise of rights and remedies, whether against the DIP Collateral or otherwise, and (ii) unless

5    the Court orders otherwise, may not contest or challenge the exercise of any such rights or remedies

6    other than to dispute whether a DIP Termination Event has in fact occurred.

7         (d)    Unless otherwise ordered by the Court during the DIP Remedies Notice

8    Period, upon the occurrence and during the continuation of a DIP Termination Event, without

9    limiting any of the other rights and remedies of the DIP Agent, and subject to, and in accordance

10   with, the Term Sheet and this Interim Order, (i) the DIP Agent and any liquidator or other

11   professional will have the right to access and utilize, at no cost or expense, any trade names,

12   trademarks, copyrights, or other intellectual property of the Debtors to the extent necessary or

13   appropriate to sell, lease, or otherwise dispose of any of the DIP Collateral, including pursuant to

14   any Court-approved sale process, and (ii) enter upon any leased or licensed premises of the Debtors

15   for the purpose of exercising any remedy with respect to the DIP Collateral located thereon, and

16   shall be entitled to all of the Debtors' rights and privileges as lessee or licensee.  For the avoidance

17   of doubt, (x) all of the Debtors' obligations under any applicable lease or license shall not be

18   affected, limited, or otherwise modified by the rights granted to the DIP Agent pursuant to this

19   paragraph, and (y) any affected landlords, lienholders, and/or licensors shall retain all remedies

20   available under applicable non-bankruptcy law.  Nothing herein shall require the Debtors, the DIP

21   Agent or the other DIP Lenders to assume any lease or license under section 365(a) as a

22   precondition to the rights afforded to the DIP Agent and the other DIP Lenders herein.

23        12.    Modification of Automatic Stay.  The automatic stay provisions of section 362 of

24   the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law

25   are hereby modified without further notice, application, or order of the Court to the extent

26   necessary to (i) permit the DIP Agent to perform any act authorized or permitted under or by virtue

27   of this Interim Order, the DIP Credit Agreement, or the Term Sheet, as applicable, including,

28

without limitation, to (A) implement the postpetition financing arrangements authorized by this Interim Order, (B) take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (ii) assess, charge, collect, advance, deduct and receive payments with respect to the Prepetition Obligations and DIP Obligations (or any portion thereof), including, without limitation, all interest, fees, costs, and expenses permitted under the Term Sheet and apply such payments to the Prepetition Obligations, and (iii) subject to the Remedies Notice Period, take any action and exercise all rights and remedies provided to it by this Interim Order, the Term Sheet, or applicable law.

**IV.** *Representations and Covenants.*

        13.   Effect of Stipulations.

        (a)   *Binding on the Debtors*. The Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including, without limitation, in paragraph D hereof (collectively, the "Stipulations"), shall be binding upon the Debtors in all circumstances and for all purposes, subject to entry of the Second Interim Order.

        (b)   *Binding on Third Parties*. The Stipulations shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' Estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtors, in all circumstances and for all purposes unless each of the following three criteria are satisfied:

        (i)   Challenge Period. Such committee, trustee, or any other party in interest (subject to in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with standing and requisite authority granted by the Court, has timely commenced an adversary proceeding or other appropriate contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph 13(b)(i) by no later than the date that is the later of (x) seventy-five (75) days from the entry of this Interim Order and (y) sixty (60) days after the appointment of the Committee (the "Challenge Period").

(ii)     <u>Challenge Proceeding</u>.     Such adversary proceeding or other appropriate contested matter (A) objects to or challenges the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations or the Prepetition Liens, or any portion thereof, or (B) otherwise asserts or prosecutes any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, a "<u>Challenge Proceeding</u>") against the Prepetition Lenders or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "<u>Representative</u>," and, collectively, the "<u>Representatives</u>") in connection with matters related to the Prepetition Documents, the Prepetition Obligations, the Prepetition Liens, and the Prepetition Collateral.

(iii)     <u>Final Non-Appealable Order</u>.  There is a final non-appealable order in favor of the plaintiff or movant in any such Challenge Proceeding; *provided*, that any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released, and barred.

(c)     *Failure to File Challenge Proceeding*.  For the avoidance of doubt, a party in interest's commencement of a timely Challenge Proceeding shall preserve the Challenge Period only with respect to such party in interest commencing the Challenge Proceeding and only to the extent of the express content of the pleading commencing such Challenge Proceeding.  If no such Challenge Proceeding is timely and properly filed during the Challenge Period, or to the extent the Court does not rule in favor of the plaintiff or movant in any such Challenge Proceeding that is timely and properly filed during the Challenge Period, then: (i) the Stipulations shall be binding on all parties in interest, including, without limitation, the Committee and any trustee; (ii) the obligations of the Debtors under the Prepetition Documents, including the Prepetition Obligations, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization,

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

subordination, reduction, defense, setoff or avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases; (iii) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, counterclaim, recharacterization, subordination, or avoidance; (iv) the Prepetition Obligations and the Prepetition Liens shall not be subject to any other or further claim or challenge by the Debtors, the Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' Estates; and (v) any defenses, claims, causes of action, counterclaims, and offsets by the Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases, or any other party acting or seeking to act on behalf of the Debtors' Estates, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Lenders arising out of or relating to the Prepetition Documents shall be deemed forever waived, released and barred. If any such Challenge Proceeding is timely filed during the Challenge Period, the Stipulations shall nonetheless remain binding and preclusive (as provided in this paragraph 13) on the Debtors, the Committee, and on any other person or entity, except to the extent that such Stipulations were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction (and solely as to the plaintiff party that timely filed such Challenge and not, for the avoidance of doubt, any other party in interest). Nothing in this Interim Order vests or confers on any Person (as such term is defined in section 101(41) of the Bankruptcy Code), including the Committee or any non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their Estates, including, without limitation, Challenge Proceedings with respect to the Prepetition Documents, the Prepetition Obligations, or the Prepetition Liens. Any motion seeking standing shall attach a draft complaint or other pleading that sets forth such claim or cause of action or other Challenge Proceeding, and any claim or cause of action or other Challenge Proceeding not included therein shall be deemed forever waived, released, and barred.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

**V.** *Other Rights and DIP Obligations.*

14. <u>No Modification or Stay of this Interim Order</u>. The DIP Lenders have acted in good faith in connection with the DIP Facility and this Interim Order, their reliance on this Interim Order is in good faith, and the DIP Lenders are entitled to the protections of section 364(e) of the Bankruptcy Code.

15. <u>Rights of Access and Information</u>. The Debtors shall comply with the rights of access and information afforded to the DIP Lenders under the Term Sheet and the Prepetition Lenders under the Prepetition Documents.

16. <u>Power to Waive Rights; Duties to Third Parties</u>.

