1                                 **<u>Exhibit A-1</u>**

2                            **DIP CREDIT AGREEMENT**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of March __, 2024,**

**among**

**Adobe Ranch, LLC,**
**Chiala LLC,**
**Dinuba Ranch, LLC,**
**Dixon East LLC,**
**Fry Road, LLC,**
**Hall Ranch LLC,**
**Jeffrey Ranch, LLC,**
**Johl LLC,**
**Lamb Ranch, LLC,**
**Marcucci Ranch, LLC,**
**Phelps Ranch, LLC,**
**Porterville LLC,**
**Rasmussen LLC,**
**Ratto Ranch, LLC,**
**Toor Ranch, LLC,**
**Trinitas Advantaged Agriculture Partners IV, LP,**
**Trinitas Farming, LLC,**
**Tule River Ranch, LLC**, and
**Turf Ranch LLC**,

**as Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code,**

**as Borrowers,**

**and**

**THE LENDERS PARTY HERETO,**

and

**RABO AGRIFINANCE LLC,**
**as Administrative Agent**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...........................................................................................1

Section 1.01     Defined Terms ..................................................................1
Section 1.02     Terms Generally ............................................................30
Section 1.03     Accounting Terms; GAAP .............................................30
Section 1.04     Rates ..............................................................................31
Section 1.05     Resolution of Drafting Ambiguities ..............................31

ARTICLE II THE COMMITMENTS AND LOANS ...............................................31

Section 2.01     The Loans ......................................................................31
Section 2.02     Borrowings of Loans .....................................................32
Section 2.03     Borrowing Procedure .....................................................33
Section 2.04     Evidence of Debt; Repayment of Loans.........................34
Section 2.05     Commitment Fees ..........................................................35
Section 2.06     Interest on Loans ...........................................................35
Section 2.07     Termination of Commitments ........................................36
Section 2.08     Optional and Mandatory Prepayments of Loans ...........36
Section 2.09     Inability to Determine Rates; Benchmark Replacement Setting.................37
Section 2.10     Increased Costs; Change in Legality ..............................38
Section 2.11     Breakage Payments ........................................................40
Section 2.12     Payments Generally; Pro Rata Treatment; Sharing of Setoffs .................40
Section 2.13     Taxes ..............................................................................42
Section 2.14     Mitigation Obligations; Replacement of Lenders .........44
Section 2.15     as of Funds from the egated accoutegated Post-Sale Remainder Account ........46

ARTICLE III REPRESENTATIONS AND WARRANTIES .................................48

Section 3.01     Organization; Powers ....................................................48
Section 3.02     Authorization; Enforceability........................................48
Section 3.03     No Conflicts; No Default ...............................................49
Section 3.04     Financial Condition; No Material Adverse Effect.........49
Section 3.05     Properties.......................................................................49
Section 3.06     Intellectual Property ......................................................50
Section 3.07     Equity Interests and Subsidiaries ..................................50
Section 3.08     Litigation .......................................................................51
Section 3.09     Material Agreements ......................................................51
Section 3.10     Federal Reserve Regulations .........................................51
Section 3.11     Investment Company Act, etc ........................................51
Section 3.12     Use of Proceeds .............................................................51
Section 3.13     Taxes ..............................................................................51
Section 3.14     No Material Misstatements ............................................52
Section 3.15     Labor Matters ................................................................52
Section 3.16     Agreements with Affiliates ............................................52
Section 3.17     Employee Benefit Plans .................................................52

Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 3 of 123
45810641.1

Section 3.18     Environmental Matters ................................................................ 53
Section 3.19     Insurance .................................................................................... 54
Section 3.20     No Bank Accounts ...................................................................... 54
Section 3.21     Anti-Terrorism Law; Foreign Corrupt Practices Act ................... 54
Section 3.22     Case; DIP Orders; Secured Super-Priority Obligations .............. 55
Section 3.23     Commercial Activity; Absence of Immunity ............................... 56

ARTICLE IV CONDITIONS PRECEDENT ........................................................... 57

Section 4.01     Conditions to Effectiveness ........................................................ 57
Section 4.02     Conditions to the Initial Loans and Withdrawals ........................ 58
Section 4.03     Conditions to All Loans and Withdrawals .................................. 59

ARTICLE V AFFIRMATIVE COVENANTS ......................................................... 60

Section 5.01     Financial Statements, Reports, etc .............................................. 60
Section 5.02     Litigation and Other Notices ...................................................... 62
Section 5.03     Existence; Businesses and Properties .......................................... 64
Section 5.04     Insurance .................................................................................... 64
Section 5.05     Obligations and Taxes ................................................................ 65
Section 5.06     Employee Benefits ...................................................................... 65
Section 5.07     Maintaining Records; Access to Properties and Inspections;....... 66
Section 5.08     Use of Proceeds .......................................................................... 66
Section 5.09     Compliance with Environmental Laws; Environmental Reports ... 67
Section 5.10     Additional Collateral .................................................................. 67
Section 5.11     Security Interests; Further Assurances ........................................ 67
Section 5.12     Maintenance of Corporate Separateness ..................................... 68
Section 5.13     Priority of Liens ......................................................................... 68
Section 5.14     Milestones .................................................................................. 69
Section 5.15     Bankruptcy Related Matters. ...................................................... 70
Section 5.16     Budget Compliance ..................................................................... 71
Section 5.17     Lender Calls ................................................................................ 71
Section tstructuring Officer; Broker ..................................................................... 71
Section 5.19     Material Agreements ................................................................... 72

ARTICLE VI NEGATIVE COVENANTS .............................................................. 72

Section 6.01     Indebtedness ............................................................................... 72
Section 6.02     Liens ........................................................................................... 73
Section 6.03     Sale and Leaseback Transactions ............................................... 74
Section 6.04     Investments, Loans and Advances .............................................. 74
Section 6.05     Mergers and Consolidations ....................................................... 75
Section 6.06     Asset Sales.................................................................................. 75
Section 6.07     Acquisitions ................................................................................ 76
Section 6.08     Dividends .................................................................................... 76
Section 6.09     Transactions with Affiliates ....................................................... 76
Section 6.10     Prepayments of Other Indebtedness; Modifications of Organizational
          Documents, Acquisition and Certain Other Documents, etc........ 77

Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 4 of 123

45810641.1

Section 6.11    Limitation on Certain Restrictions on Subsidiaries ...................................... 78
Section 6.12    Business; Employees .............................................................................. 78
Section 6.13    Limitation on Issuance of Capital ............................................................ 78
Section 6.14    Limitation on Accounting Changes; Change of Fiscal Year ...................... 78
Section 6.15    Permitted Accounts ................................................................................ 78
Section 6.16    No Further Negative Pledge .................................................................... 79
Section 6.17    Anti-Terrorism Law; Anti-Money Laundering ........................................... 79
Section 6.18    Embargoed Person .................................................................................. 79
Section 6.19    No Hedging ............................................................................................ 80
Section 6.20    Change of Auditors ................................................................................ 80
Section 6.21    Subsidiaries ........................................................................................... 80
Section 6.22    Change in Name or Location ................................................................... 80
Section 6.23    Additional Bankruptcy Matters ............................................................... 80
Section 6.24    Budget Variance ..................................................................................... 81
Section 6.25    Capital Expenditures .............................................................................. 81

ARTICLE VII OBLIGATIONS JOINT AND SEVERAL; SURETYSHIP WAIVERS ...................... 81

Section 7.01    Obligations Joint and Several .................................................................. 81
Section 7.02    Suretyship Waivers ................................................................................ 81

ARTICLE VIII EVENTS OF DEFAULT ............................................................................... 85

Section 8.01    Events of Default .................................................................................... 85
Section 8.02    Rescission .............................................................................................. 90
Section 8.03    Application of Proceeds .......................................................................... 90

ARTICLE IX THE ADMINISTRATIVE AGENT ................................................................... 91

Section 9.01    Appointment ........................................................................................... 91
Section 9.02    Administrative Agent in Its Individual Capacity ....................................... 92
Section 9.03    Exculpatory Provisions ........................................................................... 92
Section 9.04    Reliance by Agent ................................................................................... 93
Section 9.05    Delegation of Duties ............................................................................... 94
Section 9.06    Successor Administrative Agent ............................................................... 94
Section 9.07    Non-Reliance on Agent and Other Lenders ............................................... 94
Section 9.08    Indemnification ...................................................................................... 95
Section 9.09    Erroneous Payments ............................................................................... 95
Section 9.10    Withholding Taxes .................................................................................. 97
Section 9.11    Lender's Representations, Warranties and Acknowledgements ................. 98
Section 9.12    Security Documents ................................................................................ 98
Section 9.13    Administrative Agent May File Bankruptcy Disclosure and Proofs of
                Claim. ..................................................................................................... 99

ARTICLE X MISCELLANEOUS .......................................................................................... 100

Section 10.01    Notices ................................................................................................. 100
Section 10.02    Waivers; Amendment ............................................................................ 102

**TABLE OF CONTENTS**
(continued)

Section 10.03    Expenses; Indemnity; Damage Waiver ...................................................... 104
Section 10.04    Successors and Assigns ............................................................................... 106
Section 10.05    Survival of Agreement ............................................................................... 109
Section 10.06    Counterparts; Integration; Effectiveness .................................................... 110
Section 10.07    Severability................................................................................................. 110
Section 10.08    Right of Setoff; Marshalling; Payments Set Aside .................................... 110
Section 10.09    Governing Law; Jurisdiction; Consent to Service of Process ................... 111
Section 10.10    Waiver of Jury Trial ................................................................................... 111
Section 10.11    Judicial Reference ...................................................................................... 112
Section 10.12    Headings ..................................................................................................... 113
Section 10.13    Interest Rate Limitation.............................................................................. 113
Section 10.14    Assignment and Assumption....................................................................... 113
Section 10.15    Waiver of Defenses; Absence of Fiduciary Duties .................................... 113
Section 10.16    Reinstatement.............................................................................................. 113
Section 10.17    USA Patriot Act .......................................................................................... 114
Section 10.18    DIP Orders................................................................................................... 114

ANNEXES

Annex I                Commitment Schedule

SCHEDULES

Schedule 1.01(a)       Permitted Accounts
Schedule 3.09          Material Agreements
Schedule 3.16          Agreements with Affiliates
Schedule 3.18          Environmental Matters
Schedule 3.19          Insurance
Schedule 5.01(i)       Ranch Index
Schedule 6.01(b)       Existing Indebtedness
Schedule 6.02(c)       Existing Liens
Schedule 6.11(f)       Existing Restrictions

EXHIBITS

Exhibit A              Form of Assignment and Assumption
Exhibit B              Form of Borrowing Request
Exhibit C              Form of Compliance Certificate
Exhibit D              Form of Budget Variance Report
Exhibit E              Form of Agricultural Reporting Status Update
Exhibit F              Interim Order
Exhibit G              Form of Post-Sale Account Withdrawal Notice
Exhibit H              Form of Note
Exhibit I              Form of Non-Bank Certificate

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "**Agreement**") is dated as of March __ 2024, by and among each of the entities listed on the signature pages hereto as "Borrowers" and as debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code (collectively, "**Borrowers**"), the Lenders, and RABO AGRIFINANCE LLC, as administrative agent and collateral agent for the Lenders (in such capacity, the "**Administrative Agent**"). (Capitalized terms have the respective meanings assigned to them in this Agreement.)

**WITNESSETH:**

WHEREAS, on February 19, 2024 (the "**Petition Date**"), each Borrower filed a voluntary petition with the Bankruptcy Court commencing its case, which is pending under Chapter 11 of the Bankruptcy Code, jointly administered under the caption *In re Trinitas Advantaged Agriculture Partners IV, LP*, Case No. 24-50211 (DM) (the "**Case**"), and has continued in the possession of its assets and management of its business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, Borrowers have requested that the Lenders extend credit to Borrowers in the form of new money term loans in an aggregate principal amount of up to Thirty Million Dollars ($30,000,000), inclusive of the Advance (the "**DIP Term Facility**").

WHEREAS, the priority of the DIP Term Facility with respect to the Collateral granted to secure the Obligations shall be as set forth in the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

WHEREAS, Administrative Agent has advanced Borrowers the sum of One Million Dollars ($1,000,000) (the "**Advance**"), to be secured, repaid, and otherwise treated as a part of the DIP Term Facility governed by this Agreement, as approved by the Bankruptcy Court in an interim order dated February 27, 2024 (the "**First Advance Approval Order**"), which approved the Advance on the terms of the term sheet that preceded this Agreement and that, the parties acknowledge and agree, is substantially consistent with this Agreement; provided, however, that notwithstanding any reference to the term sheet in the First Advance Approval Order, upon approval of this Agreement by the Bankruptcy Court, the Advance shall in all ways be governed by this Agreement.

WHEREAS, Administrative Agent has advanced Borrowers the sum of Two Million and Five Hundred Thousand Dollars ($2,500,000.00) (the "**Second Advance**"), to be secured, repaid, and otherwise treated as a part of the DIP Facility governed by this Agreement, as approved by the Bankruptcy Court in an interim order dated [___], 2024 (the "**Second Advance Approval Order**"), which approved the Second Advance on the terms of the term sheet that preceded this Agreement and that, the parties acknowledge and agree, is substantially consistent with this Agreement; provided, however, that notwithstanding any reference to the term sheet in the Second Advance Approval Order, upon approval of this Agreement by the Bankruptcy Court, the Second Advance shall in all ways be governed by this Agreement. NOW, THEREFORE, in consideration of the premises and the agreements, provisions, and covenants herein contained, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

**Section 1.01**     **Defined Terms.** As used in this Agreement:

"**Acceptable Plan**" means a plan of reorganization for the Case, which (1) is in form and substance acceptable to the Required Lenders and the Administrative Agent, (2) (I) either (y) provides for the payment in full, in cash, upon the effective date of such plan of reorganization of all (A) Obligations and (B) secured Prepetition Obligations, or (z) is in form and substance acceptable to the Required Lenders, and (II) provides for releases and other exculpatory provisions for the Administrative Agent, the Lenders, and the Prepetition Secured Parties under the Prepetition Loan Documents and their respective Related Persons, in form and substance satisfactory to the Required Lenders and the Prepetition Lenders of a majority in aggregate principal amount of the Prepetition Loans, or (3) is a Reinstatement Plan.

"**Acceptable Sale**" has the meaning assigned to it in Section 5.14(j).

"**Adequate Protection Obligations**" has the meaning assigned to it in the Interim Order or Final Order, as applicable.

"**Administrative Agent**" has the meaning assigned to it in the preamble hereto and includes each other Person appointed as the successor administrative agent pursuant to Article IX.

"**Administrative Questionnaire**" means an Administrative Questionnaire in the form supplied from time to time by the Administrative Agent, or such other form as is acceptable to the Administrative Agent.

"**Advisors**" means legal counsel (including local and foreign counsel), auditors, accountants, consultants (including financial consultants), appraisers, engineers, or other advisors.

"**Affiliate**" means, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided*, *however*, that, solely for purposes of Section 6.09, the term "**Affiliate**" shall also include (i) any Person that directly or indirectly owns more than 10% of any class of Equity Interests of the Person specified, or (ii) any Person who is an officer or director of the Person specified.

"**Agreement**" has the meaning assigned to it in the preamble hereto.

"**Amendment**" has the meaning assigned to it in Section 6.10(a).

"**Anti-Terrorism Laws**" has the meaning assigned to it in Section 3.21(a).

"**Applicable Margin**" means 8.00% per annum.

"**Approved Budget**" means the Initial Budget (or, after the Self-Funding Date, the Estimated Remainder Budget) or, after delivery of the Initial Budget (or, if applicable, the Estimated Remainder Budget), the then-most-current Updated Budget prepared by Borrowers and approved by the Required Lenders pursuant to Section 5.01(c), as applicable.

"**Asset Sale**" (i) means any disposition of any property by a Borrower after the Closing Date, other than any disposition of assets permitted by, or expressly referred to in, Sections 6.06(a), 6.06(b), 6.06(c), 6.06(d) or 6.06(e), but (ii) expressly includes any entry by a Borrower, for compensation, of an easement affecting Real Property (for example, but without limitation, a carbon sequestration easement).

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of each party whose consent is required pursuant to Section 10.04(b)),

and accepted by the Administrative Agent, substantially in the form of Exhibit A, or such other form as the Administrative Agent approves.

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (y) if the then-current Benchmark (or component thereof) is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period, or (z) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement as of such date, but not including any tenor for such Benchmark that is then removed from the definition of "Interest Period" pursuant to Section 2.09(b)(iv) (but including any tenor for such Benchmark that is added to the definition of "Interest Period" pursuant to Section 2.09(b)(iv)).

"**Avoidance Actions**" means the Borrowers' claims and causes of action under Sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code.

"**Avoidance Proceeds**" means any and all proceeds or property recovered, unencumbered or otherwise, in connection with successful Avoidance Actions, whether by judgment, settlement, or otherwise.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended from time to time, and any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of California – San Francisco Division, or any appellate court having jurisdiction over the Case from time to time.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, including any local rules of the Bankruptcy Court.

"**Base Rate**" means, for any day, the higher of (a) the prime rate published in The Wall Street Journal for such day; *provided* that if *The Wall Street Journal* ceases to publish for any reason such rate of interest, "**Base Rate**" means the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or a successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime lending interest rates); and (b) the sum of one-half of one percent (0.50%) per annum and the greater of (i) zero, and (ii) the Federal Funds Rate. Each change in the Base Rate shall be effective on the date such change is effective. The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"**Benchmark**" means, initially, the Term SOFR Reference Rate; *provided* that if a Benchmark Transition Event and the related Benchmark Replacement Date have occurred with respect to the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.09(b).

"**Benchmark Replacement**" means, with respect to any Benchmark Transition Event, for any Available Tenor, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent (acting at the direction of the Required Lenders and that is administratively feasible as determined by the Administrative Agent), giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body, or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a

48840881.1

Case: 24-50211   Doc# 45-1   Filed: 03/07/24   Entered: 03/07/24 09:41:50   Page 10 of 123

replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time, and (b) the related Benchmark Replacement Adjustment.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), which the Administrative Agent (acting at the direction of the Required Lenders) has selected, giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body, or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time; *provided*, that any such Benchmark Replacement Adjustment shall be administratively feasible as determined by the Administrative Agent in its sole discretion.

"**Benchmark Replacement Conforming Changes**" means, with respect to the use, administration, adoption, or implementation of any Benchmark Replacement, any technical, administrative, or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion, or continuation notices, the applicability and length of lookback periods and other technical, administrative, or operational matters) that the Administrative Agent (acting at the direction of the Required Lenders) decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent (acting at the direction of the Required Lenders) determines that no market practice for the administration of any such rate exists, in such other manner of administration as (y) the Administrative Agent (acting at the direction of the Required Lenders) decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents, and (z) the Administrative Agent determines is administratively feasible).

"**Benchmark Replacement Date**" means the earliest to occur of the following events with respect to the then-current Benchmark:

(1) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein, and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2) in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; *provided* that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

4

The "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component), or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

A "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Start Date**" means, in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date, and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day (or such other date selected by the Administrative Agent (acting at the direction of the Required Lenders)) prior to the expected date of such event as of such public statement or publication of information (as such expected date may be delayed pursuant to any subsequent public statement or event) (or, if the expected date of such prospective event is fewer than ninety (90) days (or such other date selected by the Administrative Agent (acting at the direction of the Required Lenders)) after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" means, with respect to any then-current Benchmark, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.09(b), and (b) ending at the time that a Benchmark

4884088v.1

Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.09(b).

"**Bidding Procedures**" has the meaning assigned to it in Section 5.14(e).

"**Bidding Procedures Order**" has the meaning assigned to it in Section 5.14(g).

"**Board**" means the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" means, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the manager, the board of managers, or board of directors, as applicable, of such Person, or if such limited liability company does not have a manager, board of managers, or board of directors, the functional equivalent of the foregoing, (iii) in the case of any partnership, the board of directors, manager, or board of managers, as applicable, of the general partner of such Person, and (iv) in any other case, the functional equivalent of the foregoing.

"**Borrower Representative**" means Trinitas Advantaged Agriculture Partners IV, LP.

"**Borrower Operating Account**" means a demand deposit account maintained by the Borrower Representative on behalf of Borrowers at a federally insured financial institution reasonably acceptable to the Administrative Agent and over which the Administrative Agent has control, subject to a control agreement in favor of and in form and substance satisfactory to the Administrative Agent or otherwise, into which the proceeds of the Loans shall be deposited and held as provided in this Agreement.

"**Borrowers**" has the meaning assigned to it in the preamble hereto.

"**Borrowing**" means a Loan made (or deemed made) on the same date.

"**Borrowing Date**" has the meaning assigned to it in Section 2.03(b).

"**Borrowing Request**" means a request by Borrowers in accordance with the terms of Section 2.03 and substantially in the form of Exhibit B.

"**Broker**" has the meaning assigned to it in Section 5.18(b).

"**Budget**" means, as of any date, the Initial Budget, the Estimated Remainder Budget, or the Updated Budget, as applicable, then in effect.

"**Budget Compliance Period**" means the six-week period commencing with (a) until the Self-Fund Date, the first day included in the Initial Budget and the first day in each successive six-week period thereafter commencing on the day following the last day of the immediately preceding Budget Compliance Period, and (b) on and after the Self-Funding Date, the Self-Funding Date and the first date in each successive six-week period thereafter commencing on the day following the last day of the immediately preceding Budget Compliance Period.

"**Budget Variance Report**" means a variance report provided by Borrowers to the Administrative Agent, in substantially the form of Exhibit D, or in such other form as may be approved by the Required Lenders, (i) showing, in each case by line item, the actual cash receipts and disbursements for the immediately preceding week, noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in the Approved Budget then most recently delivered pursuant to Section 5.01(d), and, in each case, shall include explanations for any variance of actual performance to projected

performance for the prior calendar week and for the applicable Budget Compliance Period, and (ii) certified by a Responsible Officer of the Borrower Representative as being prepared in good faith and fairly presenting in all material respects the information set forth therein. The Budget Variance Report shall contain supporting information and detail reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) and that support the information contained in such Budget Variance Report to the satisfaction of the Required Lenders.

"**Business Day**" means (i) for all purposes other than as covered by <u>clause (ii)</u> below, any day except Saturday, Sunday, and any day that is in New York City or San Jose, California, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close, and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, Loans, any day that is a Business Day described in <u>clause (i)</u> above and that is also a U.S. Government Securities Business Day.

"**Capital Expenditures**" means, without duplication, for any period (a) any expenditure or commitment to expend money made during such period for any purchase or other acquisition of any asset including capitalized leasehold improvements, which would be classified as a fixed or capital asset on a consolidated balance sheet of Borrowers and their Subsidiaries prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by such Persons during such period with respect to real or personal property acquired during such period, or Synthetic Lease Obligations incurred by such Persons during such period, but excluding (i) expenditures made in connection with the replacement, substitution, or restoration of property pursuant to <u>Section 2.08(e)</u>, and (ii) the purchase price of equipment that is purchased substantially contemporaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time.

"**Capital Lease**" means, with respect to any Person, any lease of, or other arrangement conveying the right to use any property by such Person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such Person prepared in accordance with GAAP.

"**Capital Lease Obligations**" of any Person means the obligations of such Person to pay rent or other amounts under any Capital Lease, any lease entered into as part of any Sale and Leaseback Transaction, or any Synthetic Lease, or a combination thereof, which obligations are (or would be, if such Synthetic Lease or other lease were accounted for as a Capital Lease) required to be classified and accounted for as Capital Leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof (or the amount that would be capitalized if such Synthetic Lease or other lease were accounted for as a Capital Lease) determined in accordance with GAAP.

"**Carve-Out**" has the meaning assigned to it in the Interim Order or the Final Order, as applicable.

"**Carve-Out Trigger Date**" has the meaning assigned to it in the Interim Order or the Final Order, as applicable.

"**Carve-Out Trigger Notice**" has the meaning assigned to it in the Interim Order or the Final Order, as applicable.

"**Case**" has the meaning specified in the Preliminary Statements.

"**Cash Collateral**" has the meaning given to it in the Interim Order or the Final Order, as applicable.

4884088.1 Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 14 of 123

"**Cash Equivalents**" means (a) securities issued, or directly, unconditionally, and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person, (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof, or the District of Columbia having capital and surplus aggregating in excess of $500,000,000 and a rating of "BBB+" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such Person, (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above, entered into with any Person meeting the qualifications specified in clause (b) above, (d) commercial paper issued by any Person incorporated in the United States having one of the two highest ratings obtainable from Standard & Poor's Rating Service or Moody's Investors Service Inc., in each case maturing not more than one year after the date of acquisition by such Person, (e) investments in money market funds or overnight sweep accounts with a Lender or an Affiliate thereof, in each case at least ninety-five percent (95%) of whose assets are comprised of securities of the types described in clauses (a) through (d) above, and (f) demand deposit accounts maintained in the ordinary course of business with any bank meeting the qualifications specified in clause (b) above.

"**Casualty Event**" means any loss of title (other than through a consensual disposition of such property in accordance with this Agreement) or any loss of or damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of any Borrower. "**Casualty Event**" includes any taking of all or any part of any Real Property of any Borrower or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Legal Requirement, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any Borrower or any part thereof by any Governmental Authority, or any settlement in lieu thereof.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq*.

"**Change in Control**" means the occurrence of any of the following:

      (a)      the holders of the Borrower Representative's Equity Interests as of the Closing Date at any time cease to collectively directly own 100% of the Equity Interests of the Borrower Representative or cease to have the power to vote, or direct the voting of, any such Equity Interests; or the Borrower Representative at any time ceases to be both (i) the sole manager of each of the other Borrowers, and (ii) the sole member of each of the other Borrowers;

      (b)      the sale, lease, transfer, conveyance or other disposition (other than by way of (x) merger or consolidation or (y) in a transaction conducted in accordance with Section 5.14), in one or a series of related transactions, of all or substantially all of the assets of any Borrower to any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) except as permitted hereunder; or

      (c)      the adoption by the members or managers, as applicable, of any Borrower of a plan or proposal for the liquidation or dissolution of that Borrower (other than an Acceptable Plan).

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, order, rule, regulation, policy, or treaty by any Governmental Authority, (b) any change in any law, order, rule, regulation, or treaty or in the administration, interpretation, implementation, or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline, or directive (whether or not having the force of law) by any

4884-0881-1
Case: 24-50211   Doc# 45-1   Filed: 03/07/24   Entered: 03/07/24 09:41:50   Page 15 of 123

Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (y) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, or directives thereunder or issued in connection therewith and (z) all requests, rules, guidelines, or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority), or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, or issued.

"**Charges**" has the meaning assigned to it in Section 10.13.

"**Claim**" means all claims, demands, rights, actions, causes of action, liabilities, duties, damages, losses, obligations, diminutions in value, judgments, decrees, suits, liens, undertakings, rights to property or information, and controversies of any kind or nature whatsoever, whether absolute or contingent, due or to become due, accrued or unaccrued, disclosed or undisclosed, foreseen or unforeseen, apparent or not apparent, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, and whether existing, accrued, or arising on, before, or after the Petition Date, including all claims arising under state, federal, or foreign laws, common law, statutes, rules, regulations, or agreements. Without limiting the generality of the foregoing, the term "Claim" shall include the items described in the definition of "Claim" in 11 U.S.C. § 101(5), all claims and/or causes of action under Chapter 5 of the Bankruptcy Code (including Sections 542, 544, 545, 546, 547, 548, 549, and 550 of the Bankruptcy Code), all claims and/or causes of action under Sections 105 and/or 362 of the Bankruptcy Code, all claims and/or causes of action under any other Bankruptcy Law, all claims and/or causes of action arising under the Uniform Fraudulent Conveyance Act, Uniform Fraudulent Transfer Act, or Uniform Voidable Transactions Act as in effect in any state, and all rights of contribution, subrogation, exoneration, or indemnity.

**Closing Date**" means the first date on which all conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.02, which date shall not be later than four (4) Business Days after the Interim Order Entry Date.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means all of the "DIP Collateral" (or equivalent term, including "Collateral") as defined in the Interim Order (and, when entered, the Final Order) or in any Security Document, and shall include without limitation any and all amounts held in the Borrower Operating Account or the Segregated Post-Sale Remainder Account, and all proceeds thereof. Notwithstanding the foregoing, the Collateral shall not include Avoidance Actions and/or Avoidance Proceeds.

"**Commitment**" means (a) until the Self-Funding Date, a commitment by a Lender to make Loans hereunder. The aggregate amount of the Commitments as of the Closing Date is Thirty Million Dollars ($30,000,000), as set forth in the Commitment Schedule, and (b) on and after the Self-Funding Date, the obligation of the Lenders to permit Withdrawals from the Segregated Post-Sale Remainder Account in accordance with Sections 5.14 and 2.15.

"**Commitment Fee**" has the meaning assigned to it in Section 2.05(a).

"**Commitment Schedule**" means the Schedule attached hereto as Annex I.

"**Communications**" has the meaning assigned to it in Section 10.01(b).

"**Compliance Certificate**" means a certificate of a Financial Officer or other Responsible Officer of the Borrower Representative substantially in the form of Exhibit C, or such other form as may be approved by the Required Lenders and Borrowers.

"**Conditions**" means each of the conditions to an advance or a Withdrawal set forth in Section 2.15, Section 4.02, and Section 4.03

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contingent Obligation**" means, as to any Person, any obligation, agreement, understanding, or arrangement of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends, or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation, agreement, understanding, or arrangement of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation, or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth, net equity, liquidity, level of income, cash flow, or solvency of the primary obligor, (c) to purchase property, securities, or services primarily for the purpose of assuring the primary obligor of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) with respect to bankers' acceptances, letters of credit, and similar credit arrangements, until a reimbursement or equivalent obligation arises (which reimbursement obligation shall constitute a primary obligation), or (e) otherwise to assure or hold harmless the primary obligor of any such primary obligation against loss (in whole or in part) in respect thereof; *provided*, *however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties given in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation, or portion thereof, in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable, whether singly or jointly, pursuant to the terms of the instrument, agreements, or other documents or, if applicable, unwritten agreement, evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract, or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**CRO**" shall have meaning assigned to it in Section 5.18(a).

"**Debt Issuance**" means the incurrence by Borrowers of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Debtor**" has the meaning given to it in the Interim Order or the Final Order, as applicable.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Default**" means any event, occurrence, or condition that is, or upon notice, lapse of time, or both would constitute, an Event of Default.

"**Default Excess**" has the meaning assigned to it in Section 2.14(c).

"**Default Period**" has the meaning assigned to it in Section 2.14(c).

"**Default Rate**" has the meaning assigned to it in Section 2.06(c).

"**Defaulted Loan**" has the meaning assigned to it in Section 2.14(c).

"**Defaulting Lender**" means any Lender that (a) has failed (i) to fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder, unless such Lender notifies the Administrative Agent and Borrowers in good faith in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (which conditions precedent, together with the applicable Default, if any, shall be specifically identified in such writing) has not been satisfied, or (ii) to pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified Borrowers and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with the applicable Default, if any, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or Borrowers, to confirm in writing to the Administrative Agent and Borrowers that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and Borrowers), or (d) is, or a direct or indirect parent company of such Lender is, (i) insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, or (ii) the subject of a proceeding under any Debtor Relief Laws, or a receiver, trustee, conservator, intervenor, or sequestrator or the like (including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in a like capacity with respect to such Lender) has been appointed for such Lender or its direct or indirect parent company, or such Lender or its direct or indirect parent company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interests in such Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow, or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent or the Required Lenders that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination by the Administrative Agent or the Required Lenders to Borrowers and each Lender, and, if such determination is made by the Required Lenders, to the Administrative Agent.

"**DIP Orders**" means the Interim Order(s) and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

"**DIP Term Facility**" has the meaning specified in the Preliminary Statements.

"**Disposition**" means, with respect to any property, any conveyance, sale, lease, sublease, assignment, transfer, or other disposition of such property (including (i) by way of merger or consolidation or amalgamation, (ii) any Sale and Leaseback Transaction, (iii) any Synthetic Lease, and (iv) any disposition of property to a Delaware Divided LLC pursuant to a Delaware LLC Division).

"**Disqualified Capital Stock**" means any Equity Interest that, by its terms (or by the terms of any security or instrument into which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than solely for Qualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the Maturity Date, (b) is convertible into or exchangeable or exercisable (unless at the sole option of the issuer thereof) for (i) debt securities or other indebtedness, or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the first anniversary of the Maturity Date, or (c) contains any repurchase or payment obligation that may come into effect prior to the first anniversary of the Maturity Date.

"**Dividend**" means, with respect to any Person, that such Person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment, or delivery of property (other than Qualified Capital Stock of such Person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased, or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside or otherwise reserved, directly or indirectly, any funds for any of the foregoing purposes, or permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the outstanding Equity Interests of such Person (or any options or warrants issued by such Person with respect to its Equity Interests). Without limiting the foregoing, "**Dividends**" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans, or any similar plans or setting aside of or otherwise reserving any funds for the foregoing purposes.

"**Dollars**" or "**$**" means lawful money of the United States.

"**Electronic Signature**" means (a) the signing party's manual signature on a signature page, converted by the signing party (or its agent) to facsimile or digital form (such as a .pdf file), and received from the customary email address or customary facsimile number of the signing party (or its counsel or representative), or other mutually agreed-upon authenticated source; or (b) the signing party's digital signature executed using a mutually agreed-upon digital signature service provider and digital signature process.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.04(b) (subject to such consents, if any, as may be required under Section 10.04(b)).

"**Embargoed Person**" has the meaning assigned to it in Section 6.18.

"**Employee Benefit Plan**" means any "**employee benefit plan**" as defined in Section 3(3) of ERISA that is or was maintained, contributed to, or required to be maintained or contributed to by Borrowers or any of its ERISA Affiliates.

"**Environment**" means any surface or subsurface physical medium or natural resource, including air, land, soil, surface waters, ground waters, stream and river sediments, and biota.