(a) Subject to the terms of the DIP Documents, the DIP Agent shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Lenders (as applicable, the "<u>DIP Lender Rights</u>"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights. Any waiver by the DIP Agent of any DIP Lender Rights shall not be, nor shall it constitute, a continuing waiver unless otherwise expressly provided therein. Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agent or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert such delay in or failure to exercise or enforce any DIP Lender Right as a defense to any obligation owed by the Debtors to the DIP Agent or any DIP Lender.

17. <u>No Unauthorized Disposition of Collateral; Use of Cash Collateral</u>. The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory and Cash Collateral) or any of the equity interests in the Debtors, other than in the ordinary course, pursuant to the terms of this Interim Order, as permitted by the Term Sheet, or as otherwise ordered by the Court, and the Debtors are authorized to use Cash Collateral solely in a manner consistent with this Interim Order, the Approved Budget and the Term Sheet (including Permitted Variances and exclusions to the Approved Budget permitted

**KELLER BENVENUTTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

thereunder). Cash Collateral shall not be used (i) to finance or otherwise fund any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the DIP Lenders, the Prepetition Lenders, or any member thereof, or their respective rights and remedies under or in respect of the DIP Facility, the Prepetition Documents or any interim or final order with respect to the DIP Facility and the Adequate Protection Obligations, (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating (other than to the Carve-Out), in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and adequate protection of the DIP Lenders, and the Prepetition Lenders, including, for the avoidance of doubt, (a) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the DIP Obligations or the DIP Liens, or (b) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the Prepetition Obligations or the Prepetition Liens under the Prepetition Documents, (iii) for any purpose that is prohibited under the Bankruptcy Code, this Interim Order, or the Final Order, and (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body, which payment is not provided for in the Approved Budget, without the prior written consent of the DIP Lenders.

18. <u>No Waiver</u>. The failure of the DIP Agent, the DIP Lenders, or the Prepetition Lenders to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Term Sheet, the DIP Facility, or the Prepetition Documents, as applicable, shall not constitute a waiver of any of the DIP Agent's, the DIP Lenders', or the Prepetition Lenders' rights hereunder, thereunder, or otherwise. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Agent, the DIP Lenders, or the Prepetition Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Agent, the DIP Lenders, or the Prepetition Lenders' to: (a) request conversion of these Chapter 11 Cases to cases under chapter 7, dismissal of these Chapter 11 Cases, or the appointment of a

trustee in these Chapter 11 Cases; (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lenders or the Prepetition Lenders.

19. <u>Proceeds of Subsequent Financing</u>. If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time before the indefeasible repayment in full of all DIP Obligations and the termination of the DIP Agent's and DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied in accordance with this Interim Order and the Term Sheet.

20. <u>Maintenance of Collateral</u>. Unless the DIP Agent otherwise consents in writing, until (i) the payment in full or otherwise acceptable satisfaction of all DIP Obligations, and (ii) the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, the Debtors shall comply with the Term Sheet. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the applicable DIP Lenders) shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

21. <u>Reservation of Rights</u>. The terms, conditions, and provisions of this Interim Order are in addition to and without prejudice to the rights of each DIP Secured Party and each Prepetition Lender, as applicable, to pursue any and all rights and remedies under the Bankruptcy Code, the Term Sheet, the Prepetition Documents, or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral or granting of any interest in the DIP Collateral or the Prepetition Collateral, as applicable, or priority in favor of any other party or otherwise inconsistent with the

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

provisions of the Term Sheet, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates.

22.   Binding Effect; Dismissal.

(a)   All of the provisions of this Interim Order and the Term Sheet, the DIP Obligations, all liens, and claims granted hereunder in favor of each of the DIP Lenders and the Prepetition Lenders, and any and all rights, remedies, privileges, immunities and benefits in favor of the DIP Lenders and the Prepetition Lenders set forth herein, including, without limitation, the Stipulations, subject to paragraph 8 hereof (without each of which the DIP Lenders would not have entered into or provided funds under the DIP Documents and the Prepetition Lenders would not have consented to the priming of the Prepetition Liens as set forth herein and use of Cash Collateral provided for hereunder), provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective and enforceable as of the Petition Date immediately upon entry of this Interim Order and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, shall continue in full force and effect, and shall survive entry of any other order or action, including, without limitation, any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment, or replacement of the DIP Obligations, converting these Chapter 11 Cases to any other chapter under the Bankruptcy Code, dismissing these Chapter 11 Cases, approving any sale of any or all of the DIP Collateral or the Prepetition Collateral, or vacating, terminating, reconsidering, revoking, or otherwise modifying this Interim Order or any provision hereof; *provided*, that in the event a Final Order is entered, the terms and conditions of such Final Order shall control over this Interim Order.

(b)   Nothing in these Chapter 11 Cases may impair the DIP Superpriority Claims, the Prepetition Adequate Protection Claims, and the DIP Lenders' and the Prepetition Lenders' respective liens on and security interests in the DIP Collateral and the Prepetition

Collateral, respectively, and all other claims, liens, adequate protection, and other rights granted pursuant to the terms of this Interim Order, which shall continue in full force and effect, notwithstanding any dismissal of these Chapter 11 Cases, until the DIP Obligations and the Prepetition Obligations are indefeasibly paid and satisfied in full. Notwithstanding any such dismissal, the Court shall retain jurisdiction for the purposes of enforcing all such claims, liens, protections, and rights referenced in this paragraph and otherwise in this Interim Order.

(c)     Except as set forth in this Interim Order, in the event the Court modifies, reverses, vacates, or stays any of the provisions of this Interim Order or the Term Sheet, such modifications, reversals, vacatur, or stays shall not affect the (i) validity, priority, or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Agent of the effective date of such modification, reversal, vacatur, or stay, (ii) validity, priority, or enforceability of the DIP Liens, the DIP Superpriority Claims, the Prepetition Adequate Protection Liens, the Prepetition Adequate Protection Claims, and the Carve-Out, or (iii) rights or priorities of any DIP Secured Party, Prepetition Secured Party, or beneficiary of the Carve-Out pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders and the Prepetition Lenders shall be entitled to all the rights, remedies, privileges and benefits granted pursuant hereto, including the liens and priorities granted herein.

(d)     This Interim Order shall be binding upon the Debtors, all parties in interest in these Chapter 11 Cases, and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in these Chapter 11 Cases or any Successor Cases, and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law. This Interim Order shall also inure to the benefit of the Debtors, the DIP Lenders, the Prepetition Lenders, and each of their respective successors and assigns.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

**KELLER BENVENUTTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

23.  <u>Discharge</u>.  The DIP Obligations and the obligations of the Debtors with respect to adequate protection hereunder, including granting the Prepetition Adequate Protection Liens and the Prepetition Adequate Protection Claims, shall not be discharged by the entry of an order confirming any plan of reorganization in these Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or the DIP Agent otherwise consents in writing.