4854-9889-1...1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 19 of 123

"**Environmental Claim**" means any claim, notice, demand, Order, action, suit, proceeding, or other communication alleging or asserting liability or obligations under or relating to Environmental Law, including liability or obligation for investigation, assessment, remediation, removal, cleanup, response, corrective action, monitoring, post-remedial or post-closure studies, investigations, operations and maintenance, injury, damage, destruction or loss to natural resources, personal injury, wrongful death, property damage, fines, penalties, or other costs resulting from, related to, or arising out of (i) the presence, Release, or threatened Release of Hazardous Material in, on, into, or from the Environment at any location, or (ii) any violation of or non-compliance with Environmental Law, and shall include any claim, notice, demand, Order, action, suit, or proceeding seeking damages (including the costs of remediation), contribution, indemnification, cost recovery, penalties, fines, indemnities, compensation, or injunctive relief resulting from, related to, or arising out of the presence, Release, or threatened Release of Hazardous Material, or alleged injury or threat of injury to human health, safety, or the Environment.

"**Environmental Law**" means any and all applicable current and future Legal Requirements, to the extent relating to exposure to Hazardous Materials, relating to human health or safety or the Environment, the Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or, to the extent relating to exposure to Hazardous Materials, occupational safety or health.

"**Environmental Permit**" means any permit, license, approval, consent, registration, notification, exemption, or other authorization required by or from a Governmental Authority under any Environmental Law.

"**Equity Interest**" means, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations, or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued on or after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Issuance**" means, without duplication, (i) any issuance or sale by Borrowers after the Closing Date of any Equity Interests in Borrowers (including any Equity Interests issued upon exercise of any warrant or option or equity-based derivative) or any warrants or options or equity-based derivatives to purchase Equity Interests in Borrowers, (ii) any Preferred Stock Issuance, or (iii) any contribution to the capital of Borrowers.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, the regulations promulgated thereunder, and any successor statute.

"**ERISA Affiliate**" means, with respect to any Person, any trade or business (whether or not incorporated) that, together with such Person, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code. Any former ERISA Affiliate of a Person or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of such Person or such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such Person or such Subsidiary and with respect to liabilities arising after such period for which such Person or such Subsidiary could reasonably be expected to be liable under the Code or ERISA, but in no event for more than six (6) years after such period if no such liability has been asserted against such Person or such Subsidiary; *provided*, *however*, that such Person or such Subsidiary shall continue to be an ERISA Affiliate of such

4854088.1
Case: 24-50211   Doc# 45-1   Filed: 03/07/24   Entered: 03/07/24 09:41:50   Page 20 of 123

Person or such Subsidiary after the expiration of the six-year period solely with respect to any liability asserted against such Person or such Subsidiary prior to the expiration of such six-year period.

"**ERISA Event**" means (i) a "**reportable event**" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan; (ii) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Pension Plan (whether or not waived), or the failure to make by its due date a required installment of a material amount under Section 430(j) of the Code with respect to any Pension Plan, or the failure to make any required contribution of a material amount to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Borrowers or any of their ERISA Affiliates from any Pension Plan with two or more contributing sponsors, or the termination of any such Pension Plan resulting in liability to Borrowers pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition that could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability of a material amount on Borrowers or any of their ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA, or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Borrowers or any of their ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan, or the receipt by Borrowers or any of their ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA, if, in any such case, there is potential liability of a material amount of Borrowers therefor; (viii) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan, or the assets thereof, or against Borrowers or any of their ERISA Affiliates in connection with any Employee Benefit Plan; (ix) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (x) the imposition of a Lien pursuant to Section 401(a)(29) or 430(k) of the Code or pursuant to ERISA with respect to any Pension Plan; or (xi) the occurrence of a non-exempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) that could reasonably be expected to result in liability of a material amount to Borrowers or any of their ERISA Affiliates.

"**Erroneous Payment**" has the meaning assigned to it in Section 9.09(a).

"**Erroneous Payment Subrogation Rights**" has the meaning assigned to it in Section 9.09(e).

"**Estimated Remainder Budget**" has the meaning assigned to it in Section 5.14.

"**Estimated Remainder Cost**" has the meaning assigned to it in Section 5.14.

"**Event of Default**" has the meaning assigned to it in Section 8.01.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on (or measured by) net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such recipient being organized under the laws of, or having its principal office located in, or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax, or (ii)

that are Other Connection Taxes, (b) in the case of a Lender (other than an Eligible Assignee pursuant to a request by Borrowers under Section 2.14), any United States federal withholding Tax that is imposed on amounts payable to or for the benefit of such Lender at the time such Lender becomes a party to this Agreement (or designates a new lending office), except, in each case, to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from Borrowers with respect to such withholding tax pursuant to Section 2.13(a), (c) Taxes attributable to such Recipient's failure to comply with Section 2.13(f), and (d) any United States federal withholding tax imposed as a result of FATCA.

"**Executive Order**" has the meaning assigned to it in Section 3.21(a).

"**Existing Lien**" has the meaning assigned to it in Section 6.02(c).

"**Facility**" means the facility located on 503 East Santa Ana Avenue, Rialto, California.

"**Fair Market Value**" means, with respect to any asset (including any Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the Board of Directors or, pursuant to a specific delegation of authority by such Board of Directors, of a designated senior executive officer, of the seller/Borrower.

"**Farming Services Agreement**" means Amended & Restated Farm Services Agreement, by and between Pomona Farming L.P. and Trinitas Farming, LLC, dated February 15, 2024.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules, or practices adopted pursuant to any intergovernmental agreement, treaty, or convention among Governmental Authorities and implementing such Sections of the Code.

"**Federal Funds Effective Rate**" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary to the next 1/100th of 1%) of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Fees**" means the Commitment Fees.

"**Final Order**" means an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the DIP Term Facility and the transactions contemplated in this Agreement in the form of the Interim Order (with such modifications as are necessary to convert the Interim DIP Order into a final order; to grant the Lenders protections unavailable on an interim basis; and to include such other modifications as are satisfactory to the Lenders and Borrowers) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion), as to which no stay has been entered.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**Financial Officer**" of any Person means the chief financial officer, principal accounting officer, treasurer, or controller of such Person.

"**Foreign Lender**" means any Lender that is not, for United States federal income tax purposes, (i) a citizen or resident of the United States, (ii) a corporation or entity treated as a corporation created or organized in or under the laws of the United States, any state thereof, or the District of Columbia, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source, or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States Persons have the authority to control all substantial decisions of such trust.

"**Foreign Plan**" means each "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA, whether or not subject to ERISA) that is not subject to U.S. law and is maintained, contributed to, or required to be maintained or contributed to, by Borrowers.

"**Funding Authorization Letter**" means that certain letter agreement (in form and substance reasonably satisfactory to the Administrative Agent and the Lenders), dated as of the Closing Date, made by Borrowers in favor of the Administrative Agent, pursuant to which, among other things, Borrowers have authorized and directed the Administrative Agent to disburse or otherwise apply the proceeds of the Loans on the Closing Date in accordance with a funds flow memorandum attached to such letter.

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time, including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by such other entity as approved by a significant segment of the accounting profession.

"**Governmental Authority**" means any federal, state, local, or foreign (whether civil, criminal, military, or otherwise) court, central bank, or governmental agency, tribunal, authority, instrumentality, or regulatory body or any subdivision thereof, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Real Property Disclosure Requirements**" means any Legal Requirement of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee, or other transferee of any Real Property, facility, establishment, or business, or any notification, registration, or filing to or with any Governmental Authority, in connection with the disposition (including any transfer of control) of any Real Property, facility, establishment, or business, as may be required under any applicable Environmental Law or of any actual or threatened presence or Release in, on, into, or from the Environment, or the use, disposal, or handling of Hazardous Material on, at, under, from, or near the Real Property, facility, establishment, or business to be sold, acquired, leased, mortgaged, assigned, or transferred.

"**Granting Lender**" has the meaning assigned to it in <u>Section 10.04(h)</u>.

"**Hazardous Materials**" means hazardous substances, hazardous wastes, hazardous materials, polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs, asbestos, or any asbestos-containing materials in any form or condition, lead-based paint, urea formaldehyde, pesticides, radon, or any other radioactive materials including any source, special nuclear or by-product material, petroleum, petroleum products, petroleum-derived substances, crude oil or any fraction thereof, any toxic mold, microbial or fungal contamination that could pose a risk to human health or the Environment, or would negatively impact the condition of the Real Property in any material respect, or any other pollutants,

contaminants, chemicals, wastes, materials, compounds, constituents, or substances subject to regulation under, or that can give rise to liability or obligations under, any Environmental Laws.

"**Hedging Agreement**" means any agreement with respect to any swap, cap, collar, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial, or pricing indices or measures of economic, financial, or pricing risk or value or any similar transaction or any combination of these transactions.

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements, or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business); (e) all Indebtedness secured by any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, but limited to the lower of (1) the Fair Market Value of such property and (2) the amount of the Indebtedness secured; (f) all Capital Lease Obligations, Purchase Money Obligations, and Synthetic Lease Obligations of such Person; (g) all obligations of such Person, contingent or otherwise, in respect of Disqualified Capital Stock; (h) the Net Hedging Obligations under interest rate or currency Hedging Agreements and all other agreements or arrangements designed to protect against fluctuations in interest rates, commodity prices, and currency exchange rates; (i) all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances, and similar credit transactions, but excluding obligations with respect to letters of credit (including trade letters of credit) securing obligations of such Person described in clause (c) above or entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon; and (j) all Contingent Obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"**Indemnified Liabilities**" has the meaning assigned to it in Section 10.03(b).

"**Indemnified Taxes**" means (i) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrowers under any Loan Document, and (ii) to the extent not otherwise described in clause (i), Other Taxes.

"**Indemnitee**" has the meaning assigned to it in Section 10.03(b).

"**Independent Auditor**" means (i) Deloitte LLP, (ii) Moss Adams LLP; (iii) any "Big Four" accounting firm selected by Borrowers and notified to the Administrative Agent, or (iv) any other firm of independent public accountants of recognized national standing in the United States selected by Borrowers and reasonably acceptable to the Required Lenders.

"**Initial Auction**" has the meaning assigned to it in Section 5.14(h).

"**Initial Auction Milestone**" has the meaning assigned to it in Section 5.14(h).

4884-0884-1.1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 24 of 123

"**Initial Budget**" means the 13-week cash flow forecast, in form satisfactory to the Required Lenders (i) delivered to the Administrative Agent for purposes of the initial Pre-Closing Date Loan, and, (ii) with respect to each succeeding Budget Compliance Period, an updated 13-week cash flow forecast, in each case, setting forth, among other things, Borrowers' cash, revenue, cash flow, and net operating cash flow, trade payables, ordinary course expenses, total expenses, capital expenditures, vendor disbursements, working capital, fees and expenses of the DIP Term Facility and the Case during such 13-week period.

"**Initial Credit Extension Date**" means the date on which the initial Borrowing is made hereunder.

"**Initial Sale Hearing**" has the meaning assigned to it in Section 5.14(i).

"**Insolvency Proceeding**" means (i) any case, action, or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up, or relief of debtors, or (ii) any general assignment for the benefit of creditors, formal or informal moratorium, composition, marshaling of assets for creditors, or other similar arrangement in respect of its creditors generally or any substantial portion of its creditors, in each case, undertaken under United States federal or state or non-United States Legal Requirements, including the Bankruptcy Code.

"**Insurance Policies**" means the insurance policies and coverages maintained by Borrowers as set forth in Schedule 3.19, and all renewals and extensions thereof.

"**Insurance Requirements**" means, collectively, all provisions of the Insurance Policies, all requirements of the issuer of any of the Insurance Policies, and all Orders, rules, regulations, and any other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) binding upon Borrowers as an owner of Mortgaged Property and applicable to the Mortgaged Property or any use or condition thereof.

"**Intellectual Property**" has the meaning assigned to it in Section 3.06(a).

"**Interest Payment Date**" means (a) the first Business Day of each calendar month, beginning with the first Business Day of the second calendar month to begin after the Closing Date, (b) the Maturity Date, and (c) thereafter, each date on which demand for payment is made.

"**Interest Period**" means, for any Loan, the period commencing on the date of the Borrowing of such Loan,and ending on the last day of the calendar month in which such Borrowing is made, and, thereafter, each successive period commencing on the first day of a calendar month and ending on the last day of such month.

"**Interim Order**" means an order or orders of the Bankruptcy Court in the form set forth in Exhibit F, authorizing on an interim basis, among other things, the DIP Term Facility (or any partial advance thereon) and the transactions contemplated in this Agreement, with only such modifications as are satisfactory to Borrowers and the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion) as to which no stay has been entered.

"**Interim Order Entry Date**" means the date on which the Bankruptcy Court enters the Interim Order.

"**Investments**" has the meaning assigned to it in Section 6.04.

"**Leases**" means any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements, and any other agreements (including all amendments, extensions, replacements, renewals, modifications, and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, providing for (or affecting) the use or occupancy of all or any portion of any Real Property.

"**Legal Requirements**" means, as to any Person, the Organizational Documents of such Person, and any treaty, law (including the common law), statute, ordinance, code, rule, regulation, guidelines, license, permit requirement, Order, or determination of an arbitrator or a court or other Governmental Authority, and any interpretation thereof published by the applicable Governmental Authority or administrative procedures relating thereto established by the applicable Governmental Authority, in each case applicable to or binding upon such Person or any of its property, or to which such Person or any of its property is subject, in each case whether or not having the force of law. For purposes of Section 2.13, the term "applicable Legal Requirements" includes FATCA.

"**Lender Advisors**" means Focus Management Group USA, Inc., as advisors to the Lenders or certain members thereof.

"**Lender Expenses**" has the meaning specified in Section 10.03(a).

"**Lenders**" means (a) the financial institutions and other Persons party hereto as "**Lenders**" on the date hereof, and (b) each financial institution or other Person that becomes a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such financial institution or Person that has ceased to be a party hereto pursuant to an Assignment and Assumption, pursuant to Section 10.04(b).

"**Lien**" means, with respect to any property, (a) any mortgage, deed of trust, lien (statutory or other), judgment lien, pledge, encumbrance, claim, charge, collateral assignment, hypothecation, deposit arrangement, security interest, or encumbrance of any kind, including, without limitation, all "liens" as defined by Section 111(37) of the Bankruptcy Code, including any easement, servitude, right-of-way, or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed or arising by operation of law, and any agreement to give any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease, or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property, and (c) in the case of securities, any purchase option, call, or similar right of a third party with respect to such securities.

"**Liquidity**" means, as of any date of determination, the sum of all Qualified Cash on such date.

"**Loan**" means a loan made or deemed made by a Lender to Borrowers under Article II, including any Loans made in respect of interest, the Commitment Fee, or Lender Expenses made in accordance with Section 2.03, and each Pre-Closing Date Loan.

"**Loan Documents**" means this Agreement, the Notes (if any), the Security Documents, the DIP Orders, and any other document executed to evidence, secure, or support the Secured Obligations.

"**Margin Stock**" has the meaning assigned to it in Regulation U.

"**Material Adverse Effect**" means (a) a material adverse effect on, or material adverse change in, the condition (financial or otherwise), results of operations, assets, liabilities (contingent or otherwise), properties, or business of any Borrower, (b) material impairment of the ability of any Borrower to fully and timely perform any of its obligations under any Loan Document, (c) a material impairment of the rights of

4884088v.1
Case: 24-50211   Doc# 45-1   Filed: 03/07/24   Entered: 03/07/24 09:41:50   Page 26 of 123

or benefits or remedies available to the Lenders or the Administrative Agent under any Loan Document, or (d) a material adverse effect on the Collateral (or any portion thereof) or the Liens in favor of the Administrative Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral, or the validity, enforceability, perfection, or priority of such Liens as provided in the DIP Orders. Solely for purposes of clause (a) hereof, "Material Adverse Effect" shall expressly exclude (y) any matters disclosed in any "first day" pleadings or declarations, and (z) the effect of filing the Case, the events and conditions related to, resulting from, and/or leading up to the effects thereon, and any action required to be taken under the Loan Documents or the DIP Orders.

"**Material Agreements**" means, individually and collectively, (a) the Farming Services Agreement; and (b) any other agreement or contract entered into by any Borrower and any other Person, or assigned to any Borrower, that (i) provides for the payment by Borrowers, or the provision to Borrowers, of goods, inventory, or services equal to or in excess of Seventy-five Thousand Dollars ($75,000) in the aggregate thereunder per fiscal year for which the respective disbursements are not included in the Approved Budget, (ii) provides revenue or income to Borrowers equal to or in excess of Seventy-five Thousand Dollars ($75,000) in the aggregate thereunder per fiscal year, or (iii) provides for a deposit or prepayment of revenue equal to or in excess of Seventy-five Thousand Dollars ($75,000) in the aggregate thereunder per fiscal year.

"**Material Counterparty**" means each Person (other than the Administrative Agent, Lender, or a Borrower) from time to time party to any Material Agreement.

"**Maturity Date**" means the earliest of (a) [_____, 2024,][1] if the Final Order has not been entered by such date, (b) the effective date of any Chapter 11 plan for the reorganization of Borrowers confirmed pursuant to an Order of the Bankruptcy Court, (c) April 30, 2025, (d) the date that all Loans become due and payable in full in accordance with the terms of this Agreement, including due to acceleration, except in connection with a transaction that results in the deposit of funds into the Segregated Post-Sale Remainder Account, in which case the "Maturity Date," for purposes of this clause (d), shall mean the date on which the Administrative Agent declares all remaining Obligations due and payable in full; (e) the consummation of a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the assets of Borrowers, and (f) the date on which Borrowers seek approval of a disclosure statement for a plan of reorganization or liquidation, other than an Acceptable Plan.

"**Maximum Rate**" has the meaning assigned to it in Section 10.13.

"**Milestone**" has the meaning assigned to it in Section 5.14.

"**Mortgage**" means (a) an agreement, including a mortgage, deed of trust, or any other document creating and evidencing a first priority Lien (subject to Permitted Collateral Liens) on a Mortgaged Property, which shall be in form reasonably satisfactory to the Administrative Agent and Required Lenders, in each case with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law or as shall be customary under applicable local or foreign Legal Requirements; and (b) with respect to any Real Property for which no such agreement is executed pursuant to Section 5.10 or 5.11, this Agreement and the other Loan Documents.

"**Mortgaged Property**" means all Real Property of any Borrower owned as of the Petition Date and such additional Real Property, if any, as is acquired after the Petition Date, whether or not made subject to a Mortgage pursuant to Section 5.10 or 5.11.

---

[1] NTD: Enter the date that is 80 days after the date of this Agreement.

Case: 24-50211   Doc# 45-1   Filed: 03/07/24   Entered: 03/07/24 09:41:50   Page 27 of 123

"**Multiemployer Plan**" means a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA, (a) to which Borrowers or any of their ERISA Affiliates are then making or accruing an obligation to make contributions, (b) to which Borrowers or any of their ERISA Affiliates have within the preceding six (6) plan years made or been obligated to make contributions, or (c) with respect to which Borrowers could incur liability.

"**Net Cash Proceeds**" means:

(a)      with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the proceeds thereof in the form of cash, cash equivalents, and marketable securities (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable, or by the sale, transfer, or other disposition of any non-cash consideration received in connection therewith or otherwise, but only as and when received) received by any Borrower (including cash proceeds subsequently received (as and when received by any Borrower) in respect of non-cash consideration initially received), net of (i) reasonable and customary selling expenses (including reasonable brokers' fees or commissions, legal, accounting, and other professional and transactional fees, transfer and similar taxes (but excluding any such amounts payable to any Affiliate of Borrowers) and Borrowers' good faith estimate of income, transfer, and other taxes paid or payable in connection with such sale (after taking into account any available tax credits or deductions and any tax sharing agreements)), (ii) amounts provided as a reserve, in accordance with GAAP, against (y) any liabilities under any indemnification obligations associated with such Asset Sale, or (z) any other liabilities retained by Borrowers associated with the properties sold in such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), (iii) to the extent paid by one or more Borrowers, cure costs associated with executory contracts included within any such Asset Sale, and (iv) the principal amount, premium, or penalty, if any, interest, and other amounts on any Indebtedness for borrowed money that is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(b)      with respect to any (i) Debt Issuance, (ii) Equity Issuance, or (iii) other issuance or sale of Equity Interests by any Borrower, the cash proceeds thereof received by Borrowers, net of reasonable and customary fees (including legal, accounting, and other professional and transaction fees and brokers' fees), commissions, costs, and other expenses incurred in connection therewith, including, if any, Borrowers' good faith estimate of income, transfer and other taxes paid or payable in connection with such transaction (after taking into account any available tax credits or deductions and any tax sharing arrangements);

(c)      with respect to any Casualty Event, the cash insurance proceeds, condemnation awards, and other compensation received by Borrowers in respect thereof, net of (i) all reasonable costs and expenses (including legal, accounting, and other professional and transaction fees and brokers' fees) incurred in connection with the collection of such proceeds, awards, or other compensation in respect of such Casualty Event (including legal, accounting, and other professional and transaction fees and brokers' fees), (ii) Borrowers' good faith estimate of income, transfer, and other taxes paid or payable in connection with such Casualty Event (after taking into account any available tax credits or deductions and any tax sharing agreements), (iii) amounts provided as a reserve, in accordance with GAAP, against (y) any liabilities under any indemnification obligations associated with such Casualty Event, or (z) any other liabilities retained by Borrowers associated with the properties subject to such Casualty Event (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), and (iv) the principal amount, premium, or penalty, if any, interest and other amounts on any Indebtedness for borrowed money that is secured by a Lien on the properties subject to

48840881.1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 28 of 123

such Casualty Event (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale), and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties); and

(d) with respect to any receipt of termination payments, liquidated damages, indemnity payments, or other extraordinary payments under the Material Agreements, the aggregate amount of payments received by Borrowers in respect of such event, net of (i) all reasonable costs and expenses incurred in connection with the collection of such proceeds, including Borrowers' good faith estimate of income, transfer, and other taxes paid or payable in connection with such event, if any (after taking into account any available tax credits or deductions and any tax sharing arrangements), (ii) amounts provided as a reserve, in accordance with GAAP, against (y) any liabilities under any indemnification obligations associated with such Material Agreement, or (z) any other liabilities retained by Borrowers associated with such Material Agreement (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), and (iii) the principal amount, premium, or penalty, if any, interest and other amounts on any Indebtedness for borrowed money that is secured by a Lien on such Material Agreement or any Borrower's interests therein (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale), and which is repaid with such proceeds (other than any such Indebtedness assumed by the assignee of such Material Agreement).

"**Net Hedging Obligations**" means, as of any date, the Termination Value of any Hedging Agreement on such date.

"**Notes**" means the notes evidencing the Loans pursuant to Section 2.04(e), if any, substantially in the form of Exhibit H.

"**Obligations**" means of the due and punctual payment by of (i) the principal of and interest on the Loans, as and when due, whether at maturity, by acceleration, or otherwise, and (ii) all other monetary obligations of Borrowers under this Agreement and the other Loan Documents, including advances, debts, liabilities, obligations, fees, costs, expenses, and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, or fixed or contingent, under this Agreement and the other Loan Documents (including the reasonable costs and expenses of the advisors to the Administrative Agent and Lenders).

"**OFAC**" has the meaning assigned to it in Section 3.21(b).

"**Order**" means any judgment, decree, verdict, order, consent order, consent decree, writ, declaration, or injunction.

"**Organizational Documents**" means, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation or deed of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate or articles of formation or organization and operating agreement or memorandum and articles of association (or similar constitutive documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar constitutive documents) of such Person (and, where applicable, the equityholders or shareholders registry of such Person), (iv) in the case of any general partnership, the partnership agreement (or similar constitutive document) of such Person, (v) in any other case, the functional equivalent of the foregoing, and (vi) any shareholder, voting trust, or similar agreement between or among any holders of Equity Interests of such Person.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means any and all present or future stamp, court, or documentary, intangible, recording, filing, or similar Taxes arising from any payment made or required to be made under any Loan Document or from the execution, delivery, performance, enforcement, or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.14</u>).

"**Outstanding Amount**" means, with respect to the Loans, on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"**Participant**" has the meaning assigned to it in <u>Section 10.04(e)</u>.

"**Participant Register**" has the meaning assigned to it in <u>Section 10.04(e)</u>.

"**Patriot Act**" has the meaning assigned to it in <u>Section 3.21(a)</u>.

"**Payment Recipient**" has the meaning assigned to it in <u>Section 9.09(a)</u>.

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Pension Plan**" means any Employee Benefit Plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA that is maintained, contributed to, or required to be maintained or contributed to by Borrowers or any of their ERISA Affiliates or with respect to which Borrowers could reasonably be expected to incur liability, contingent or otherwise, under ERISA (including under Section 4069 of ERISA).

"**Petition Date**" has the meaning specified in the Preliminary Statements.

"**Performance Obligations**" means the due and punctual performance of all covenants, agreements, obligations, and liabilities of Borrowers under or pursuant to this Agreement and the other Loan Documents, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"**Periodic Term SOFR Determination Day**" has the meaning specified in the definition of "Term SOFR".

"**Permitted Accounts**" means the accounts listed on <u>Schedule 1.01(a)</u>.

"**Permitted Collateral Liens**" means (a) in the case of Collateral other than Mortgaged Property, Permitted Liens, and (b) in the case of Mortgaged Property, Permitted Third Party Liens and the Liens described in <u>clauses (a)</u>, <u>(b)</u>, <u>(d)</u>, <u>(e)</u>, <u>(g)</u> and <u>(l)</u> of <u>Section 6.02</u>; *provided*, *however*, upon the date of delivery of each Mortgage under <u>Section 5.10</u> or <u>5.11</u> (if applicable), Permitted Collateral Liens means only those Liens that are (i) excepted as being prior to the Lien of such Mortgage as  in the title insurance policy (or

commitment) relating to such Mortgaged Property issued by the applicable Title Company, and (ii) otherwise Permitted Liens.

"**Permitted Liens**" has the meaning assigned to it in <u>Section 6.02</u>.

"**Permitted Third Party Liens**" has the meaning assigned to it in the Interim Order or Final Order, as applicable.

"**Permitted Variances**" means (i) all variances that are favorable to the financial condition and the interests of Borrowers and the interests of the Lenders, (ii) any variance (as compared to then Approved Budget) that is unfavorable to the financial condition and the interests of Borrowers or the interests of the Lenders and, in the case of this clause (ii), does not exceed (x) with respect to (A) aggregate receipts and (B) aggregate disbursements of Borrowers, shown on the Approved Budget as the line item labeled "Net Aggregate Receipts and Disbursements", ten percent (10%), tested every week on a cumulative basis since the beginning of the applicable Budget Compliance Period and (y) with respect to operating disbursements (excluding property taxes, professional fees and expenses and adequate protection claims), shown on the Approved Budget as the line item labeled "Aggregate Operating Disbursements", ten percent (10%), tested every week on a cumulative basis since the beginning of the applicable Budget Compliance Period, (iii) any variance resulting from the payment of principal and accrued and unpaid interest in connection with any prepayments made pursuant to Section 2.08 or the payment of any other amounts required to be paid to the Administrative Agent or Lenders under the Loan Documents, (iv) any variance resulting from the payment of expenses authorized to be paid pursuant to any interim cash collateral orders of the Bankruptcy Court and (v) any variance resulting from the payment of expenses of third parties paid in connection with any sale process, including for the preparation of an independent technical report and a market report..

"**Person**" means any natural person, corporation, business trust, joint venture, trust, association, company (whether limited in liability or otherwise), partnership (whether limited in liability or otherwise) or Governmental Authority, or any other entity, in any case, whether acting in a personal, fiduciary, or other capacity.

"**Petition Date**" has the meaning specified in the Preliminary Statements.

"

"**Platform**" has the meaning assigned to it in Section 10.01(d).

"**Post-Petition**" means the time period commencing immediately upon the filing of the Case.

"**Pre-Closing Date Loan**" means each of the Advance, the Second Advance, and any additional disbursement of funds advanced to Borrowers by Lenders prior to the Closing Date.

"**Post-Sale Account Withdrawal Notice**" has the meaning assigned to it in <u>Section 2.15</u>.

"**Preferred Stock**" means, with respect to any Person, any and all preferred or preference Equity Interests (however designated) of such Person, whether now outstanding or issued after the Closing Date.

"**Preferred Stock Issuance**" means the issuance or sale by any Borrower of any Preferred Stock after the Closing Date.

"**Premises**" means any Real Property constituting Collateral.

"**Prepetition Lenders**" has the meaning assigned to it in the Interim Order or Final Order, as applicable.

"**Prepetition Liens**" has the meaning assigned to it in the Interim Order or Final Order, as applicable.

"**Prepetition Loans**" means the obligations of Borrowers to the Prepetition Lenders under that certain Loan Agreement dated as of November 15, 2022, among Trinitas Advantaged Agriculture Partners IV, LP, a Delaware limited partnership, as borrower, the guarantors party thereto, each Person party thereto as a lender, and Rabo AgriFinance LLC, a Delaware limited liability company, as Administrative Agent, as heretofore amended, supplemented, or otherwise modified.

"**Prepetition Loan Documents**" means (i) the Prepetition Indenture, (ii) the Prepetition Loan Agreement, and (iii) all documents, instruments, and agreements (including all pledge, collateral, security, and guaranty documents and agreements) entered into in connection therewith.

"**Prepetition Obligations**" has the meaning assigned to it in the Interim Order or Final Order, as applicable.

"**Prepetition Administrative Agent**" has the meaning assigned to it in the Interim Order or Final Order, as applicable.

"**property**" means any right, title, or interest in or to property or assets of any kind whatsoever, whether real, personal, or mixed, and whether tangible or intangible, and including Equity Interests of any Person, and whether now in existence or owned or hereafter entered into or acquired, including all Real Property, cash, securities, accounts, revenues, and contract rights.

"**Purchase Money Obligation**" means, for any Person, the obligations of such Person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any fixed or capital assets (including Equity Interests of any Person owning fixed or capital assets) or the cost of installation, construction, or improvement of any fixed or capital assets.

"**Qualified Capital Stock**" of any Person means any Equity Interests of such Person that are not Disqualified Capital Stock.

"**Qualified Cash**" means, as of any date of determination, the amount of unrestricted (other than restrictions imposed pursuant to the Loan Documents) cash and Cash Equivalents of Borrowers that is in a deposit account or in a securities account, or any combination thereof, and which deposit account and securities account, as the case may be, and all cash and Cash Equivalents are subject to a perfected, first priority security interest in favor of the Administrative Agent; *provided however,* that Qualified Cash shall not include the Carve Out Account or the Utilities adequate protection account.

"**Real Property**" means, collectively, all right, title, and interest (including any leasehold, fee, mineral, or other estate) in and to any and all parcels of or interests in real property owned, leased, or operated by any Person, whether by lease, license, or other means, together with, in each case, all easements, hereditaments, and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights, and other property and rights incidental to the ownership, lease, or operation thereof.

"**Recipient**" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrowers hereunder.

4884-0881-1

"**Register**" has the meaning assigned to it in Section 10.04(c).

"**Regulation T**" means Regulation T of the Board as from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Board as from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Board as from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"**Reinstatement Plan**" means a chapter 11 plan of reorganization for Borrowers filed in the Case that provides for reinstatement of the Prepetition Loans under Section 1124 of the Bankruptcy Code. The Prepetition Lenders shall retain their rights to object to any Reinstatement Plan.

"**Related Person**" means, with respect to any Person, (a) each Affiliate of such Person and each of the officers, directors, partners, trustees, employees, affiliates, shareholders, investors (including, if such Person is a Borrower, such Person's potential investors), Advisors, agents, attorneys-in-fact, and Controlling Persons of each of the foregoing, and (b) if such Person is the Administrative Agent, each other Person designated, nominated, or otherwise mandated by or assisting the Administrative Agent pursuant to Section 9.05, or any comparable provision of any Loan Document.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating, or migrating of any Hazardous Materials in, into, onto, from, or through the Environment or any Real Property (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Materials).

"**Relevant Governmental Body**" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"**Remedies Notice Period**" has the meaning assigned to it in Section 8.01.

"**Required Lenders**" means, at any date of determination, Lenders holding more than fifty percent (50%) of the sum of (a) the Outstanding Amount of the Loans, and (b) the aggregate unused Commitments as of such date. For purposes of this definition, the Outstanding Amount of the Loans and the aggregate unused Commitments shall be determined by excluding the sum of the Outstanding Amount of the Loans of each Defaulting Lender and the aggregate unused Commitments of each Defaulting Lender at such time.

"**Response**" means (a) "**response**" as such term is defined in CERCLA, 42 U.S.C. § 9601(25) or any other applicable Environmental Law, or (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, remediate, contain, assess, abate, monitor, or in any other way address any Hazardous Materials at, in, on, under, or from any Real Property, or otherwise in the Environment, (ii) prevent, stop, control, or minimize the Release or threat of Release, or minimize the further Release, of any Hazardous Material, or (iii) perform studies, investigations, maintenance, or monitoring in connection with, following, or as a precondition to, or to determine the necessity of, the actions set forth in clause (i) or (ii) above.

"**Restricted Indebtedness**" means Indebtedness of Borrowers, the payment, prepayment, repurchase, defeasance, or acquisition for value of which is restricted under Section 6.10.

4884988v1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 33 of 123

"**Responsible Officer**" of any Person means any Financial Officer or other executive officer of such Person.

"**Sale and Leaseback Transaction**" has the meaning assigned to it in <u>Section 6.03</u>.

"**Sale Assets**" has the meaning assigned to it in <u>Section 5.14(h)</u>.

"**Sale Process**" has the meaning assigned to it in <u>Section 5.18(b)</u>.

"**Schedules of Assets and Liabilities**" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by Borrowers with the Bankruptcy Court on _____ __, 2024 Doc. No. __, as amended from time to time.

"**SEC**" means the Securities and Exchange Commission (or any successor thereto or an analogous Governmental Authority).

"**Secured Obligations**" means the Obligations and the Performance Obligations.