24.  <u>No Priming of the Prepetition Obligations</u>.  Notwithstanding anything to the contrary herein, from and after the entry of this Interim Order, absent the express written consent of the Prepetition Lenders, the Debtors shall not seek authorization from the Court to obtain or incur any indebtedness or enter into an alternative financing facility other than the DIP Facility (a "<u>Competing DIP Facility</u>") seeking to impose liens on any Prepetition Collateral ranking on a *pari passu* or priming basis with respect to the Prepetition Liens held by the Prepetition Lenders; *provided*, *however*, that nothing herein shall preclude the Debtors from seeking authorization to incur any indebtedness or enter into any Competing DIP Facility that provides for the payment in full of the DIP Obligations and the Prepetition Obligations at the initial closing of such Competing DIP Facility.

25.  <u>Section 506(c) Waiver</u>.  Subject to entry of the Final Order granting such relief, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Lenders upon the DIP Collateral, or by the Prepetition Lenders upon the Prepetition Collateral, as applicable) shall be charged against the DIP Lenders or the Prepetition Lenders, or any of the DIP Obligations, the Prepetition Obligations, the DIP Collateral, or the Prepetition Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Lenders and/or the affected Prepetition Lenders, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such

agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).

26. <u>Section 552(b) Waiver</u>. Subject to entry of the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facility and using Cash Collateral as provided in this Interim Order that the Prepetition Lenders are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception under section 552(b) shall not apply to the DIP Lenders, the DIP Obligations, the Prepetition Lenders, or the Prepetition Obligations.

27. <u>No Marshaling/Application of Proceeds</u>. Subject to entry of the Final Order granting such relief, in no event shall the DIP Lenders or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with the Term Sheet and the Prepetition Documents, as applicable.

28. <u>Payment of DIP Lender Fees and Expenses</u>. Consistent with the Approved Budget, the Debtors shall pay, by automatic draw under the DIP Facility and application of the proceeds of such draw to the payment thereof, (i) the reasonable and documented fees and expenses reimbursable under the DIP Facility, the DIP Credit Agreement, or the Term Sheet, as applicable, whether incurred before or after the Petition Date, and (ii) all reasonable and documented out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders including, without limitation, reasonable and documented fees and disbursements of counsel in connection with the enforcement or preservation of any rights under the DIP Facility, the DIP Credit Agreement, or the Term Sheet. With respect to payment of fees and expenses incurred from and after the Petition Date, the DIP Agent and the DIP Lenders shall comply with the procedures set forth in paragraph 3(c) hereof.

29. <u>Limits on Lender Liability</u>.

(a) In determining to make any loan under the Term Sheet or the DIP Credit Agreement, authorizing the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the Term Sheet, the DIP Lenders and the

Prepetition Lenders, as applicable, shall not be deemed to (i) be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of the Debtors, so long as such party's actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a facility owned or operated by a Debtors, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq*., as amended, or any similar federal or state statute), or (ii) owe any fiduciary duty to the Debtors.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Lenders or any of the Prepetition Lenders of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and its Affiliates (as such term is defined in section 101(2) of the Bankruptcy Code).

(b)     Nothing in this Interim Order or the other DIP Documents shall be construed to permit the Debtors to violate 28 U.S.C. § 959(b).

(c)     As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the other DIP Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

30.     <u>Release</u>.  Subject to paragraph 13 of this Interim Order, each of the Debtors and their Estates, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably release, discharge, and acquit each of the DIP Lenders and each of the Prepetition Lenders, and (in such capacity) each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors,

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

successors and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to (i) the Prepetition Obligations and the DIP Obligations, or (ii) the Term Sheet and the Prepetition Documents, as applicable, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all Claims (as such term is defined in section 101(5) of the Bankruptcy Code) and any and all causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, setoff rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the Prepetition Obligations and the DIP Obligations, the Prepetition Documents and the Term Sheet, or the Prepetition Liens and the DIP Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the Prepetition Obligations and the DIP Obligations that the Debtors now has or may claim to have against the Released Parties, arising under, in connection with, based upon, or related to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Interim Order. The Debtors are authorized in any payoff letter or similar agreement into which they enter upon payment in full of the DIP Obligations to provide a waiver and release substantially similar to the waiver and release set forth in this paragraph 30 of the DIP Agent and the applicable DIP Lenders and their respective related parties.

31. <u>Survival</u>. The provisions of this Interim Order, the validity, priority, and enforceability of the DIP Liens, the DIP Superpriority Claims, the Prepetition Adequate Protection

Liens, the Prepetition Adequate Protection Claims, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in these Chapter 11 Cases, (b) converting these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing these Chapter 11 Cases, (d) any other act or omission, (e) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents), or (f) pursuant to which the Court abstains from hearing any of these Chapter 11 Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Lenders and the Prepetition Lenders pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in these Chapter 11 Cases, following dismissal of any of these Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facility, all of the DIP Obligations, pursuant to this Interim Order and the Term Sheet, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility are terminated, and (ii) in respect of the Prepetition Obligations, all of the Adequate Protection Obligations owed to the Prepetition Lenders provided for in this Interim Order and under the Prepetition Documents have been indefeasibly paid in full in cash.

32. <u>Protections of Rights of the DIP Agent, the DIP Lenders, and the Prepetition Lenders</u>. The Debtors (and their legal and financial advisors in the case of clauses (ii) through (iv) below) will, whether or not the DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash, (i) maintain books, records, and accounts to the extent and as required by the Term Sheet and the Prepetition Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the DIP Agent all such information and documents that the Debtors are obligated (including upon reasonable request by any of the DIP Agent) to provide under the Term Sheet, the Prepetition Documents, or the provisions of this Interim Order; (iii)

authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to reasonably cooperate and consult with the DIP Agent (and, so long as an Event of Default has occurred and is continuing, each DIP Lender); (iv) upon reasonable advance notice during regular business hours, permit the DIP Agent, and the DIP Lenders to visit and inspect any of the Debtors' properties, to examine and make abstracts or copies from any of their non-privileged books and records, to tour the Debtors' business premises and other properties, and to discuss their affairs, finances, properties, business operations, and accounts with the Debtors' officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the Term Sheet and the Prepetition Documents; (v) permit the DIP Agent to consult with the Debtors' management and advisors on matters concerning the Debtors' business, financial condition, operations, and assets; and (vi) upon reasonable advance notice during regular business hours, permit the DIP Agent to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, and liquidation valuations at reasonable times in respect of any or all of the DIP Collateral or the Prepetition Collateral, in accordance with the Term Sheet and the Prepetition Documents.

33. <u>Credit Bidding</u>. Subject to entry of the Final Order, section 363(k) of the Bankruptcy Code, and the express written direction of the DIP Lenders and the terms of the Term Sheet, the DIP Agent, on behalf of itself and the DIP Lenders, shall have the right to credit bid, in accordance with the Term Sheet, up to the full amount of the DIP Obligations in any sale of the DIP Collateral (or any portion thereof) constituting property or assets of the Debtors, whether such sale is effectuated pursuant to section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. Subject to entry of the Final Order and section 363(k) of the Bankruptcy Code, the Prepetition Lenders shall have the right to credit bid, in accordance with the Prepetition Documents, up to the full amount of the Prepetition Obligations (including any claims for Diminution in Value) in any sale of the Prepetition Collateral (or any portion thereof) constituting property or assets of the Debtors.