"**Secured Parties**" means, collectively, the Administrative Agent and the Lenders.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Security Documents**" means the DIP Orders, each other security document or pledge agreement delivered in accordance with applicable local or foreign Legal Requirements to grant a valid, enforceable, perfected security interest (with the priority required under the DIP Orders) in any property as collateral for the Secured Obligations, all UCC or other financing statements (including fixture filings) or instruments of perfection required by this Agreement, the DIP Orders, or any other such security document or pledge agreement to be filed or registered with respect to the security interests in property created pursuant to the DIP Orders and any other document or instrument utilized to pledge any property as collateral for the Secured Obligations.

"**Segregated Post-Sale Remainder Account**" has the meaning assigned to it in <u>Section 5.14</u>

"**Self-Funding Date**" has the meaning assigned to it in <u>Section 5.14</u>.

"**SOFR**" means a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SPC**" has the meaning assigned to it in <u>Section 10.04(h)</u>.

"**Specified Material Agreements**" has the meaning assigned to it in <u>Section 3.09(a)</u>.

"**Subordinated Indebtedness**" means Indebtedness of Borrowers that is by its terms subordinated in right of payment to all or any portion of the Obligations.

"**Subsidiary**" means, with respect to any Person (the "**parent**") at any date, (i) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, (ii) any

4884088v.1
Case: 24-50211   Doc# 45-1   Filed: 03/07/24   Entered: 03/07/24 09:41:50   Page 34 of 123

other corporation, limited liability company, association, or other business entity of which securities or other ownership interests representing more than fifty percent (50%) of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled, or held by the parent and/or one or more subsidiaries of the parent, (iii) any partnership (a) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent, or (b) the only general partners of which are the parent and/or one or more subsidiaries of the parent, and (iv) any other Person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "**Subsidiary**" refers to a Subsidiary of Borrowers.

"**Superpriority Claim**" means any administrative expense claim in the Case having priority under Section 364(c)(1) of the Bankruptcy Code over any and all other obligations, liabilities, indebtedness, administrative expenses, diminution claims, and all other priority claims against Borrowers, subject only to the Carve-Out and claims secured by Permitted Third Party Liens, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order granting such relief), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provisions of the Bankruptcy Code, in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Synthetic Lease**" means, as to any Person, (a) any lease (including leases that may be terminated by the lessee at any time) of any property (i) that is accounted for as an operating lease under GAAP, and (ii) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor, or (b)(i) a synthetic, off-balance sheet or tax retention lease, or (ii) an agreement for the use or possession of property (including a Sale and Leaseback Transaction), in each case under this <u>clause (b)</u>, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"**Synthetic Lease Obligations**" means, as to any Person, an amount equal to the capitalized amount of the remaining lease payments under any Synthetic Lease that would appear on a balance sheet of such Person in accordance with GAAP if such obligations were accounted for as Capital Lease Obligations.

"**Synthetic Purchase Agreement**" means any swap, derivative, or other agreement or combination of agreements pursuant to which any Borrower is or may become obligated to make (a) any payment in connection with a purchase by any third party from a Person other than Borrowers of any Equity Interest or Restricted Indebtedness, or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness), the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted Indebtedness.

"**Tax Returns**" means all returns, statements, filings, attachments, and other documents or certifications filed or required to be filed in respect of Taxes.

"**Taxes**" means any and all present or future taxes, duties, levies, imposts, assessments, fees, deductions, withholdings, or other similar charges, whether computed on a separate, consolidated, unitary, combined, or other basis and any and all liabilities (including interest, fines, penalties or additions with respect to any of the foregoing) with respect to the foregoing.

"**Term SOFR**" means, for any Business Day, the grater of (a) zero and (b) the Term SOFR Reference Rate for a one month tenor on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the Closing Date and, thereafter,

4884-0884-1.1

two (2) U.S. Government Securities Business Days prior to the first Business Day of each month, as such rate is published by the Term SOFR Administrator; *provided, however,* that if as of 5:00 p.m. (Eastern time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator, so long as such first preceding Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited ("**CBA**") (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**Termination Value**" means, in respect of any one or more Hedging Agreement, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) or any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"**Transactions**" means, collectively, (a) the execution and delivery of, and the performance under, the Loan Documents, in each case by Borrowers, (b) the making (or deemed making) of the Loans hereunder, and (c) the payment of fees, costs, and expenses related to the foregoing.

"**Treasury Rate**" means the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year.

"**UCC**" means the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement, excluding the related Benchmark Replacement Adjustment.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the actuarial assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**United States**" and "**U.S.**" means the United States of America.

"**Updated Budget**" means a 13-week cash flow forecast covering the 13-week period commencing on the first day of the week in which such 13-week cash flow forecast is required to be delivered pursuant to Section 5.01(c), setting forth all forecasted receipts and disbursements of Borrowers on a weekly basis during such 13-week period, which shall include, among other things, available cash, revenue, cash flow and net operating cash flow, trade payables, ordinary course expenses, total expenses, capital expenditures,

4884888v.1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 36 of 123

vendor disbursements, working capital, and fees and expenses related to the DIP Term Facility and the Case (including professional fees) for such 13-week period.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday, or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**Variance Testing Date**" means the last Business Day of (i) the second full calendar week after the Closing Date, and (ii) every week thereafter.

"**Voting Stock**" means, with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors of such Person.

"**Withdrawal**" means a disbursement of funds from the Segregated Post-Sale Remainder Account. "**Withdraw**" and "**Withdrawn**" have correlative meanings thereto.

"**Withdrawal Date**" has the meaning assigned to it in Section 2.15.

"**Withdrawal Termination Instruction**" has the meaning assigned to it in Section 2.15.

Section 1.02 **Terms Generally.** The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation". The phrase "Material Adverse Effect" shall be deemed to be followed by the phrase ", individually or in the aggregate". The words "asset" and "property" shall be construed to have the same meaning and effect. The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth in any Loan Document), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, and (d) all references herein to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, unless otherwise noted, and (e) any reference to any law or regulation shall (i) include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting or supplementing such law or regulation, and (ii) unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time. This Section 1.02 shall apply, *mutatis mutandis*, to all Loan Documents, regardless of whether it is expressly incorporated therein.

Section 1.03 **Accounting Terms; GAAP.** Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with, and all terms of an accounting or financial nature shall be construed and interpreted in accordance with, GAAP as in effect from time to time. If Borrowers notify the Administrative Agent that Borrowers wish to amend any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then Borrowers' compliance with such provision shall be determined on the basis of GAAP as in effect and applied immediately before such

4834988v.1:
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 37 of 123

change has become effective until such notice is withdrawn or such provision amended in a manner satisfactory to Borrowers and the Administrative Agent; *provided* that any obligations under a Synthetic Lease shall be construed in accordance with GAAP as in effect on the Closing Date, notwithstanding any changes to GAAP occurring after the Closing Date. Notwithstanding any provision contained herein or in any other Loan Document, any lease (or similar arrangement) that would have been characterized, classified, or reclassified as an operating lease in accordance with GAAP prior to the date of Borrowers' adoption of ASC 842 (or any other ASC having a similar result or effect) (and related interpretations) (whether or not such lease was in effect on such date) shall not constitute an obligation under a Synthetic Lease, Capital Lease, or a Capital Lease Obligation, and any such lease shall be, for all purposes of this Agreement and the other Loan Documents, treated as though it were reflected on Borrowers' consolidated financial statements in the same manner as an operating lease would have been reflected prior to Borrowers' adoption of ASC 842.

**Section 1.04     Rates.** The Administrative Agent does not warrant or accept any responsibility for, and the Administrative Agent shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of, or any other matter related to the Base Rate, the Term SOFR Reference Rate, or Term SOFR, or any component definition thereof, or rates referred to in the definition thereof, or any alternative, successor, or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor, or replacement rate (including any Benchmark Replacement) is similar to, or produces the same value or economic equivalence of, or has the same volume or liquidity as, the Base Rate, the Term SOFR Reference Rate, Term SOFR, or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation, or composition of any Benchmark Replacement Conforming Changes. The Administrative Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of the Base Rate, the Term SOFR Reference Rate, Term SOFR, any alternative or replacement rate (including any Benchmark Replacement), or any relevant adjustments thereto, in each case, in a manner adverse to Borrowers. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Base Rate, the Term SOFR Reference Rate, Term SOFR, or any other Benchmark, or any component definition thereof, or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to Borrowers, any Lender, or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental, or consequential damages, costs, losses, or expenses (whether in tort, contract, or otherwise, and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

**Section 1.05     Resolution of Drafting Ambiguities.** Each Borrower acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof or thereof, and that any common law, statutory, or otherwise arising rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

## ARTICLE II
## THE COMMITMENTS AND LOANS

**Section 2.01     The Loans.**

(a)        Loans. On the terms and subject to the conditions hereof and in the DIP Orders, each Lender agrees, following the Interim Order Entry Date and the satisfaction (or waiver) of the conditions to Borrowing set forth in Sections 4.01, 4.02 and 4.03, to make term loans to Borrowers from time to time during the period commencing on the Closing Date and ending on the Maturity Date, in an

aggregate principal amount in Dollars for each such Borrowing not to exceed such Lender's unused Commitment (collectively, the "**Loans**") at such time; *provided* that (i) the aggregate principal amount of all Loans made by the Lenders shall not exceed (A) prior to the Final Order Entry Date, Six Million Five Hundred Thousand Dollars ($6,500,000), inclusive of Pre-Closing Date Loans; and (B) following the Final Order Entry Date, the aggregate amount of the Commitments in effect on the Closing Date (immediately prior to any funding thereof); and (ii) the Lenders shall not be obligated to fund more than one (1) Borrowing in any calendar week.

(b)      Loans Generally.  Following the making of any Loan (inclusive of the Pre-Petition Loans) by a Lender, the Commitment of such Lender to make Loans shall be automatically and permanently reduced by the amount of such Loan so made by such Lender, and shall automatically and permanently terminate when reduced to $0.  Each Pre-Petition Loan and, once funded, each other Loan, shall be a "Loan" for all purposes under this Agreement and the other Loan Documents. Amounts borrowed under Section 2.01 and repaid or prepaid may not be reborrowed.  Effective as of the Self-Funding Date, the Commitments, as they relate to the obligation to make further Loans, shall automatically be reduced to $0, and the term "Commitment" shall refer to the obligations of the Lenders to permit Withdrawals from the Segregated Post-Sale Remainder Account in accordance with the provisions of the Loan Documents.

**Section 2.02     Borrowings of Loans.**

(a)      Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments.  Any such Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $500,000 and not less than $1,000,000, or (ii) equal to the remaining available balance of the Commitments.  Unless the Required Lenders otherwise agree in their sole discretion, no more than one Borrowing may be requested to be made in any calendar week.

(b)      Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by not later than 11:00 a.m. Pacific Time, by wire transfer of immediately available funds to such account as the Administrative Agent may designate from time to time, and upon satisfaction or waiver of the applicable conditions precedent specified herein and receipt by the Administrative Agent of all of the proceeds of the Loans, the Administrative Agent will remit the amounts so received, in like funds, to the Borrower Operating Account except, in the case of the Loans being made on the Initial Credit Extension Date, as provided in the Funding Authorization Letter (which may provide that a portion of such funds be remitted to an account or accounts other than the Borrower Operating Account).

(c)      Unless the Administrative Agent has received written notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with Section 2.02(b), and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to Borrowers on such date a corresponding amount.  If the Administrative Agent has made such funds available, then, to the extent that such Lender has not made such portion available to the Administrative Agent, each of such Lender and Borrowers severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount, together with interest thereon, for each day from the date such amount is made available to Borrowers until the date such amount is repaid to the Administrative Agent at, for each such day, the Federal Funds Effective Rate, plus any standard administrative or processing fees charged by the Administrative Agent in connection with such Lender's non-payment. If such Lender repays to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement, and

Borrowers' obligation to repay the Administrative Agent such corresponding amount pursuant to this Section 2.02(c) shall cease.

(d) The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

**Section 2.03** **Borrowing Procedure.** To request a Borrowing, the Borrowers Representative shall deliver by email (telecopy or transmit by other electronic transmission, if arrangements for doing so have been approved in writing by the Administrative Agent), a duly completed and executed Borrowing Request to the Administrative Agent not later than 11:00 a.m. Pacific Time, three (3) Business Days before the date of the proposed Borrowing. Each Borrowing Request (x) shall be irrevocable; (y) if such Borrowing is the Borrowing on the Initial Credit Extension Date, shall be accompanied by the Funding Authorization Letter, and for each other Borrowing, direct that the proceeds of such Borrowing be remitted to the Borrower Operating Account; and (z) shall specify the following information in compliance with Section 2.02:

(a) the aggregate principal amount of such Borrowing;

(b) the date of such Borrowing, which shall be a Business Day ("**Borrowing Date**");

(c) a forecast of its Qualified Cash immediately after giving effect to the disbursements to be made with such requested Borrowing and all other cash disbursements and all cash receipts to be made or received, as applicable, during the one-week period following the applicable Borrowing Date, in a form substantially consistent with the Approved Budget, certified by a Responsible Officer of the Borrower Representative, demonstrating to the satisfaction of the Required Lenders or their advisors that (i) the aggregate amount of Qualified Cash prior to giving effect to such Borrowing will not exceed One Million Five Hundred Thousand Dollars ($1,500,000), and (ii) all Conditions shall be satisfied prior to and after giving effect to such withdrawal;

(d) specifying, in reasonable detail, the use of proceeds of all Loans to be made on the applicable Borrowing Date, and, if such proceeds are to be used to pay one or more disbursements set forth in the Approved Budget (subject to Permitted Variances and not including any post-sale expenses in respect of Sale Assets for which a sale has been consummated) for the applicable week, such detail shall refer to the applicable line items in such Approved Budget (subject to Permitted Variances and excluding any post-sale expenses in respect of Sale Assets for which a sale has been consummated);

(e) that as of the applicable Borrowing Date, the Conditions are satisfied;

(f) to the extent that the use of proceeds of such requested Loans requires consent from the Required Lenders as provided for herein, a representation and warranty that Borrowers have received such approval; and

(g) that the conditions set forth in Sections 4.03(b), (c), and (d) and, in the case of any Borrowing on or after the Initial Credit Extension Credit Date, (e) are satisfied as of the date of the notice.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made

33

as part of the requested Borrowing. Borrowers further authorize the Administrative Agent to make Loans to pay, and to pay directly to the Lenders and/or the Administrative Agent, as applicable: (i) interest accrued on the Loans as and when due and payable hereunder, (ii) the Commitment Fee payable in connection with any Borrowing, or (ii) Lender's Fees, notwithstanding that Borrowers may not have requested a disbursement of such amounts. The Administrative Agent in its sole discretion (unless otherwise directed by the Required Lenders) may (but shall not be obligated to do so) make such disbursements notwithstanding that the Default or Event of Default exists or that any other applicable condition precedent to Borrowings hereunder has not been satisfied. Such disbursements shall constitute Loans, be added to the outstanding principal balance of the Loans, and reduce the remaining availability of the Commitments. The foregoing authorization is irrevocable, and no further direction or authorization from any Borrower is necessary for the Administrative Agent to make such Loans.

**Section 2.04    Evidence of Debt; Repayment of Loans.**

(a)    Borrowers hereby unconditionally promise to pay to the Administrative Agent, for the account of each Lender, the unpaid principal amount of each Loan (including Loans in respect of interest, the Commitment Fee, or Lender Expenses made in accordance with Section 2.03  and added to the aggregate outstanding principal amount of Loans of such Lender) on the Maturity Date.  On the Maturity Date, all funds in the Borrower Operating Account or the Segregated Post-Sale Remainder Account shall be applied by the Administrative Agent on behalf of Borrowers in accordance with the priorities of payment set forth in Section 8.03.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain an account in which it will record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrowers to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to Sections 2.04(b) and (c) shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded absent manifest error; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of Borrowers to pay, and perform, the Secured Obligations in accordance with the Loan Documents.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such entries, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(e)    Any Lender by written notice to Borrowers (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a promissory note.  In such event, Borrowers shall promptly (and, in all events, within five (5) Business Days of receipt of such request) prepare, execute, and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in the form of Exhibit H.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

4884089 .1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 41 of 123

**Section 2.05    Commitment Fees.**  Borrowers shall pay to each Lender on the date of each Borrowing of a Loan, as fee compensation for such Lender having committed to make such Loan on such date, a commitment fee (a "**Commitment Fee**") in an amount equal to one and one-half percent (1.50%) of such Loan made by such Lender on such date.  Commitment Fees shall be fully and irrevocably due and payable to each Lender on each date that such Lender makes a Loan pursuant to Section 2.01.  Commitment Fees shall be fully earned when due and shall not be refundable for any reason whatsoever. TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE COMMITMENT FEE.  Borrowers expressly agree that: (A) the Commitment Fee is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Commitment Fee shall be payable notwithstanding the then-prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and Borrowers giving specific consideration in this transaction for such agreement to pay the Commitment Fee; and (D) Borrowers shall be estopped hereafter from claiming differently than as agreed to in this paragraph. Borrowers expressly acknowledge that their agreement to pay the Commitment Fee to the Lenders as herein described is a material inducement for the Lenders to provide the Commitments and provide the Loans.

**Section 2.06    Interest on Loans.**

(a)    Subject to the provisions of Section 2.06(c), the Loans comprising each SOFR Borrowing shall bear interest on the outstanding principal amount thereof from the date made or deemed made (including, in the case of Pre-Closing Date Loans, from the date of disbursement) through repayment (whether by acceleration or otherwise) at a rate per annum equal to Term SOFR for the Interest Period in effect for such Borrowing, plus the Applicable Margin in effect from time to time.

(b)    Once capitalized and added to the outstanding amount of the Loans on each applicable date set forth in Section 2.05(a) or Section 10.03, such amounts so added to principal shall bear interest as set forth in this Section 2.06.

(c)    Upon the occurrence and during the continuance of an Event of Default, upon notification by the Administrative Agent (acting at the direction of the Required Lenders) to Borrowers, all outstanding Obligations shall bear interest at a per annum rate equal to two percent (2%) plus the rate otherwise applicable to Loans as provided in Section 2.06(a) (the rate thus augmented, the "**Default Rate**"), and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable laws and without further notice, motion, or application to, or hearing before, or order from, the Bankruptcy Court.

(d)    Accrued interest on the Loans shall be payable in arrears in cash on each Interest Payment Date and at such other times as may be specified herein; *provided* that (i) interest accrued pursuant to Section 2.06(c) (including interest on past due interest and interest accruing on the Prepetition Loans at the Default Rate) and all interest accrued but unpaid on or after the Maturity Date shall be payable on demand in cash, (ii) in the event of any repayment or prepayment of all or any portion of the Loans, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law to the extent permitted by applicable law.

(e)    All interest hereunder shall be computed on the basis of a year of 360 days and shall be accrue and be payable for the actual number of days elapsed (including the first day, but excluding the last day); *provided* that any Loan that is repaid on the same day on which it is advanced shall, subject

35

to Section 2.12, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.07   **Termination of Commitments.**   To the extent not terminated earlier, the DIP Commitments of each Lender shall terminate immediately and without further action on the Maturity Date. Borrowers may terminate the unused DIP Commitments of the Lenders in full (and not in part) at any time in writing delivered to the Administrative Agent at least three (3) Business Days prior to the date of such termination, and such notice shall be irrevocable.

Section 2.08   **Optional and Mandatory Prepayments of Loans.**

(a)   Optional Prepayments.  Borrowers shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, without premium or penalty, subject to the requirements of this Section 2.08; *provided* that each partial prepayment shall be in an amount that is an integral multiple of One Hundred Thousand Dollars ($100,000) and not less than Two Hundred Thousand Dollars ($200,000) or, if less, the outstanding principal amount of such Borrowing.

(b)   Material Agreements.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds of any termination payments, damages (including liquidated damages), indemnity payments, or other extraordinary payments under or in respect of any Material Agreement of Borrowers, in excess of Fifty Thousand Dollars ($50,000) individually or One Hundred Thousand Dollars ($100,000) in the aggregate per calendar year, Borrowers shall apply one hundred percent (100%) of such Net Cash Proceeds to make prepayments in accordance with Section 2.08(f).

(c)   Asset Sales.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds of any Asset Sale by Borrowers, Borrowers shall apply one hundred percent (100%) of such Net Cash Proceeds to make prepayments in accordance with Section 2.08(f).

(d)   Debt Issuance or Equity Issuance.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds of any Debt Issuance or Equity Issuance by Borrowers, Borrowers shall make prepayments in accordance with Section 2.08(f) in an aggregate principal amount equal to 100% of such Net Cash Proceeds.

(e)   Casualty Events.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds from a Casualty Event by Borrowers, unless otherwise agreed to in writing by the Required Lenders, Borrowers shall apply an amount equal to one hundred percent (100%) of such Net Cash Proceeds to make prepayments in accordance with Section 2.08(f).

(f)   Application of Prepayments.  Any prepayments made pursuant to this Section 2.08 shall be applied ratably to the Loans then outstanding.

(g)   Notice of Prepayment.  Borrowers shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m. Pacific Time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable; *provided* that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by Borrowers (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition, though no fault of Borrowers, is not satisfied.  Each such notice shall specify the prepayment date, the principal amount of the Loans to be prepaid, and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such

4884-8884-1.1

notice, the Administrative Agent shall advise the Lenders of the contents thereof. Such notice to the Lenders may be by electronic communication. Each partial prepayment of Loans shall be in an amount that would be permitted in the case of a Borrowing of Loans as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. All prepayments under Section 2.08 shall be accompanied by accrued and unpaid interest on the principal amount being prepaid to but excluding the date of payment.

**Section 2.09     Inability to Determine Rates; Benchmark Replacement Setting.**

(a)     _Inability to Determine Rates_.  If in connection with any request for a Loan, except in the case where the circumstances described in Section 2.09(b) apply, (A) the Administrative Agent reasonably determines that, pursuant to the definition thereof, adequate and reasonable means do not exist for determining Term SOFR for the then-current Interest Period, or (B) the Required Lenders reasonably determine (provided the Required Lenders shall notify the Administrative Agent following such determination) that for any reason Term SOFR for the then-current Interest Period with respect to a proposed Loan does not adequately and fairly reflect the cost to such Lenders of funding (or being deemed to fund) such Loan, the Administrative Agent will promptly so notify Borrowers and each Lender. Thereafter, (y) the obligation of the Lenders to make or maintain Loans shall be suspended until the Administrative Agent (in the case of a determination pursuant to clause (b) above, upon the instruction of the Required Lenders) revokes such notice, and (z) until a Benchmark Replacement has been selected and implanted, the Loans shall accrue interest at the Base Rate plus the Applicable Margin.

(b)     _Benchmark Replacement Setting_.

(i)     _Benchmark Replacement_.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent (acting at the direction of the Required Lenders) may, without further action or consent of any other party to this Agreement or any other Loan Document, amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. Eastern Time on the fifth (5th) Business Day after the Administrative Agent has posted notice of such proposed amendment to all affected Lenders and Borrowers, so long as the Administrative Agent has not received by such time written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders, stating that such Benchmark Replacement does not constitute a replacement index rate that is widely adopted in the leveraged syndicated loan market. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.09(b)(i) will occur prior to the applicable Benchmark Transition Start Date.

(ii)     _Benchmark Replacement Conforming Changes_.  In connection with the use, administration, adoption, or implementation of a Benchmark Replacement, the Administrative Agent (acting at the direction of the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document (and the Lenders hereby (i) authorize and direct the Administrative Agent to make any Benchmark Replacement Conforming Changes (and to enter into any modifications to this Agreement or other Loan Documents implementing such Benchmark Replacement Conforming Changes) in respect of which the Administrative Agent has received a direction from the Required Lenders to implement, and (ii) acknowledge and agree that the Administrative Agent shall be entitled to all of the exculpations, protections and indemnifications provided for in this Agreement in favor of the Administrative Agent in implementing any Benchmark Replacement Conforming Changes (or in entering into any modifications to this Agreement

4884088.1.1     Case: 24-50211     Doc# 45-1     Filed: 03/07/24     Entered: 03/07/24 09:41:50     Page 44 of 123

or the other Loan Documents implementing the same) in respect of which the Administrative Agent has received a direction from the Required Lenders to implement).

(iii)     Notices; Standards for Decisions and Determinations. The Administrative Agent (acting at the direction of the Required Lenders) will promptly notify Borrowers and the applicable Lenders of (1) the implementation of any Benchmark Replacement, (2) the effectiveness of any Benchmark Replacement Conforming Changes, (3) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.09(b)(iv), and (4) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision, or election that may be made by the Administrative Agent (acting at the direction of the Required Lenders) as expressly set forth in this Section 2.09(b) and the defined terms used herein, including any determination with respect to a tenor, rate, or adjustment or of the occurrence or non-occurrence of an event, circumstance, or date, and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.09(b).

(iv)     Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion and in consultation with Borrowers, or (2) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent (acting at the direction of the Required Lenders) may (by providing notice thereof (which may be via email) to Borrowers and the Lenders), modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor, (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent (acting at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time (by providing notice thereof (which may be via email) to Borrowers and the Lenders) to reinstate such previously removed tenor, and (C) if a new tenor for such Benchmark is displayed on a screen or other information service selected by the Administrative Agent in its reasonable discretion, then the Administrative Agent (acting at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to add such new tenor.

(v)     Benchmark Unavailability Period. During the continuance of any Benchmark Unavailability Period, any outstanding Loans will, after the end of the applicable Interest Period, accrue interest at the Base Rate plus the Applicable Margin.

Section 2.10     **Increased Costs; Change in Legality.**

(a)     If any Change in Law shall:

(i)     impose, modify, or deem applicable any reserve, special deposit, compulsory loan, insurance charge, or similar requirement against property of, deposits with or for the account of, or credit extended by or participated in by, any Lender (except any such reserve requirement reflected in the Term SOFR); or

(ii)　　subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)　　impose on any Lender or the SOFR market any other condition, cost, or expense affecting this Agreement or Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest, or otherwise), then Borrowers shall, upon the written request of such Lender, pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.  The protection of this Section 2.10 shall be available to each Lender regardless of any possible contention regarding the invalidity or inapplicability of the Change in Law that has occurred or has been imposed.

(b)　　If any Lender determines (in its sole and absolute discretion) that any Change in Law regarding Capital Requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)　　A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 2.10(a) or (b) shall be delivered to Borrowers (with a copy to the Administrative Agent) and shall be conclusive and binding absent manifest error; *provided, however,* that such certificate need not include any confidential or price sensitive information or any information that is prohibited by applicable Legal Requirements from being disclosed.  Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)　　Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation; provided that Borrowers shall not be required to compensate a Lender pursuant to this Section 2.10 for any increased costs incurred or reductions suffered more than nine (9) months prior to the earlier of (y) the date on which such Lender notifies Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor, and (z) the date on which such Change in Law becomes effective; *provided* that if such Change in Law is retroactive, then the nine (9)-month period referred to above shall be extended to denote the period of retroactive effect thereof.

(e)　　Notwithstanding any other provision of this Agreement, if any Change in Law makes it unlawful for any Lender to make or maintain any Loan based on Term SOFR or to give effect to its obligations as provided herein with respect to any Loan based on Term SOFR, then, by written notice to Borrowers and to the Administrative Agent:

(i)　　such Lender may declare that Loans based on Term SOFR will not thereafter (for the duration of such unlawfulness (as determined in good faith by such Lender)) be made

4884-0881-1
Case: 24-50211　　Doc# 45-1　　Filed: 03/07/24　　Entered: 03/07/24 09:41:50　　Page 46 of 123

by such Lender hereunder, unless such declaration is subsequently withdrawn by such Lender by written notice to Borrowers and to the Administrative Agent; and

(ii)      such Lender may require that all outstanding Loans made by it will automatically commence to, and any future Loans made by it will, accrue interest based on the Base Rate as of the effective date of such notice as provided in <u>Section 2.10(f)</u>.

For purposes of <u>Section 2.10(e)</u>, a notice to Borrowers by any Lender shall be effective as to each Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Loan. In all other cases, such notice shall be effective on the date of receipt by Borrowers.

   **Section 2.11      Breakage Payments.**   In the event of (a) the payment or prepayment, whether optional or mandatory, of any principal of any Loan earlier than the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Loan from interest accrual based on Term SOFR to interest accrual based on the Base Rate earlier than the last day of the Interest Period applicable thereto, (c) the failure to borrow or prepay any Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Loan earlier than the last day of the Interest Period applicable thereto as a result of a request by Borrowers pursuant to <u>Section 2.14</u>, then, in any such event, Borrowers shall compensate each Lender for the loss, cost, and expense attributable to such event.  In the case of a Loan, such loss, cost, or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at Term SOFR plus the Applicable Margin (together with any interest payable at the Default Rate, if then applicable) that would have been applicable to such Loan, for the period from the date of such event to the last day of the then-current Interest Period therefor (or, in the case of a failure to borrow, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for Dollar deposits of a comparable amount and period from other banks in the SOFR market.  A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this <u>Section 2.11</u> shall be delivered to Borrowers (with a copy to the Administrative Agent) and shall be conclusive and binding absent manifest error.  Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof; *provided, however*, that such certificate need not include any confidential or price sensitive information or any information that is prohibited by applicable Legal Requirements from being disclosed.

   **Section 2.12      Payments Generally; Pro Rata Treatment; Sharing of Setoffs.**

(a)      Borrowers shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, or fees, or of amounts payable under <u>Section 2.10</u>, <u>2.11</u> or <u>2.13</u>, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 1 p.m. Pacific Time), on the date when due, in immediately available funds, without setoff, deduction, or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its account most recently designated by it for such purpose by notice to Borrowers, except that payments pursuant to <u>Sections 2.10</u>, <u>2.11</u>, <u>2.13</u> and <u>10.03</u> shall be made directly to the Persons entitled thereto, and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document is due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in

40

the case of any payment accruing interest, interest thereon shall be payable for the period of such extension, *provided* that, if such extension would cause payment of interest on or principal of Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day. All payments under each Loan Document shall be made in Dollars.

(b)       If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, and fees then due hereunder, such funds shall be applied (1) *first*, to payment of that portion of the Obligations constituting fees, indemnities, expenses, and other amounts (including reasonable fees, charges, and disbursements of counsel to the Administrative Agent) then due and payable to the Administrative Agent in its capacity as such, until payment in full of all such fees has been made, (2) *second,* to payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, (3) *third*, to the payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, and (4) *fourth*, to the payment of all other Obligations then due hereunder, ratably among the parties entitled thereto in accordance with the amount of such amounts then due to such parties.

(c)       If any Lender, by exercising any right of setoff or counterclaim (including pursuant to Section 10.08) or otherwise (including by exercise of its rights under the Security Documents), obtains payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 2.12(c) shall not be construed to apply to any payment made by Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Eligible Assignee or participant. Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Legal Requirements, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of Borrowers in the amount of such participation. If under applicable Debtor Relief Law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.12(c) applies, such Secured Party shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.12(c) to share in the benefits of the recovery of such secured claim.

(d)       Unless the Administrative Agent has received written notice from Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that Borrowers will not make such payment, the Administrative Agent may assume that Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules or practices on interbank compensation.

4884-0884-1

(e)     If any Lender fails to make any payment required to be made by it pursuant to Section 2.02(b), 2.12(d), or 10.03(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

### Section 2.13     Taxes.

(a)     Any and all payments by or on account of any obligation of Borrowers hereunder or under any other Loan Document shall be made without setoff, counterclaim, or other defense, and free and clear of and without deduction, reduction, or withholding for any and all Taxes, except as required by applicable Legal Requirements; *provided* that if any Taxes are required by applicable Legal Requirements (as determined in the good faith discretion of an applicable withholding agent) to be deducted or withheld from such payments, then (i) if such Tax is an Indemnified Tax, the sum payable by Borrowers shall be increased as necessary so that after making all required deductions, reductions, or withholdings (including deductions, reductions, or withholdings applicable to additional sums payable under this Section 2.13), the Administrative Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions, reductions, or withholdings been made, (ii) the applicable withholding agent shall be entitled to make such deductions, reductions, or withholdings, and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Legal Requirements. In addition, Borrowers shall timely pay to the relevant Governmental Authority in accordance with applicable Legal Requirements, or at the option of the Administrative Agent timely reimburse it for payment of, any Other Taxes.

(b)     Borrowers shall indemnify the Administrative Agent and each Lender, within ten (10) Business Days after written demand therefor, for the full amount of any Indemnified Taxes paid or payable by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of Borrowers hereunder or under any other Loan Document or required to be withheld or deducted from a payment to such recipient (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.13), and any penalties, interest, and expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender (in each case, with a copy delivered concurrently to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(c)     Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrowers have not already indemnified the Administrative Agent for such Indemnified Taxes, and without limiting the obligation of Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.04(e) relating to the maintenance of a Participant Register, and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (c).