34. <u>No Third Party Rights</u>. Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

35. <u>No Avoidance</u>. No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facility shall be avoidable or recoverable from the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law; *provided*, that nothing in this paragraph is intended to limit or curtail the provisions of paragraph 13 hereof, with respect to the Prepetition Obligations.

36. <u>Reliance on Order</u>. All postpetition advances are made in reliance on this Interim Order.

37. <u>No Modification of Interim Order</u>. Until and unless the DIP Obligations and the Prepetition Obligations (other than contingent obligations with respect to then unasserted claims) have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtors shall not seek or consent to, directly or indirectly, any modification, stay, vacatur, or amendment to this Interim Order without the prior written consent of the DIP Agent, and no such consent shall be implied by any action or inaction of the DIP Agent.

38. <u>Payments Free and Clear</u>. Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or the Prepetition Lenders, pursuant to the provisions of this Interim Order, any subsequent order of the Court or the Term Sheet, shall, subject to the terms of this paragraph 38, be irrevocable, received free and clear of any claims, charges, assessments, or other liabilities, including, without limitation, subject to entry of the Final Order granting such relief, any such claims or charges arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of a Carve-Out Trigger Notice, subject to the Carve-Out in all respects.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

39.    <u>Limited Effect</u>.  In the event of a conflict between the terms and provisions of the Term Sheet and this Interim Order, the terms and provisions of this Interim Order shall govern.

40.    <u>Headings</u>.  Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

41.    <u>Bankruptcy Rules</u>.  The requirements of Bankruptcy Rules 4001, 6003, and any stay otherwise arising under such sections or under any other Bankruptcy Rule is hereby waived.

42.    <u>General Authorization</u>.  The Debtors, the DIP Lenders, and the Prepetition Lenders are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

43.    <u>Retention of Exclusive Jurisdiction</u>.  The Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the DIP Credit Agreement, and the Term Sheet.

44.    <u>Supplemental Interim Hearing</u>.  The Supplemental Interim Hearing on the Motion shall be held on February __, 2024, at ___:__.m, prevailing Pacific Time.  Not later than two business days after the date of this Interim Order, notice of the Motion, if not previously served, and the Supplemental Interim Hearing shall be filed with the Court, and served on the Notice Parties.  Oppositions may be filed through 4:00 pm prevailing Pacific Time on the day before the Supplemental Interim Hearing.  In the event no objections to entry of the Second Interim Order on the Motion are timely received, the Court may enter such Second Interim Order without the need for a hearing.

45.    <u>Final Hearing</u>.  The final hearing (the "<u>Final Hearing</u>") on the Motion shall be held on March ___, 2024, at ___:__ .m., prevailing Pacific Time.  On or before five (5) business days prior to the Final Hearing at 4:00 p.m. Pacific Time, any objections or responses to entry of a final order on the Motion shall be filed with the Court, and served on the Notice Parties.  In the event no objections to entry of the Final Order on the Motion are timely received, the Court may enter such Final Order without the need for the Final Hearing.

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

<dd>2</dd>

**EXHIBIT B**

**(Term Sheet)**

## Term Sheet for Debtor-in-Possession Financing

*The following is a non-binding summary of the proposed terms and conditions upon which the Lenders identified below (the "**DIP Lenders**") would consider providing a debtor-in-possession financing loan (the "**DIP Loan**") to the Borrowers/Debtors identified below (the "**Debtors**"), in connection with the filing of a chapter 11 petition for each of the Debtors (collectively, the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**"), pursuant to Bankruptcy Code section 364 in connection with the Bankruptcy Case (the "**Financing Transaction**").*

*This term sheet (the "**Term Sheet**") is non-binding and is for discussion purposes only. This Term Sheet does not purport to summarize all of the terms and conditions that would be contained in definitive documentation for the Financing Transaction. This Term Sheet is confidential and should not be disclosed to any third party other than the parties' respective attorneys, accountants, and financial advisors.*

| DIP Lenders | Rabo AgriFinance LLC, as Administrative Agent and as a DIP Lender, and such other entities, if any, as may later join as DIP Lenders |
|---|---|
| DIP Agent | Rabo AgriFinance LLC, as Administrative Agent (the "***DIP Agent***") |
| Borrowers/Debtors | Adobe Ranch, LLC<br>Chiala LLC<br>Dinuba Ranch, LLC<br>Dixon East LLC<br>Fry Road, LLC<br>Hall Ranch LLC<br>Jeffrey Ranch, LLC<br>Johl LLC<br>Lamb Ranch, LLC<br>Marcucci Ranch, LLC<br>Phelps Ranch, LLC<br>Porterville LLC<br>Rasmussen LLC<br>Ratto Ranch, LLC<br>Toor Ranch, LLC<br>Trinitas Advantaged Agriculture Partners IV, LP<br>Trinitas Farming, LLC<br>Tule River Ranch, LLC<br>Turf Ranch LLC |

| Terms of DIP Financing | |
|---|---|
| DIP Loan | An up to Thirty Million Dollars ($30,000,000) senior secured credit facility (with lien priorities discussed below) in the form of a delayed draw term loan facility (the "**DIP Loan**"; the facility providing the DIP Loan, the "**DIP Facility**"; and the credit agreement governing the DIP Facility, the "**DIP Credit Agreement**"), which, following the entry of an interim order approving the DIP Facility ("the **Interim DIP Order**"), would be available to be drawn in multiple draws, in number no more than to be mutually agreed, for operating and related business expenses; to be made available in amounts and at the times specified in conformance with the Approved Budget (as defined below); and subject to the conditions set forth in the section entitled "Conditions Precedent to Each DIP Loan Draw" below; provided that no more than Six Million Five Hundred Thousand Dollars ($6,500,000) in the aggregate (the "**Interim DIP Order Availability Cap Amount**") shall be available to be drawn under the DIP Facility until the entry of a final order approving the DIP Facility, which order shall be substantially in the same form as the Interim DIP Order, with such modifications as are necessary to convert the Interim DIP Order into a final order; to grant the DIP Lenders protections unavailable on an interim basis; and to include such other modifications as are satisfactory to the DIP Lenders and the Debtors (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"). Any amounts drawn under the DIP Facility will permanently reduce the committed amount hereunder, and any amount repaid may not be re-borrowed. The draws under the DIP Facility shall be denominated in US Dollars.<br><br>Notwithstanding anything to the contrary herein, all commitments on the DIP Facility shall terminate and be of no further force or effect upon the Termination Date (as defined below), and no further amounts under the DIP Facility will be available to be drawn under the DIP Facility.<br><br>DIP Lender Expenses. The Debtors shall reimburse DIP Lender all of its reasonable and necessary fees and expenses, including, without limitation, attorneys' and consultants' fees, costs, and expenses incurred (i) in connection with the negotiation and preparation of this Term Sheet and the agreements contemplated herein, and (ii) in connection with the Bankruptcy Case ("**DIP Lender Expenses**"). The DIP Lender Expenses shall be added to the principal amount of the DIP Loan, shall be treated as disbursements and reduce remaining availability under the DIP Facility, and shall be part of the DIP Obligations[1] until paid in full, whether prior to or at maturity. |