(d)     As soon as practicable after any payment of Taxes pursuant to this Section and in any event within twenty (20) Business Days following any such payment being due by Borrowers to a Governmental Authority, Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the Tax Return reporting such payment, or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Borrower is resident for tax purposes, or under any treaty to which such jurisdiction is a party with respect to payments under any Loan Document, shall deliver to Borrowers and the Administrative Agent, at the time or times reasonably requested by Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. Notwithstanding anything to the contrary in the preceding sentence, the completion, execution, and submission of such documentation (other than such documentation set forth in part (i) of the following sentence or in Section 2.13(g)) shall not be required if in the Foreign Lender's reasonable judgment such completion, execution, or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Without limiting the generality of the foregoing, each Foreign Lender shall, to the extent it is legally entitled to do so, (i) furnish to Borrowers and the Administrative Agent whichever of the following is applicable: (A) two accurate and complete executed copies of U.S. Internal Revenue Service Form W-8BEN E (or successor form), *provided* that any Foreign Lender that is relying on the so-called "portfolio interest exemption" within the meaning of Section 881(c) of the Code shall also furnish a "Non-Bank Certificate" in the form of Exhibit I, (B) two accurate and complete executed copies of U.S. Internal Revenue Service Form W-8ECI (or successor form), (C) two accurate and complete executed copies of U.S. Internal Revenue Service Form W-8EXP (or successor form), or (D) two accurate and complete executed copies of U.S. Internal Revenue Service Form W-8IMY (or successor form) (with any required attachments), certifying, in each case, to such Foreign Lender's legal entitlement to an exemption or reduction from U.S. federal withholding tax with respect to all withholdable payments under any Loan Document, and (ii) to the extent it may lawfully do so at such times, upon reasonable request by Borrowers or the Administrative Agent, provide a new Form W-8BEN-E (or successor form), Form W-8ECI (or successor form), Form W-8EXP (or successor form), Form W-8IMY (or successor form), and/or certification upon the expiration or obsolescence of any previously delivered form or certification to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any withholdable payment under any Loan Document. Any Lender that is not a Foreign Lender shall (1) furnish to Borrowers and the Administrative Agent two accurate and complete executed copies of U.S. Internal Revenue Service Form W-9 (or successor form), or shall otherwise establish an exemption from U.S. backup withholding, and (2) at such times, upon reasonable request by Borrowers or the Administrative Agent, provide a new Form W-9 (or successor form) upon the expiration or obsolescence of any previously delivered form. Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Administrative Agent in writing of its legal inability to do so.

(f)     If a payment made to a Lender hereunder would be subject to U.S. federal withholding Tax under FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrowers and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by Borrowers or the Administrative Agent, such documentation prescribed by applicable Legal Requirements (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrowers or the Administrative Agent as may be necessary for Borrowers and the Administrative Agent to comply with

4884-0884-1

their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA, or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.13(f), the term "FATCA" shall include any amendments to FATCA after the date hereof.

(g)    If the Administrative Agent or a Lender (or an assignee) determines in its sole discretion exercised in good faith that it has received a refund of any Indemnified Taxes as to which it has been indemnified by Borrowers or with respect to which Borrowers have paid additional amounts pursuant to this Section 2.13, it shall pay over an amount equal to such refund to Borrowers (but only to the extent of indemnity payments made, or additional amounts paid, by Borrowers under this Section 2.13 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender (or assignee) incurred in order to obtain such refund, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided, however,* that if the Administrative Agent or such Lender (or assignee) is required to repay all or a portion of such refund to the relevant Governmental Authority, Borrowers, upon the request of the Administrative Agent or such Lender (or assignee), shall repay the amount paid over to Borrowers that is required to be repaid (plus any penalties, interest, or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender (or assignee) within five (5) Business Days after receipt of written notice that the Administrative Agent or such Lender (or assignee) is required to repay such refund (or a portion thereof) to such Governmental Authority. Nothing contained in this Section 2.13(h) shall require the Administrative Agent or any Lender (or assignee) to make available its Tax Returns or any other information that it deems sensitive, confidential, or privileged to Borrowers or any other Person. Notwithstanding anything to the contrary, in no event will the Administrative Agent or any Lender (or assignee) be required to pay any amount to Borrowers the payment of which would place the Administrative Agent or such Lender (or assignee) in a less favorable net after-tax position than the Administrative Agent or such Lender (or assignee) would have been in if the Indemnified Taxes or Other Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld, or otherwise imposed, and the indemnification payments or additional amounts with respect to such Taxes had never been paid.

(h)    Survival. Each party's obligations under this Section 2.13 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, and the repayment, satisfaction, or discharge of all obligations under any Loan Document.

Section 2.14    Mitigation Obligations; Replacement of Lenders.

(a)    Mitigation of Obligations. If any Lender requests compensation under Section 2.10(a) or (b), or if Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.13, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches, or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce materially amounts payable pursuant to Section 2.10(a), 2.10(b) or 2.13, as the case may be, in the future, (ii) would not subject such Lender to any unreimbursed cost or expense, (iii) would not require such Lender to take any action inconsistent with its internal policies or legal or regulatory restrictions, and (iv) would not otherwise be disadvantageous to such Lender. Borrowers shall pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment. A certificate setting forth such costs and expenses submitted by such Lender to the Administrative Agent shall be conclusive and binding absent manifest error.

44

(b)      <u>Replacement of Lenders</u>.  In the event (i) any Lender delivers a certificate requesting compensation pursuant to <u>Section 2.10(a)</u> or <u>(b)</u>, (ii) any Lender delivers a notice described in <u>Section 2.10(e)</u>, (iii) Borrowers are required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to <u>Section 2.13</u>, (iv) any Lender fails to consent to any amendment, waiver, or other modification of any Loan Document requested by Borrowers that requires the consent of one hundred percent (100%) of the Lenders or one hundred percent (100%) of all affected Lenders, and which, in each case, has been consented to by all other Lenders or all other affected Lenders, as the case may be, or (v) any Lender defaults in its obligations to make Loans, Borrowers may, at their sole expense and effort (including with respect to the processing and recordation fee referred to in <u>Section 10.04(b)</u>), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in <u>Section 10.04</u>), all of its interests, rights, and obligations under this Agreement to an Eligible Assignee, which shall assume such assigned obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment); *provided* that (w) except in the case of <u>clause (iv)</u> above, if the effect of such amendment, waiver, or other modification of the applicable Loan Document would cure any Default or event of Default then ongoing, no such Default or Event of Default shall have occurred and be continuing, (x) such assignment shall not conflict with any applicable Legal Requirement, (y) Borrowers shall have received the prior written consent of the Administrative Agent (at the direction of the Required Lenders), which consent shall not unreasonably be withheld or delayed, and (z) Borrowers or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest and any prepayment premium or penalty (if any) accrued to the date of such payment on the outstanding Loans of such Lender affected by such assignment, plus all Fees and other amounts owing to or accrued for the account of such Lender hereunder (including any amounts under <u>Sections 2.10</u> and <u>2.11</u>); *provided further* that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under <u>Section 2.10(a)</u> or <u>(b)</u> or notice under <u>Section 2.10(e)</u> or the amounts paid pursuant to <u>Section 2.13</u>, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in <u>Section 2.10(e)</u>, or cease to result in amounts being payable under <u>Section 2.13</u>, as the case may be (including as a result of any action taken by such Lender pursuant to <u>Section 2.14(a)</u>), or if such Lender waives its right to claim further compensation under <u>Section 2.10(a)</u> or <u>(b)</u> in respect of such circumstances or event or withdraws its notice under <u>Section 2.10(e)</u> or waives its right to further payments under <u>Section 2.13</u> in respect of such circumstances or event, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder.  Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Assumption necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this <u>Section 2.14(b)</u>.

(c)      <u>Defaulting Lenders</u>.  Anything contained herein to the contrary notwithstanding, in the event that any Lender becomes a Defaulting Lender, then (i) during any Default Period with respect to such Defaulting Lender, such Defaulting Lender shall be deemed not to be a "**Lender**", and the amount of such Defaulting Lender's Commitments and Loans shall be excluded for purposes of voting, and the calculation of voting, on any matters (including the granting of any consents or waivers) with respect to any of the Loan Documents; *provided*, *however*, that such Defaulting Lender shall continue to be deemed a Lender for purposes of <u>Section 10.02(b)(i)</u>, <u>(ii)</u> and <u>(iii)</u>; and (ii) to the extent permitted by applicable Legal Requirements, until such time as the Default Excess with respect to such Defaulting Lender has been reduced to zero, (A) any voluntary prepayment of the Loans pursuant to <u>Section 2.08(a)</u> shall, if Borrowers so direct at the time of making such voluntary prepayment, be applied to the Loans of other Lenders in accordance with <u>Section 2.08(a)</u> as if such Defaulting Lender had no Loans outstanding, and (B) any mandatory prepayment of the Loans pursuant to <u>Section 2.08</u> shall, if Borrowers so direct at the time of making such mandatory prepayment, be applied to the Loans of other Lenders (but

45

not to the Loans of such Defaulting Lender) in accordance with Section 2.08, as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender, it being understood and agreed that Borrowers shall be entitled to retain any portion of any mandatory prepayment of the Loans that is not paid to such Defaulting Lender solely as a result of the operation of the provisions of this clause (B).

For purposes of this Agreement, (i) "**Funding Default**" means, with respect to any Defaulting Lender, the occurrence of any of the events set forth in the definition of "Defaulting Lender"; (ii) "**Defaulted Loan**" means the Loans of a Defaulting Lender; (iii) "**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (a) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable, (b) with respect to any Funding Default (other than any such Funding Default arising pursuant to clause (e) of the definition of "**Defaulting Lender**"), the date on which (1) the Default Excess with respect to such Defaulting Lender is reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms hereof or any combination thereof), and (2) such Defaulting Lender has delivered to Borrowers and the Administrative Agent a written reaffirmation of its intention to honor its obligations under this Agreement with respect to its Commitment(s), and (c) the date on which Borrowers, the Administrative Agent, and the Required Lenders waive all Funding Defaults of such Defaulting Lender in writing; and (iv) "**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Percentage of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Defaulting Lenders (including such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of Loans of such Defaulting Lender.

No amount of the Commitment of any Lender shall be increased or otherwise affected, and, except as otherwise expressly provided in Section 2.14(c), performance by Borrowers of their obligations under this Agreement and the other Loan Documents shall not be excused or otherwise modified, as a result of any Funding Default or the operation of Section 2.14(c). The rights and remedies against a Defaulting Lender under Section 2.14(c) are in addition to other rights and remedies that Borrowers may have against such Defaulting Lender with respect to any Funding Default, and that the Administrative Agent or any Lender may have against such Defaulting Lender with respect to any Funding Default.

**Section 2.15    Withdrawal of Funds from the Segregated Post-Sale Remainder Account**. Borrowers shall have the right, no more than (A) one (1) time each calendar week (commencing with the first (1st) calendar week after achievement of the Self-Funding Date), to withdraw the funds on deposit in the Segregated Post-Sale Remainder Account, by delivering written notice to the Administrative Agent and the Lenders in the form of Exhibit G (each such notice, a "**Post-Sale Account Withdrawal Notice**") not later than 12:00 p.m. Pacific Time, one (1) Business Day prior to the proposed Withdrawal Date; *provided* that (i) Borrowers shall concurrently provide a forecast of their Qualified Cash immediately after giving effect to the disbursements to be made with such requested withdrawal and all other cash disbursements and all cash receipts to be made or received, as applicable, during the one-week period following the applicable Withdrawal Date, in a form substantially consistent with the Approved Budget, certified by a Responsible Officer of the Borrower Representative, demonstrating to the satisfaction of the Required Lenders or their advisors, that the aggregate amount of Qualified Cash at the end of such one-week period will not exceed One Million Five Hundred Thousand Dollars ($1,500,000), and (ii) all Conditions shall be satisfied prior to and after giving effect to such withdrawal. Each Post-Sale Account Withdrawal Notice shall specify the following information:

(a)    the amount of such Withdrawal;

(b)     the date of such proposed Withdrawal (which shall be on the first Business Day following the delivery of a Post-Sale Account Withdrawal Notice) (the "**Withdrawal Date**");

(c)     specifying, in reasonable detail, the use of proceeds of all amounts to be Withdrawn on the applicable Withdrawal Date, and, if such proceeds are to be used to pay one or more disbursements set forth in the Approved Budget (subject to Permitted Variances and not including any post-sale expenses in respect of Sale Assets for which a sale has been consummated) for the applicable week, such detail shall refer to the applicable line items in such Approved Budget (subject to Permitted Variances and excluding any expenses post-sale expenses in respect of Sale Assets for which a sale has been consummated);

(d)     that as of the date of such withdrawal, the Conditions are satisfied;

(e)     the wiring instructions of the account of Borrowers to which the proceeds of such withdrawal are to be disbursed; and

(f)     to the extent that the use of proceeds of such requested Withdrawal requires consent from the Required Lenders as provided for herein, a representation and warranty that Borrowers have received such approval.

Borrowers shall provide any supporting evidence regarding a requested Withdrawal as the Administrative Agent may reasonably request. On the Withdrawal Date specified in the Post-Sale Account Withdrawal Notice, if all requested supporting evidence has been provided and is acceptable to the Administrative Agent, the Administrative Agent shall disburse funds from the Segregated Post-Sale Remainder Account in an aggregate principal amount equal to the amount specified in such Post-Sale Account Withdrawal Notice to the account of Borrowers specified in such Post-Sale Account Withdrawal Notice, unless the Administrative Agent has received a Withdrawal Termination Instruction from the Required Lenders prior to 10:00 a.m. Pacific Time, on such Withdrawal Date (and such Withdrawal Termination Instruction has not been withdrawn by the Required Lenders in writing prior to 10:00 a.m. Pacific Time on such Withdrawal Date).

Funds withdrawn or applied from the Segregated Post-Sale Remainder Account shall be used solely to pay (y) one or more disbursements set forth in the then-effective Approved Budget (subject to Permitted Variances thereto), or (z) any fees or other amounts due and payable to the Lenders or the Administrative Agent, other than those capitalized in accordance with the provisions hereof.

On and after the date of receipt by the Administrative Agent of a written direction from the Required Lenders instructing the Administrative Agent that it may no longer honor instructions from Borrowers with respect to the Segregated Post-Sale Remainder Account due to any of the Conditions being unsatisfied or incapable of satisfaction (a "**Withdrawal Termination Instruction**"), Borrowers shall have no right to request withdrawals from the Segregated Post-Sale Remainder Account, and the Administrative Agent shall not honor any such request until instructed otherwise by the Required Lenders or the Bankruptcy Court; *provided*, *however*, that the Administrative Agent shall not be liable for (i) any disbursements pursuant to instructions from Borrowers or the Bankruptcy Court, or (ii) irrevocable electronic funds transfers or wire transfers that are subject to cut-off times, in each case, that were processed or initiated prior to receipt of such Withdrawal Termination Instruction. Any Withdrawal Termination Instruction received by the Administrative Agent from the Required Lenders shall remain in effect until such time, if any, as the Administrative Agent has received a written termination of such Withdrawal Termination Instruction from the Required Lenders.

Each submission by Borrowers to the Administrative Agent of a Post-Sale Account Withdrawal Notice shall be deemed to constitute a representation and warranty by Borrowers that the

4884-0889-1...
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 54 of 123

Conditions have been satisfied as of the applicable Withdrawal Date (both before and after giving effect to the proposed Withdrawal). With respect to any disbursement, withdrawal, transfer, or application of funds from the Segregated Post-Sale Remainder Account hereunder, the Administrative Agent shall be entitled to conclusively rely upon, and shall be fully protected in relying upon, (i) any Post-Sale Account Withdrawal Notice submitted by Borrowers as evidence that all Conditions have been satisfied, unless the Administrative Agent has received a Withdrawal Termination Instruction from the Required Lenders prior to 10:00 a.m. Pacific Time, on the applicable Withdrawal Date (and such Withdrawal Termination Instruction has not been subsequently withdrawn by the Required Lenders in writing prior to 10:00 a.m. Pacific Time on such Withdrawal Date), and (ii) any Withdrawal Termination Instruction received by it. Notwithstanding anything herein to the contrary, the Administrative Agent shall have no obligation to disburse any amount from the Segregated Post-Sale Remainder Account in excess of the amounts then held in the Segregated Post-Sale Remainder Account. The Administrative Agent shall have no duty to inquire or investigate whether any condition precedent to a withdrawal from the Segregated Post-Sale Remainder Account has been satisfied, and shall not be deemed to have any knowledge that a condition is not satisfied unless it has received a Withdrawal Termination Instruction.

Notwithstanding anything to the contrary contained herein, the Administrative Agent shall be entitled to apply funds held in the Segregated Post-Sale Remainder Account to the payment of the fees owing and all expenses and indemnities payable to the Administrative Agent or the Lenders hereunder or under any other Loan Document, regardless of whether any condition precedent in Article IV or in this Section 2.15 has been satisfied, and regardless of whether a Withdrawal Termination Instruction has been delivered to the Administrative Agent. Notice of such application shall be provided to Borrowers and the Lenders, but the failure to provide such notice shall not affect the validity of such application. In the event that any amount remains in the Segregated Post-Sale Remainder Account on the Maturity Date, such funds shall be applied to the Obligations in the order provided in Section 8.03.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Borrowers represent and warrant to the Administrative Agent and each of the Lenders on the Closing Date and on the date of each Loan and on each Withdrawal Date that:

**Section 3.01    Organization; Powers.**  Each Borrower (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) subject to the entry of the DIP Orders and any other orders of the Bankruptcy Court, if applicable, has all requisite power and authority to carry on its business as now conducted, and (c) is qualified, licensed, and in good standing (to the extent such concept is legally recognized in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify, be licensed, or be in good standing could not reasonably be expected to result in a Material Adverse Effect.

**Section 3.02    Authorization; Enforceability.**  Subject to the entry of the DIP Orders and the terms thereof, the Transactions to be entered into by Borrowers are within each Borrower's powers and have been duly authorized by all necessary limited liability company action on the part of Borrowers. Subject to the entry of the DIP Orders and the terms thereof, this Agreement has been duly executed and delivered by each Borrower and constitutes, and each other Loan Document to which any Borrower is to be a party, when executed and delivered by that Borrower, will constitute, a legal, valid, and binding obligation of that Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, or other laws affecting creditors' rights generally, regardless of whether considered in a proceeding in equity or at law.

**Section 3.03    No Conflicts; No Default.**  Subject to the entry of the DIP Orders and the terms thereof, the Transactions (a) do not require any consent, exemption, authorization, or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, and (ii) consents, approvals, exemptions, authorizations, registrations, filings, permits, or actions the failure of which to obtain or perform could not reasonably be expected to result in a Material Adverse Effect, (b) will not violate or result in a default or require any consent or approval (other than such as have been obtained and are in full force and effect) under (1) any Post-Petition indenture, instrument, agreement, or other document binding upon Borrowers or their properties, or to which any Borrower or its property is subject, or give rise to a right thereunder to require any payment to be made by any Borrower, or (2) any Organizational Document of any Borrower, (d) will not violate any Legal Requirement in any material respect (other than violations arising as a result of the commencement of the Case, and except as otherwise excused by the Bankruptcy Code), and (e) will not result in the creation or imposition of any Lien on any property of any Borrower, except Liens created by the Security Documents and the DIP Orders.  No Default or Event of Default has occurred and is continuing.

**Section 3.04    Financial Condition; No Material Adverse Effect.**

(a)    All financial statements relating to Borrowers that have been or may hereafter be delivered by Borrowers to the Administrative Agent and the Lenders pursuant to the terms of this Agreement have been prepared in accordance with GAAP and present fairly, in all material respects, the financial position and results of operations and cash flows of Borrowers and their consolidated Subsidiaries as of such dates and for such periods.  The representations in this Section 3.04(a), as applicable, are subject, in the case of unaudited financial statements, to normal year-end audit adjustments and accruals and the absence of notes. The representations in this Section 3.04(a), as applicable, are subject, in the case of unaudited financial statements, to normal year-end audit adjustments and accruals and the absence of notes.

(b)    Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect. As of the Closing Date, no Default or Event of Default has occurred and is continuing on such date or after giving effect to the extensions of credit requested to be made on such date (it being understood that notwithstanding any other provision in this Agreement, none of the following shall constitute a Default, or an Event of Default, or an event or circumstance having a Material Adverse Effect under this Agreement: (1) any fact or circumstance arising or occurring prior to the Petition Date; or (2) the commencement of the Case).

**Section 3.05    Properties.**

(a)    Each Borrower has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens and irregularities, deficiencies, and defects in title, except for Permitted Liens (or, in the case of Collateral, Permitted Collateral Liens) and minor irregularities, deficiencies, and defects in title that, individually or in the aggregate, do not, and could not reasonably be expected to, interfere in any material respect with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose.

(b)    The property of each Borrower, taken as a whole, (i) is in good operating order, condition, and repair (ordinary wear and tear excepted), and (ii) constitutes all the property that is required for the business and operations of that Borrower as presently conducted, in each case, except as could not reasonably be expected to have a Material Adverse Effect.

(c)    The Schedules of Assets and Liabilities contain a true and complete list of each ownership and leasehold interest in Real Property (i) owned by any Borrower as of the Closing Date, and

49

describes the type of interest therein held by each Borrower, and (ii) leased, subleased, or otherwise occupied or utilized by any Borrower, as lessee, sublessee, franchisee, or licensee, as of the Closing Date, and describes the type of interest therein held by any Borrower.

(d) Each Borrower owns or has rights to use all of its property and all rights with respect to any of the foregoing used in or necessary for any Borrower's business as currently conducted, except for those the failure to own or have rights to use which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The use by Borrowers of their respective property and all such rights with respect to the foregoing do not infringe on the rights or other interests of any Person, other than any infringement that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. No claim has been made and remains outstanding that any Borrower's use of any of its property does or may violate the rights of any third party that, individually or in the aggregate, has had, or could reasonably be expected to result in, a Material Adverse Effect. The Real Property is zoned in all material respects to permit the uses for which such Real Property is currently being used. The present uses of the Real Property and the current operations of Borrowers' businesses do not violate in any material respect any provision of any applicable building codes, subdivision regulations, fire regulations, health regulations, or building and zoning by-laws.

**Section 3.06    Intellectual Property.**

(a) Each Borrower owns or is licensed to use, free and clear of all Liens (other than Permitted Liens), all patents and patent applications, trademarks, trade names, service marks, copyrights, domain names, and applications for registration thereof, and technology, trade secrets, proprietary information, inventions, know-how, and processes, in each case necessary for the conduct of its business as currently conducted (the "**Intellectual Property**"), except for those the failure to own or license which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and the use thereof by Borrowers does not, to the knowledge of Borrowers, infringe in any material respect upon the rights of any other Person.

(b) Each Borrower has obtained the necessary intellectual property licenses that Borrowers reasonably believe are required for the conduct of its business as currently conducted, the absence of any of which could reasonably be expected to have a Material Adverse Effect.

(c) With respect to each material license in or to Intellectual Property held by any Borrower: (i) such license is valid and binding and in full force and effect and represents the entire agreement between the respective licensor and licensee with respect to the subject matter of such license, and (ii) such license will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the rights and interests granted herein, nor will the grant of such rights and interests constitute a breach or default under such license or otherwise give the licensor or sublicensor a right to terminate such license.

**Section 3.07    Equity Interests and Subsidiaries.**  No Borrower, other than the Borrower Representative, has any Subsidiaries. All Equity Interests of Borrowers are duly and validly issued and are fully paid and non-assessable. The Borrower Representative is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by (or purporting to be pledged by) it under the Security Documents, free of any and all Liens, rights, or claims of other Persons, except the security interest created by the Security Documents and any Permitted Liens that arise by operation of applicable Legal Requirements and are not voluntarily granted, and, as of the Closing Date, there are no outstanding warrants, options, or other rights (including derivatives) to purchase, or shareholder, voting trust, or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or

sale of, any such Equity Interests pledged by the Borrower Representative (or any economic or voting interests therein).

Section 3.08    Litigation.  Except for the Case and the actions, suits, claims, disputes, and proceedings pending therein, there are no actions, suits, claims, disputes, or proceedings, at law or in equity, by or before any Governmental Authority now pending or, to the best of the knowledge of Borrowers, threatened against or affecting Borrowers or any business, property, or rights of any Borrower (i) that purport to affect or involve any Loan Document or any of the Transactions, or (ii) that have resulted, or as to which there is a reasonable possibility of an adverse determination, and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 3.09    Material Agreements.  To the knowledge of any Responsible Officer of the Borrower Representative, each Material Agreement with liabilities of, or revenues to, any Borrower in excess of Seventy-five Thousand Dollars ($75,000) (the "**Specified Material Agreements**") in existence on the Closing Date is listed on Schedule 3.09.  The copies of each of the Specified Material Agreements, and any amendments thereto provided or to be provided by Borrowers to the Administrative Agent are, or when delivered will be, true and complete copies of such agreements and documents.  Except as permitted under Section 6.10 or disclosed on Schedule 3.09, as of the Closing Date, to the knowledge of any Responsible Officer of the Borrower Representative, no termination event has occurred under any Specified Material Agreement, each Specified Material Agreement is in full force and effect, and no Borrower has received any written notice of a material default, expiration, breach, or termination pursuant to any Specified Material Agreement.  To the knowledge of any Responsible Officer of the Borrower Representative, except as disclosed on Schedule 3.09, each Borrower is in compliance in all material respects with the terms of the Specified Material Agreements to which it is a party, excluding any effects arising from the filing of the Case or from any action required to be taken under the Loan Documents or under the DIP Orders.  To the knowledge of any Responsible Officer of the Borrower Representative, no Material Counterparty is in default of any of its obligations under any Specified Material Agreement other than defaults which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 3.10    Federal Reserve Regulations.

(a)    No Borrower is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing, buying or carrying Margin Stock.

(b)    No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally, or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulations T, U, or X.

Section 3.11    Investment Company Act, etc.  No Borrower is (a) an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to regulation under, or required to be registered pursuant to, the Investment Company Act of 1940, as amended, or (b) subject to regulation under any Legal Requirement (other than Regulation X) that limits its ability to incur, create, assume, or permit to exist Indebtedness or grant any Contingent Obligation in respect of Indebtedness.

Section 3.12    Use of Proceeds.  Borrowers will use the proceeds of any Borrowing and Withdrawal solely in accordance with Section 5.08.

Section 3.13    Taxes.  (a) Except for Taxes that need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code, and Taxes that are being contested in good faith by

51

appropriate proceedings and for which Borrowers have set aside on their books adequate reserves in accordance with GAAP, each Borrower has duly paid or caused to be duly paid all material Taxes (whether or not shown on any Tax Return) due and payable by it and all assessments received by it, and (b) each Borrower has filed or caused to be filed all material federal, state, local, and foreign Tax Returns required to have been filed by it, and all such Tax Returns are true and correct in all material respects. Each Borrower has made adequate provision in accordance with GAAP for all Taxes not yet due and payable. No Borrower has any knowledge of any proposed or pending tax assessments, deficiencies, audits, or other proceedings, and no proposed or pending tax assessments, deficiencies, audits, or other proceedings have resulted, or could, individually or in the aggregate, reasonably be expected to result, in a Material Adverse Effect. No Borrower has ever "participated" in a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4. No Borrower is party to any tax sharing or similar agreement. No Property owned by any Borrower is the subject of any temporary abatement or any other temporary tax reduction. Each Borrower has been properly treated as a disregarded entity or a partnership for U.S. federal income tax purposes.

      **Section 3.14**   **No Material Misstatements.**   Borrowers have disclosed to the Lenders all agreements, instruments, and corporate or other restrictions to which any of them is subject, and all other matters known to any Borrower that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates, or other information furnished by or on behalf of Borrowers to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered pursuant thereto (as modified or supplemented by other information so furnished) contained or contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading as of the date such information is dated or certified; *provided* that, with respect to projected financial information, Borrowers represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time. The Initial Budget, the Estimated Remainder Budget, and each Updated Budget and cash flow forecast delivered following the delivery of either thereof are prepared in good faith based upon estimates and assumptions believed by management of Borrowers to be reasonable in light of the current conditions and facts known to Borrowers at the time delivered.

      **Section 3.15**   **Labor Matters.**   There are no strikes, lockouts, or slowdowns against Borrowers pending or, to the best of the knowledge of Borrowers, threatened that have resulted in, or could reasonably be expected to result in, a Material Adverse Effect. The hours worked by, and payments made to, employees of Borrowers (or employees of any farm labor contractor utilized by Borrowers) have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable Legal Requirement dealing with such matters in any manner that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

      **Section 3.16**   **Agreements with Affiliates.**   Schedule 3.16 sets forth any and all agreements, transactions, or series of related transactions among, on the one hand, any Borrower, and on the other hand, one or more Affiliates of any Borrower, in each case, that involve payment of more than Ten Thousand Dollars ($10,000) and that are in existence as of the Closing Date.

      **Section 3.17**   **Employee Benefit Plans.**

            (a)       Except to the extent the failure to comply could not reasonably be expected to result in a Material Adverse Effect, Borrowers and each of its ERISA Affiliates are in compliance with all applicable Legal Requirements, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder, with respect to all Employee Benefit Plans. Each Employee Benefit Plan complies in all material respects, and is operated and maintained in compliance in

52

all material respects, with all applicable Legal Requirements, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder. Each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination from the Internal Revenue Service for all required amendments, and nothing has occurred that could reasonably be expected to prevent, or cause the loss of, such qualification.

(b)        No ERISA Event has occurred or is expected to occur. No Pension Plan has any Unfunded Pension Liability. Except as could not reasonably be expected to result in a Material Adverse Effect (either individually or in the aggregate), within the last six (6) years, no Pension Plan has been terminated, whether or not in a "standard termination" as that term is used in Section 4041 of ERISA, nor has any Pension Plan (determined at any time within the last six (6) years) with an Unfunded Pension Liability been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA) of Borrowers or any of its ERISA Affiliates. Using actuarial assumptions and computation methods consistent with subpart I of subtitle E of Title IV of ERISA, the aggregate liabilities of Borrowers or any of its ERISA Affiliates to all Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Multiemployer Plan, have not resulted in, and could not reasonably be expected to result in, a Material Adverse Effect.

(c)        Borrowers have no Foreign Plans.

**Section 3.18        <u>Environmental Matters</u>.**

(a)        Except as set forth on <u>Schedule 3.18</u> or the Schedules of Assets and Liabilities:

(i)        Each Borrower and its business, operations, and Real Property are, and at all times during such Borrower's ownership or lease thereof have been, in compliance in all material respects with, and no Borrower has any material liability under, any applicable Environmental Law that would be senior in priority to the Obligations;

(ii)        each Borrower (y) has obtained all Environmental Permits required for the conduct of its business and operations, and the ownership, operation, and use of its Real Property, under all applicable Environmental Laws, and (z) is in compliance with the terms and conditions of such Environmental Permits, and all such Environmental Permits are valid and in good standing, in each case, except as would not reasonably be expected to result in a Material Adverse Effect;

(iii)        there has been no Release or threatened Release, or any handling, management, generation, treatment, storage, or disposal of Hazardous Materials on, at, under, or from any Real Property or facility presently or formerly owned, leased, or operated by Borrowers or its predecessors in interest that has resulted in, or is reasonably likely to result in, material liability or obligations by any Borrower under Environmental Law or in an Environmental Claim, in each case, except as would not reasonably be expected to result in a Material Adverse Effect;

(iv)        there is no Environmental Claim pending or, to the knowledge of Borrowers, threatened against any Borrower, or relating to the Real Property currently or formerly owned, leased, or operated by any Borrower or relating to the operations of any Borrower, and, to the knowledge of Borrowers, there are no actions, activities, circumstances, conditions, events, or incidents that are reasonably likely to form the basis of such an Environmental Claim, in each case, except as would not reasonably be expected to result in a Material Adverse Effect;

(v)        No Borrower is obligated to perform any action or otherwise incur any expense under Environmental Law, including pursuant to any Order or agreement by which it is bound or

48840884.1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 60 of 123

has assumed by contract or agreement, and no Borrower is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location, in each case, except as would not reasonably be expected to result in a Material Adverse Effect;

(vi)  to the best knowledge of Borrowers, no Real Property or facility owned, operated, or leased by any Borrower and, to the knowledge of Borrowers, no Real Property or facility formerly owned, operated, or leased by any Borrower or any of its predecessors in interest, is (i) listed or proposed for listing on the National Priorities List as defined in and promulgated pursuant to CERCLA, or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA, or (iii) included on any similar list maintained by any Governmental Authority that denotes that any Borrower has or is reasonably likely to have an obligation to undertake investigatory or remediation obligations under applicable Environmental Laws;

(vii)  to Borrowers' knowledge, there are no underground or aboveground storage tanks containing any Hazardous Material located on any Real Property, except as set forth on Schedule 3.18; and

(viii)  the execution, delivery, and performance of this Agreement and the other Loan Documents, and the consummation of the Transactions and the other transactions provided for herein and therein will not require any notification, registration, filing, reporting, disclosure, investigation, remediation, or cleanup obligations pursuant to any Governmental Real Property Disclosure Requirements or any other Environmental Law, except for such notice, filings, reports, and/or disclosures as are required under the Bankruptcy Code and Bankruptcy Rules or under the Loan Documents.

**Section 3.19    Insurance.**  Schedule 3.19 sets forth a true, complete, and accurate description in reasonable detail of all insurance where any Borrower is a named insured as of the Closing Date.  Each Borrower is covered by insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations, or as are otherwise deemed prudent by such Borrower in the exercise of its reasonable business judgment.  All material insurance for which any Borrower is a named insured is in full force and effect, all premiums have been duly paid and, except as set forth on Schedule 3.19, no Borrower has received a notice of violation, invalidity, or cancellation thereof.  The Premises, and the use, occupancy, and operation thereof, comply in all material respects with all Insurance Requirements, and there exists no default under any Insurance Requirement.

**Section 3.20    No Bank Accounts.**  No Borrower maintains any deposit or other bank accounts other than Permitted Accounts.

**Section 3.21    Anti-Terrorism Law; Foreign Corrupt Practices Act.**

(a)  No Borrower is, and, to the knowledge of Borrowers, no Affiliate of any Borrower is, in violation of, nor shall Borrowers use any proceeds of the Loans in violation of, any Legal Requirements relating to terrorism or money laundering ("**Anti-Terrorism Laws**"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "**Executive Order**"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (the "**Patriot Act**").

(b)  No Borrower is, and, to the knowledge of Borrowers, no Affiliate or broker or other agent of any Borrower acting or benefiting in any capacity in connection with the Loans, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"); and Borrowers will not directly or indirectly use the proceeds of the Loans or

54

otherwise make available such proceeds to any Person for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

(c) Neither any Borrower nor, to the knowledge of Borrowers, any Affiliate or broker or other agent of any Borrower acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods, or services to or for the benefit of any Person described in <u>Section 3.21(b)</u>, (ii) deals in, or otherwise engages in any transaction relating to, any property, or interests in property, blocked or frozen pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(d) Neither any Borrower nor any director or officer, nor to the knowledge of Borrowers, any agent, employee, or other Person acting, directly or indirectly, on behalf of any Borrower, has, in the course of its actions for, or on behalf of, any Borrower, directly or indirectly (i) used any corporate funds for any unlawful contribution, gift, entertainment, or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback, or other unlawful payment to any foreign or domestic government official or employee.