---

[1] "**DIP Obligations**" means the due and punctual payment by the Debtors of (i) the unpaid principal amount of and interest on the DIP Loan (including interest accruing after the maturity of the DIP Loan), as and when due, whether at maturity, by acceleration, or otherwise, and (ii) all other monetary obligations of the Debtors to the DIP Agent and the DIP Lenders, including advances, debts, liabilities, obligations, fees, costs, expenses, and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, or fixed or contingent. under the DIP Loan documents and the DIP Orders (including the costs and expenses of the advisors to the DIP Agent and the DIP Lenders).

| | |
|---|---|
| | **Maturity Date**: The term of the DIP Loan commences upon entry of the Interim DIP Order through the earliest to occur of (a) April 30, 2025, (b) an Event of Default as defined in the DIP Loan documents, (c) ten (10) days after the occurrence of the effective date of any plan of reorganization (a "***Plan***"), (d) the failure of the Final DIP Order to be entered within thirty (30) days after the filing of the Debtors' motion for approval of the DIP Facility (the "***DIP Motion***"), unless otherwise agreed in writing by the DIP Lenders; and (e) the closing of the sale(s) of substantially all of the Debtors' assets (the earliest of the foregoing to occur is the "***Termination Date***"). <br><br> **Interim DIP Order**:  A form of Interim DIP Order acceptable to the DIP Lenders and the Debtors shall be attached to the DIP Credit Agreement. <br><br> **Broker(s)**: The Debtors shall retain one or more qualified brokers acceptable to the DIP Lenders in their sole discretion (the "***Broker(s)***").  The Broker(s) shall be employed with the approval of the Bankruptcy Court to sell the assets of the Debtors (the "***Sale Process***").   Among other reporting covenants, the DIP Credit Agreement will require the Debtors to comply with the following covenants in connection with the Sale Process: <br><br>       (a)     delivery by the Debtors or their advisors to the DIP Lenders of a confidential weekly report summarizing potential bidders, data site access, indications of interest received, letters of intent received, and such other reasonable and appropriate updates as the DIP Agent may request; <br><br>       (b)     within one (1) Business Day (as defined below) of receipt, the Debtors will provide to the DIP Lenders or their consultants copies of all indications of interest, letters of intent, or draft purchase agreements received from a third- party bidder; <br><br>       (c)     the Debtors and their advisors will hold a weekly call with the DIP Agent and/or the DIP Lenders to provide an update on the Sale Process and related topics; and <br><br>       (d)     weekly provision of an Agricultural Reporting Status Update in a form acceptable to the DIP Lenders, detailing all major cultivation activities, separated by ranch. |
| Interest and Fees: | **Interest Rate**:  SOFR[2] + eight percent (8.00%), payable in arrears. <br><br> **Interest Only Payment**:  The Debtors will make monthly interest payments to the Lender until the Maturity Date, which payments shall be reflected in each Approved Budget (as that term is defined below.) <br><br> **Default Rate**: Two percent (2.00%) per annum in addition to the then-current interest rate, payable upon demand. <br><br> **Commitment Fee**: On the date of each borrowing under the DIP Loan, a fee in the amount of one and one-half percent (1.5%) of the amount of such DIP |

---

[2] One-Month Term SOFR, adjusted at the beginning of every month.

| | |
|---|---|
| | Loan draw borrowed on such date, which fee shall be payable in-kind by being capitalized and deemed to have been disbursed so as to reduce remaining availability under the DIP Facility. |
| Use of Proceeds: | Subject to the satisfaction of the other terms and conditions of the DIP Facility, and consistent with the Approved Budget and subject to Permitted Variances, the proceeds of the DIP Facility may be used (a) for working capital and general corporate purposes during the Bankruptcy Case (including payment of fees and expenses in connection with the transactions contemplated hereby, and working capital), and (b) for (i) the funding of a segregated account intended for the payment of the fees and expenses of professionals retained in the Bankruptcy Case (hereafter, "***Professionals***"), and (ii) interest, payments, and expenses associated with the entry into the DIP Credit Agreement and the other documents executed in connection therewith, including reasonable and documented (in summary form) fees and expenses of professionals retained by the DIP Lenders.<br><br>Unless explicitly provided for in and otherwise in accordance with the Approved Budget, such proceeds will not be permitted to be used for (1) repayment of existing pre-petition debt, except as permitted by order of the Bankruptcy Court (and including, among other things, adequate protection payments on the prepetition loans held by the DIP Lenders); (2) payments or transfers to any affiliates; or (3) expenses relating to production of the 2025 crop. |
| Segregated Accounts: | Proceeds of the DIP Facility will be deposited into a segregated escrow account (the "***Segregated Account***") with the DIP Agent, which will be subject to the liens and security interests securing the DIP Facility. The DIP Lenders will fund their respective shares of DIP Loan draws into the Segregated Account, the conditions to each of which are set forth herein and shall be more fully set forth in the DIP Credit Agreement. Funds in the Segregated Account will become available to the Debtors via weekly withdrawals, upon submission of a request for withdrawal specifying the use of proceeds, as provided in the DIP Credit Agreement and subject to the Approved Budget and satisfaction of applicable conditions precedent. It is anticipated that advances under the DIP Facility for deposit into the Segregated Account will coincide with the beginning of each six-week Budgetary Compliance Period.<br><br>If at any time one or more Acceptable Sales (as that term is defined below) have closed and, following application of the proceeds thereof to all amounts owing under the DIP Credit Agreement, the DIP Loan has been repaid in full, then remaining proceeds shall be deposited into a segregated escrow account (the "***Segregated Post-Sale Remainder Account***"). Upon deposit of funds into the Segregated Post-Sale Remainder Account, Debtors shall provide to DIP Lenders for approval a budget (the "***Estimated Remainder Budget***"), in a form reasonably acceptable to DIP Lenders, detailing the Debtors' projected operating cash requirements through and including the remainder of the Bankruptcy Case. An amount equal to the total projected operating costs shown in the Estimated Remainder Budget (that amount, the "***Estimated Remainder Cost***") shall be left in the |