**Section 3.22**     <u>**Case; DIP Orders; Secured Super-Priority Obligations.**</u>

(a) The Case was commenced on the Petition Date in accordance with applicable Legal Requirements, and legally sufficient notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and, when applicable, the Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (*provided* that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled).

(b) The provisions of the Loan Documents and the Interim Order (with respect to the period prior to the Final Order Entry Date) or the Final Order (with respect to the period on and after the Final Order Entry Date), as the case may be, are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid, and perfected Liens on and security interests in all right, title, and interest in and to the Collateral, having the priority provided for herein and in the Interim Order (with respect to the period prior to the Final Order Entry Date) or the Final Order (with respect to the period on and after the Final Order Entry Date), as the case may be, and which are enforceable against Borrowers.

(c) Pursuant to, and to the extent permitted in the Interim Order (with respect to the period on and after the Interim Order Entry Date and prior to the Final Order Entry Date) and the Final Order (with respect to the period on and after the Final Order Entry Date), the Obligations will constitute allowed administrative expense claims in the Case having priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order granting such relief), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject only to payment of the Carve-Out in accordance with the DIP Orders, and any Claims secured by Permitted Third Party Liens.

(d) Pursuant to, and to the extent permitted in the Interim Order (with respect to the period on and after the Interim Order Entry Date and prior to the Final Order Entry Date) and the Final Order (with respect to the period on and after the Final Order Entry Date), the Secured Obligations will be secured by a valid and perfected Lien on all of the Collateral of Borrowers subject, as to priority, to the Carve-Out and Permitted Third Party Liens in accordance with the DIP Orders.

4884088v1

(e) The Interim Order (with respect to the period on and after the Interim Order Entry Date and prior to the Final Order Entry Date) or the Final Order (with respect to the period on and after the Final Order Entry Date), as the case may be, is in full force and effect and has not been challenged, reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's written consent, modified or amended. Borrowers are in compliance in all material respects with the Interim Order (with respect to the period on and after the Interim Order Entry Date and prior to the Final Order Entry Date) or the Final Order (with respect to the period on and after the Final Order Entry Date).

(f) Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and, subject to the provisions of Article VIII, to enforce the remedies provided for hereunder or under applicable Legal Requirements, without further notice, motion, or application to, hearing before, or order from, the Bankruptcy Court.

(g) Subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, neither the Obligations nor the obligations under the Prepetition Loan Documents shall be subject to setoff or recoupment or any such rights under Section 553 of the Bankruptcy Code or otherwise with respect to any claim Borrowers may have against the Lenders arising on or before the Petition Date.

(h) Pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Order, all Obligations and all other obligations of Borrowers under the Loan Documents at all times shall constitute allowed Superpriority Claims, and shall at all times be senior to the rights of Borrowers, the estate of Borrowers, and any successor trustee or estate representative in the Case or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out.

(i) Pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Orders, all Secured Obligations are secured by a first priority perfected Lien on all unencumbered assets of Borrowers (now existing or hereafter acquired) and all proceeds thereof that were not subject to a perfected, non-avoidable Lien as of the Petition Date, subject only to the Carve-Out.

(j) Pursuant to Section 364(c)(3) of the Bankruptcy Code and the DIP Orders, and subject and subordinate in all respects to the Carve-Out, all Secured Obligations are secured by valid, binding, continuing, fully-perfected junior Liens on and security interests in all Collateral that, on or as of the Petition Date, are subject to Permitted Third Party Liens, in each case other than the Prepetition Liens.

(k) Pursuant to Section 364(d)(1) of the Bankruptcy Code, and subject in all respects to the Carve-Out, all Secured Obligations are secured by a perfected first priority senior priming Lien on and security interest in all Collateral, subject and junior to Permitted Third Party Liens.

**Section 3.23     Commercial Activity; Absence of Immunity.** Each Borrower is subject to civil and commercial law with respect to its obligations under the Loan Documents, and the making and performance of the Loan Documents by Borrowers constitute private and commercial acts rather than public or governmental acts. No Borrower is entitled to any immunity on the ground of sovereignty or the like from the jurisdiction of any court or from any action, suit, setoff, or proceeding, or the service of process in connection therewith, arising under the Loan Documents. No Borrower is subject to any kind of statutory claims presentation requirement, including, without limitation, the Government Claims Act or any analogous statutory scheme, whether state or federal.

# ARTICLE IV
# CONDITIONS PRECEDENT

**Section 4.01     Conditions to Effectiveness.** The effectiveness of this Agreement is subject to satisfaction (or waiver) of the following conditions precedent set forth in this Section 4.01:

(a)     Loan Documents. There shall have been delivered to the Administrative Agent and the Lenders a properly executed counterpart of each of the Loan Documents.

(b)     Corporate Documents. The Administrative Agent and the Lenders shall have received:

(i)     a certificate of a Responsible Officer of the Borrower Representative dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of Borrowers certified (to the extent applicable) as of a recent date by the Secretary of State of the state of its organization, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of each Borrower authorizing the execution, delivery, and performance of the Loan Documents to which that Borrower is a party and the Loans hereunder, and that such resolutions have not been modified, rescinded, or amended and are in full force and effect, and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of any Borrower (together with a certificate of another officer as to the incumbency and specimen signature of the Responsible Officer executing the certificate required by this clause (i)); and

(ii)     a certificate as to the good standing (to the extent such concept is legally recognized in the applicable jurisdiction) of each Borrower as of a recent date, from such Secretary of State.

(c)     Officer's Certificate. The Administrative Agent and the Lenders shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower Representative, confirming compliance with the conditions precedent set forth in this Section 4.01 and Sections 4.03(b), (c) and (d).

(d)     Insurance. The Administrative Agent and the Lenders shall have received a copy of, or a certificate as to coverage under, the Insurance Policies and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), and shall name the Administrative Agent, on behalf of the Secured Parties, as additional insured, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(e)     Bank Regulatory Documentation. To the extent requested two (2) Business Days prior to the Closing Date, the Administrative Agent and the Lenders shall have received, in form and substance satisfactory to them, all documentation and other information required by bank regulatory authorities or reasonably requested by the Administrative Agent or any Lender under or in respect of applicable Anti-Terrorism Laws or "know-your-customer" Legal Requirements, including the Executive Order.

(f)     Initial Budget. The Lenders shall have received the Initial Budget, in form and substance satisfactory to the Required Lenders.

4854988v.1

(g)        No Material Adverse Effect.  No change in the business, assets, management, operations, financial condition, or prospects of Borrowers, other than the filing of the Case, shall have occurred since the Petition Date, which change has had or would reasonably be expected to have a Material Adverse Effect.

(h)        No Action.  Except for the Case and the actions, suits, investigations, litigation, and proceedings pending in the Case, there shall exist no unstayed action, suit, investigation, litigation, or proceeding pending or (to the knowledge of the Borrower Representative) threatened in any court or before any arbitrator or governmental instrumentality (other than the Bankruptcy Court) that would reasonably be expected to have a Material Adverse Effect.

(i)        Material Agreements.  To the extent not previously delivered to the Administrative Agent and the Lenders, a copy of each of the Material Agreements executed prior to the Closing Date and any amendments thereto shall have been made available to the Administrative Agent and the Lenders for their review.

(j)        Bankruptcy Related Items.

(i)        The Case shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(ii)        A motion, in form and substance satisfactory to the Required Lenders and the Administrative Agent, seeking approval of the DIP Term Facility, shall have been filed in the Case.

(iii)        Borrowers shall have made no payments after the Petition Date on account of any Indebtedness arising prior to the Petition Date unless such payment is made (x) with the express written consent of the Required Lenders, (y) pursuant to "first day" orders acceptable to the Required Lenders, or (z) as provided in the Approved Budget.

(iv)        No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner (other than a fee examiner) shall have been appointed in the Case.

(v)        The Interim Order Entry Date shall have occurred not later than thirty (30) calendar days following February 19, 2024, and the Interim Order shall be in full force and effect and shall not have been challenged, vacated, or reversed, shall not be subject to a stay or appeal, and shall not have been modified or amended in any respect without the prior express written consent of the Required Lenders.

Each Lender, by delivering its signature page to this Agreement on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved or accepted or to be satisfied with, each Loan Document and each other document required to be approved by, acceptable, or satisfactory to the Administrative Agent, the Required Lenders, or any Lenders, as applicable, on the Closing Date.

**Section 4.02    Conditions to the Initial Loans and Withdrawals.**  The obligation of each Lender to make Loans on the Initial Credit Extension Date shall be subject to, and to the satisfaction of, each of the conditions precedent set forth below:

(a)        Officer's Certificate.  The Administrative Agent and the Lenders shall have received a certificate, dated the Initial Credit Extension Date and signed by a Responsible Officer of the Borrower Representative, confirming compliance with the conditions precedent set forth in this  and Sections 4.03(b), (c) and (d).

(b)     No Material Adverse Effect.  No change in the business, assets, management, operations, financial condition, or prospects of Borrowers, other than the filing of the Case, shall have occurred since the Petition Date, which change has had or would reasonably be expected to have a Material Adverse Effect.

(c)     No Action.  Except for the Case and the actions, suits, investigations, litigation, and proceedings pending in the Case, there shall exist no unstayed action, suit, investigation, litigation, or proceeding pending or (to the knowledge of Borrowers) threatened in any court or before any arbitrator or governmental instrumentality (other than the Bankruptcy Court) that would reasonably be expected to have a Material Adverse Effect.

(d)     Bankruptcy Related Items.

(i)     The Case shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(ii)     Borrowers shall have made no payments after the Petition Date on account of any Indebtedness arising prior to the Petition Date unless such payment is made (x) with the express written consent of the Required Lenders, (y) pursuant to "first day" orders acceptable to the Required Lenders, or (z) as provided in the Approved Budget.

(iii)     No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner (other than a fee examiner) shall have been appointed in the Case.

(iv)     The Interim Order Entry Date shall have occurred not later than thirty (30) calendar days following February 19, 2024, and the Interim Order shall be in full force and effect and shall not have been challenged, vacated, or reversed, shall not be subject to an appeal or stay, and shall not have been modified or amended in any respect without the prior express written consent of the Required Lenders.

(e)     Schedules.  The Administrative Agent and the Lenders shall have received Schedule 6.01(b) and Schedule 6.02(c).

**Section 4.03     Conditions to All Loans and Withdrawals.**  The obligation of each Lender to make any Loan (including the initial Loans), and Borrowers' right to make a Withdrawal from the Segregated Post-Sale Remainder Account on each Withdrawal Date, shall be subject to, and to the satisfaction of, each of the conditions precedent set forth below.

(a)     Notice.  The Administrative Agent shall have received a Borrowing Request as required by Section 2.03 if Loans are being requested or a Post-Sale Account Withdrawal Notice (and all other required deliveries under Section 2.15) if a Withdrawal from the Segregated Post-Sale Remainder Account is being requested.

(b)     No Default.  Borrowers shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after giving effect to such Loan or Withdrawal and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date.

(c)     Representations and Warranties.  Each of the representations and warranties made by Borrowers set forth in Article III or in any other Loan Document shall be true and correct in all

4884088v.12

material respects on and as of the date of such Loan or Withdrawal with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); *provided* that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(d)  DIP Orders.  The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, or subject to a stay pending appeal.

(e)  Entry of Final Order.  With respect to any Borrowing or Withdrawal Date that is on or after the date which is eighty (80) calendar days following [_____, 2024],[2] the Final Order shall have been signed and entered by the Bankruptcy Court, and such order shall be in full force and effect and shall not hexave been reversed, modified, amended, stayed, or vacated absent the prior written consent of the Required Lenders.

Each Borrowing Request or Post-Sale Account Withdrawal Notice submitted by Borrowers after the Closing Date shall be deemed to be a representation and warranty (upon which reliance is both presumed and presumed to be reasonable) that the conditions specified in Sections 4.03(b), (c), and (d) and, in the case of each Borrowing Request or Post-Sale Account Withdrawal Notice submitted on or after the date specified in Section 4.03(e), Section 4.03(e), have been satisfied on and as of the date of the applicable Loan or Withdrawal, as the case may be.

# ARTICLE V
# AFFIRMATIVE COVENANTS

Until the Commitments have been terminated and the principal of and interest and premium (if any) on each Loan and all Fees and all other expenses or amounts payable under any Loan Document (other than contingent indemnification and reimbursement obligations as to which no claim is pending) have been paid in full in cash, Borrowers will, and will cause each of their respective Subsidiaries to, at Borrowers' sole cost and expense:

**Section 5.01  Financial Statements, Reports, etc.**  Furnish to the Administrative Agent (for prompt distribution to each Lender):

(a)  Quarterly Reports.  As soon as available and in any event within forty-five (45) days after the end of each fiscal quarter of each fiscal year, the consolidated balance sheet of Borrowers as of the end of such fiscal quarter and related consolidated statements of income and cash flows for such fiscal quarter and for the then-elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year (if any), all prepared in accordance with GAAP and accompanied by a certificate of a Responsible Officer of the Borrower Representative stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of Borrowers as of the date and for the periods specified in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(b)  Monthly Reports.  As soon as available and in any event within thirty (30) days after the end of each fiscal month, the consolidated balance sheet of Borrowers as of the end of such fiscal

---

[2] NTD:  Enter the date that is 80 days after the date of this Agreement.

Case: 24-50211   Doc# 45-1   Filed: 03/07/24   Entered: 03/07/24 09:41:50   Page 67 of 123

month and related consolidated statements of income and cash flows for such fiscal month and for the then-elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year, all prepared in accordance with GAAP and accompanied by a certificate of a Responsible Officer of the Borrower Representative stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations, and cash flows of Borrowers as of the date and for the periods specified in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)     Updated Budget.  No later than by 11:59 p.m. Pacific Time on the Tuesday preceding the end of the then-current Budget Compliance Period, an Updated Budget covering the 13-week period beginning on the first day of the next-following Budget Compliance Period, except for the initial Budget Compliance Period commencing upon the first day of the Estimated Remainder Budget; *provided, however,* that if the Tuesday on which the Updated Budget is due is a legal holiday, then the Updated Budget shall be due no later than  12:00 p.m. (noon) Pacific Time on the next day that is not a legal holiday. Each Updated Budget delivered after the Closing Date shall be subject to the consent of the Required Lenders, and no such Updated Budget shall be effective as the Approved Budget until so approved; *provided,* that in the event the Required Lenders have not approved an Updated Budget as being the "Approved Budget" within three (3) Business Days after delivery thereof, the then-existing Approved Budget shall continue to constitute the Approved Budget for the subsequent Budget Compliance Period and shall continue to be effective, including for testing purposes, until such time as an Updated Budget is approved by the Required Lenders; *provided*, *further* that the Administrative Agent and the Lenders (i) may assume that Borrowers will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance, (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget, (iv) the line items in the Approved Budget for payment of interest, expenses, and other amounts to the Administrative Agent and the Lenders shall be estimates only, and Borrowers shall remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable DIP Order regardless of whether such amounts exceed such estimates, and (v) nothing in any Approved Budget  shall constitute an amendment or other modification of any Loan Document.  Approved Budgets will be the only basis for measuring the Budget variance covenant set forth in Section 5.16;

(d)     Liquidity Certificate and Flash Revenue Report. No later than 11:59 p.m. Pacific Time on the Tuesday of the first full week after the Closing Date, and on the same day and by the same time of each succeeding week (*provided, however,* that if the relevant Monday or Tuesday is a legal holiday, then the due date and time shall be no later than 12:00 p.m. (noon) Pacific Time on the relevant Wednesday), (i) a certificate of a Responsible Officer of the Borrower Representative reporting Liquidity as of the last Business Day of the immediately preceding week, and (ii) a flash revenue report, including details in respect of revenue by type during the immediately preceding week, in form and substance reasonably satisfactory to the Lenders;

(e)     Compliance Certificate.  Concurrently with any delivery of financial statements under Section 5.01(a) or (b),  a Compliance Certificate certifying that no Default has occurred, or, if such a Default has occurred, specifying in reasonable detail the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(f)     Budget Variance Report.  No later than 11:59 p.m. Pacific Time on the Tuesday following a Variance Testing Date (*provided, however,* that if the relevant Monday or Tuesday is a legal holiday, then the due date and time shall be no later than 12:00 p.m. (noon) Pacific Time on the relevant Wednesday), a Budget Variance Report with respect to the Budget Compliance Period to which such Variance Testing Date relates, commencing with the first Variance Testing Date to occur following the Closing Date;

4884088v.1
Case: 24-50211     Doc# 45-1     Filed: 03/07/24     Entered: 03/07/24 09:41:50     Page 68 of 123

(g)     <u>Operating Metrics</u>. Concurrently with the delivery of financial statements under <u>Section 5.01(a)</u> or <u>(b)</u>, in each case with respect to the immediately preceding quarter or month, as the case may be, schedules detailing certain operating metrics in accordance with <u>Exhibit D</u>;

(h)     <u>Bank Accounts</u>.  Within five (5) Business Days of the end of each calendar month, in electronic format, an itemized summary of all withdrawals from the Permitted Accounts made during such calendar month;

(i)     <u>Sale Efforts</u>.

(i)     (i)     Concurrently with each delivery of a Budget Variance Report, a confidential weekly report regarding efforts to sell Sale Assets, prepared by the Borrower Representative, the Broker, or another Bankruptcy Court-approved advisor, which report shall summarize potential bidders, data site access, indications of interest received, letters of intent received, and such other matters as the Administrative Agent may request; and

(ii)     within one (1) Business Day of receipt, copies of all indications of interest, letters of intent, or draft purchase agreements received from a third-party bidder;

and, in addition, the Borrower Representative and the Broker (or other Bankruptcy Court-approved advisor) will hold a weekly call with the Administrative Agent and/or the Lenders to provide an update on efforts to sell the Sale Assets and related topics;

(j)     <u>Agriculture Reporting Status Update</u>.  Concurrently with each delivery of a Budget Variance Report, an Agricultural Reporting Status Update in substantially the form of <u>Exhibit E</u> or in such other form as may be approved by the Required Lenders, detailing all major cultivation activities, separated by Ranch (and, as used herein "**Ranch**" means each generally contiguous portion of agricultural land, whether under cultivation now, planted to trees yet to reach maturity, or intended to be so planted, as identified in the "**Ranch Index**" attached hereto as <u>Schedule 5.01(i)</u>; and

(k)     <u>Change in Producers</u>.  Promptly following the occurrence thereof, notice of (i) any material change in volume of farm products being delivered by any Borrower to a processor, or (ii) any change in processor(s) utilized by any Borrower.

(l)     <u>Other Information</u>.  Promptly, from time to time, such other information regarding the operations, business affairs, and financial condition of Borrowers or any of their Subsidiaries (including, without limitation, balance sheets and related statements of income and cash flow), or compliance with the terms of any Loan Document, or the environmental condition of any Real Property, or the 363 sale process as the Administrative Agent or any Lender may reasonably request.

**Section 5.02**     **<u>Litigation and Other Notices</u>**. Furnish to the Administrative Agent written notice of the following promptly (and, in any event, within five (5) Business Days following the date on which a Responsible Officer obtains knowledge thereof):

(a)     any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)     the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit, litigation, or proceeding (other than before the Bankruptcy Court), whether at law or in equity or otherwise by or before any Governmental Authority, (i) against any Borrower, or any Subsidiary or Affiliate of a Borrower, that has had, or could reasonably be expected to

result in, a Material Adverse Effect, (ii) with respect to any Loan Document, or (iii) with respect to any of the other Transactions;

(c)        any development that has resulted, or could reasonably be expected to result, in a Material Adverse Effect after the Closing Date;

(d)        the occurrence of a Casualty Event in excess of Twenty-five Thousand Dollars ($25,000) (whether or not covered by insurance);

(e)        the occurrence of any ERISA Event or any event with respect to a Foreign Plan, that, alone or together with any other ERISA Events or any other events with respect to a Foreign Plan that have occurred, could reasonably be expected to result in liability of Borrowers in an aggregate amount exceeding Fifty Thousand Dollars ($50,000);

(f)        the receipt by any Borrower of any notice of any Environmental Claim or violation of or potential liability under, or knowledge by any Borrower that there exists a condition that has resulted, or could reasonably be expected to result, in an Environmental Claim or a violation of or liability under, any Environmental Law, except for Environmental Claims, violations, and liabilities the consequence of which, in the aggregate, have not and could not be reasonably likely to subject Borrowers to liabilities exceeding Twenty-five Thousand Dollars ($25,000);

(g)        (i) the incurrence of any Lien (other than Permitted Collateral Liens) on, or claim asserted against, all or any substantial portion of the Collateral, or (ii) the occurrence of any other event that could reasonably be expected to materially and adversely affect the value of the Collateral (other than the commencement of the Case and related matters);

(h)        no later than five (5) Business Days prior to the execution and delivery thereof (where available or otherwise as soon thereafter as practicable) (which period may be shortened in any instance at the Administrative Agent's discretion), notice of any amendment to any Material Agreement;

(i)        within ten (10) Business Days of any documents becoming available, true and complete copies of any amendment of any Material Agreement and of any Material Agreements executed after the Closing Date;

(j)        within three (3) Business Days of delivery or receipt, copies of all notices (including but not limited to all formal correspondence and all correspondence relating to any potential or anticipated litigation) received from, or delivered to, any counterparty to a Material Agreement or any other vendor or customer agreement that could reasonably be expected to require payments by, or to, any Borrower in excess of Twenty-five Thousand Dollars ($25,000), outside the ordinary course of business;

(k)        within five (5) Business Days after the earlier of (i) a Responsible Officer of the Borrower Representative obtaining knowledge thereof, and (ii) receipt of any notice thereof, any Indebtedness or Lien that existed on the Petition Date and that is not listed on Schedule 6.01(b) or Schedule 6.02(c), respectively;

(l)        promptly (and in any event within three (3) Business Days) after the filing thereof, each update to the Schedules of Assets and Liabilities if not otherwise provided through the Bankruptcy Court's electronic docketing system; and

4884088v.1

(m)        within five (5) Business Days after the earlier of (i) a Responsible Officer of the Borrower Representative obtaining knowledge thereof, and (ii) receipt of any notice thereof, the occurrence of any material default under any Material Agreement.

**Section 5.03    Existence; Businesses and Properties.**

(a)        Do or cause to be done all things necessary to preserve, renew, and maintain in full force and effect (y) its legal existence, and (z) all rights and franchises, licenses, and permits necessary to the conduct of its business, except, in the case of this <u>clause (z)</u>, as otherwise expressly permitted under <u>Section 6.05</u> or <u>Section 6.06</u> or otherwise would reasonably be expected to result in a Material Adverse Effect.

(b)        Do or cause to be done all things necessary to maintain or cause to be maintained in good repair, working order, and condition, ordinary wear and tear excepted, all properties material to the conduct of the business of any Borrower, and from time to time will make or cause to be made all appropriate repairs, renewals, and replacements thereof necessary in order that the business carried on in connection therewith may be properly conducted at all times, except as would not reasonably be expected to result in a Material Adverse Effect; *provided* that nothing in this <u>Section 5.03(b)</u> shall prevent any abandonment or other disposition of property or assets permitted to be made pursuant to <u>Section 6.06</u>.

(c)        Adhere at all times to sound and commercially reasonable cultural practices in line with industry norms.

**Section 5.04    Insurance.**  (a)  Maintain such insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, or as is otherwise deemed prudent by the Borrower Representative in the exercise of its reasonable business judgment, including (i) physical hazard insurance on an "all risk" basis, (ii) commercial general liability insurance against claims for bodily injury, death, or property damage covering any and all insurable claims, (iii) business interruption insurance, and (iv) worker's compensation insurance, and such other insurance as may be required by any Legal Requirement (in each case, such policies to be in such form and amounts and having such coverage as may be reasonably satisfactory to the Required Lenders); *provided* that with respect to physical hazard insurance, (y) neither the Required Lenders nor Borrowers shall agree to the adjustment of any claim thereunder without the consent of the other (such consent not to be unreasonably conditioned, withheld, or delayed), and (z) no consent of Borrowers shall be required during an Event of Default.  Each such policy of insurance maintained by or on behalf of any Borrower shall (A) in the case of liability insurance policies, name the Administrative Agent, for the benefit of the Secured Parties, as an additional insured thereunder, and (B) in the case of business interruption and casualty insurance policies, contain a lender's loss payable clause or endorsement, reasonably satisfactory in form and substance to the Required Lenders, that names the Administrative Agent, for the benefit of the Secured Parties, as the lender's loss payee thereunder, and shall provide that it shall not be canceled or not renewed (i) by reason of nonpayment of premium upon not less than ten (10) days' prior written notice thereof by the insurer to the Administrative Agent (giving the Administrative Agent the right to cure defaults in the payment of premiums), or (ii) for any other reason upon not less than thirty (30) days' (or such shorter number of days as may be agreed to by the Administrative Agent or as may be the maximum number of days permitted by applicable law) prior written notice thereof by the insurer to the Administrative Agent.

(b)        Notify the Administrative Agent promptly (and, in any event, within three (3) Business Days) whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this <u>Section 5.04</u> is taken out by any Borrower; and promptly (and, in any event, within five (5) Business Days) deliver to the Administrative Agent a true and complete copy of each such policy.

(c) With respect to each Mortgaged Property, obtain flood insurance in such total amount as the Required Lenders may from time to time reasonably require, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973.

(d) With respect to any Mortgaged Property owned by any Borrower, no Borrower shall take any action that is reasonably likely to be the basis for termination, revocation, or denial of any insurance coverage required to be maintained under any Borrower's Mortgage or that could reasonably be the basis for a defense to any claim under any Insurance Policy maintained in respect of the Premises, and Borrowers shall otherwise comply in all material respects with all Insurance Requirements in respect of the Premises; *provided*, *however*, that any Borrower may, at its own expense and after written notice to the Administrative Agent, (i) contest the applicability or enforceability of any such Insurance Requirements by appropriate legal proceedings, the prosecution of which does not constitute a basis for cancellation or revocation of any insurance coverage required under this <u>Section 5.04</u>, or (ii) cause the Insurance Policy containing any such Insurance Requirement to be replaced by a new policy complying with the provisions of this <u>Section 5.04</u>.

Section 5.05 **Obligations and Taxes.** (a) In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court (it being understood that no Borrower shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code or an Order of the Bankruptcy Court, without an Order of the Bankruptcy Court authorizing such payments), pay its material Post-Petition obligations promptly and in accordance with their terms, and pay and discharge promptly when due all material Post-Petition Taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful Post-Petition Claims for labor, services, materials, and supplies or otherwise that, if unpaid, might give rise to a Lien other than a Permitted Lien upon such properties or any part thereof; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy, or claim so long as (i) the validity or amount thereof is contested in good faith by appropriate proceedings timely instituted and diligently conducted, and each affected Borrower has set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP, and (ii) such contest operates to suspend collection of the contested obligation, Tax, assessment, or charge and enforcement of a Lien other than a Permitted Lien.

Section 5.06 **Employee Benefits.** (a) Comply in all material respects with all applicable Legal Requirements, including the applicable provisions of ERISA and the Code, with respect to all Employee Benefit Plans and Foreign Plans, and (b) furnish to the Administrative Agent (y) as soon as possible after, and in any event within five (5) Business Days after, any Responsible Officer of the Borrower Representative or any ERISA Affiliate of Borrowers knows or has reason to know that any ERISA Event or other event with respect to an Employee Benefit Plan or Foreign Plan has occurred that, alone or together with any other ERISA Event, could reasonably be expected to result in liability of any Borrower or any of its ERISA Affiliates in an aggregate amount exceeding Twenty-five Thousand Dollars ($25,000), or the imposition of a Lien, a statement of a Responsible Officer of the Borrower Representative setting forth details as to such ERISA Event and the action, if any, that Borrowers propose to take with respect thereto, and (z) upon request by the Administrative Agent, copies of (i) the annual report (Form 5500 Series) filed by any Borrower or any of its ERISA Affiliates with the Employee Benefits Security Administration with respect to each Employee Benefit Plan; (ii) the most recent actuarial valuation report for each Pension Plan; (iii) all notices received by any Borrower or any of its ERISA Affiliates from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; and (iv) such other information, documents, or

4884088v.1
Case: 24-50211   Doc# 45-1   Filed: 03/07/24   Entered: 03/07/24 09:41:50   Page 72 of 123

governmental reports or filings relating to any Employee Benefit Plan or Foreign Plan as the Administrative Agent reasonably requests.

      **Section 5.07**    **Maintaining Records; Access to Properties and Inspections.**  Keep proper books of record and account in a manner to allow financial statements to be prepared in conformity with GAAP consistently applied in respect of all of its material financial transactions and matters involving its material assets and business. Borrowers will permit any representatives designated by the Administrative Agent or any Lender (i) to visit and inspect the financial records and the property of Borrowers upon reasonable prior notice and at reasonable times during normal business hours, and (ii) to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent (or, upon the occurrence and during the continuation of any Event of Default, any Lender) to discuss the affairs, finances, accounts, and condition of Borrowers with the officers and employees thereof, and advisors therefor (including independent accountants).

      **Section 5.08**    **Use of Proceeds.**  Use the proceeds of the Loans and Withdrawals solely in accordance with the DIP Orders and the Approved Budget (subject to Permitted Variances), (i) to pay costs, fees, and expenses related to the Case and in connection with the DIP Term Facility, including, without limitation, payments of interest, fees, and expenses owed to the Lenders and the Administrative Agent, (ii) for working capital and general corporate purposes (including capital expenditures) of Borrowers, (iii) to make payments in respect of Adequate Protection Obligations provided to the Prepetition Administrative Agent and Prepetition Lenders under the Prepetition Loan Documents as authorized by the Bankruptcy Court in the applicable DIP Order, and (iv) deposit into a segregated account for application to the payment of fees and expenses to professionals employed by Borrowers and the Official Committee of Unsecured Creditors in accordance with the procedures contained in the DIP Orders. No proceeds of the Loans or Withdrawals may be used for (i) repayment of Indebtedness permitted pursuant to Section 6.01(b) (other than payments of Adequate Protection Obligations permitted pursuant to the DIP Orders or other amounts set forth in the Approved Budget (subject to Permitted Variances), or (ii) payments or transfers to any Affiliates of a Borrower, unless in accordance with the Approved Budget (subject to Permitted Variances) or any Order approved by the Bankruptcy Court. Except to the extent set forth in the DIP Orders, no proceeds of the DIP Term Facility, any Collateral, or any Cash Collateral may be used (1) to finance any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion, or other litigation of any type adverse to the Administrative Agent or Lenders, the Prepetition Administrative Agent, and Prepetition Lenders under the Prepetition Loan Documents, or their respective rights and remedies under or in respect of the Loan Documents, the Prepetition Loan Documents, any DIP Order, or any Adequate Protection Obligations provided to the Prepetition Administrative Agent or Prepetition Lenders under the Prepetition Loan Documents, (2) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable the liens, claims, interests, and Adequate Protection Obligations of the Administrative Agent and the Lenders or the Prepetition Administrative Agent and Prepetition Lenders under the Prepetition Loan Documents, including (A) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations under the Loan Documents or the Prepetition Loan Documents or the Liens securing the Loan or the Prepetition Loans outstanding under the Prepetition Loan Documents, or (B) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the Obligations or the Prepetition Loans and Liens under the Loan Documents or Prepetition Loan Documents, (3) for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders, (4) to repay existing Indebtedness (other than Adequate Protection Obligations owing to the Prepetition Administrative Agent and Prepetition Lenders), (5) to make payments or transfers to any Affiliate of any Borrower not provided for in the Approved Budget (subject to Permitted Variances), (6) to make any payment in settlement of any claim, action, or proceeding before any court, arbitrator, or other governmental body, which payment is not provided for in the Approved Budget (subject to Permitted Variances), without the prior written consent of

the Required Lenders, or (7) to pay any expenses attributable to, or in contemplation of the production of any crop for the 2025 crop year.

     **Section 5.09    Compliance with Environmental Laws; Environmental Reports.**  (a) Comply, and use commercially reasonable efforts to cause all lessees and other Persons occupying its properties to comply, in all material respects with all Environmental Laws applicable to its operations and properties; obtain and renew all material environmental permits necessary for its operations and properties; and conduct any remedial action in accordance with Environmental Laws; *provided, however,* that no Borrower shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings, and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

     **Section 5.10    Additional Collateral.**  Subject to this Section 5.10, with respect to any property acquired after the Closing Date by any Borrower that is intended to be subject to the Liens securing the Secured Obligations but is not so subject, promptly (and in any event within fifteen (15) Business Days after the acquisition thereof, unless extended by the Required Lenders in writing in their sole discretion) (i) notify the Administrative Agent of such acquisition, and (ii) promptly following the Administrative Agent's request therefor, (A) execute and deliver to the Administrative Agent such amendments or supplements to the relevant Security Documents or such other documents as the Administrative Agent or the Required Lenders shall deem necessary or advisable to grant to the Administrative Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on such property subject to no Liens other than Permitted Collateral Liens, and (B) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Security Documents in accordance with all applicable Legal Requirements, including, if requested by the Administrative Agent, the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent.  Borrowers shall otherwise take such actions and execute and deliver to the Administrative Agent such documents as the Administrative Agent or the Required Lenders shall require to confirm the validity, perfection, and priority of the Lien of the Security Documents against such after-acquired properties.

     **Section 5.11    Security Interests; Further Assurances.**

        (a)      Promptly, upon the reasonable request of the Administrative Agent or any Lender, at Borrowers' expense, execute, acknowledge, and deliver, or cause the execution, acknowledgment, and delivery of, and thereafter register, file, or record, or cause to be registered, filed, or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent or the Required Lenders reasonably necessary or desirable for the continued validity, enforceability, perfection, and priority of the Liens on the Collateral covered thereby, subject to no other Liens except Permitted Liens, or obtain any consents or waivers as may be necessary or appropriate in connection therewith.