| | |
|---|---|
| | Segregated Post-Sale Remainder Account to be disbursed in accordance with the procedure for DIP Loan disbursements set forth herein, subject to the conditions precedent set forth herein. Any amount in the Segregated Post-Sale Remainder Account beyond the Estimated Remainder Cost shall be applied to the payment of the prepetition obligations owed to DIP Lenders. |
| Milestones | Certain milestones (the "***Milestones***") shall include, without limitation, the following (subject to extension by the DIP Lenders in their sole discretion): <ul><li>by the petition date, the Debtors shall have identified the Broker(s);</li><li>no later than thirty (30) days after agreement of the parties to this DIP Term Sheet and the parties' execution of all related documentation, the Bankruptcy Court shall enter the Interim DIP Order;</li><li>no later than sixty (60) days after the parties' execution of all documents evidencing, securing, or supporting the repayment of the DIP Loan (the "***DIP Documents***"), the Bankruptcy Court shall enter the Final DIP Order;</li><li>no later than thirty (30) days after the petition date, the Bankruptcy Court shall enter an order approving employment of the Broker(s);</li><li>no later than March 30, 2024, the Debtors shall file a motion seeking approval of bidding procedures (the "***Bidding Procedures***"), in form and substance reasonably acceptable to the DIP Lenders and consistent with this DIP Term Sheet;</li><li>no later than March 30, 2024, the Debtors shall commence the Sale Process, including the issuance of preliminary offering materials;</li><li>no later than April 30, 2024, the Bankruptcy Court shall have entered the order approving the Bidding Procedures (the "***Bidding Procedures Order***"), in form and substance acceptable to the DIP Lenders;</li><li>no later than May 31, 2024, an auction shall have been conducted, if necessary, for such portion of the Debtors' non-cash consolidated assets as has been agreed to between the Debtors and the Required Lenders (as defined in the DIP Credit Agreement) pursuant to section 363 of the Bankruptcy Code and in accordance with the Bidding Procedures Order (the "***Initial Auction***," and such Milestone, the "***Initial Auction Milestone***");</li><li>no later than June 14, 2024, the Bankruptcy Court shall hold a hearing (the "***Initial Sale Hearing***") regarding approval of the sale pursuant to section 363 of the Bankruptcy Code of all or a portion of the Debtors' non-cash assets (the "***Assets***");</li><li>no later than three (3) Business Days after the Initial Sale Hearing, the Bankruptcy Court shall have entered an order approving the sale of the Assets that either (y) pays the entirety of the DIP Loan and the prepetition debts of the DIP Lenders in full, in cash or (z) is acceptable to the DIP Lenders in their sole discretion (an "***Acceptable Sale***"), to a successful bidder in accordance with the Bidding Procedures Order;</li><li>additional auctions shall occur by December 31, 2024, and March 31, 2025, and each auction shall follow the timeframes and process set forth in the DIP Documents; and</li></ul> |

| | |
|---|---|
| | <ul><li>no later than April 30, 2025, one or more Acceptable Sales shall have closed that either pays the entire pre-petition secured indebtedness and DIP Loan in full, or is otherwise acceptable to the DIP Lenders; *provided* that if regulatory approvals associated with an Acceptable Sale remain pending as of such date, such date shall be automatically extended to the date that is the third (3rd) Business Day (as defined in the DIP Documents) following receipt of all necessary regulatory approvals.</li><li>Debtors shall ensure that the first Acceptable Sale, to occur on the schedule set forth herein, shall provide for the sale of at least twenty percent (20%), by acreage, of the Debtors' total real property holdings. A second Acceptable Sale, occurring on or about December 31, 2024, shall provide for the sale of at least fifty percent (50%) of the Debtors' total real property holdings, by acreage, remaining after the first Acceptable Sale. The final Acceptable Sales, to close on or before April 30, 2025, with all requisite Bankruptcy Court approvals completed by that time, shall provide for the sale of the remainder of the Debtors' real property holdings.</li><li>On or before December 31, 2024, Debtors shall provide documentation reasonably acceptable to DIP Lenders, such as a signed Purchase Agreement from a qualified buyer, to demonstrate to the DIP Lenders' reasonable satisfaction that the final Acceptable Sale will be consummated on or before April 30, 2025, as set forth herein.</li></ul> |
| Prepayments | The DIP Documents will contain mandatory prepayments that are customary for debtor-in-possession financing of this type, including, without limitation, one hundred percent (100%) of the net cash proceeds from (i) non-ordinary course asset sales, (ii) insurance/condemnation events and other extraordinary receipts, and (iii) any incurrence of indebtedness not otherwise permitted under the DIP Documents. <br><br> The Debtors may, at any time prior to maturity, voluntarily repay the DIP Loan in full or in part; *provided*, that any such prepayment shall be made with all accrued interest, fees, and other amounts outstanding in respect of the DIP Loan. Besides prepaying the DIP Loan, the Debtors may choose to prepay the DIP Lenders' prepetition debt in full, whether through refinancing or through raising new equity or to reinstate the balance of the pre-petition debt. The Debtors shall have the right, at their discretion, to effectuate any of the foregoing by way of a motion or a Plan. |
| DIP Lenders' Collateral, Liens & Priority | Subject only to the Carve-Out (defined below), the DIP Obligations shall: <ul><li>pursuant to section 364f(1) of the Bankruptcy Code, be entitled to superpriority administrative expense status (the "***DIP Superpriority Claims***"), with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code;</li><li>pursuant to section 364(c)(2) of the Bankruptcy Code, have a first priority lien on and security interest in all property of the Debtors (other than the Excluded Property defined below) that is not subject to a valid</li></ul> |

| | |
|---|---|
| | and perfected lien existing on the Petition Date (all such property, exclusive of the Excluded Property, the "**Collateral**"); <br>■ pursuant to section 364(c)(3) of the Bankruptcy Code, have a lien on and security interest in all Collateral that is subject to a valid, perfected, and unavoidable lien in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code ("**Permitted Third Party Liens**"); and <br>■ pursuant to section 364(d)(1) of the Bankruptcy Code, have a first priority, senior priming lien on and security interest in all Collateral, subject and junior to Permitted Third Party Liens. (All of the above is collectively referred to as the "**DIP Lenders' Collateral, Liens & Priority**.") <br><br>Notwithstanding the foregoing, no security interest or lien securing the DIP Obligations shall attach to the avoidance actions under chapter 5 of the Bankruptcy Code ("**Excluded Property**") nor shall proceeds of the Excluded Property be applied to the DIP Lenders' priority claims. |
| Adequate Protection for Prepetition Secured Parties | Subject to the Carve-Out, the DIP Lenders' Collateral, Liens & Priority, and limitations on recourse to Excluded Property, as and for adequate protection the prepetition secured lenders shall receive: <br>■ Adequate protection liens on all Collateral; <br>■ Adequate protection 507(b) superpriority claim; <br>■ Waiver of marshalling, section 506(c), and section 552(b) equity of the cases exception (as of petition date); <br>■ Interest on prepetition obligations in favor of DIP Lenders shall accrue at the contractual default rate; <br>■ All required written financial reporting and other periodic reporting that is provided to the DIP Agent and the DIP Lenders; and <br>■ other customary legal protections, including benefit of the Milestones, subject to the terms hereof. |
| Carve-Out | The DIP Lenders' Collateral, Liens & Priority, and the prepetition secured parties' adequate protection liens and claims, shall be subject and subordinate to payment of (a) the Professional fees incurred, but not in excess of amounts therefor provided in the applicable Approved Budget, prior to the earliest of (i) an Event of Default (as defined in the DIP Credit Agreement), (ii) the termination of the DIP Facility, or (iii) the maturity date of the DIP Facility (the earliest, the "**Carve-Out Date**"); (b) the sum of One Hundred Fifty Thousand Dollars ($150,000) for payment of Professionals' costs and expenses incurred after the Carve-Out Date; (c) fees and expenses of a chapter 7 trustee in an amount not to exceed Seventy-five Thousand Dollars ($75,000); and (d) statutory fees of the United States Trustee (collectively, the "**Carve-Out**"). |