        (b)      Deliver or cause to be delivered to the Administrative Agent from time to time such other documentation, instruments, consents, authorizations, approvals, and Orders in form and substance reasonably satisfactory to the Required Lenders as the Required Lenders shall reasonably deem necessary or advisable to perfect or maintain the validity, enforceability, perfection, and priority of the Liens on the Collateral pursuant to the Security Documents.

        (c)      Make best efforts to deliver within ten (10) Business Days after the Closing Date, to the Administrative Agent, insurance endorsements or amendments to the Insurance Policies that include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), and that name the Administrative Agent, on behalf of the Secured Parties, as an additional insured, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

**Section 5.12** **Maintenance of Corporate Separateness.** Satisfy in all material respects customary corporate, limited liability company, or other like formalities, including the accurate maintenance of organizational and business records separate from those of any other Person.

**Section 5.13** **Priority of Liens.** Borrowers hereby covenant, represent, and warrant that, upon entry of the Interim Order (and when applicable, the Final Order) and to the extent provided for in such Order, the Secured Obligations:

(a) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim payable from and having recourse to all pre- and post-petition property of Borrowers and all proceeds thereof (excluding Avoidance Proceeds), having the priority of the Liens in respect of the DIP Term Facility as set forth in the DIP Order;

(b) pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and subject to the Carve-Out to the extent provided in the DIP Orders, shall be secured by a Lien on all Collateral of Borrowers, which Lien shall have the priority of the Liens in respect of the DIP Term Facility as set forth in the DIP Orders; and

(c) shall not be (A) subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of Borrowers and its estate under Section 551 of the Bankruptcy Code, (ii) unless otherwise provided for in the Loan Documents, any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other domestic or foreign governmental unit (including any regulatory body), commission, board, or court for any liability of Borrowers, or (iii) any intercompany or Affiliate Liens of the Borrowers or security interests of the Borrowers; or (B) subordinated to or made *pari passu* with any other lien or security interest granted by Borrowers under Section 363 or 364 of the Bankruptcy Code, except as provided in the DIP Order.

The Collateral shall not include Avoidance Actions or Avoidance Proceeds.

Subject to and effective only upon the Final Order Entry Date and the terms of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Case or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of Section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the Administrative Agent and the Required Lenders, with respect to their respective interests, and no consent shall be implied from any action, inaction, or acquiescence by the Administrative Agent or the Lenders. In no event shall the Administrative Agent or the Lenders be subject to (i) the "equities of the case" exception contained in Section 552(b) of the Bankruptcy Code (subject only to and effective upon entry the Final Order Entry Date), or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

Except for the Carve-Out, subject to the entry of the DIP Orders and the terms thereof, the Superpriority Claims shall at all times be senior to the rights of Borrowers, any Chapter 11 trustee and, subject to Section 726 of the Bankruptcy Code, any Chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Case or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 case (if the Case is converted to a case under Chapter 7 of the Bankruptcy Code).

Each Borrower hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens on the Collateral of Borrowers in favor of the Administrative Agent on behalf of and for the benefit of the Secured Parties in all of the assets of Borrowers shall be created and (to the extent the Interim Order (and, when entered, the Final Order) is effective to perfect under local law) perfected, without the necessity of the execution, recordation of filings by Borrowers of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral of Borrowers, as set forth in the Interim Order and the Final Order, as applicable.

Section 5.14    **Milestones.**  Ensure the satisfaction of the following milestones (collectively, the "**Milestones**," and each a "**Milestone**"), unless waived or extended with the consent of the Required Lenders or the Administrative Agent (with the written consent of the Required Lenders):

(a)    no later than March 1, 2024, Borrowers shall have identified a Broker reasonably acceptable to the Required Lenders;

(b)    no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall enter the Interim Order;

(c)    no later than eighty (80) days after the parties' execution of this Agreement, the Bankruptcy Court shall enter the Final DIP Order;

(d)    no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall enter an Order approving employment of the Broker(s);

(e)    no later than March 30, 2024, Borrowers shall file a motion seeking approval of bidding procedures (the "**Bidding Procedures**"), in form and substance reasonably acceptable to the Lenders and consistent with this Agreement;

(f)    no later than March 30, 2024, Borrowers shall commence the Sale Process, including the issuance of preliminary offering materials;

(g)    no later than April 30, 2024, the Bankruptcy Court shall have entered an Order approving the Bidding Procedures (the "**Bidding Procedures Order**"), in form and substance acceptable to the Lenders;

(h)    no later than May 31, 2024, an auction shall have been conducted, if necessary, for at least twenty percent (20%) (or such other percentage as has been agreed to between the Borrowers and the Required Lenders, in their sole discretion), determined on the basis of acreage, of the Borrowers' consolidated Real Property acreage and non-cash assets of the Borrower(s) that own the affected Real Property (Borrowers' Real Property and non-cash assets, the "**Sale Assets**") pursuant to section 363 of the Bankruptcy Code and in accordance with the Bidding Procedures Order (the "**Initial Auction**," and such Milestone, the "**Initial Auction Milestone**");

(i)    no later than June 14, 2024, the Bankruptcy Court shall hold a hearing (the "**Initial Sale Hearing**") regarding approval of the sale pursuant to section 363 of the Bankruptcy Code of at least twenty percent (20%) (or such other percentage as has been agreed to between the Borrowers and the Required Lenders, in their sole discretion) of the Sale Assets, determined on the basis of acreage;

(j)    no later than three (3) Business Days after the Initial Sale Hearing, the Bankruptcy Court shall have entered an order approving the sale of Sale Assets that either (y) pays the

4838089J.1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 76 of 123

Obligations and the Prepetition Loans in full, in cash, or (z) effects a sale of that percentage of the Sale Assets (determined on the basis of acreage) agreed to by Borrowers and the Lenders and is otherwise acceptable to the Lenders in their sole discretion (an "**Acceptable Sale**"), to a successful bidder in accordance with the Bidding Procedures Order;

(k)        unless sales of Sale Assets and the application of the Net Cash Proceeds thereof have previously paid off the Obligations and the Prepetition Loans in full, then additional auctions shall occur by December 31, 2024, and March 31, 2025, the first for fifty percent (50%) of the remaining Sale Assets, and the second for all remaining Sale Assets in accordance with the foregoing procedures, adjusted to account for the projected auction dates;

(l)        unless sales of Sale Assets and the application of the Net Cash Proceeds thereof have previously paid off the Obligations and the Prepetition Loans in full, then, on or before December 31, 2024, Borrowers shall provide documentation reasonably acceptable to the Lenders (e.g., a signed purchase and sale agreement with a qualified buyer) to demonstrate to the Lenders' reasonable satisfaction that the final Acceptable Sale will be consummated on or before April 30, 2025, as set forth herein; and

(m)        no later than April 30, 2025, one or more Acceptable Sales shall have closed that either pay the Obligations and the Prepetition Loans in full or are otherwise acceptable to the Lenders; provided that if regulatory approvals associated with an Acceptable Sale remain pending as of such date, such date shall be automatically extended to the date that is the third (3rd) Business Day following receipt of all necessary regulatory approvals.

If at any time one or more Acceptable Sales have closed and, following application of the Net Cash Proceeds thereof to the Obligations, the Loans have been repaid in full, then remaining Net Cash Proceeds shall be deposited into a blocked, non-interest-bearing trust account maintained by the Administrative Agent (at a financial institution of its choice (the "**Segregated Post-Sale Remainder Account**"). Upon deposit of funds into the Segregated Post-Sale Remainder Account, Debtors shall provide Lenders for approval a budget (each such budget, an "**Estimated Remainder Budget**"), in a form reasonably acceptable to Lenders, detailing Borrowers' projected operating cash requirements through the remainder of the Case. If, following any Acceptable Sale and deposit of Net Cash Proceeds into the Segregated Post-Sale Remainder Account, the amount held in the Segregated Post-Sale Remainer exceeds the total projected operating costs shown in the most recently-prepared Estimated Remainder Budget (that amount, the "**Estimated Remainder Cost**," and the date of such occurrence, the "**Self-Funding Date**"), (i) that Estimated Remainder Budget shall become the newest Approved Budget, (ii) that amount (i.e., the Estimated Remainder Cost) shall be left in the Segregated Post-Sale Remainder Account to be disbursed in accordance with the procedures, and subject to the Conditions, applicable to Withdrawals from the Segregated Post-Sale Remainder Account set forth in <u>Section 2.15</u>, and (iii) any amount in the Segregated Post-Sale Remainder Account in excess of the Estimated Remainder Cost as of the Self-Funding Date shall be applied to the payment of the Prepetition Loans.

**Section 5.15    Bankruptcy Related Matters.**

(a)        Cause all proposed (i) Orders related to or affecting the Secured Obligations, the Prepetition Loans, the Loan Documents, and the Prepetition Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto, (ii) Orders seeking relief under Section 361, 362, 363, 364, 365, 503, 507, 1113 or 1114 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure, and (iii) Orders approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by Borrowers to be in

accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders;

(b)      comply with each Order entered by the Bankruptcy Court in connection with the Case;

(c)      comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim Order, and the Final Order, as applicable;

(d)      upon the request of the Required Lenders, provide the Administrative Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, and operational and restructuring activities, in each case subject to customary confidentiality restrictions and agreement upon mutually acceptable times and locations;

(e)      deliver to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent promptly as soon as available but not later than two (2) Business Days prior to filing (to the extent practicable), copies of pleadings, motions, applications, orders, financial information, and other documents to be filed by or on behalf of Borrowers with the Bankruptcy Court in the Case, or distributed by or on behalf of Borrowers to any official or unofficial committee appointed or appearing in the Case or any other party in interest related to a plan, a disclosure statement, plan exclusivity, assumption or rejection of executory contracts and unexpired leases, and key employee incentive or retention plans; and

(f)      if not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information, and other documents filed by or on behalf of Borrowers with the Bankruptcy Court in the Case.

**Section 5.16      Budget Compliance.**  Comply with, and use the proceeds of the Loans and all Withdrawals in accordance with, the Approved Budget, subject to Permitted Variances.

**Section 5.17      Lender Calls.**  Upon reasonable advance written request of the Lender Advisors at a mutually agreeable time during normal business hours, facilitate and hold calls between the Lender Advisors, on the one hand, and members of the Borrower Representative's executive management team and, to the extent appropriate, their advisors, on the other hand, once every week.

**Section 5.18      Chief Restructuring Officer; Broker.**

(a)      Chief Restructuring Officer.  Within ten (10) days after the Administrative Agent's request (based on instructions by the Required Lenders) made during the existence of an Event of Default, retain (but need not have yet obtained Bankruptcy Court approval of) a chief restructuring officer (a "**CRO**") acceptable to the Administrative Agent.  The CRO shall (i) assist Borrowers with all budgeting and financial reporting matters, and any other financial matters, (ii) report to Borrowers and will have consultation rights, including with respect to the sale of the Assets, and (iii) work with Borrowers to try to reduce expenses.  At all times after Bankruptcy Court approval of their engagement of such CRO, Borrowers shall retain, at the sole cost and expense of Borrowers, a CRO having the responsibilities described in this Section 5.18.

(b)    Broker.  No later than March 1, 2024, select, and within thirty (30) days after the Petition Date, retain, at the sole cost and expense of Borrowers, a real estate broker to run the process with respect to the sale of the Sale Assets reasonably acceptable to the Required Lenders (the "**Sale Process**").  Any real estate broker so retained by Borrowers ("**Broker**") shall report to Borrowers, but the Lenders shall have full access to the Broker.

Section 5.19    **Material Agreements.**  Other than as consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned, or delayed), as excused as a consequence of the Case, or as authorized by an order of the Bankruptcy Court, but without limiting the rights of the Administrative Agent in Section 6.10: (a) duly and punctually perform and observe all of its covenants and obligations contained in each Material Agreement to which it is a party, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and (b) use commercially reasonable efforts to enforce against the relevant Material Counterparty each material covenant or obligation of such Material Agreement, as applicable, in accordance with its terms.

# ARTICLE VI
# NEGATIVE COVENANTS

Until the Commitments have been terminated and the principal of and interest and premium (if any) on each Loan, and all Fees and all other expenses or amounts payable under any Loan Document (other than contingent indemnification and reimbursement obligations as to which no claim is pending) have been paid in full, no Borrower shall, nor shall any Borrowers cause or permit any Subsidiary to:

Section 6.01    **Indebtedness.**  Incur, create, assume, or permit to exist, directly or indirectly, any Indebtedness, except:

(a)    Indebtedness incurred under this Agreement and the other Loan Documents;

(b)    Indebtedness outstanding on the Petition Date and listed, to the extent known by Borrowers, on Schedule 6.01(b);

(c)    Indebtedness created under the Prepetition Loan Documents so long as the aggregate principal amount thereof does not exceed the aggregate principal amount thereunder as of the Petition Date (plus any interest or other amounts capitalized and added thereto in accordance with the DIP Orders);

(d)    Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances and bid, performance, or surety bonds issued for the account of Borrowers in the ordinary course of business, including guarantees or obligations of Borrowers with respect to letters of credit supporting such workers' compensation claims, self-insurance obligations, bankers' acceptances, and bid, performance, or surety obligations (in each case other than for an obligation for money borrowed), in each case consistent with the Approved Budget (subject to Permitted Variances);

(e)    Contingent Obligations of Borrowers in respect of Indebtedness otherwise permitted under this Section 6.01; *provided*, that in the event that such Indebtedness in respect of which such Contingent Obligation relates is Subordinated Indebtedness, then the related Contingent Obligation shall be subordinated to the Obligations on the same terms;

(f)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft, or similar instrument inadvertently (except in the case of daylight overdrafts) drawn

against insufficient funds in the ordinary course of business; *provided, however*, that such Indebtedness is extinguished within five (5) Business Days of incurrence;

(g)      Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business and consistent with the Approved Budget (subject to Permitted Variances); and

(h)      in each case consistent with the Approved Budget (subject to Permitted Variances), Indebtedness owed to any Person providing property, casualty, liability, or other insurance to Borrowers that is incurred in the ordinary course of business, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during the period covered by such insurance.

Section 6.02    Liens. Create, incur, assume, or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)      inchoate Liens for taxes, assessments, or governmental charges or levies, in each case arising Post-Petition, not yet delinquent, and Liens for taxes, assessments, or governmental charges or levies that are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted for which adequate reserves have been established in accordance with GAAP, which proceedings (or Orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien, and (i) that do not in the aggregate materially detract from the value of the property of Borrowers, and do not materially impair the use thereof in the operation of the business of Borrowers, and (ii) that, if they secure obligations that are then delinquent, are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted for which adequate reserves have been established in accordance with GAAP, which proceedings (or Orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b)      Liens in respect of property of Borrowers imposed by law and incurred in the ordinary course of business that do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business;

(c)      any Lien in existence on the Petition Date and set forth, to the extent known by Borrowers, on Schedule 6.02(c) (any such Lien, an "**Existing Lien**");

(d)      easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions, servitudes, and other similar charges or encumbrances, and minor title deficiencies, in each case, on or with respect to any Real Property, whether now or hereafter in existence, not (i) securing Indebtedness, (ii) in the aggregate materially impairing the value of such Real Property, or (iii) in the aggregate materially interfering with the ordinary conduct of the business of Borrowers at or otherwise with respect to such Real Property;

(e)      Liens arising Post-Petition out of judgments, attachments, or awards not resulting in a Default and in respect of which Borrowers shall in good faith be diligently prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

48840884.1

(f)         Liens (other than any Lien imposed by ERISA) (x) imposed by law or deposits made in connection therewith in the ordinary course of business and subject to the DIP Orders and the terms thereof in connection with workers' compensation, unemployment insurance, and other types of social security legislation, (y) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs, and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds, and other similar obligations and letters of credit in respect of the foregoing (in each case, exclusive of obligations for the payment of Indebtedness), or (z) arising by virtue of deposits made, subject to the DIP Orders and the terms thereof, in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that (i) with respect to clauses (x), (y) and (z) of this Section 6.02(f), such Liens are for amounts not yet delinquent or, to the extent such amounts are so delinquent, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or Orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien, and (ii) to the extent such Liens are not imposed by Legal Requirements, such Liens shall in no event encumber any property other than cash and Cash Equivalents;

(g)         bankers' Liens, rights of setoff, and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by Borrowers, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of applicable Legal Requirements, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(h)         Liens securing the Secured Obligations;

(i)         licenses of Intellectual Property granted by Borrowers in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of Borrowers;

(j)         the filing of UCC financing statements prior to the Petition Date solely as a precautionary measure in connection with operating leases or consignment of goods;

(k)         Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the UCC (or any equivalent provision of the UCC) covering only the items being collected upon;

(l)         Liens in the nature of the right of setoff in favor of counterparties to contractual agreements with Borrowers in the ordinary course of business; and

(m)         Liens created under the Prepetition Loan Documents securing the Prepetition Loans.

**Section 6.03     Sale and Leaseback Transactions.**  Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred (each, a "**Sale and Leaseback Transaction**").

**Section 6.04     Investments, Loans and Advances.**  Directly or indirectly, lend money or credit (by way of guarantee, assumption of debt, or otherwise) or make advances to any Person, or purchase or

4854-0824-1.1     Case: 24-50211     Doc# 45-1     Filed: 03/07/24     Entered: 03/07/24 09:41:50     Page 81 of 123

acquire any stock, bonds, notes, debentures, or other obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or create, purchase, or other acquisition of the Equity Interests of any Subsidiary (or other Person that following such creation, purchase, or other acquisition would be a Subsidiary), or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)　　Investments outstanding on the Petition Date and identified on <u>Schedule 6.04(a)</u>;

(b)　　Any Borrower may (i) acquire and hold accounts receivable owing to it if acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire, and hold cash and Cash Equivalents, (iii) endorse negotiable instruments held for collection in the ordinary course of business, or (iv) make lease, utility, and other similar deposits in the ordinary course of business;

(c)　　guarantees existing as of the Petition Date under the Prepetition Loan Documents;

(d)　　guarantees created by the Loan Documents; and

(e)　　acquisitions of property in compliance with <u>Section 6.07</u> (other than <u>Section 6.07(a)</u>).

**Section 6.05　　Mergers and Consolidations.**　Wind up, liquidate, or dissolve its affairs, change its legal form to liquidate or dissolve, or enter into any transaction of merger or consolidation (including, in each case, pursuant to any division in accordance with applicable law), or agree to do any of the foregoing at any time, except for dispositions of assets in compliance with <u>Section 6.06</u> (other than <u>Section 6.06(b)</u> and <u>Section 6.06(c)</u>).

**Section 6.06　　Asset Sales.**　Effect any Asset Sale, or agree to effect any disposition of any property, except that the following shall be permitted:

(a)　　dispositions consistent with the Approved Budget of (i) obsolete property by Borrowers in the ordinary course of business and the abandonment or other disposition of Intellectual Property that is, in the reasonable good faith judgment of Borrowers, no longer economically practicable to maintain or useful in the conduct of the business of Borrowers; or (ii) of other equipment, having in the case of any single transaction or series of related transactions a value not to exceed Twenty-Five Thousand Dollars ($25,000), that is, in the reasonable good faith judgment of Borrowers, no longer economically practicable to maintain or useful in the conduct of the business of Borrowers;

(b)　　Investments in compliance with <u>Section 6.04</u>;

(c)　　mergers and consolidations in compliance with <u>Section 6.05</u>;

(d)　　(1) sales of inventory in the ordinary course of business, and (2) dispositions of cash and Cash Equivalents consistent with the Approved Budget (subject to the Permitted Variances) and not otherwise prohibited hereunder, and in the ordinary course of business;

(e)　　any disposition of property that constitutes a Casualty Event;

(f)        any disposition of Assets pursuant to the Bidding Procedures and Bidding Procedures Order and otherwise in compliance with <u>Section 5.14</u>, so long as (1) the Obligations and the Prepetition Loans are repaid in full in cash on the closing date thereof; or (2) the Net Cash Proceeds thereof are applied to the payment of the Obligations and deposited into the Segregated Post-Sale Remainder Account and treated in accordance with the provisions of <u>Section 5.14</u>;

(g)        dispositions of Investments or receivables in connection with the compromise, settlement, or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings, and exclusive of factoring or similar arrangements;

(h)        the non-exclusive licensing or sublicensing of intellectual property or other general intangibles and non-exclusive licenses, sublicenses, leases, or subleases of other property in the ordinary course of business that do not materially interfere with the business of Borrowers.

**Section 6.07**    <u>**Acquisitions.**</u>  Purchase or otherwise acquire (in one or a series of related transactions) any part of the property of any Person (including through the creation, purchase, or other acquisition of the Equity Interests of any Subsidiary (or other Person that following such creation, purchase, or other acquisition would be a Subsidiary)) (or agree to do any of the foregoing at any time), except that the following shall be permitted:

(a)        Investments in compliance with <u>Section 6.04</u>;

(b)        Capital Expenditures by Borrowers to the extent denoted in the Approved Budget and permitted under <u>Section 6.25</u>;

(c)        purchases and other acquisitions of inventory, materials, equipment, and intangible property in the ordinary course of business and consistent with the Approved Budget;

(d)        leases or licenses of real or personal property in the ordinary course of business and in accordance with this Agreement and the applicable Security Documents, and consistent with the Approved Budget; and

(e)        mergers and consolidations in compliance with <u>Section 6.05</u>;

*provided* that the Lien on and security interest in such property granted or to be granted in favor of the Administrative Agent under the Security Documents shall be maintained or created in accordance with provisions of <u>Section 5.10</u> or <u>Section 5.11</u>, as applicable.

**Section 6.08**    <u>**Dividends.**</u>  Authorize, declare, or pay, directly or indirectly, any Dividends with respect to Borrowers (including pursuant to any Synthetic Purchase Agreement), or incur any obligation (contingent or otherwise) to do so.

**Section 6.09**    <u>**Transactions with Affiliates.**</u>  Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of a Borrower, except that the following shall be permitted:

(a)        Investments permitted by <u>Section 6.04(e)</u>;

(b)        transactions set forth on <u>Schedule 3.16</u> and reasonable modifications, renewals, or extensions thereto as contemplated by the Approved Budget; and

(c) transactions consented to in writing by the Administrative Agent (at the direction of the Required Lenders).

Notwithstanding the foregoing provisions of this Section 6.09 or anything else contained in this Agreement to the contrary, on and after the Closing Date, no Borrower shall, directly or indirectly, enter into any transaction or series of related transactions with an Affiliate of a Borrower without the prior written consent of the Administrative Agent (at the direction of the Required Lenders), other than transactions expressly referenced in, and permitted by, the Approved Budget (subject to Permitted Variances), it being acknowledged and agreed that Borrowers shall not pay any costs in respect of any Affiliate thereof other than in accordance an Order of the Bankruptcy Court. In no event shall Borrowers make any voluntary or optional payment or prepayment on or redemption, retirement, defeasance, or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control, or similar event of any Indebtedness of an Affiliate.

**Section 6.10** **Prepayments of Other Indebtedness; Modifications of Organizational Documents, Acquisition and Certain Other Documents, etc.** Directly or indirectly:

(a) amend, modify, supplement, or grant a consent, approval, or waiver under, or permit or consent to the amendment, modification, supplement, consent, approval, or waiver of (collectively, an "**Amendment**") (i) any Material Agreement, or (ii) any Prepetition Loan Document, in any such case, in a manner materially adverse to the interests of the Secured Parties under the Loan Documents or in the Collateral (and a Responsible Officer shall provide prior written notice of any such proposed Amendment, together with a draft thereof, to the Administrative Agent as soon as reasonably practicable (and, in any event, at least three (3) Business Days' prior written notice of any such Amendment));

(b) transfer, terminate, cancel, or permit or consent to the transfer, termination, or cancellation (including by exercising any contractual option to terminate, or failing to exercise any contractual option to extend) of any Material Agreement, in each case, to the extent such action would be adverse to the Secured Parties (and a Responsible Officer shall provide prior written notice of the proposed transfer, termination, or cancellation, together with a draft thereof, to the Administrative Agent as soon as reasonably practicable (and, in any event, at least five (5) Business Days' prior written notice of such transfer, termination, or cancellation));

(c) enter into any Material Agreement that would be adverse to the interests of the Secured Parties (and a Responsible Officer shall provide prior written notice of the proposed Material Agreement, together with a draft thereof, to the Administrative Agent as soon as reasonably practicable (and, in any event, at least five (5) Business Days' prior written notice of such Material Agreement));

(d) make or offer to make (or give any notice in respect thereof) any voluntary or optional payment or prepayment on or redemption, retirement, defeasance, or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control, or similar event of, any Subordinated Indebtedness or any Indebtedness (including pursuant to any Synthetic Purchase Agreement) incurred prior to the Petition Date;

(e) amend or modify any of its Organizational Documents to the extent any such amendment, modification, or waiver would be materially adverse to the Lenders; or

(f) terminate, amend, modify (so as to designate any of its Equity Interests a "security" under Section 8-103 of the UCC) or change any of its Organizational Documents or any

4854089\_1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 84 of 123

agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests.

Section 6.11    **Limitation on Certain Restrictions on Subsidiaries.**  Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance, restriction, or condition on the ability of any Subsidiary to (i) pay Dividends or make any other distributions on its Equity Interests or any other interest or participation in its profits owned by a Borrower, or pay any Indebtedness owed to a Borrower, (ii) make loans or advances to a Borrower, or (iii) transfer any of its properties to a Borrower, except for such encumbrances, restrictions, or conditions existing under or by reason of:

(a)    applicable Legal Requirements;

(b)    this Agreement, the other Loan Documents and the Prepetition Loan Documents;

(c)    customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary;

(d)    customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business;

(e)    customary restrictions and conditions contained in any agreement relating to the sale or other disposition of any property pending the consummation of such sale; *provided* that (1) such restrictions and conditions apply only to the property to be sold, and (2) such sale or other disposition is permitted hereunder;

(f)    agreements listed on Schedule 6.11(f); or

(g)    customary restrictions on assignment set forth in any license entered into in the ordinary course of business, so long as such restrictions relate solely to the assets subject thereto.

Section 6.12    **Business; Employees.**

(a)    Business.  Engage (directly or indirectly) in any businesses other than those businesses in which Borrowers are engaged on the Closing Date or reasonably related thereto.

(b)    Employees.  Retain any full-time employees at a compensation (determined on an annualized basis) in excess of Seventy-Five Thousand Dollars ($75,000) per year.  The Lenders agree that the CRO, if engaged, shall not be deemed an employee for the purpose of this Section 6.12(b).

Section 6.13    **Limitation on Issuance of Capital.**  Issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest.

Section 6.14    **Limitation on Accounting Changes; Change of Fiscal Year.**  Make or permit any material change in accounting policies or reporting practices without the consent of the Required Lenders, except changes that are required by GAAP. No Borrower shall change its fiscal year (all of which currently end on December 31).

Section 6.15    **Permitted Accounts.**  Open or maintain, or instruct any Person to open or maintain, any securities accounts, deposit accounts, or other bank accounts other than Permitted Accounts.

**Section 6.16     No Further Negative Pledge.**  Enter into any agreement, instrument, deed, or lease that prohibits or limits the ability of any Borrower to create, incur, assume, or suffer to exist any Lien upon any of its properties or assets, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following:  (a) this Agreement and the other Loan Documents and the Prepetition Loan Documents; (b) covenants in documents creating Liens permitted by Section 6.02 prohibiting further Liens (other than Liens permitted under Section 6.02(i)) on the properties encumbered thereby; (c) any prohibition or limitation that (i) exists pursuant to applicable Legal Requirements, or (ii) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property pending the consummation of such sale; *provided* that (1) such restrictions apply only to the property to be sold and such sale is permitted hereunder, and (2) such sale is permitted hereunder, or (iii) restricts subletting or assignment of any lease governing a leasehold interest of a Borrower or one of its Subsidiaries; (d) prohibitions and limitations contained in any agreement to which a Subsidiary is a party that was in effect at the time such Subsidiary became a Subsidiary of a Borrower, so long as such agreement was not entered into in anticipation or contemplation of such Person becoming a Subsidiary and such prohibitions and limitations only relate to such Subsidiary; (e) customary non-assignment provisions in customer contracts and licenses of (or any other grants of rights to use) Intellectual Property, in each case entered into in the ordinary course of business; and (f) is imposed by any amendments that are otherwise permitted by the Loan Documents of the contracts, instruments, or obligations referred to in this Section 6.16; *provided* that such amendments are no more restrictive with respect to the prohibitions and limitations in such contracts, instruments, or obligations as in effect prior to any such amendment.

### Section 6.17     Anti-Terrorism Law; Anti-Money Laundering.

(a)     Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods, or services to or for the benefit of any Person described in Section 3.21, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and Borrowers shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming Borrowers' compliance with this Section 6.17).

(b)     Cause or permit any of the funds of any Borrower that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of Legal Requirements.

**Section 6.18     Embargoed Person.**  Cause or permit (a) any of the funds or properties of Borrowers that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, any Person subject to sanctions or trade restrictions under United States law ("**Embargoed Person**" or "**Embargoed Persons**") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq*., and any Executive Order or regulation promulgated thereunder, with the result that the investment in Borrowers (whether directly or indirectly) is prohibited by applicable Legal Requirements, or the Loans would be in violation of Legal Requirements, or (2) the Executive Order, any related enabling legislation, or any other similar executive orders (the Legal Requirements referred to in clauses (1) and (2), collectively, "**Sanctions Laws**"), (b) any Embargoed Person to have any direct or indirect interest, of any nature whatsoever in Borrowers, with the result that the investment in any Borrowers (whether directly or indirectly) is prohibited by applicable Legal

4884088v.1

Requirements or Loans are in violation of applicable Legal Requirements, or (c) any Borrower to conduct any business or engage in any action that is in violation of any Sanctions Law.

**Section 6.19** **No Hedging.** Enter into, or suffer to exist, any Hedging Agreement.

**Section 6.20** **Change of Auditors.** Change its Independent Auditor, except (i) with the prior written consent of the Administrative Agent (at the direction of the Required Lenders), such consent not to be unreasonably withheld, conditioned, or delayed, and (ii) to the extent not prohibited by the Prepetition Loan Documents.

**Section 6.21** **Subsidiaries.** Create, acquire, or otherwise permit to exist any Subsidiary that is not in existence as of the Closing Date.

**Section 6.22** **Change in Name or Location.** Without fifteen (15) days' prior written notice to the Administrative Agent, (a) change its name as it appears in official filings in the state of its incorporation or organization, (b) change its chief executive office or principal place of business, (c) change the type of entity that it is, (d) change its organization identification number, if any, issued by its state of incorporation or other organization, or (e) change its state of incorporation or organization.

**Section 6.23** **Additional Bankruptcy Matters.** Without the Required Lenders' prior written consent, Borrowers will not, directly or indirectly:

(a)     enter into any agreement to return any of its inventory to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables, or other pre-petition claims under Section 546(c) of the Bankruptcy Code, or allow any creditor to take any setoff or recoupment against any of its pre-petition Indebtedness, pre-petition trade payables, or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff, or recoupment, the aggregate amount applied to pre-petition Indebtedness, pre-petition trade payables, and other pre-petition claims subject to all such agreements, setoffs, and recoupments since the Petition Date would exceed Twenty-five Thousand Dollars ($25,000);

(b)     incur, create, assume, suffer to exist, or permit any other superpriority administrative claim that is *pari passu* with or senior to the claim of the Administrative Agent or the Lenders against Borrowers other than the Carve-Out and Claims secured by Permitted Third Party Liens;

(c)     assert or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against the Administrative Agent or the Lenders;

(d)     subject to the terms of the Interim Order or the Final Order, as applicable, object to, contest, delay, prevent, or interfere with in any material manner the exercise of rights and remedies by the Administrative Agent or the Lenders with respect to the Collateral following the occurrence of an Event of Default (*provided* that Borrowers may contest or dispute whether an Event of Default has occurred);

(e)     seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, at the direction of Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Interim Order, the Final Order, or the other Loan Documents, or refrain from taking any action that is required to be taken by the terms of this Agreement, the Interim Order, the Final Order, or any of the other Loan Documents;

(f)       except (1) as expressly provided or permitted hereunder (it being understood that any payment made pursuant to the Approved Budget (subject to Permitted Variances) is permitted hereunder), (2) with the prior consent of the Required Lenders in their sole discretion, or (3) as provided pursuant to any other Order of the Bankruptcy Court acceptable to Required Lenders, make any payment or distribution on account of any Indebtedness arising prior to the Petition Date;

(g)       make any payment, or set aside funds for the purpose of making any payments, or otherwise transfer any economic value (including the payment of any fees, costs, or expenses of any advisors) to any direct or indirect equity holder of Borrowers solely in its capacity as such (except to the extent such payments are made pursuant to an Order of the Bankruptcy Court); or

(h)       without the prior written consent of the Required Lenders, make, enter into, or implement any amendment, waiver, supplement, or other modification to the Farm Services Agreement, any employment agreement, or employee compensation plan, in each case, solely to the extent such agreement or compensation plan relates to an Executive Officer, or pay or cause to be paid any amount provided for in such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of the such agreements or plans, as applicable, or pay or cause to be paid any bonus, incentive, retention, severance, change of control, or termination payments pursuant to the terms of such agreements or plans, as applicable, including, without limitation, any transaction or other bonus previously awarded but unpaid (it being understood that "**Executive Officer**" means any of the [Chief Executive Officer, Chief Financial Officer, or Principal of the Borrower Representative)].

Section 6.24     **Budget Variance.**  As of any Variance Testing Date for the immediately preceding Budget Compliance Period, not allow any variances to exist from the Approved Budget, except for Permitted Variances.

Section 6.25     **Capital Expenditures.** Make any Capital Expenditures except to the extent reflected in the Approved Budget (subject to Permitted Variances).