| Budgets | Budget: The Debtors shall prepare a budget consisting of a 13-week cash flow forecast, setting forth, among other things, the Debtors' cash, revenue, cash flow, and net operating cash flow, trade payables, ordinary course expenses, total expenses, capital expenditures, vendor disbursements, working capital, and fees and expenses of the DIP Facility the Bankruptcy Case during such 13-week period that Debtors are authorized to use proceeds of the DIP Loan ("***Approved Budget***"). The Approved Budget shall be revised on a six-week cycle (i.e., every six weeks a new 13-week cash flow forecast will be delivered, and variances will be calculated based on that six-week period) ("***Budgetary Compliance Period***"). |
|---|---|
| Conditions Precedent for Each DIP Loan Draw | On the funding date of each DIP Loan draw, including the initial DIP Loan disbursement and withdrawals from the Segregated Account, (i) there shall exist no Default or Event of Default under and defined in the DIP Credit Agreement and the other DIP Documents, (ii) the representations and warranties of the Debtors therein shall be true and correct in all material respects immediately prior to, and after giving effect to, such funding, (iii) the making of such DIP Loan draw shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently, (iv) the Debtors shall be in compliance with the Approved Budget (subject to Permitted Variances (as defined below)) in all respects, (v) the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed in any respect without the consent of the DIP Lenders and the Debtors unless superseded by the Final DIP Order, (vi) the Liquidity (to be defined in the DIP Credit Agreement) of the Debtors prior to giving effect to such funding shall not exceed One Million Five Hundred Thousand Dollars ($1,500,000), and (vii) in the event the Debtors are borrowing amounts in excess of the Interim DIP Order Availability Cap Amount, the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed in any respect without the consent of the DIP Lenders and the Debtors. |
| Representations & Warranties | The DIP Documents shall contain representations and warranties usual and customary for facilities of this type, to be applicable to the Debtors and, in each case, with customary exceptions, qualifications, materiality modifiers, and baskets to be agreed upon in the DIP Documents, subject to the approval of the DIP Lenders in their sole discretion, which shall include, but not be limited to, the following: (i) organization and powers, (ii) authorization and enforceability, (iii) no conflicts and no default, (iv) no material adverse effect, (v) properties, (vi) intellectual property, (vii) equity interests and subsidiaries, (viii) litigation, (ix) material agreements, (x) federal reserve regulations, (xi) investment company act, (xii) use of proceeds, (xiii) taxes, (xiv) no material misstatements, (xv) labor matters, (xvi) agreements with affiliates, (xvii) employee benefit plans, (xviii) environmental matters, (xix) insurance, (xx) bank accounts, (xxi) anti-terrorism laws and foreign corrupt practices act, (xxii) the Bankruptcy Case and the secured superpriority obligations, and (xxiii) commercial activity and absence of immunity; *provided*, *however*, that the foregoing shall take into account the pending nature of the Bankruptcy Case. |

| | |
|---|---|
| Affirmative Covenants | The DIP Documents shall contain affirmative covenants usual and customary for facilities of this type, to be applicable to the Debtors and, in each case, with customary exceptions, qualifications, and baskets to be agreed upon in the DIP Documents, subject to the approval of the DIP Lenders in their reasonable discretion, which shall include, but not be limited to, the following: (i) financial statements and reports (including, without limitation, the reports relating to the Sale Process, (ii) upon request by Required Lenders, engagement by Debtors of a chief restructuring officer or other consultant to oversee the Debtors' compliance, budgeting, and financial reporting related to the DIP Facility (the "**Required Consultant**"), (iii) litigation and other notices, (iv) maintenance of existence, businesses, and properties, (v) maintenance of insurance, (vi) payment of obligations and taxes, (vii) employee benefits, (viii) maintaining records and access to properties and inspections, (ix) use of proceeds, (x) compliance with environmental laws and environmental reports, (xi) additional collateral, (xii) security interests and further assurances, (xiii) maintenance of corporate separateness, (xiv) priority of liens, (xv) compliance with the Milestones, subject to the economic adjustment provided herein, (xvi) bankruptcy -related matters, (xvii) budget compliance, (xviii) lender calls, (xix) maintenance of cash collateral system (as may be modified), and (xx) material agreements; *provided*, *however*, that the foregoing shall take into account the pending nature of the Bankruptcy Case. |
| Negative Covenants | The DIP Documents shall contain negative covenants usual and customary for facilities of this type, to be applicable to the Debtors and, in each case, with customary exceptions, qualifications, and baskets to be agreed upon in the DIP Documents, subject to the approval of the DIP Lenders in their reasonable discretion, which shall include, but not be limited to, the following: (i) limitations on indebtedness and incurrence of additional senior or *pari passu* claims, (ii) limitations on liens, (iii) limitations on fundamental changes, (iv) limitations on dispositions of property, (v) limitations on restricted payments, (vi) limitations on investments, (vii) limitations on prepayments and modifications of certain debt instruments or organizational documents, (viii) prohibition against termination of any Required Consultant, (ix) limitations on changes in fiscal periods and accounting changes, (x) limitations on negative pledge clauses, (xi) limitations on clauses restricting subsidiary distributions, (xii) limitations on lines of business, (xiii) limitations on material agreements, (xiv) limitations on capital expenditures, (xv) limitations on sale and leaseback transactions, (xvi) limitations on locations of collateral, (xvii) limitations on acquisitions, (xviii) limitations on issuance of capital stock, (xix) anti-terrorism and anti-money laundering and embargoed persons, (xx) limitations on hedging and speculative transactions, (xxi) limitations on changing auditors, (xxii) limitations on new subsidiaries, (xxiii) limitations on changes of name or location, (xxiv) certain bankruptcy matters, and (xxv) limitations on ability to change the terms of ongoing ordinary course business relationships with third parties; *provided*, *however*, that the foregoing shall take into account the pending nature of the Bankruptcy Case. |