## ARTICLE VII
## OBLIGATIONS JOINT AND SEVERAL; SURETYSHIP WAIVERS

Section 7.01     **Obligations Joint and Several.** The obligations of all Borrowers in respect of the Loans shall be joint and several.

Section 7.02     **Suretyship Waivers.**  To the extent that the obligations of any Borrower in respect of the Loans render, or are deemed to render, it a guarantor or surety of any other Borrower (any Borrower so deemed to be a guarantor or surety, for purposes of this Section 7.02, a "*Guarantor*"):

(a)       Each Guarantor hereby absolutely and unconditionally, jointly and severally, guarantees, as a guaranty of payment and performance and not merely as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand, or otherwise, and at all times thereafter, of any and all of the Secured Obligations, whether for principal, interest, premiums, fees, indemnities, damages, costs, expenses, or otherwise, of each other Borrower to the Secured Parties, arising hereunder or under any other Loan Document (including all renewals, extensions, amendments, refinancings, and other modifications thereof, and all Lender Expenses incurred by the Secured Parties in connection with the collection or enforcement thereof). The Administrative Agent's books and records showing the amount of the Obligations shall be admissible in evidence in any action or proceeding, and shall be binding upon each Guarantor absent manifest error, and conclusive for the purpose of establishing the amount of the Obligations. This Agreement shall not be affected by the genuineness, validity, regularity, or enforceability of the Secured Obligations or any instrument or agreement evidencing

any Secured Obligations, or by the existence, validity, enforceability, perfection, non-perfection, or extent of any Collateral therefor, or by any fact or circumstance relating to the Secured Obligations that might otherwise constitute a defense to the obligations of any Guarantor under this Agreement, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

(b)     Each Guarantor consents and agrees that the Secured Parties may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof: (a) amend, extend, renew, compromise, discharge, accelerate, or otherwise change the time for payment or the terms of the Obligations or any part thereof; (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of, each in accordance with applicable law, any security for the payment of this Agreement or any Secured Obligations; (c) apply such security and direct the order or manner of sale thereof as the Administrative Agent may determine; and (d) release or substitute one or more of any Borrowers, any endorsers, or any other guarantors of any of the Secured Obligations. Without limiting the generality of the foregoing, each Guarantor consents to the taking of, or failure to take, any action that might in any manner or to any extent vary the risks of each Guarantor under this Agreement or which, but for this provision, might operate as a discharge of a Guarantor.

(c)     Each Guarantor waives (1) any defense arising by reason of any disability or other defense of any Borrower or any other Guarantor, or the cessation from any cause whatsoever (including any act or omission of a Secured Party) of the liability of any Borrower or other Guarantor; (2) any defense based on any claim that the Guarantor's obligations exceed or are more burdensome than those of any Borrower or other Guarantor; (3) any right to proceed against any Borrower or other Guarantor, proceed against or exhaust any security for the Secured Obligations, or pursue any other remedy in the power of the Secured Parties whatsoever; (4) any benefit of and any right to participate in any security now or hereafter held by the Secured Parties; and (5) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by applicable laws limiting the liability of or exonerating guarantors or sureties. Each Guarantor expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor, and all other notices or demands of any kind or nature whatsoever with respect to the Secured Obligations, and all notices of acceptance of this Agreement or of the existence, creation, or incurrence of new or additional Secured Obligations. Without limiting the foregoing, each Guarantor agrees as follows:

(i)     Guarantor specifically agrees that such Guarantor shall not be released from liability hereunder by any action taken by Secured Parties, including, without limitation, a nonjudicial sale under the Security Instrument that would afford any Borrower or other Guarantor a defense based on California's anti–deficiency laws, in general, and California Code of Civil Procedure Section 580d, specifically. Guarantor waives all rights and defenses arising out of an election of remedies by Secured Parties, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for the Secured Obligations, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

(ii)     (A) Guarantor hereby waives, to the fullest extent permitted by law, all rights and benefits under Section 2809 of the California Civil Code purporting to reduce a Guarantor's obligations in proportion to the principal obligation, all rights and benefits under Section 580a of the California Code of Civil Procedure purporting to limit the amount of any deficiency judgment that might be recoverable following the occurrence of a trustee's sale under the Security Instrument, all rights and benefits under Section 580b of the California Code of Civil Procedure stating that no deficiency may be recovered on a real property purchase money obligation, and all rights and benefits under Section 580d of the California Code of Civil Procedure stating that no deficiency

may be recovered on a note secured by a deed of trust on real property in case such real property is sold under the power of sale contained in such deed of trust, to the extent any such sections have any application hereto or any application to Guarantor; (B) Guarantor waives all rights and defenses that the Guarantor may have because any Borrower's or other Guarantor's debt is secured by real property. This means, among other things: (1) Secured Parties may collect from Guarantor without first foreclosing on any real or personal property Collateral pledged by any Borrower or other Guarantor, (2) if Secured Parties foreclose on any real property Collateral pledged by any Borrower or other Guarantor: (A) the amount of debt may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Secured Parties may collect from Guarantor even if Secured Parties, by foreclosing on the real property Collateral, have destroyed any right Guarantor may have to collect from any Borrower or other Guarantor. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because any Borrower's or other Guarantor's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d, 580e, or 726 of the California Code of Civil Procedure; (C) Guarantor's sole right with respect to any foreclosure of real or personal property Collateral shall be to bid at such sale in accordance with applicable law. Guarantor acknowledges and agrees that Secured Parties may also bid at any such sale, and in the event such Collateral is sold to Secured Parties in whole or partial satisfaction of the obligations owed to Secured Parties, Guarantor shall not have any further right or interest with respect thereto; and (D) without limiting the generality of the foregoing or any other provision hereof, in accordance with California Civil Code Section 2856, and to the maximum extent permitted by applicable law, Guarantor waives any and all rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive, 2899, 2953, and 3433 including, without limitation, any and all rights or defenses Guarantor may have by reason of protection afforded to the principal with respect to any of the Secured Obligations or to any other guarantor of any of the Secured Obligations with respect to such guarantor's obligations under its guaranty, in either case, pursuant to the antideficiency or other laws of this state limiting or discharging the principal's indebtedness or such other guarantor's obligations, including, without limitation, California Code of Civil Procedure Sections 580a, 580b, 580d, 580e, or 726.

(iii)    Guarantor expressly waives any and all fair value rights under California Code of Civil Procedure Section 580a as set forth in *Bank of Southern California v. Dombrow*, 39 Cal.App.4th 1457, 46 Cal.Rptr.2d 656 (4th Dist., Div. 1, 1995) (decertified).

(iv)    Guarantor understands that it may record a Request for Notice of Default pursuant to California Civil Code § 2924b and thereby receive notice of any proposed foreclosure of any real property Collateral then securing Borrower's obligations under the Loan Documents.

(v)    Guarantor shall not be released or discharged, either in whole or in part, by any Secured Party's delay or failure to (a) perfect or continue the perfection of any lien or security interest in any Collateral described in the Loan Documents or otherwise, which secures the obligations of any Borrower or any other Guarantor, or (b) protect the property covered by such lien or security interest. Guarantor consents to the waiver by each Borrower and other Guarantor of all of its rights under California Civil Code Section 2822, which provides as follows: "(a) The acceptance, by a creditor, of anything in partial satisfaction of an obligation, reduces the obligation of a surety thereof, in the same measure as that of the principal, but does not otherwise affect it. However, if the surety is liable upon only a portion of an obligation and the principal provides partial satisfaction of the obligation, the principal may designate the portion of the obligation that is to be satisfied; and (b) For purposes of this section and Section 2819, an agreement by a creditor

4858-0884-1

to accept from the principal debtor a sum less than the balance owed on the original obligation, without the prior consent of the surety and without any other change to the underlying agreement between the creditor and principal debtor, shall not exonerate the surety for the lesser sum agreed upon by the creditor and principal debtor."

(d)     The obligations of the Guarantors hereunder are those of a primary obligor, and not merely as surety, and are independent of the Secured Obligations and the obligations of any other guarantor, and a separate action may be brought against any Guarantor to enforce this Agreement, whether or not any Borrower or other Guarantor or any other Person is joined as a party.

(e)     No Guarantor shall exercise any right of subrogation, contribution, indemnity, reimbursement, or similar rights with respect to any payments it makes under this Agreement until the termination of all Commitments and the payment in full of all Obligations. If any amounts are paid to Guarantor in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to Administrative Agent to reduce the amount of the Obligations, whether matured or unmatured.

(f)     This Section 7.02 is a continuing and irrevocable guaranty of all Secured Obligations now or hereafter existing and shall remain in full force and effect until the termination of all Commitments and the payment and performance in full of all Secured Obligations (other than contingent indemnity and reimbursement obligations as to which no claim is then pending). Notwithstanding the foregoing, this Agreement shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of Borrowers or Guarantors is made, or any Secured Party exercises its right of setoff, in respect of the Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required (including pursuant to any settlement entered into by a Secured Party) to be repaid to a trustee, receiver, or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, all as if such payment had not been made or such setoff had not occurred, and whether or not a Secured Party is in possession of or has released this Agreement, and regardless of any prior revocation, rescission, termination, or reduction. The obligations of Guarantors under this Section 7.02 shall survive termination of this Agreement.

(g)     Each Guarantor hereby subordinates the payment of all obligations and indebtedness of each Borrower owing to such Guarantor, whether now existing or hereafter arising, including but not limited to any obligation of any Borrower to such Guarantor as subrogee of any Secured Party, or resulting from any Guarantor's performance under this Agreement, to the payment in full of all Obligations. If the Administrative Agent requests, any such obligation or indebtedness of any Borrower to Guarantor shall be enforced and performance received by Guarantor as trustee for the Administrative Agent, and the proceeds thereof shall be paid over to the Administrative Agent on account of the Obligations, but without reducing or affecting in any manner the liability of Guarantors under this Agreement.

(h)     If acceleration of the time for payment of any of the Obligations is stayed in connection with any case commenced by or against any other Guarantor or Borrower, under any Debtor Relief Law or otherwise, all such amounts shall nonetheless be payable by Guarantor immediately upon demand by Lender.

(i)     Guarantor acknowledges and agrees that it has the sole responsibility for, and has adequate means of, obtaining from each Borrower and any other guarantor such information concerning the financial condition, business, and operations of that Borrower and any such other guarantor as Guarantor requires, and that no Secured Party has any duty, and Guarantor is not relying on the Secured Parties at any time, to disclose to such Guarantor any information relating to the business, operations, or financial condition of

the Borrower or any other guarantor, Guarantor waiving any duty on the part of the Secured Parties to disclose such information and any defense relating to the failure to provide the same.

## ARTICLE VIII
## EVENTS OF DEFAULT

**Section 8.01     Events of Default.**  Upon the occurrence and during the continuance of any of the following events (each, an "**Event of Default**"):

(a)     default shall be made in the payment of any principal of any Loan when due, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof, or by acceleration thereof or otherwise;

(b)     default shall be made in the payment when due of any amount, other than principal, required hereunder or under any Loan Document to be paid in cash and such failure continues for more than three (3) Business Days;

(c)     any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings of Loans or Withdrawals hereunder, or any representation, warranty, statement, or information contained in any report, certificate, financial statement, or other instrument furnished in connection with or pursuant to any Loan Document, proves to have been false or misleading in any material respect when so made, deemed made, or furnished;

(d)     default (other than to an immaterial extent) is made in the due observance or performance by Borrowers of any covenant, condition, or agreement contained in <u>Section 5.01(c)</u>, <u>5.01(d)</u>, <u>5.01(e)</u>, <u>5.01(f)</u>, <u>5.01(g)</u>, <u>5.01(i)</u>, <u>5.01(j)</u>, <u>5.03(a)</u>, <u>5.04(a)</u>, <u>5.07</u>, <u>5.08</u>, <u>5.11</u>, <u>5.13</u>, <u>5.14 (including, without limitation, the failure to timely complete any Milestone or to apply or otherwise deal with the proceeds of any sale of Sale Assets strictly in accordance with the requirements of Section 5.14)</u>, <u>5.15</u>, <u>5.16</u>, <u>5.17</u>, <u>5.18</u>, <u>or 5.19</u>, or in <u>Article VI</u>;

(e)     default (other than to an immaterial extent) is made in the due observance or performance by Borrowers of any covenant, condition, or agreement contained in any Loan Document (other than those specified in <u>paragraphs (a)</u>, <u>(b)</u> or <u>(d)</u> immediately above), and such default continues unremedied or is not waived for a period of seven (7) Business Days after the earlier of (1) written notice thereof to Borrowers, and (2) knowledge of such default by a Responsible Officer of the Borrower Representative; *provided* that, if (A) such default cannot be cured within such 7-Business-Day period, (B) such default is capable of cure, and (C) Borrowers are proceeding with diligence and in good faith to cure such default, then such 7-Business-Day cure period shall be extended to such date, not to exceed a total of thirty (30) days, as shall be necessary for Borrowers to diligently cure such default;

(f)     Borrowers (1) fail to pay any principal or interest due in respect of any Indebtedness in an amount in excess of Seventy-five Thousand Dollars ($75,000) (other than (y) the Obligations, and (z) Indebtedness that is created or incurred prior to the Petition Date), when and as the same becomes due and payable beyond any applicable grace period, or (2) fail to observe or perform any other term, covenant, condition, or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness (other than (i) the Obligations, and (ii) Indebtedness that is created or incurred prior to the Petition Date) beyond the grace period, if any, provided in the instrument or agreement under which such Indebtedness was created if the effect of any failure referred to in this <u>clause (2)</u> is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its stated maturity or become subject to a mandatory offer to purchase by the obligor;

85

4884-0884-1

(g)          except for allowance in the Case of a general unsecured claim, (y) one or more final judgments, non-interlocutory orders, decrees, or arbitration awards are entered against one or more of Borrowers or Secured Parties (in respect of matters relating to the Loan Documents) involving an aggregate liability of Seventy-five Thousand Dollars ($75,000) or more (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has affirmatively confirmed coverage therefor), and the same remains unsatisfied, unvacated, and unstayed pending appeal for a period of thirty (30) consecutive days after the entry thereof, or (z) one or more final non-monetary judgments, orders, or decrees are entered against Borrowers that have or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect;

(h)          one or more ERISA Events, or any events with respect to any Foreign Plan, have occurred that, when taken together with all other such ERISA Events, or any other events with respect to any Foreign Plan, that have occurred, could reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on any properties of Borrowers;

(i)          any security interest and Lien purported to be created by any Security Document (i) except to an immaterial extent, ceases to be in full force and effect, or ceases to give the Administrative Agent, for the benefit of the Secured Parties, the Liens, rights, powers, and privileges purported to be created and granted under such Security Documents (including a valid, enforceable, perfected, first priority security interest in and Lien on all of the Collateral thereunder (except as otherwise expressly provided in the DIP Orders) in favor of the Administrative Agent, or (ii) is asserted by or on behalf of Borrowers not to be a valid, enforceable, perfected, first priority (except as otherwise expressly provided in the DIP Orders) security interest in or Lien on the Collateral covered thereby;

(j)          any Loan Document or any material provisions thereof at any time and for any reason is declared by a court of competent jurisdiction to be null and void, or a proceeding is commenced by or on behalf of Borrowers or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or Borrowers (directly or indirectly) repudiate, revoke, terminate, or rescind (or purport to do any of the foregoing) or deny any portion of their liability or obligation for the Secured Obligations; or

(k)          a Change in Control has occurred;

(l)          the Case is converted to a case under Chapter 7 of the Bankruptcy Code;

(m)          a trustee or an examiner with expanded powers (other than a fee examiner) is appointed or elected in the Case, or the Bankruptcy Court enters an order providing for such appointment;

(n)          Borrowers use, or try to use, Cash Collateral on a non-consensual basis;

(o)          Borrowers, or any person claiming by or through Borrowers, with any Borrower's consent, obtains Bankruptcy Court authorization to commence, or commences, joins in, assists, or otherwise participates as an adverse party in any suit or other proceeding against (A) the Administrative Agent or any of the Lenders relating to the DIP Term Facility, or (B) the Prepetition Administrative Agent or any Prepetition Lender relating to the Prepetition Loan Documents;

(p)          the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing (i) any claims or charges, other than in respect of the DIP Term Facility and the Carve-Out or as otherwise permitted under the applicable Loan Documents or the DIP Orders, entitled to superpriority administrative expense claim status in any Case pursuant to Section 364(c)(1) of the

Bankruptcy Code that are *pari passu* with or senior to the claims of the Administrative Agent and the Lenders under the DIP Term Facility, or the Bankruptcy Court grants any claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or Section 507(b) of the Bankruptcy Code (other than the Carve-Out), or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests provided for herein securing the Secured Obligations hereunder, except, in each case, as expressly provided in the Loan Documents or in the DIP Order then in effect (but only in the event specifically consented to by the Required Lenders (or the Administrative Agent with the consent of the Required Lenders)), in each case, other than Liens secured by Permitted Third Party Liens;

(q)        the Bankruptcy Court enters an Order or Orders granting relief from any stay of proceeding (including the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of Borrowers that have a value in excess of Twenty-five Thousand Dollars ($25,000) in the aggregate, or (ii) permit other actions that would have a Material Adverse Effect on Borrowers or their estates;

(r)        an Order of the Bankruptcy Court is entered reversing, amending, supplementing, staying, vacating, or otherwise amending, supplementing, or modifying the Interim Order or the Final Order, without the prior written consent of the Required Lenders (and, with respect to any provision that affects the rights or duties of the Administrative Agent, the Administrative Agent), or Borrowers apply for the authority to do so;

(s)        the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) ceases to create a valid and perfected Lien on the Collateral or ceases to be in full force and effect, has been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without the prior written consent of the Required Lenders (or the Administrative Agent with the consent of the Required Lenders);

(t)        the Bankruptcy Court enters an Order avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations;

(u)        the Bankruptcy Court enters an Order terminating or modifying the exclusive right of Borrowers to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders (or the Administrative Agent with the consent of the Required Lenders);

(v)        Borrowers fail to comply with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(w)        other than with respect to the Carve-Out, an Order in the Case is entered charging any of the collateral securing the Prepetition Loans under Section 506(c) of the Bankruptcy Code against the Lenders or the Prepetition Lenders under the Prepetition Loan Documents, or the commencement of other actions by Borrowers that are materially adverse to Administrative Agent or the Lenders, or the Prepetition Lenders under the Prepetition Loan Documents or their respective rights and remedies under the DIP Term Facility in the Case or inconsistent with any of the Loan Documents;

(x)        any Order is entered that (i) dismisses the Case, and (ii) does not provide for termination of the Commitments and indefeasible payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable) and continuation of the Liens with respect thereto until the effectiveness thereof, or Borrowers seek, support, or fail to contest in good faith the entry of any such Order;

(y)        Borrowers take any action in support of any matter set forth in this <u>Section 8.01</u> or any other Person does so, and the relief requested is granted in an order that is not stayed pending appeal;

(z)        Borrowers obtain Bankruptcy Court authorization to commence, or commence, join in, assist, or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination, or other challenging of the Superpriority Claims and Liens granted to secure the Secured Obligations or any other rights granted to the Administrative Agent and the Lenders in the DIP Orders or this Agreement, or (ii) any relief under Section 506(c) of the Bankruptcy Code with respect to any Collateral;

(aa)        Borrowers challenge, support, or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Secured Obligations or the Prepetition Administrative Agent or any Prepetition Lender under the Prepetition Loan Documents with respect to the obligations thereunder, other than to challenge the occurrence of a Default or Event of Default or the reasonableness of such amounts (where such amounts are subject to a reasonableness standard under the Loan Documents or the DIP Order);

(bb)        without the consent of the Administrative Agent and the Required Lenders, the filing of any motion by Borrowers seeking approval of (or the entry of an Order by the Bankruptcy Court approving) adequate protection to any pre-petition agent, trustee, bondholder, or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(cc)        without the Required Lenders' consent, the entry of any Order by the Bankruptcy Court granting, or the filing by Borrowers of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking authority to use any cash proceeds of any of the Collateral without the Administrative Agent's and the Required Lenders' consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the facility hereunder, unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions provided for therein;

(dd)        Borrowers or any person on behalf of Borrowers files any motion seeking authority to consummate a sale of assets of Borrowers or the Collateral (other than an Acceptable Sale) outside the ordinary course of business and not otherwise permitted hereunder that does not provide for termination of the Commitments and indefeasible payment in full in cash of the Obligations  and the Prepetition Loans, or is not otherwise acceptable to the Required Lenders in their sole discretion;

(ee)        the filing by Borrowers of a plan of reorganization under Chapter 11 of the Bankruptcy Code that is not an Acceptable Plan;

(ff)        entry of an Order by the Bankruptcy Court confirming a plan of reorganization or liquidation in the Case that is not an Acceptable Plan;

(gg)        if any Borrower is enjoined, restrained, or in any way prevented by an Order of a court from continuing to conduct all or any part of the business affairs of that Borrower, which could reasonably be expected to have a Material Adverse Effect; *provided*, that Borrowers shall have ten (10) Business Days after the entry of such an Order to obtain a Bankruptcy Court Order vacating, staying, or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court Order;

4854988v.1

(hh) Borrowers make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments in respect of the repayment of the Indebtedness outstanding under the Prepetition Loan Documents or as otherwise permitted under this Agreement, in each case, to the extent authorized by the Utilities Order, the Interim Order, or the Final Order, and consistent with the Approved Budget (subject to Permitted Variances);

(ii) without the Required Lenders' consent, Borrowers file any motion or other request with the Bankruptcy Court seeking (1) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal, or subordinate to the Administrative Agent's liens and security interests; (2) to use, or seek to use, Cash Collateral; (3) to obtain any financing under Section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions provided for therein; or (4) to modify or affect any of the rights of the Administrative Agent or the Lenders under the DIP Orders or the Loan Documents, by any Order entered in the Case; or

(jj) Permitted Variances under the Approved Budget are exceeded for any relevant Budget Compliance Period;

then, and in every such event, and at any time thereafter during the continuance of such event, subject to the terms of the Interim Order and the Final Order, the Administrative Agent may, and at the written request of the Required Lenders shall, subject to the terms and conditions of the DIP Orders, upon the delivery of written notice (which may include electronic mail) to the DIP Remedies Notice Parties (as defined in the DIP Orders) take any one or more of the following actions, at the same or different times:  (i) declare the Commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated; (ii) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which Borrowers hereby expressly waive; (iii) terminate the DIP Term Facility and any Loan Documents as to any future liability or obligation of the Lenders hereunder, but without affecting any of the Secured Obligations or the Liens securing the Secured Obligations; (iv) invoke the right to charge interest at the Default Rate; (v) terminate and/or revoke Borrowers' rights, if any, under the DIP Orders and the Loan Documents to use any Cash Collateral; (vi) freeze monies or balances in Borrowers' accounts; (vii) otherwise enforce any and all rights against the Collateral in the possession of the applicable Agent, including, without limitation, disposition of the Collateral solely for application towards the Carve-Out and the Obligations in accordance with their respective priorities; and (viii) exercise any and all of its other rights and remedies under applicable Legal Requirements, the DIP Orders, hereunder, and under the other Loan Documents; *provided*, that prior to the exercise of any right in clauses (vii) and (viii) of this Section 8.01 or in Section 10.08, the applicable Agent shall provide Borrowers, their bankruptcy counsel, the Prepetition Administrative Agent, the U.S. Trustee (as defined in the DIP Orders), and the Committee (as defined in the DIP Orders) five (5) Business Days' written notice prior to taking such action (the "**Remedies Notice Period**").

The filing of a Reinstatement Plan shall not constitute an Event of Default, and Borrowers and the Prepetition Lenders shall retain all of their respective rights under the Bankruptcy Code with respect thereto.

In addition, without limiting the foregoing, subject to the terms of the Interim Order and the Final Order, in the event of a foreclosure (or other similar exercise of remedies) by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Secured Party may be the purchaser of any or all of such Collateral at any such sale or other

4884088v.1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 96
of 123

disposition and, in addition, the Administrative Agent, as agent for and representative of all of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or other disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by Administrative Agent at such sale.

**Section 8.02     Rescission.**  If at any time after termination of the Commitments or acceleration of the maturity of the Loans, Borrowers pay all arrears of interest and all payments on account of principal of the Loans owing by them that have become due otherwise than by acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified herein), and all Defaults (other than non-payment of principal of and accrued interest on the Loans due and payable solely by virtue of acceleration) are remedied or waived pursuant to Section 10.02, then upon the written consent of the Required Lenders (which may be given or withheld in their sole discretion) and written notice to Borrowers, the termination of the Commitments or the acceleration and their consequences may be rescinded and annulled, but such action shall not affect any subsequent Default or Event of Default, or impair any right or remedy consequent thereon.  The provisions of the preceding sentence are intended merely to bind the Lenders and the other Secured Parties to a decision that may be made at the election of the Required Lenders, and such provisions do not give Borrowers the right to require the Lenders to rescind or annul any acceleration hereunder, even if the conditions set forth herein are met.

**Section 8.03     Application of Proceeds.**  After the exercise of remedies provided for in this Article XIII (or after the Loans have automatically become immediately due and payable), any amounts received under any Loan Documents, and all funds credited to the Borrower Operating Account or the Segregated Post-Sale Remainder Account, shall be applied by the Administrative Agent as follows:

(a)       *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses, and other amounts (including reasonable fees, charges, and disbursements of counsel to the Administrative Agent) then due and payable to the Administrative Agent in their respective capacities as such, until payment in full of all such fees has been made;

(b)       *Second*, to payment of that portion of the Obligations constituting fees, indemnities, expenses, and other amounts (other than principal and interest) payable to the Lenders, ratably among them in proportion to the amounts described in this clause *second* payable to them;

(c)       *Third*, to pay ratably all accrued and unpaid interest on the Loans, until payment in full of all such interest has been made;

(d)       *Fourth*, to pay the unpaid principal amount of the Loans ratably, until payment in full of the principal of all Loans has been made;

(e)       *Fifth*, to pay all other Obligations ratably, until payment in full of all such other Obligations has been made; and

(f)       *Sixth*, the balance, if any, to the Person lawfully entitled thereto (including Borrowers or their respective successors or assigns) or as the Bankruptcy Court or other court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (f) above, Borrowers shall remain liable for any deficiency.

# ARTICLE IX
# THE ADMINISTRATIVE AGENT

**Section 9.01     Appointment.**

(a)     Each Lender hereby irrevocably designates and appoints Rabo AgriFinance LLC as the Administrative Agent under this Agreement and the other Loan Documents, and Rabo AgriFinance LLC hereby accepts such designation and appointment. Each Lender irrevocably authorizes the Administrative Agent, in such capacity, through its agents or employees, to take such actions on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto. The provisions of this <u>Article IX</u> are solely for the benefit of the Administrative Agent and the Lenders, and no Borrowers shall have rights as a third-party beneficiary of any such provisions. Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and any rights of the Secured Parties with respect thereto as contemplated by and in accordance with the provisions of this Agreement and the other Loan Documents. In performing its functions and duties hereunder, the Administrative Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Borrower. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)     Each Lender hereby irrevocably authorizes the Administrative Agent, based upon the instruction of the Required Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC (or any equivalent provision of the UCC), at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any other sale or foreclosure conducted by Administrative Agent (whether by judicial action or otherwise) in accordance with applicable Legal Requirements.

(c)     Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable Legal Requirement a security interest can be perfected by possession or control. Should any Lender (other than the Administrative Agent) obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly following the Administrative Agent's request therefor, shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

(d)     Any corporation or association into which the Administrative Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Administrative gent Agent is a party, will be and become the successor Administrative Agent, as applicable, under this Agreement and will have and succeed to the rights, powers, duties, immunities and

privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

Section 9.02    **Administrative Agent in Its Individual Capacity.**  The Administrative Agent shall have the same rights and powers in its capacity as a Lender, if applicable, as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder, if applicable, in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, Borrowers or Affiliate thereof as if it were not the Administrative Agent hereunder and without duty to account therefor to the Lenders.

Section 9.03    **Exculpatory Provisions.**  The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02); *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability, if the Administrative Agent is not indemnified to its satisfaction, or that is contrary to any Loan Document or applicable Legal Requirements including, for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a foreclosure, modification or termination of Property of a Defaulting Lender under any Debtor Relief Law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose or shall be liable for the failure to disclose, any information relating to Borrowers or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 8.03 or Section 10.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and nonappealable judgment.  The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof describing such Default or Event of Default is given to such Agent by Borrowers or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document.  Each party to this Agreement acknowledges and agrees that the Administrative Agent may from time to time use one or more outside service providers for the tracking of all UCC financing statements (and/or other collateral related filings and registrations from time to time) required to be filed or recorded pursuant to the Loan Documents and the notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof, and that each of such service providers will be deemed to be acting at the request and on behalf of Borrowers.  The Administrative Agent shall not be liable for any action taken or not taken by any such service provider.  Neither the Administrative Agent nor any of its officers, partners, directors, employees or agents shall be liable to the Lenders for any action taken or omitted by the Administrative

92

Agent under or in connection with any of the Loan Documents. In no event shall the Administrative Agent be liable for any failure or delay in the performance of their respective obligations under this Agreement or any related documents because of circumstances beyond such Agent's control, including, but not limited to, a failure, termination, or suspension of a clearing house, securities depositary, settlement system or central payment system in any applicable part of the world or acts of God, flood, war (whether declared or undeclared), civil or military disturbances or hostilities, nuclear or natural catastrophes, pandemics,, epidemics, political unrest, explosion, severe weather or accident, earthquake, terrorism, fire, riot, labor disturbances, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like (whether domestic, federal, state, county or municipal or foreign) which delay, restrict or prohibit the providing of the services contemplated by this Agreement or any related documents, or the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, or any other causes beyond the Administrative Agent's control whether or not of the same class or kind as specified above.

Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent, it is understood that in all cases the Administrative Agent shall be fully justified in failing or refusing to take any such action under this Agreement if it shall not have received such written instruction, advice or concurrence of the Required Lenders or such other number or percentage of the Lenders as shall be expressly provided for herein or any agreement to which the Lenders and the Administrative Agent is a party and acting in accordance with such documents (such Lenders being referred to herein as the "**Relevant Lenders**"), as the Administrative Agent deems appropriate. Upon receipt of such written instruction, advice or concurrence from the Relevant Lenders, the Administrative Agent shall take such discretionary actions in accordance with such written instruction, advice or concurrence. This provision is intended solely for the benefit of the Administrative Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

Nothing in this Agreement or any other Loan Document shall require the Administrative Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder.

The Administrative Agent shall have no obligation for (a) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under the Credit Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby; (b) the filing, re-filing, recording, re-recording, or continuing of any document, financing statement, mortgage, assignment, notice, instrument of further assurance, or other instrument in any public office at any time or times; or (c) providing, maintaining, monitoring, or preserving insurance on or the payment of taxes with respect to any Collateral.

Section 9.04    Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent, or otherwise authenticated by a proper Person. The Administrative Agent also may rely upon any statement made to it orally and believed by it to be made by a proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be

fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for Borrowers), independent accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

Section 9.05     **Delegation of Duties.**  The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Affiliates of the Administrative Agent and any such sub-agent, and shall apply, without limiting the foregoing, to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

Section 9.06     **Successor Administrative Agent.**  The Administrative Agent may resign as such at any time upon at least ten (10) days' prior notice to the Lenders and Borrowers. Upon any such resignation, the Required Lenders shall have the right, in consultation with Borrowers, to appoint a successor Administrative Agent. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within ten (10) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which successor shall be a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, in each case, having combined capital and surplus of at least $500,000,000. If no successor Administrative Agent shall have been appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the retiring (or retired) Agent shall be discharged from its duties and obligations under the Loan Documents, and the Required Lenders shall assume and perform all of the duties of the Administrative Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Administrative Agent.

Upon the acceptance of its appointment as the Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring (or retired) Administrative Agent shall be discharged from its duties and obligations under the Loan Documents (if not already discharged therefrom as provided in this paragraph). The fees payable by Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor. After an Administrative Agent's resignation hereunder, the provisions of this Article IX, Section 10.03 and Sections 10.08 to 10.10 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while it was acting as the Administrative Agent.

Section 9.07     **Non-Reliance on Agent and Other Lenders.**  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it has deemed appropriate, conducted its own independent investigation of the financial condition and affairs of Borrowers and made its own credit analysis and decision to enter into this Agreement. Each Lender further represents and warrants that

it has reviewed each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof (including any such terms and conditions set forth, or otherwise maintained, on the Platform with respect thereto). Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

**Section 9.08** **Indemnification.** The Lenders severally agree to indemnify the Administrative Agent in its capacity as such and each of its Related Persons (to the extent not reimbursed by Borrowers and without limiting the obligation of Borrowers to do so), ratably according to their respective outstanding Loans and Commitments in effect on the date on which indemnification is sought under this Section 9.08 (or, if indemnification is sought after the date upon which all Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such outstanding Loans and Commitments as in effect immediately prior to such date), from and against any and all Indemnified Liabilities (IN ALL CASES, WHETHER OR NOT CAUSED OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE ADMINISTRATIVE AGENT OR RELATED PERSON); *provided* that no Lender shall be liable for the payment of any portion of such Indemnified Liabilities that are found by a final and nonappealable judgment of a court of competent jurisdiction to have directly resulted solely and directly from the Administrative Agent's or Related Person's, as the case may be, gross negligence or willful misconduct; *provided*, *however*, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be provided by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.08. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.08 shall apply whether or not any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limiting the foregoing, the Lenders shall reimburse the Administrative Agent upon demand ratably according to their respective outstanding Loans and Commitments in effect on the date on which reimbursement is sought under this Section 9.08 (or if such reimbursement payment is sought after the date on which the Loans have been paid in full and the Commitments have terminated, ratably in accordance with the outstanding Loans and Commitments as in effect immediately prior to such date) any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise and including the enforcement of this Section 9.08) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent are not reimbursed for such expenses by or on behalf of Borrowers. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any source against any amount due to the Administrative Agent under this Section 9.08. The undertaking in this Section 9.08 shall survive termination of the Commitments, the payment of all other Obligations and the resignation or removal of the Administrative Agent. The agreements in this Section 9.08 shall survive the payment of the Loans and all other amounts payable hereunder.