| | |
|---|---|
| Financial Covenants | The Debtors shall maintain a cumulative ledger of line items appearing in the Approved Budget (the "***Performance Ledger***"). Variance covenants comparing the Performance Ledger to the Approved Budget will be tested weekly, calculated on a cumulative basis from the beginning date of the six-week Budgetary Compliance Period coinciding with the first six weeks included in such Approved Budget ("***Cumulative Basis***"), requiring (i) the unfavorable variance (as compared to the Approved Budget) of the net of the aggregate receipts and disbursements of the Debtors not to exceed ten percent (10%) (on a Cumulative Basis), and (ii) the unfavorable variance (as compared to the Approved Budget) of the aggregate operating disbursements (excluding professional fees and expenses and adequate protection claims) made by the Debtors not to exceed ten percent (10%) (on a Cumulative Basis).<br><br>As used in this DIP Term Sheet, "***Permitted Variances***" means (i) all favorable variances, and (ii) any unfavorable variance permitted in the budget variance covenant. |
| Events of Defaults and Remedies | Customary events of default ("***Events of Default***"), consistent with the terms hereof, as may be modified for the particulars of the Bankruptcy Case, including any Events of Default for the failure to adhere to reporting requirements contained in the DIP Credit Agreement, defaults under covenants (including, without limitation, any variance beyond the Permitted Variances under the then-applicable Approved Budget), resignation or termination of any Required Consultant, appointment of a bankruptcy trustee, examiner, or receiver, invalidity of collateral documents, dismissal or conversion of the Bankruptcy Case, certain other bankruptcy matters, failure to comply materially with the DIP Orders, entry of an order amending, modifying, staying, revoking, or reversing the DIP Orders without the consent of the DIP Lenders, termination of the Interim DIP Order or the Final DIP Order, as applicable, allowance of a claim under section 506(c) of the Bankruptcy Code, filing of a Plan or disclosure statement other than (1) a Plan that is approved by the DIP Lenders, or (2) one that provides for repayment in cash on the effective date of the entirety of the DIP Loan and repayment in cash or reinstatement of the balance of the remaining pre-petition secured debts, payment of prepetition claims other than as permitted by the Bankruptcy Court and included in the Approved Budget or the DIP Documents, entry of an order granting stay relief in respect of any Collateral, granting any superpriority claim that is *pari passu* with or senior to those of the DIP Lenders, and pursuit of a sale that is not an Acceptable Sale, or failure to promptly obtain Bankruptcy Court approval of an Acceptable Sale.<br><br>Upon the occurrence of an Event of Default, the DIP Agent may, and at the direction of the applicable DIP Lenders shall, exercise all rights and remedies provided for in the DIP Documents, and may declare (i) the termination, reduction, or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, and (iii) the termination of the commitments under the DIP Loan as to any future |

| | |
|---|---|
| | liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the liabilities or obligations of the Debtors; *provided*, that prior to the exercise of any enforcement or liquidation remedies against the Collateral, the DIP Agent shall be required to provide five (5) days' written notice to the Debtors, their bankruptcy counsel, the prepetition trustee, the United States Trustee for the Northern District of California, and any Official Committee of Unsecured Creditors and its counsel. |
| Other Provisions: | The DIP Documents shall include other customary provisions including, without limitation, representations and warranties, affirmative and negative covenants, and provisions relating to indemnification, confidentiality, and assignments/participations. The Debtors shall promptly notify the DIP Lenders of either (i) any material change in volume of farm products being delivered to a processor, or (ii) any change in processor(s) utilized. |

3

**EXHIBIT C**

**(Budget)**

# TAAP IV DIP APPROVED Budget

Consolidated with Trinitas Farming LLC     v21, 2/16     2/19/24

Draft - subject to change.   In $000's USD     Petition Date

**APPROVED DIP BUDGET DETAILS**

| | Post-Petition |
|---|---|
| **Week Ending** | **2/24/24** |
| **Case Status** | *Post-Petition* |
| **Month** | *Feb-24* |
| **Week Number** | **1** |

| **CASH FLOW** | |
|---|---|
| Cash Collections from Almond, net | |
| Other Operating Cash Receipts | |
| **Aggregate Receipts** | **-** |
| | |
| Payroll & Taxes, Benefits Reimbursement - COGS | (20) |
| Payroll & Taxes, Benefits Reimbursement - SG&A | (41) |
| General | (87) |
| Water Pool | (17) |
| Irrigation R&M | (26) |
| Fertilizers | (53) |
| Chemicals | (159) |
| Miscellaneous | (7) |
| Pollination | (283) |
| Harvest | (10) |
| Mechanics & Shop | (24) |
| Farming Overhead | (12) |
| Ranch Management | (10) |
| SG&A Costs | (21) |
| Management Fees | (35) |
| Maintenance Capital Expenditures | (14) |
| Capital Lease Payments | (23) |
| Interest Payments | - |
| Other Operating Disbursement / Reserve for Unknown | |
| **Aggregate Operating Disbursements** | **(842)** |
| | |
| **Operating Cash Flow** | **(842)** |
| *Cumulative Operating Cash Flow* | (842) |
| | |
| Legal and Professional Fees [2] | (160) |
| DIP Lender Interest & Draw Fees | (18) |
| 503(b)9 Administrative Creditors | |
| Wind-down expenses (case disposition TBD) | |
| Utility Adequate Assurance Account Funding | |
| US Trustee Fees Accrual | (8) |
| **Restructuring Disbursements** | **(186)** |
| | |
| **Net Aggregate Receipts and Disbursements** | **$ (1,028)** |
| **Cumulative Net Aggregate Receipts & Disbursements** | **$ (1,028)** |
| | |
| DIP Loan Advances | 1,000 |
| DIP Loan Repayments | |
| Net Proceeds from Asset Sales in Bankruptcy | |
| Pre-petition Senior Secured Debt Repayments | |
| Other Financing Cash Flows | |
| **Financing and Asset Sale Cash Flows** | **1,000** |
| | |
| Shared Services Cash Flows | |
| Intercompany Cash Collections & Reimbursements | |
| Intercompany Disbursements | |
| **Shared Services Net Cash Flows** | **-** |
| | |
| **NET CASH FLOW** | **$ (28)** |
| **Cumulative Net Cash Flow** | **$ (28)** |

# TAAP IV DIP APPROVED Budget

Consolidated with Trinitas Farming LLC            v21, 2/16      2/19/24
Draft - subject to change.   In $000's USD                     Petition Date
**APPROVED DIP BUDGET DETAILS**

| | Post-Petition |
|---|---|
| *Week Ending* | **2/24/24** |
| *Case Status* | *Post-Petition* |
| *Month* | *Feb-24* |
| *Week Number* | *1* |

| **BANK BALANCES** | | |
|---|---|---|
| Beginning Cash (Consolidated) | $ | 40 |
| Net Cash Flow | | (28) |
| **Ending Cash Balance** | $ | 12 |

| **LOAN BALANCES** | | |
|---|---|---|
| **DIP Loan** | | |
| Max DIP Loan Facility | | |
| Beginning DIP Balance | $ | - |
| DIP Loan Proceeds | | 1,000 |
| DIP Loan (Repayment) | | - |
| **Ending DIP Loan Balance** | $ | 1,000 |