**Section 9.09** **Erroneous Payments.**

(a) If the Administrative Agent (x) notifies a Lender, Secured Party or any Person who has received funds on behalf of a Lender or Secured Party (a "**Payment Recipient**") that the Administrative Agent has determined in its reasonable discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative

Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 9.09 and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect . A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding clause (a), each Lender, Secured Party or any Person who has received funds on behalf of a Lender or Secured Party, agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)     it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)     such Lender or Secured Party shall use commercially reasonable efforts to (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one (1) Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this clause (b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this clause (b) shall not have any effect on a Payment Recipient's obligations pursuant to clause (a) or on whether or not an Erroneous Payment has been made.

(c)      Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent has demanded to be returned under immediately preceding clause (a).

(d)      The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender, or Secured Party, as the case may be) under the Loan Documents with respect to such amount (the "**Erroneous Payment Subrogation Rights**") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by Borrowers; *provided* that this Section 9.09 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of Borrowers relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; *provided, further*, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from, or on behalf of (including through the exercise of remedies under any Loan Document), the Borrowers for the purpose of making a payment on the Obligations.

(e)      To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

Each party's obligations, agreements and waivers under this Section 9.10 shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

**Section 9.10      Withholding Taxes.**      To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the U.S. Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 9.10. The agreements in this Section 9.10 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the

replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

**Section 9.11    Lender's Representations, Warranties and Acknowledgements.**  (a) Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Borrowers in connection with Loans hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Borrowers.  The Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and the Administrative Agent shall not have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders.  Each Lender acknowledges that neither the Administrative Agent nor any Related Person of the Administrative Agent has made any representation or warranty to it.  Except for documents expressly required by any Loan Document to be transmitted by the Administrative Agent to the Lenders, the Administrative Agent shall not have any duty or responsibility (either express or implied) to provide any Lender with any credit or other information concerning Borrowers, including the business, prospects, operations, Property, financial and other condition or creditworthiness of any Borrower or any Affiliate of a Borrower, that may come in to the possession of the Administrative Agent or any of its Related Persons.

(b)         Each Lender, by delivering its signature page to this Agreement or an Assignment and Assumption and funding its Loan, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by the Administrative Agent, the Required Lenders or the Lenders, as applicable, on the Closing Date.

**Section 9.12    Security Documents .**

(a)         Agent under Security Documents.  Each Secured Party hereby further authorizes the Administrative Agent, on behalf of and for the benefit of the Secured Parties, to be the Administrative Agent for and representative of the Secured Parties with respect to the Collateral and the Loan Documents.  Subject to Section 10.02, without further written consent or authorization from any Secured Party, the Administrative Agent may execute any documents or instruments necessary to in connection with a sale or disposition of assets permitted by this Agreement or to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 10.02) have otherwise consented.

(b)         Right to Realize on Collateral.  Anything contained in any of the Loan Documents to the contrary notwithstanding, Borrowers, the Administrative Agent, and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by the Administrative Agent for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Administrative Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Administrative Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Required Lenders, for the purpose of

bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale or other disposition.

(c)     Release of Collateral, Termination of Loan Documents.

(i)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent shall, subject to, and to the extent required by the Bankruptcy Court, take such actions as shall be required to release its security interest in any Collateral subject to any disposition permitted by the Loan Documents.

(ii)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than contingent expense reimbursement and indemnity obligations that are not then due and payable) have been paid in full and all Commitments have terminated or expired, upon request of Borrowers, the Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any other Secured Party) take such actions as shall be required to release its security interest in all Collateral.

(iii)     The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by Borrowers in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

**Section 9.13     Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim.** The Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file a verified statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such Rule's disclosure requirements for entities representing more than one creditor;

(b)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent Administrative Agent under Sections 2.05 and 10.03) allowed in such judicial proceeding; and

(c)     to collect and receive any monies or other Property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under this Agreement.  To the extent that the payment of any

such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**ARTICLE X**
**MISCELLANEOUS**

**Section 10.01   Notices.**

(a)      Generally.   Notices and other communications provided for herein shall, except as provided in Section 10.01(b), be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or e-mail, as follows:

(i)      if to any Borrower:

c/o Trinitas Advantage Agriculture Partners IV. LP
2055 Woodside Road, #195
Redwood City, CA 94061
Attention: Ryon Paton
Email: ryon.paton@trinitaspartners.com

with a copy (which shall not constitute notice) to:

Keller Benvenutti Kim LLP
425 Market Street, 26th Floor
San Francisco, CA 94105
Attn: Jane Kim and Jeremy Richards
Email: jkim@kbkllp.com
          jrichards@kbkllp.com

(ii)      if to the Administrative Agent or to Rabo AgriFinance LLC in its capacity as a Lender, to:

Rabo AgriFinance LLC
1630 S. Stapley Dr., Suite 106
Mesa, AZ 85204;
Attn:  Roger Becker
Email:  Roger.Becker@raboag.com

with a copy (which shall not constitute notice) to:

Fennemore Dowling Aaron
8080 N Palm Avenue, Third Floor

100

Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 107 of 123

such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**ARTICLE X**
**MISCELLANEOUS**

**Section 10.01   Notices.**

(a)      Generally.   Notices and other communications provided for herein shall, except as provided in Section 10.01(b), be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or e-mail, as follows:

(i)      if to any Borrower:

c/o Trinitas Advantage Agriculture Partners IV. LP
2055 Woodside Road, #195
Redwood City, CA 94061
Attention: Ryon Paton
Email: ryon.paton@trinitaspartners.com

with a copy (which shall not constitute notice) to:

Keller Benvenutti Kim LLP
425 Market Street, 26th Floor
San Francisco, CA 94105
Attn: Jane Kim and Jeremy Richards
Email: jkim@kbkllp.com
          jrichards@kbkllp.com

(ii)      if to the Administrative Agent or to Rabo AgriFinance LLC in its capacity as a Lender, to:

Rabo AgriFinance LLC
1630 S. Stapley Dr., Suite 106
Mesa, AZ 85204;
Attn:  Roger Becker
Email:  Roger.Becker@raboag.com

with a copy (which shall not constitute notice) to:

Fennemore Dowling Aaron
8080 N Palm Avenue, Third Floor

100

Fresno, California 93711
Attn: Jackson Waste and Don Pool
Email: jwaste@fennemorelaw.com
dpool@fennemorelaw.com

(iii)    if to any other Lender, to it at its address (or telecopy number) set forth on its Administrative Questionnaire.

Any notice or other communication to any one or more Borrowers hereunder shall be sufficiently given if given c/o the Borrower Representative, and all requirements for notice "to Borrowers" or to any Borrower shall be understood to require only notice c/o the Borrower Representative; and the giving of any notice or other communication to the Administrative Agent or any Lender by the Borrower Representative as provided herein shall be deemed to have been sufficiently given on behalf of all Borrowers referenced in such notice or communication. Notices and other communications to the Lenders hereunder may (subject to Section 10.01(b)) be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent. Any party hereto may change its address, telecopier number, or e-mail address for notices and other communications hereunder by notice to the other parties hereto. The Administrative Agent or the Borrower Representative may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (A) of notification that such notice or communication is available and identifying the website address therefor.

(b)    Posting.    Each Borrower hereby agrees that it will provide to the Administrative Agent all information, documents, and other materials that it is obligated to furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new Borrowing or other extension of credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement, or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications, collectively, the "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at such e-mail address(es) as is/are provided to Borrowers by the Administrative Agent from time to time or in such other form, including hard copy delivery thereof, as the Administrative Agent requires. In addition, Borrowers agree to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document or in such other form, including hard copy delivery thereof, as the Administrative Agent reasonably requires. Nothing in this Section 10.01 shall prejudice the right of the Administrative Agent, any Lender, or any Borrower to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as any such Agent shall reasonably require.

(c)     To the extent consented to by the Administrative Agent in writing from time to time, the Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.

(d)     The Administrative Agent may make the Communications available to the Lenders by posting the Communications on Debt Domain or a substantially similar electronic transmission system (the "*Platform*"). The Platform is provided "as is" and "as available." The Administrative Agent does not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform, and expressly disclaims liability for errors or omissions in the communications. No warranty of any kind, express, implied, or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights, or freedom from viruses or other code defects, is made by the Administrative Agent in connection with the Communications or the Platform. In no event shall the Administrative Agent have any liability to any Borrower, any Lender, or any other Person for damages of any kind, whether or not based on strict liability, and including direct or indirect, special, incidental, or consequential damages, losses, or expenses (whether in contract, tort, or otherwise) arising out of or related to any Borrower's or the Administrative Agent's transmissions of Communications through the Internet (including the Platform), except to the extent caused by the willful misconduct or gross negligence of the Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction. Notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address of notification that such notice or communication is available and identifying the website address therefor. Each Borrower understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution, and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of the Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(e)     The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(f)     Each Borrower, and each Lender, agrees that the Administrative Agent may, but shall not be obligated to, store any electronic Communications on the Platform in accordance with the Administrative Agent's customary document retention procedures and policies.

**Section 10.02   Waivers; Amendment.** (a) No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by Borrowers therefrom shall in any event be effective unless the same is permitted by

Section 10.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or Withdrawal from the Segregated Post-Sale Remainder Account shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on Borrowers in any case shall entitle Borrowers to any other or further notice or demand in similar or other circumstances.

(b) Subject to Section 2.14(c) and Section 10.02(c), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented, or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Borrowers and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and Borrowers, in each case with the written consent of the Required Lenders; *provided* that no such agreement shall:

(i) increase or extend the expiry date of the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver, or consent with respect to any condition precedent, covenant, or Default (or any definition used, respectively, therein) shall constitute an increase in or an extension of the expiry date of the Commitment of any Lender for purposes of this clause (i));

(ii) reduce the principal amount or premium, if any, of any Loan or reduce the rate of interest thereon (other than interest pursuant to Section 2.06(c)), or reduce any Fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly affected thereby;

(iii) postpone or extend the maturity of any Loan, or any scheduled date of payment of or the installment otherwise due on the principal amount of any Loan under Section 2.04, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment (other than a waiver of any increase in the interest rate pursuant to Section 2.06(c)), or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby;

(iv) change (A) Section 8.03 in a manner that would alter the application of payments required thereby without the written consent of each Lender affected thereby, or (B) Section 2.12(b) or (c) in a manner that would alter the order of or the *pro rata* sharing of payments or setoffs required thereby, without the written consent of each Lender;

(v) change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document (including this Section 10.02) specifying the number or percentage of Lenders required to waive, amend, or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender.

(vi) except as expressly permitted in this Agreement or any Security Document, release all or substantially all of the Collateral from the Liens of the Security Documents or alter the relative priorities of the Obligations entitled to the Liens of the Security Documents, except in connection with a "credit bid" undertaken by the Administrative Agent at the direction of the Required Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii), or any other section of the Bankruptcy Code, or any other sale or other disposition of assets in connection with other Debtor Relief Laws, or an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents;

(vii)    change <u>Section 10.04(h)</u> without the consent of each Granting Lender all or any part of whose Loans are being funded by any SPC at the time of any such amendment, waiver, or modification;

(viii)    change <u>Section 10.04(b)</u> in a manner that further restricts assignments thereunder without the written consent of each Lender;

(ix)    permit assignments by Borrowers of their rights or obligations under the DIP Term Facility without the written consent of each Lender;

(x)    subordinate the Obligations under the Loan Documents to any other Indebtedness; or

(xi)    except as provided by operation of law and otherwise permitted hereunder, amend or modify the Superpriority Claims status of the Obligations under the DIP Orders or under any Loan Document;

*provided*, *further*, that no such agreement shall amend, modify, or otherwise affect the rights or duties of the Administrative Agent without the prior written consent of the Administrative Agent.

(c)    Without the consent of any other Person, Borrowers and the Administrative Agent may (at the direction of the Required Lenders) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion, or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by applicable Legal Requirements to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or assets so that the security interests therein comply with applicable Legal Requirements.

**Section 10.03    <u>Expenses; Indemnity; Damage Waiver</u>.**

(a)    Subject to review, allowance, and authorization by the Bankruptcy Court, Borrowers agree to pay (i) all reasonable and documented out-of-pocket costs and expenses for the Administrative Agent or any Lender or the Lender Advisors incurred by the Administrative Agent, the Lenders and any of their respective Affiliates, in connection with the structuring, documentation, negotiation, arrangement, and syndication of the credit facilities provided for herein and any credit or similar facility refinancing, extending, or replacing, in whole or in part, the credit facilities provided herein, including the preparation, negotiation, execution, delivery, and administration of this Agreement and the other Loan Documents, or any amendments, modifications, or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby are consummated) or any other document or matter requested by Borrowers, (ii) all reasonable and documented out-of-pocket costs and expenses of creating, perfecting, recording, maintaining, and preserving Liens in favor of the  Agent for the benefit of the Secured Parties, including filing and recording fees, expenses, and taxes, stamp or documentary taxes, search fees, title insurance premiums, and reasonable fees, expenses, and other charges of counsel to the Administrative Agent, and (iii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges, and disbursements of any counsel or other advisor for the Administrative Agent or any Lender, including the Lender Advisors) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this <u>Section 10.03</u>, or (B) in connection with the Loans made hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring, or negotiations in respect of such Loans (all of the foregoing, collectively, the "**Lender Expenses**").  Lender Expenses shall be paid in cash as provided in <u>Section 2.03</u>, with the amount

thereof added to the aggregate outstanding principal amount of the Loans on the date incurred, in lieu of cash payment (and shall be treated as advanced hereunder and as principal of the Loans at all times thereafter).

(b)     Borrowers agree to indemnify the Administrative Agent, each Lender, and each of their respective Related Persons (each such Person being called an "**Indemnitee**") against, and to hold each Indemnitee harmless from, all reasonable out-of-pocket costs and any and all losses, claims, damages, liabilities, fees, fines, penalties, actions, judgments, suits, and related expenses, including reasonable Advisors fees, charges, and disbursements, incurred by, imposed on, or asserted against any Indemnitee, directly or indirectly, arising out of, in any way connected with, or as a result of (i) the execution, delivery, performance, administration, or enforcement of the Loan Documents or any agreement or instrument contemplated therein, or the performance by the parties thereto of their respective obligations thereunder, (ii) any actual or proposed use of the proceeds of the Loans, (iii) any claim, litigation, investigation, or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, (iv) any actual or alleged presence or Release or threatened Release of Hazardous Materials, on, at, under, or from any property owned, leased, or operated by Borrowers at any time, or any Environmental Claim or threatened Environmental Claim related in any way to Borrowers, (v) any past, present, or future non-compliance with, or violation of, Environmental Laws or Environmental Permits applicable to any Borrower, or any Borrower's business, or any property presently or formerly owned, leased, or operated by any Borrower or its predecessors in interest, (vi) the environmental condition of any property owned, leased, or operated by any Borrower at any time, or the applicability of any Legal Requirements relating to such property, whether or not occasioned wholly or in part by any condition, accident, or event caused by any act or omission of any Borrower, (vii) the imposition of any environmental Lien encumbering any Real Property, (viii) the consummation of the Transactions and the other transactions contemplated hereby, or (ix) any actual or prospective action, claim, suit, litigation, investigation, inquiry, or proceeding relating to any of the foregoing, whether based on contract, tort, or any other theory, whether brought by a third party or by any Borrower, or otherwise, and regardless of whether any Indemnitee is a party thereto (all of the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted, in whole or in part, from the gross negligence, bad faith, or willful misconduct of such Indemnitee.

(c)     The provisions of this <u>Section 10.03</u> shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Transactions and the other transactions contemplated hereby, the repayment of the Loans and any other Obligations, the release of all or any portion of the Collateral, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent or any Lender. All amounts due under this <u>Section 10.03</u> shall be accompanied by reasonable documentation with respect to any reimbursement, indemnification, or other amount requested.

(d)     To the extent that Borrowers fails to pay any amount required to be paid by it to the Administrative Agent under <u>Section 10.03(a)</u> or <u>(b)</u>, each Lender severally agrees to pay to the Administrative Agent, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought (or, if such payment is sought after the date on which the Loans have been paid in full and the Commitments terminated, determined immediately prior to the time that the Loans were paid in full and the Commitments terminated)) of such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities, and related expenses are incurred or asserted by any party hereto or any third party); *provided* that the unreimbursed amount was incurred by or asserted against any of the Administrative Agent in its capacity as such. For purposes of this <u>Section 10.03(d)</u>, a Lender's "*pro rata* share" shall be determined based upon its share of

the sum of the total outstanding Loans and unused Commitments at the time. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any source against any amount due to the Administrative Agent under this <u>Section 10.03(d)</u>.

(e)      To the fullest extent permitted by applicable Legal Requirements, no party hereto shall assert, and each party hereto hereby waives, any claim against any other party hereto and each Indemnitee, on any theory of liability, for special, indirect, exemplary, consequential, or punitive damages (including any loss of profits, business, or anticipated savings) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, or the use of the proceeds thereof. No party hereto or any Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic, or other information transmission systems in connection with the Loan Documents or the transactions contemplated hereby or thereby.

(f)      All amounts due under this <u>Section 10.03</u> shall be payable not later than thirty (30) days after demand therefor.

(g)      The agreements in this <u>Section 10.03</u> shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments, and the repayment, satisfaction, or discharge of all the other Secured Obligations.

**Section 10.04   <u>Successors and Assigns</u>.**

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, except that Borrowers may not assign or otherwise transfer any of their respective rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, which consent may be withheld in their respective sole discretion (and any attempted assignment or transfer by Borrowers without such consent shall be null and void). Nothing in this Agreement or any other Loan Document, express or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective permitted successors and assigns, Participants to the extent expressly provided in <u>Section 10.04(e)</u> and, to the extent expressly provided for herein, the other Indemnitees) any legal or equitable right, remedy, or claim under or by reason of this Agreement or any other Loan Document.

(b)      Any Lender shall have the right at any time to assign to one or more assignees (other than Borrowers or any Affiliate thereof or a natural person) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that:

(i)      except in the case of (A) an assignment to a Lender, a direct or indirect owner of a Lender, an Affiliate of the foregoing, or (B) an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than One Million Dollars ($1,000,000); *provided* that the foregoing may be reduced with the consent of the Administrative Agent;

(ii)      each partial assignment shall be made as an assignment of a proportionate part of all of the assigning Lender's rights and obligations under this Agreement;

(iii)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with any Tax forms required to be delivered by Section 2.13(f), and a processing and recordation fee of Three Thousand Five Hundred Dollars ($3,500); *provided* that in its sole discretion the Administrative Agent may elect to waive such processing and recordation fee in connection with any such assignment;

(iv)    the assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(v)    except in the case of an assignment to a Lender, a direct or indirect owner of a Lender, or an Affiliate of the foregoing, or if an Event of Default has occurred and is continuing, the Borrowers must give its prior written consent to such assignment (which consent shall not be unreasonably withheld, delayed, or conditioned); and

(vi)    except in the case of an assignment to a Lender, a direct or indirect owner of a Lender, or an Affiliate of the foregoing, the Administrative Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld, delayed, or conditioned).

Subject to acceptance and recording thereof pursuant to Section 10.04(d), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement (*provided* that any liability of Borrowers to such assignee under Section 2.10, 2.11 or 2.13 shall be limited to the amount, if any, that would have been payable thereunder by Borrowers in the absence of such assignment, except to the extent any such amounts are attributable to a Change in Law occurring after the date of such assignment), and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto, but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 2.13 and 10.03).

(c)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of and stated interest on the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive and binding in the absence of manifest error, and Borrowers, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrowers and any Lender (with respect to its own interest only), at any reasonable time and from time to time upon reasonable prior notice.

(d)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee is already a Lender hereunder), the processing and recordation fee referred to in Section 10.04(b)(iii), and any written consent to such assignment required by Section 10.04(b), the Administrative Agent shall accept such Assignment and Assumption, and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 10.04(d). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with the requirements of this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(e).

4581881.1
Case: 24-50211    Doc# 45-1    Filed: 03/07/24    Entered: 03/07/24 09:41:50    Page 114 of 123

(e)     Any Lender shall have the right at any time, without the consent of, or notice to Borrowers, the Administrative Agent, or any other Person to sell participations to any Person (other than Borrowers or any Affiliate thereof or a natural Person) (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) Borrowers, the Administrative Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification, or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification, or waiver that (1) is described in clauses (i), (ii) or (iii) of the proviso to Section 10.02(b), and (2) directly affects such Participant. Subject to Section 10.04(f), each Participant shall be entitled to the benefits of (and subject to the obligations of) Sections 2.10, 2.11 and 2.13 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.04(b) (it being understood that the documentation required under Section 2.13(f) shall be delivered to the participating Lender). To the extent permitted by Legal Requirements, each Participant shall also be entitled to the benefits of Section 10.08 as though it were a Lender; *provided* that such Participant agrees in writing to be subject to Section 2.12(c) as though it were a Lender. Each Lender that sells a participation shall, acting for this purpose as a non-fiduciary agent of Borrowers, maintain at one of its offices a register for the recordation of the names and addresses of its Participants, the principal amounts of and stated interest on, and terms of, its participations (the "**Participant Register**"). The entries in the Participant Register shall be conclusive and binding absent manifest error, and such Lender (and Borrowers, to the extent that the Participant requests payment from Borrowers) shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement. No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit, or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)     A Participant shall not be entitled to receive any greater payment under Section 2.10, 2.11 or 2.13 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the prior written consent of Borrowers (which consent shall not be unreasonably withheld, delayed, or conditioned) or the greater payment results from a Change in Law after the date the participation was sold to such Participant.

(g)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank, and this Section 10.04(g) shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. Without limiting the foregoing, in the case of any Lender that is a fund that invests in bank loans or similar extensions of credit, such Lender may, without the consent of Borrowers, the Administrative Agent, or any other Person, collaterally assign or pledge all or any portion of its rights under this Agreement, including the Loans and Notes or any other instrument evidencing its rights as a Lender under this Agreement, to any holder of, trustee for, or any other

108

representative of holders of, obligations owed or securities issued, by such fund, as security for such obligations or securities.

(h)　　　　Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPC**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and Borrowers, the option to provide to Borrowers all or any part of any Loan that such Granting Lender would otherwise be obligated to make to Borrowers pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to make any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof; *provided further* that nothing herein shall make the SPC a "**Lender**" for the purposes of this Agreement, obligate Borrowers or the Administrative Agent to deal with such SPC directly, obligate Borrowers in any manner to any greater extent than they were obligated to the Granting Lender, or increase costs or expenses of Borrowers.  Borrowers and the Administrative Agent shall be entitled to deal solely with, and obtain good discharge from, the Granting Lender and shall not be required to investigate or otherwise seek the consent or approval of any SPC, including for the approval of any amendment, waiver, or other modification of any provision of any Loan Document.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceedings under the laws of the United States of America or any state thereof. In addition, notwithstanding anything to the contrary contained in this Section 10.04(h), any SPC may (i) with notice to, but without the prior written consent of, Borrowers and the Administrative Agent, and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by Borrowers and the Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans, and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer, or provider of any surety, guarantee,, or credit or liquidity enhancement to such SPC.

(i)　　　　This Agreement, any other Loan Document, and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure, or authorization related to this Agreement or any other Loan Document (each, for purposes of this clause (i), a "**Communication**"), including Communications required to be in writing, may be in the form of an electronic record and may be executed using Electronic Signatures.  Borrowers agree that any Electronic Signature on or associated with any Communication shall be valid and binding on Borrowers to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature will constitute the legal, valid, and binding obligation of Borrowers enforceable against them in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered.  Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.

**Section 10.05**　**Survival of Agreement.**　All covenants, agreements, representations, and warranties made by Borrowers in the Loan Documents and in the reports, certificates, or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or

Case: 24-50211　　Doc# 45-1　　Filed: 03/07/24　　Entered: 03/07/24 09:41:50　　Page 116 of 123

on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default, failure of any condition set forth in Article IV to be satisfied, or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as any Obligation (other than contingent indemnification obligations not then payable) is outstanding and so long as the Commitments have not expired or terminated.  The provisions of Article IX and Sections 2.12 to 2.15, 10.03 and 10.08 to 10.10 shall survive and remain in full force and effect regardless of the consummation of the Transactions and the other transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments, or the termination of this Agreement or any provision hereof.

Section 10.06    **Counterparts; Integration; Effectiveness.**  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof, and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it has been executed by the Administrative Agent and when the Administrative Agent has received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 10.07    **Severability.**  Any provision of this Agreement held to be invalid, illegal, or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability without affecting the validity, legality, and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08    **Right of Setoff; Marshalling; Payments Set Aside.**  If an Event of Default has occurred and is continuing, each Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Legal Requirements, subject to the Remedies Notice Period, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower against any and all of the obligations of the Borrowers now or hereafter existing under this Agreement or any other Loan Documents held by such Lender, irrespective of whether or not such Lender has made any demand under this Agreement or any other Loan Document and although such obligations may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender under this Section 10.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender may have.  Each Lender agrees to notify Borrowers and the Administrative Agent promptly after any such setoff and application; *provided*, *however*, that in no event shall the failure to give such notice affect the validity or enforceability of any such setoff, subject to the Remedies Notice Period.  Neither the Administrative Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Borrower or any other Person or against or in payment of any or all of the Obligations. To the extent that any Borrower makes a payment or payments to the Administrative Agent or Lenders (or to the Administrative Agent, on behalf of Lenders), or the Administrative Agent or Lender enforces any security interests or exercises any right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, and/or required to be repaid to

a trustee, receiver, or any other party under any Debtor Relief Law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continue in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**Section 10.09    Governing Law; Jurisdiction; Consent to Service of Process.**

(a)    This Agreement and the other Loan Documents and any claim, controversy, dispute, or cause of action (whether sounding in contract law or tort law or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed and enforced in accordance with the laws of the State of California, without giving effect to any choice of law principles, other than mandatory principles that are not permitted to be waived, that would apply the laws of another jurisdiction and, to the extent applicable, the Bankruptcy Code.

(b)    Each of the Borrowers and the Secured Parties hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have or abstains from jurisdiction, the courts of the State of California and of the United States District Court of the Northern District of California, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in the Bankruptcy Court and, if the Bankruptcy Court does not have or abstains from jurisdiction, such California State court or, to the extent permitted by applicable Legal Requirements, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Legal Requirements.  To the extent not required to be brought in Bankruptcy Court, nothing in this Agreement or any other Loan Document or otherwise shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Borrowers or its properties in the courts of any jurisdiction, and hereby submits to the jurisdiction of any such court.

(c)    Borrowers and Secured Parties hereby irrevocably and unconditionally waive, to the fullest extent permitted by applicable Legal Requirements, any objection that they may now or hereafter have to the laying of venue of any suit, action, or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 10.09(b).  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Legal Requirements, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document in the manner provided for notices (other than telecopy or email) in Section 10.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable Legal Requirements.

**Section 10.10    Waiver of Jury Trial.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT, THE TRANSACTIONS OR THE OTHER TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR**

ANY OTHER THEORY). **EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.10</u>.**

  **Section 10.11**   **<u>Judicial Reference</u>.** Pursuant to <u>Section 10.10</u>, the parties waive their respective 0rights to a trial before a jury in connection with any Claim (as "**Claim**" is hereinafter defined), and Claims shall be resolved by a judge sitting without a jury. If a court determines that <u>Section 10.10</u> is not enforceable for any reason, then, at any time prior to trial of the Claim, but not later than thirty (30) days after entry of the order determining this provision is unenforceable, any party shall be entitled to move the court for an order compelling judicial reference and staying or dismissing such litigation pending resolution ("**Reference Order**"). If a Claim, dispute, or controversy arises between any one or more parties, and only if the jury trial waiver set forth in <u>Section 10.10</u> is not permitted by applicable law or ruling by the Bankruptcy Court (or any other court having jurisdiction over the matter), the parties elect to proceed under this <u>Section 10.11</u>. With the exception of the items specified below, any controversy, dispute or claim between the parties relating to this Agreement or any other document, instrument or transaction between the parties (each, a "**Claim**"), will be resolved by a reference proceeding in California pursuant to Sections 638 *et seq*. of the California Code of Civil Procedure, or their successor sections, which shall constitute the exclusive remedy for the resolution of any Claim, including whether the Claim is subject to reference. Venue for the reference will be the Superior Court in the County where real property involved in the action, if any, is located, or in a County where venue is otherwise appropriate under law (the appliable court). The following matters shall not be subject to reference: (i) nonjudicial foreclosure of any security interests in real or personal property, (ii) exercise of self-help remedies (including without limitation set-off), (iii) appointment of a receiver, and (iv) temporary, provisional or ancillary remedies (including without limitation writs of attachment, writs of possession, temporary restraining orders or preliminary injunctions). The exercise of, or opposition to, any of the above does not waive the right to a reference hereunder. The referee shall be selected by agreement of the parties. If the parties do not agree, upon request of any party a referee shall be selected by the presiding judge of the applicable court. The referee shall determine all issues in accordance with existing case law and statutory law of the State of California, including without limitation the rules of evidence applicable to proceedings at law. The referee is empowered to enter equitable and legal relief, and rule on any motion which would be authorized in a court proceeding, including without limitation motions for summary judgment or summary adjudication. The referee shall issue a decision, and pursuant to California Code of Civil Procedure § 644, the referee's decision shall be entered by the applicable court as a judgment or order in the same manner as if tried by such court. The final judgment or order from any decision or order entered by the referee shall be fully appealable as provided by law. The parties reserve the right to findings of fact, conclusions of law, a written statement of decision, and the right to move for a new trial or a different judgment, which new trial if granted, will be a reference hereunder. **AFTER CONSULTING (OR HAVING THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS CHOICE, EACH PARTY AGREES THAT ALL CLAIMS RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY A REFEREE AND NOT A JURY**. By agreeing to resolve a Claim by judicial reference, each party is giving up any right it may have to a jury trial, as well as other rights it would have in court that are not available or are more limited in arbitration, such as the rights to discovery and to appeal. In addition, and not by way of limitation, each party hereto waives the right to litigate in court or arbitrate any claim or dispute as a class action, either as a member of a class or as a representative, or to act as a private attorney general. As a result of the provisions of this <u>Section 10.11</u>, each party hereto (i) certifies that no one has represented to such party that the other party would not seek to enforce jury and class action waivers in the event of suit, and (ii) acknowledges

that it and the other parties have been induced to enter into this agreement by, among other things, the mutual waivers, agreements, and certifications in this <u>Section 10.11</u>.

Section 10.12    **Headings.**  Article and Section headings and the Table of Contents used herein are for convenience of reference only, and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.13    **Interest Rate Limitation.**  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges, and other amounts that are treated as interest on such Loan under applicable law (collectively, the "**Charges**"), exceeds the maximum lawful rate (the "**Maximum Rate**") that may be contracted for, charged, taken, received, or reserved by the Lender holding such Loan in accordance with applicable Legal Requirements, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this <u>Section 10.13</u> shall be cumulated, and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, have been received by such Lender.

Section 10.14    **Assignment and Assumption.**  Each Eligible Assignee to become a party to this Agreement as a Lender (other than the Administrative Agent and any other Lender that is a signatory hereto) shall do so by delivering to the Administrative Agent an Assignment and Assumption duly executed by such Lender and the Administrative Agent.

Section 10.15    **Waiver of Defenses; Absence of Fiduciary Duties.**  The Administrative Agent, each Lender, and their respective Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of Borrowers and/or their respective Related Persons. Borrowers agree that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary, or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and Borrowers and their Related Persons, on the other.  Each Borrower acknowledges and agrees that (i) the transactions provided for in the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and Borrowers, on the other, and (ii) in connection therewith and with the process leading thereto, (y) no Lender has assumed an advisory or fiduciary responsibility in favor of any Borrower or any Borrower's Related Person with respect to the transactions contemplated hereby, or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising, or will advise any Borrower or any of its Related Persons on other matters), or any other obligation to any Borrower except the obligations expressly set forth in the Loan Documents, and (z) each Lender is acting solely as principal and not as an agent or fiduciary of any Borrower, its management, any of its Related Persons, or any other Person. Each Borrower acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Borrower agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Borrower, or any other Borrowers, in connection with such transaction or the process leading thereto. Further, Borrowers agree that their relationship with Lenders is solely that of debtor and creditor.  In no sense does this or any other Loan Document or other agreement between the parties hereto create a partnership or joint venture.

Section 10.16    **Reinstatement.**  To the extent that any payments on the Obligations or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside, or

required to be repaid to a trustee, debtor in possession, receiver, receiver and manager, interim receiver, or other Person under any bankruptcy law or other Debtor Relief Law, common law, or equitable cause, then to such extent, the Indebtedness so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Secured Parties' Liens, security interests, rights, powers, and remedies under this Agreement and each Loan Document shall continue in full force and effect. In such event, each Loan Document shall be automatically reinstated, and Borrowers shall take such action as may be requested by the Administrative Agent or the Required Lenders to effect such reinstatement.

      **Section 10.17**   **USA Patriot Act.**  Each Lender and the Administrative Agent hereby notifies Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify, and record information that identifies each Borrower, which information includes the name, address,  and taxpayer identification number of each Borrower, and other information that will allow it to identify each Borrower in accordance with the Patriot Act.

      **Section 10.18**   **DIP Orders.** In the event of any conflict between the terms of any of the DIP Orders , on the one hand, and the terms of this Agreement or any other Loan Document, on the other hand, the terms of the DIP Orders shall govern and control.

(Signature Pages Follow)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers or other authorized signatories as of the day and year first above written.

**[SIGNATURE BLOCKS OF BORROWERS]**

By:_____
Name:_____
Title:_____


**RABO AGRIFINANCE LLC**, as Administrative Agent and as a Lender


By:_____
Name:_____
Title:_____

[Signature Page to DIP Credit Agreement

ANNEX I

Commitments

| Lender | Commitment |
|---|---|
| Rabo AgriFinance LLC | $30,000,000 |