**RAINES FELDMAN LITTRELL LLP**
Robert S. Marticello (SBN 244256)
rmarticello@raineslaw.com
3200 Park Center Drive, Suite 250
Costa Mesa, CA 92626
Telephone: (310) 400-4001

Mark S. Melickian (IL SBN 6229843) (*Admitted Pro Hac Vice*)
mmelickian@raineslaw.com
30 North LaSalle Street, Suite 3100
Chicago, IL 60602
Telephone: (312) 704-9400

*Proposed Counsel for the Official Committee of Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No. 24-50211 (DM) (Lead Case) |
| TRINTAS ADVANTAGED AGRICULTURE PARTNERS IV, LP, *et al.*, | Chapter 11 |
| Debtor | **COMMITTEE'S OBJECTION TO MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V) SETTING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF** |
| | Date: March 21, 2024<br>Time: 10:00 a.m. (Pacific Time)<br>Place: **Tele/Videoconference Appearances Only**<br>United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ................................................................................................1

II. BACKGROUND .................................................................................................4

III. ARGUMENT ......................................................................................................6

    A.  Legal Standard .........................................................................................6

    B.  The DCA Contains an Undisclosed Roll-Up ...............................................7

    C.  The DCA Leaves No Sale Proceeds for General Unsecured Creditors .........9

    D.  The DCA Contains Excessive Costs of Lending .........................................11

    E.  The Lenders' Entitlement to Adequate Protection Payments Has Not
        Been  Demonstrated .......................................................................................11

    F.  The Lenders Should Not Be Granted Liens on Unencumbered Assets .......13

    G.  The Sale Milestones Should Be Flexible ...................................................14

    H.  The Lenders Should Not Be Granted Liens on Causes of Action................14

    I.  The Indemnification Provision Should Be Eliminated ................................15

    J.  The Events of Default Should Be Limited and Revised ............................15

    K.  The Budget Needs Revision and Clarification ..............................................17

    L.  The Carve-Out Should Be Modified ..............................................................18

    M.  Required Disclosures Have Not Been Updated ...........................................19

IV. CONCLUSION ..................................................................................................19

# TABLE OF AUTHORITIES

Page

**Cases**

Chiasson v. Matherne & Assoc. (In re Oxford Mgmt., Inc.),
   4 F.3d 1329 (5th Cir. 1993) ........................................................................................7

In re 1121 Pier Vill. LLC,
   635 B.R. 127 (Bankr. E.D. Pa. 2022) ......................................................................10

In re 354 E. 66th St. Realty Corp.,
   177 B.R. 776 (Bankr. E.D.N.Y. 1995)......................................................................11

In re Adamson Co.,
   29 B.R. 937 (Bankr. E.D. Va. 1983) ..........................................................................6

In re Allegheny International, Inc.,
   118 B.R. 282 (W.D.Pa. 1990)......................................................................................8

In re Barbara K. Enters., Inc.,
   No. 08-11474 (MG), 2008 WL 2439649 (Bankr. S.D.N.Y. 2011)...................................6

In re Crouse Grp.,
   71 B.R. 544 (Bankr. E.D. Pa.), aff'd, 75 B.R. 553 (E.D. Pa. 1987)................................6

In re Def. Drug Stores, Inc.,
   145 B.R. 312 (B.A.P. 9th Cir. 1992)............................................................................7

In re Equalnet Communications Corp.,
   258 B.R. 368 (Bankr. S.D. Tex. 2000) ........................................................................7

In re Four Seasons Marine & Cycle, Inc.,
   263 B.R. 764 (Bankr. E.D. Tex. 2001) ......................................................................13

In re Hubbard Power & Light,
   202 B.R. 680 (Bankr. E.D.N.Y. 1996)........................................................................6

In re Integrated Testing Prods. Corp.,
   69 B.R. 901 (D.N.J. 1987) .........................................................................................13

In re Latam Airlines Grp. S.A.,
   620 B.R. 722 (Bankr. S.D.N.Y. 2020).........................................................................7

In re Latam Airlines Grp. S.A.,
   620 B.R. 722 (Bankr. S.D.N.Y. 2020).......................................................................10

In re Mellor,
   734 F.2d 1396 (9th Cir. 1984) ..................................................................................12

In re Roe Excavating, Inc.,
   52 B.R. 439 (Bankr. S.D. Ohio 1984).......................................................................11

In re Saypol,
   31 B.R. 796 (Bankr. S.D.N.Y. 1983) ........................................................................12

*In re Sonora Desert Dairy*,
    2015 WL 65301 (B.A.P. 9th Cir. 2015)...................................................................11

*In re Sun Runner Marine, Inc.*,
    945 F.2d 1089 (9th Cir. 1991) .......................................................................8

*In re Timbers of Inwood Forest*,
    484 U.S. 365 (1988)...................................................................................12

*In re Tri-Union Development Corp.*,
    253 B.R. 808 (Bankr. S.D. Tex. 2000) .............................................................8

*In re Weinstein*,
    227 B.R. 284 (B.A.P. 9th Cir. 1998)...............................................................12

*Resolution Tr. Corp. v. Official Unsecured Creditors Comm. (In re Def. Drug Stores, Inc.)*,
    145 B.R. 312 (B.A.P. 9th Cir. 1992)............................................................6, 7

The Official Committee of Unsecured Creditors (the "**Committee**") of Trinitas Advantaged Agriculture Partners IV, LP; Trinitas Farming, LLC; Dixon East LLC; Turf Ranch LLC; Rasmussen LLC; Johl LLC; Chiala LLC; Hall Ranch LLC; Dinuba Ranch, LLC; Porterville LLC; Tule River Ranch, LLC; Jeffrey Ranch, LLC; Toor Ranch, LLC; Lamb Ranch, LLC; Fry Road, LLC; Adobe Ranch, LLC; Marcucci Ranch, LLC; Ratto Ranch, LLC; and Phelps Ranch, LLC, the debtors and the debtors-in-possession (collectively, the "**Debtors**")[1] in the above-captioned bankruptcy cases (collectively, the "**Case**"), hereby objects to the Debtors' *Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing; (II) Granting Liens and Superpriority Claims; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Setting a Final Hearing; and (VI) Granting Related Relief* [Docket No. 14] (the "**Motion**") seeking an order of the Court approving the use of cash collateral and the debtor-in-possession financing provided by Rabo AgriFinance, LLC ("DIP Agent" or "Lender" and collectively with the other lenders, the "Lenders"), on the terms and conditions set forth in the Superpriority Secured Debtor-in-Possession Credit Agreement [Docket No. 45] (the "**DCA**") and the proposed interim order attached as Exhibit "A-1" to the *Notice of Filing of Revised Proposed Interim Order With Respect to Motion of the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing* [Docket No. 63] (the "**Proposed Interim Order**").

## I.     <u>INTRODUCTION</u>

This Case should not be run for the sole benefit of the Lenders and its outcome should not be predetermined at the outset.  These are fundamental tenets of bankruptcy correctly

---

[1]     The last four digits of Trinitas Advantaged Agriculture Partners IV, LP's tax identification number are 3730. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.donlinrecano.com/trinitas. The Debtors' service address is 2055 Woodside Road, Suite 195, Redwood City, CA 94061.

identified by the Court during the "first-day" hearings. However, the proposed DIP Loan,[2] as currently structured, raises the very real risk of exactly that – creating a situation where, once the sales have concluded, this Case could fairly be characterized as a *sub rosa* foreclosure run for the benefit of the Lenders with no recovery for general unsecured creditors.

The Court has done substantial work to improve the terms of the DIP Loan and protect the rights of unsecured creditors in the Committee's absence, and the Committee appreciates the Court's diligence in that regard. To date, at the Court's urging, the Debtors and the Lenders have removed or amended several objectionable provisions, such as, releases binding the Committee, waivers of the estates' rights under §§ 506(c) or 552(b), and limits on the Committee's investigation of the Lenders' pre-petition liens and loans. However, more work remains to be done and the final approval of the DIP Loan, which is memorialized in the 45-page Proposed Interim Order and 123-page DCA, should not be rushed.

The DCA itself contemplates an extended period prior to final approval. The DCA's Milestones do not require the entry of a final order until 80 days after its execution. (*See* DCA [Docket No. 45][3] at 77 of 123, Sec. 5.14(c).) The filed DCA is unsigned and undated other than the reference to "March __, 2024" in the opening section, and the Committee understands that the DCA has yet to be signed.[4] If March 7 (the date the DCA was filed) is used as the signing date, then, according to the Lenders, a final order is not required until **May 27, 2024**. Even if the Petition Date is used as the signing date, this Milestone would not occur until May 9, 2024.

The Committee understands that the Debtors have exceeded the $6,500,000 limit on interim borrowing in the DCA. However, this is not an issue the Committee created. Rather, the budget and Milestones were developed by the Debtors and the Lenders without the Committee's involvement. Given the distant Milestone in the DCA for entry of a final financing order, it appears that there was a miscalculation of the amounts the Debtors would need to

---

[2]    Capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Motion.

[3]    All citations to the DCA shall be citations to the version filed at Docket 45-1 on March 7, 2024.

[4]    At the March 14, 2024 hearing, the Debtors' counsel indicated that further revisions of the DCA are forthcoming to address the $6,500,000 cap on borrowing pending a final hearing.

borrow during the interim period. The current interim borrowing limit (determined by the Lenders and the Debtors) does not warrant expediting final approval of the DIP Loan and, thereby, prejudicing the Committee's review and opportunity to negotiate the terms of the DIP Loan with the Debtors and the Lenders.

The DIP Loan contains certain fundamental issues that must be addressed. For example, as raised by Committee counsel at the March 14 hearing, the DIP Loan effectively includes a roll-up of the Lenders' Prepetition Loan. Under the DCA, "each Pre-Petition Loan . . . shall be a 'Loan' for all purposes under this Agreement." (*See* DCA at 39 of 123, Sec. 2.01(b).) This definition impacts many provisions of the DCA. As a "Loan," the Prepetition Loan is to accrue the interest and fees, receive the superpriority status and liens, and be paid from the sale proceeds like the DIP Loan. While a "roll-up" may not have been intended, the DCA includes a *de facto* roll-up that was not disclosed in the Motion and is contrary to the post-petition financing guidelines in the Northen District.[5]

In addition, the DCA operates as a *sub rosa* foreclosure by predetermining the disposition of all sale proceeds and leaving nothing for general unsecured creditors. The DCA provides that all sale proceeds will be used to pay the DIP Loan and the Prepetition Loan save for the amounts needed for budgeted case operating costs approved by the Lenders. (*See* DCA at 77 of 123, Sec. 5.14.) Thus, the DCA ensures that no sale proceeds shall be left for the general unsecured creditors unless the sale proceeds exceed all obligations of the Lenders – a fact that remains far from determined at this early stage. No evidence has been provided regarding the value of the Debtors' real properties. These are but a few examples of the problematic aspects of the proposed DIP Loan identified by the Committee in a short period of a few days. More are detailed below.

For these reasons, the Committee proposes that the upcoming hearing be treated as an interim hearing on the DIP Loan, as contemplated by the Court's *Third Supplemental Order* and the Debtors' Proposed Interim Order. The Committee and its professionals have had very

---

[5] *See https://www.canb.uscourts.gov/procedure/guidelines-cash-collateral-financing-motions-stipulations-effective-112006.*

Case: 24-50211    Doc# 87    Filed: 03/19/24    Entered: 03/19/24 17:40:47    Page 7 of 23

little time to absorb and analyze the proposed terms and conditions of the DIP Loan and have had no time whatsoever to negotiate with the Debtors and the Lenders regarding its concerns. The Committee would welcome that opportunity.

Given the risk that the March 21 hearing may go forward as a final hearing, the Committee now sets forth its substantive objections to the DIP Loan. The Committee may have additional objections and concerns to those raised herein, given sufficient time to complete its analysis and engage in substantive discussions with the Debtors and the Lenders about case financing and the Case generally.

## II. **BACKGROUND**

On February 19, 2024, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California, thereby commencing the Case. Additional factual background relating to the Debtors' businesses and capital structure and the commencement of the Case is set forth in the *Declaration of Kirk Hoiberg In Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15].

On March 7, 2024, the Committee was appointed in the Case [Docket Nos. 43 and 44]. That same day, the Debtors filed the proposed DCA as an attachment to a proposed interim order [Docket No. 45].

On March 11, 2024, the Committee selected Raines Feldman Littrell LLP and Husch Blackwell LLP[6] as its proposed co-counsel.

On March 12, 2024, the Debtors filed the Proposed Interim Order [Docket No. 63]. Certain revisions in the Proposed Interim Order expressly highlighted the concept that the final hearing was to occur more than a week after interim approval, and that the final hearing would

---

[6]  Husch Blackwell LLP has obtained a waiver from its client, Rabo AgriFinance, LLC, to serve as co-counsel to the Committee in these cases on the condition that Husch Blackwell LLP may not participate in discussions, negotiations, disputes, or litigation with Rabo AgriFinance, LLC. Husch Blackwell LLP has no involvement in this objection and will not appear in any captions of pleadings filed in this case by the Committee that involve challenges to Rabo AgriFinance, LLC.

be used, for example, to review the submission of evidence sufficient for the Court to make the "Evidentiary Determination" of "good faith" as required under 11 U.S.C. § 364. (*See* Proposed Interim Order at 19 of 94, Sec. E(vi).) The Proposed Interim Order, which has not yet been entered, contemplates a roadmap toward a final hearing on the DIP Loan on the timeline set forth in the DCA.

On March 14, 2024, the Court held a further interim hearing on the Motion. Prior to that hearing, the Committee's understanding was that, at its counsel's request, the Debtors and the Lenders agreed to a one-week continuance. From the Committee's perspective, the goal of the short continuance of the interim hearing was to reach a consensual form of *interim* order that preserved the Committee's rights to raise substantive objections to the DIP Loan in connection with a to-be-set final hearing.

At the March 14 hearing, the Court indicated that it would approve another interim period of financing based on the Term Sheet first approved on an interim basis on February 22, 2024 [Docket No. 22]. The Court then indicated that the March 21, 2024 hearing would be a final hearing and that the Committee should immediately raise any substantive issues it has with the DIP Loan. On March 15, 2024, the Court issued its *Third Supplemental Order Authorizing Term Sheet for Debtor-in-Possession Financing on an Interim Basis* [Docket No. 78] (the "**Third Supplemental Order**"). Among other provisions, the Third Supplemental Order sets March 21, 2024 as the "Fifth Interim Hearing" on the DIP Loan.

Although the Third Supplemental Order defines the March 21 hearing as the "Fifth Interim Hearing," and the Proposed Interim Order has not been entered, given the Court's indication during the March 14 hearing that the March 21 hearing would be a final hearing on the DIP Loan, the Committee is setting forth its initial concerns here in as much detail as it can under the circumstances.

### III. **ARGUMENT**

#### A. **Legal Standard**

The Lenders want the best of both worlds. The Lenders want the benefits of being oversecured (and without any Court determination to that effect), *e.g.*, post-petition attorney's fees and interest (including at the default rate)−while at the same time, they act as though they are at material risk of loss, and, as a result, are entitled to liens on any unencumbered assets and adequate protection payments. In furtherance of benefiting from chapter 11 while eliminating their risk as much as possible, the Lenders seek to predetermine the outcome of this Case by dictating now, at this early stage, that all proceeds from the sale will be used to pay the DIP Loan and the Prepetition Loan.

Upon any request for debtor-in-possession financing, the debtor has the burden of proving that: (i) it is unable to obtain financing on better terms; (ii) the proposed credit transaction is "necessary to preserve the assets of the estate;" and (iii) the proposed terms "are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender." *See In re Crouse Grp*., 71 B.R. 544, 549 (Bankr. E.D. Pa.), *aff'd*, 75 B.R. 553 (E.D. Pa. 1987); *see also In re Barbara K. Enters., Inc*., No. 08-11474 (MG), 2008 WL 2439649, at \*10 (Bankr. S.D.N.Y. 2011); *In re Strug-Division LLC*, 380 B.R. 505, 514-15 (Bankr. N.D. Ill. 2008) (stating that the debtors have burden of proof under § 364); *In re Hubbard Power & Light*, 202 B.R. 680, 684-85 (Bankr. E.D.N.Y. 1996) (stating that debtor has burden of proving that requirements of § 364 have been met). A debtor's burden in seeking to obtain § 364 protections is akin to, if not heavier than, the burden of proof needed for a temporary restraining order. *See In re Adamson Co*., 29 B.R. 937, 940 (Bankr. E.D. Va. 1983). This is because the debtor seeks to "alter the status quo...." *See id.*

Post-petition financing proposals can trigger *sub rosa* plan concerns. "[A] bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *Resolution Tr. Corp. v. Official Unsecured Creditors Comm. (In re Def. Drug Stores, Inc.*), 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (citation omitted). Bankruptcy courts should not "allow terms in financing arrangements

that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender...." *Id.* (citation omitted); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (stating that "the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). Courts have refused to approve transactions that dictate plan terms or restrict parties' "rights to engage in the restructuring process" as *sub rosa* plans. *See, e.g.*, *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 812–13 (Bankr. S.D.N.Y. 2020).

Post-petition financing should not enable a lender to exert undue leverage and control over a bankruptcy case. As stated by the Ninth Circuit BAP:

> A bankruptcy court's discretion to authorize incentives to postpetition lenders is not unfettered. Debtors in possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a prepetition lien on cash collateral. As a result, lenders often exact favorable terms that harm the estate and creditors.
>
> While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, **bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender**. *Id.* Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest.

*In re Def. Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (internal citations omitted) (emphasis added).

### B. The DCA Contains an Undisclosed Roll-Up

Absent an evidentiary showing of extreme necessity, the Bankruptcy Code flatly prohibits payment of prepetition claims outside of a plan of reorganization. *See, e.g., Chiasson v. Matherne & Assoc. (In re Oxford Mgmt., Inc.),* 4 F.3d 1329 (5th Cir. 1993); *In re Equalnet Communications Corp.*, 258 B.R. 368 (Bankr. S.D. Tex. 2000); *In re Tri-Union Development*

*Corp.*, 253 B.R. 808, 814 (Bankr. S.D. Tex. 2000); *In re Allegheny International, Inc.*, 118 B.R. 282, 296 (W.D.Pa. 1990). Section 364 of the Bankruptcy Code provides certain incentives that a debtor may offer to convince a potential lender to extend credit post-petition, including granting the lender an administrative expense priority claim under § 364(b), a superpriority claim under § 364(c)(1), or (under some circumstances not present here) a lien on unencumbered estate assets under § 364(c)(2) or (3). Section 364 does not, however, authorize the debtor to pay a lender's pre-petition unsecured claim as a condition precedent to post-petition financing. *See In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1092–93 (9th Cir. 1991)

The DCA contains a roll-up of the Prepetition Loan. This fact was not disclosed in the Motion, and there has been no evidentiary showing made or argued for its necessity. Roll-ups are disfavored under the Northern District's *Guidelines for Cash Collateral & Financing Motions & Stipulations* (the "**Guidelines**"). Section E.1 of the Guidelines provides that the Court will not ordinarily approve "'roll-ups," <u>i.e.</u>, such as provisions deeming pre-petition debt to be post-petition debt or using post-petition loans or using post-petition loans from a pre-petition secured creditor to pay part or all of that secured creditor's pre-petition debt...."[7]

Section 2.01(b) of the DCA provides that "[**e**]**ach Pre-Petition Loan . . . shall be a 'Loan' for all purposes under this Agreement**." (*See* DCA at 39 of 123, Sec. 2.01(b) (emphasis added).) The Committee understands from the Debtors' counsel that a roll-up was not intended.[8] However, intended or not, this one provision underscores the need for time to carefully review the Proposed Interim Order and the DCA. Moreover, defining the Prepetition Loan as a Loan effectively rolls up the Prepetition Loan. The designation of each Prepetition Loan as a "Loan" permeates multiple provisions of the DCA and entitles the Prepetition Loan

---

[7] *See www.canb.uscourts.gov/procedure/guidelines-cash-collateral-financing-motions-stipulations-effective-112006.*

[8] After the March 14, 2024 interim hearing, counsel for the Committee identified this issue for the Debtors' counsel and was subsequently informed that a roll-up was not intended. To the Committee's knowledge, the DCA has not yet been revised to address this issue. Moreover, the intent of defining the Prepetition Loan as a Loan under the DCA and the benefits to be gained thereby, even if not meant to be a roll-up, remain to be seen. The Committee raises this objection herein to preserve its rights on this issue pending any amendment to the DCA.

to unwarranted treatment. For example, the DCA gives the Prepetition Loan the following rights and status:

- It is required be repaid by the DCA's Maturity Date (*see* DCA at 41 of 123, Sec. 2.04(a));

- It entitles the Lenders to Commitment Fees (*see* DCA at 42 of 123, Sec. 2.05);

- It accrues interest at the rate in the DCA, (*see* DCA at 42 of 123, Sec. 2.06(a)), *in addition to* interest at the default rate under the Prepetition Loan Documents; and

- The principal and interest of the Prepetition Loan are included in the "Secured Obligations" under the DCA, which Secured Obligations receive superpriority treatment and liens on all assets, including previously unencumbered assets. (*See* DCA at 75 of 123, Sec. 5.13).

The Proposed Interim Order, in turn, authorizes the Debtors to pay all obligations under the DCA. (*See* Proposed Interim Order at 18 of 45, Sec. I.2.) Although not acknowledged as a roll-up, the collective effect of the DCA's provisions is exactly that. The DCA should be fully vetted and modified to eliminate any provision and language that purports to cross-collateralize pre- and post-petition lending, treats the Prepetition Loan as a DIP Loan with elevated priority and security, or authorizes the use of the DIP Loan to pay the Prepetition Loan.

Treating the Prepetition Loan as a "Loan" under the DCA also significantly increases the cost of the DIP Loan. It appears that, under the DCA, the Prepetition Loan will accrue or incur double the interest. That is, the Prepetition Loan will accrue interest at the default rate under the Prepetition Loan Documents, (*see, e.g.*, Proposed Interim Order at 29 of 45, Sec. I.9(a)(ii)), *and*, in addition, the Prepetition Loan (and any other amounts included therein) will accrue interest and Commitment Fees as provided for the DIP Loan under the DCA. (*See* DCA at 42 of 123.)

## C. The DCA Leaves No Sale Proceeds for General Unsecured Creditors

The DCA predetermines the disposition of expected sale proceeds. Net Cash Proceeds from the sale of the Debtors' real properties will be used solely to pay down the "Loans," which,

as defined by the DCA, includes the Prepetition Loan. (*See* DCA at 77 of 123, Sec. 5.14.) Assuming the roll-up of the Prepetition Loan is eliminated, 100% of any Net Cash Proceeds remaining after payment of the DIP Loan will still be used to repay the Prepetition Loan save for the amounts set forth in a new post-DIP Loan budget, approved by the Lenders, for the remainder of the Case. (*See id.*)

The Committee's objection with respect to this provision in the DCA is twofold.

First, the proposed DIP Loan terms should be amended to provide that some portion of the sales proceeds, as they are generated, can be used for ongoing operational and Case costs. This concern is addressed further in Section III.K. below. Second, any provisions requiring or permitting the application of sale proceeds to the Prepetition Loan should be eliminated entirely from the DCA. This Case has been pending for only one month and there has been no evidence provided concerning the expected value of the Debtors' portfolio of real estate. The Committee has not yet performed an investigation into the Lenders' prepetition liens. Depending upon the outcome of the sale process, the DCA could predetermine that general unsecured creditors receive nothing from the Debtors' real properties. Deciding now that all Net Cash Proceeds will be used to pay the Prepetition Loan is premature, grants the Lenders too much control and leverage, and improperly dictates the ultimate distribution of recoveries in this Case. *See In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 820 (Bankr. S.D.N.Y. 2020) (denying a motion for post-petition financing because it prematurely dictated "key terms of an eventual plan of reorganization….").

The Debtors and the Lenders have chosen to avail themselves of the chapter 11 process to sell assets and must "pay the freight" – not just at the end, but along the way. The Lenders could have chosen a foreclosure process, but, instead, have elected chapter 11 as the path to maximizing their returns. However, the estates cannot be administered solely for the Lenders' benefit. *See In re 1121 Pier Vill. LLC*, 635 B.R. 127, 141 (Bankr. E.D. Pa. 2022) ("**This is consistent with bankruptcy policy — broadly speaking, the bankruptcy court does not serve as an expedited foreclosure court for the sole benefit of secured creditors**. Chapter 7 trustee sales under 11 U.S.C. § 363 generally must provide some benefit to unsecured creditors."

(emphasis added)).  The Committee contends that – having chosen this path – the DIP Loan must ensure that proceeds are available to sustain the Case and its costs *and* to ensure that the general unsecured creditors receive a meaningful recovery.

### D.  The DCA Contains Excessive Costs of Lending

The proposed Commitment Fee of 1.5% on lending should be eliminated.  The DIP Loan Lenders are the prepetition lenders, *i.e.*, they are already committed.  The Commitment Fee is effectively the Lenders' surcharge on the estates for the costs of protecting and recovering their own collateral in the manner that the Lenders chose.  The Commitment Fee is an unnecessary charge of $450,000 (based on the principal amount of the DIP Loan alone) that pushes the general unsecured creditors further from a recovery.

In addition, under the Proposed Interim Order, all fees and costs of the Lenders (such as their professionals' fees) will be added to the balance of the DIP Loan (and will reduce the borrowing capacity).  (*See* Proposed Interim Order at 20 of 45, Sec. I.3(c).)  Thus, not only are the estates being charged for the Lenders' attorney's fees and costs in this Case as if they are oversecured (and with no evidence regarding the equity in the Debtors' real properties), but the estates will also be charged interest and Commitment Fees on those attorney's fees.  Any attorney's fees and costs to which the Lenders are entitled should not accrue interest and fees, and the DIP Loan should not be a vehicle for charging interest on interest.

### E.  The Lenders' Entitlement to Adequate Protection Payments Has Not Been Demonstrated

The furnishing of adequate protection to prepetition lenders under §§ 361, 363, and 364 of the Bankruptcy Code must be narrowly tailored, limited to preserving the *status quo* and preserving the lenders' security granted prior to the petition date.  *See In re Sonora Desert Dairy*, 2015 WL 65301, at *11 (B.A.P. 9th Cir. 2015) ("In other words, adequate protection is provided to ensure that the prepetition creditor receives the value for which the creditor bargained prebankruptcy"); *see also In re 354 E. 66th St. Realty Corp.*, 177 B.R. 776, 782 (Bankr. E.D.N.Y. 1995); *In re Roe Excavating, Inc.*, 52 B.R. 439, 440 (Bankr. S.D. Ohio 1984).  A secured creditor is entitled to adequate protection only to the extent that the value of its

interest in its collateral is declining post-petition. *See In re Timbers of Inwood Forest*, 484 U.S. 365, 370 (1988); *see also In re Weinstein*, 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998); *accord In re Saypol,* 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("In the context of the automatic stay, Congress believed the existence vel non of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection.").

Both the Debtors and the Lenders have contended that the Lenders are materially oversecured. Based on statements made at the "first-day" hearing in this Case, the Lenders believe that the loan to value ratio for the Prepetition Loan was approximately 65% on the Petition Date, while the Debtors dispute that the loan to value ratio exceeds 60%. This means that, according to the Debtors and the Lenders, the Lenders are protected by an equity cushion of 35-40%. In the Ninth Circuit, an equity cushion of 20% has been deemed sufficient to provide adequate protection. *See In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984) ("A 20% equity cushion has been held to be adequate protection for a secured creditor."). Using the Lenders' estimate, the Debtors' Portfolio may be collectively worth approximately $247 million as of the Petition Date, leaving an equity in excess of $50 million (including the proposed $30 million DIP Loan) – a margin that still exceeds a 20% equity cushion.

Notwithstanding the presumed equity cushion, the Debtors propose to pay the Lenders adequate protection payments at the contractual default interest rate (approximately 12.5%). These payments would total approximately $20 million over the next 12 months. Moreover, as the Debtors currently have no revenues, the Debtors will be required to borrow from the DIP Loan in order to make the adequate protection payments. There has been no evidentiary showing that there has been any decline in the Lenders' interest in their collateral and that the Lenders are, as a result, entitled to any adequate protection, much less $20 million worth of adequate protection.

The Committee objects to the provision of adequate protection to the Lenders at this stage in the Case. In addition, if the Lenders are granted adequate protection, the amount should be limited (*e.g.*, not more than simple interest at the base rate under the Prepetition Loan

documents),[9] with the right to recharacterize such payments as paydown of Prepetition Loan principal should there be no showing that the Lenders suffered a diminution in the value during the Case.

**F.    <u>The Lenders Should Not Be Granted Liens on Unencumbered Assets</u>**

The DCA grants the Lenders a "prior perfected Lien on all unencumbered assets of Borrowers (now existing or hereafter acquired) and all proceeds thereof[.]" (*See* DCA at 62 of 123, Sec. 3.22(i); *see also id.* at 75 of 123, Sec. 5.13(b).)  The Proposed Interim Order mirrors this treatment.  (*See* Proposed Interim Order at 22 of 45, Sec. II.6(a)(i).)  Even if the roll-up is eliminated, the Lenders should not be granted liens on unencumbered assets.

Unencumbered assets should be preserved for the benefit of the estates' general unsecured creditors.  The Lenders and the Debtors have taken the position that the Lenders are oversecured by 35 to 40% *and* the Lenders are to receive post-petition attorney's fees and interest as if that fact has already been determined by the Court.  There is no basis on which to punish the general unsecured creditors by expanding the Lenders' prepetition collateral package with any previously unencumbered assets. *See, e.g., In re Four Seasons Marine & Cycle, Inc.*, 263 B.R. 764, 771 (Bankr. E.D. Tex. 2001) (describing fundamental unfairness imposed on unsecured creditors by granting of replacement lien on unencumbered assets of estate); *In re Integrated Testing Prods. Corp.*, 69 B.R. 901, 905 (D.N.J. 1987) (holding that prepetition secured creditor was not entitled to proceeds of sale of collateral recovered as preference because to allow the secured creditor to "claim these preferences would frustrate the policy of equal treatment of creditors under the Code").  The Lenders should not be able to access the estates' unencumbered assets under any circumstance, and certainly not without first seeking to recover from their existing collateral.  The record before the Court does not warrant granting the Lenders' liens on any unencumbered assets.

---

[9]    Debtors' counsel indicated at the First Day Hearing that the base rate for the Prepetition Loans was a blended rate of approximately 7.5%.

**G.** **The Sale Milestones Should Be Flexible**

The DCA requires that the Debtors hold an auction on 20% and 50% of their real properties (by acreage) by May 31, 2024, and December 31, 2024, respectively. (*See* DCA at 76-77of 123, Sec. 5.14(h) and (k).)

The Committee understands the benefit for specific milestones and the Committee is not advocating that Debtors hold their real estate for an extended period. However, the Committee understands that the Debtors' post-petition sale process has only just begun and the first auction is a mere 2½ months away. The Debtors should not be forced to sell real property prematurely solely to repay the Lenders' obligations and at the expense of the general unsecured creditors. The Debtors should be afforded some flexibility to sell the real properties as needed to maximize the chances of net proceeds to pay general unsecured claims. The flexibility afforded to the Debtors should include the ability to sell more than 20% of the real properties by the first sale Milestone (with the agreement of the Committee) if needed to maximize recoveries.[10] Moreover, the sale Milestones should be treated as guidelines, not (as they are) hard deadlines which, if not met, automatically trigger an Event of Default under the DCA. (*See* DCA at 92 of 123, Sec. 8.01(d).) The Debtors should be able to extend the sale Milestones within reason and with the consultation of the Lenders and the Committee. It is far too early in this Case to predetermine its course. Automatic defaults tied to case milestones tend to alter parties' behavior, incentives, and approach in unproductive ways.

**H.** **The Lenders Should Not Be Granted Liens on Causes of Action**

The Lenders are not being granted liens in Avoidance Actions, but that does not go far enough. The terms of the DIP Loan should be amended such that that the Lenders are not receiving liens on <u>any</u> causes of action (other than mere collection actions based on accounts receivable or contract disputes) that may benefit general unsecured creditors, including actions based on recoveries against directors, officers, or other insiders on whatever theories, inclusive

---

[10] The DCA requires the Debtors to sell at "at least twenty percent (20%) (or such other percentage as has been agreed to between the Borrowers and the Required Lenders…." (*See* DCA at 69 of 123, Sec. 5.14.) The Committee should be added as a necessary consenting party.

of the proceeds of such causes of action and regardless of the source (including insurance), whether or not such actions fall within the scope of Article 5 of the Bankruptcy Code.

## I. **The Indemnification Provision Should Be Eliminated**

The proposed indemnification by the Debtors of the Lenders should be eliminated. The indemnity provisions are broad and expose the estates to unspecified amounts that will be added to the DIP Loan. (*See* Proposed Interim Order at 11 of 45, Sec. D(iii) and 21-22 of 45, Sec. I.5; *see also id.* 4 of 45, Sec. (iii).) It appears by the Court's *Concerns Regarding Proposed Interim Order* [Docket No. 24] that the Court intended the indemnity provision (if it was not eliminated entirely) to exclude ordinary negligence. (*See* Concerns at 2 of 5 "Please explain why [it] is necessary in subparagraph (iii) to provide for indemnity to the very obligors on the prepetition debt. Further, even if there is indemnity, why should it exclude 'gross negligence or willful misconduct' but not any negligence.") This change was not made. In addition, if this provision is not eliminated, it should be revised to provide that such indemnification shall not apply to a successful challenge by the Committee (including one resulting in a settlement) to the amount, validity, and extent of the Prepetition Loan or the liens held by the Lenders.

## J. **The Events of Default Should Be Limited and Revised**

The "Events of Default" under the DCA are extensive (36 categories) and provide very limited notice and opportunity to respond prior to exercise of any and all remedies. The Lenders are required to give only five (5) business days' notice to the Debtors, the Committee, and the U.S. Trustee for two (2) out of the 36 categories of default prior to exercising remedies – specifically, prior to exercising remedies directly against Collateral (*see* DCA at 96 of 123, Sec. 8.01(vii)), and prior to exercising "any and all of its other rights and remedies under application Legal Requirements." (*See id*., Sec. 8.01(viii).) The definition of Legal Requirements is:

> "**Legal Requirements**" means, as to any Person, the Organizational Documents of such Person, and any treaty, law (including the common law), statute, ordinance, code, rule, regulation, guidelines, license, permit requirement, Order, or determination of an arbitrator or a court or other Governmental Authority, and any interpretation thereof published by the applicable Governmental Authority or administrative procedures relating thereto established by the applicable Governmental

> Authority, in each case applicable to or binding upon such Person or any of its property, or to which such Person or any of its property is subject, in each case whether or not having the force of law. For purposes of Section 2.13, the term "applicable Legal Requirements" includes FATCA.

(*See* DCA at 26 of 123, Sec. 1.01 (Defined Terms).)  In sum, under the Legal Requirements provision, the Lenders must give five (5) days' notice if they are otherwise required to by some law, regulation, ruling, contract, and so on – whatever that may mean.

The Proposed Interim Order contains conflicting provisions regarding the Lenders' rights upon a default.  Section 11(a) of the Proposed Interim Order parrots the language quoted above from the DCA, requiring five (5) days' notice prior to taking certain actions (but not others).  Section 11(b)(ii) of the Proposed Interim Order suggests that the Lenders cannot take *any* enforcement steps absent a further Court order.  (*See* Proposed Interim Order at 31 of 45, Sec. 11(b)(ii), stating that "the DIP Agent may only exercise remedies (including enforcement) with respect to the DIP Collateral and the DIP Obligations upon motion to the Court and entry of an unstayed order . . . modifying or terminating the automatic stay[.]")  However, Sections 11(c) and (d) contain language, which conflicts with Section 11(b)(ii), suggesting that the Lenders can exercise rights *without* a Court order or unless the Court orders otherwise during the 5-day notice period.  (*See id.* at 32 of 45, Sec. III.11(c) and (d).)

Any alleged default under the DCA should require notice to the Debtors, the Committee, and the U.S. Trustee, an opportunity to cure, and require that the Lenders obtain a Court order prior to exercising any remedies.  The Committee should have the right to oppose any such request for a Court order on the basis that no default occurred or that any alleged default was not material.

Finally, the Committee's professionals have not had the time to analyze all of the ways by which the Lenders can determine that an Event of Default has occurred and whether certain events of default are inappropriate and should be removed or modified.  The Committee noted above its objection to allowing a missed Milestone to be an automatic Event of Default.  The Committee needs more time to analyze these provisions and discuss them with the Debtors and the Lenders.

### K.  The Budget Needs Revision and Clarification

As discussed above, it is a matter of record that the Debtors' borrowings have not aligned with the proposed budget and the Milestones.  Although the Milestones contemplate the interim DIP Loan period extending well into May, the Debtors have already hit the $6,500,000 cap on borrowing prior to entry of a final order.  The Committee has other observations, questions, and concerns about the budget and the terms of the DCA:

1.  With 50% of the DIP Loan budget to be used by May 18, 2024, (*See* Docket No. 32, Ex. B at 5 of 5), the proposed timeline through April 2025 will require the use of sale proceeds to sustain the Case.  As noted above, the DCA does not currently require that funds be set aside from the sales of assets to fund the Case on a rolling basis.

2.  The 13-week budget from March to May does not appear to provide an accurate representation of operating expenses as costs fluctuate on a monthly basis and it is the Committee's understanding, based on discussions with the Debtors (via their respective professionals), that March, April, and May have lower costs than other months throughout the year.

3.  Weekly management fees of $35,000 are being paid to an insider, Trinitas Partners.  The Committee currently does not object to the fee but notes that, if paid into the spring of 2025, the amount will total as much as $2.1 million.  The Committee reserves its rights with respect to the propriety of this fee.  In addition, even if appropriate now, this budgeted fee should be revisited from time to time as real properties are sold.

4.  The DCA and Proposed Interim Order provide a "Carve-Out" that limits the fees and expenses of the professionals in this Case to the amounts in the "Approved Budget."  The Approved Budget contains one line item for "Legal and Professional Fees" with a footnote reference, although none of the footnote references in the Approved Budget have actual footnotes.  (*See* Docket No. 32, Ex. B at 2 of 5 and 5 of 5.)  Based on the information provided to the Committee regarding the Approved Budget, the Debtors have allocated $4.4 million for their professionals (counsel and financial advisor) through March 2025, while the Committee has been allocated $650,000 for that same period, a figure that may be woefully inadequate

given the size and complexities of the Case. The Committee's involvement in this Case should not be limited by the budget developed by the Debtors and the Lenders. To the extent the Court approves a cap on professional fees based on the Approved Budget, the Committee's budget should be increased to at least 1/3 of any amount budgeted or otherwise allowed (if in excess of current budgeted amounts) for the Debtors' professionals, and the Approved Budget should be revised to provide line-item clarity for the various professionals subject to the Approved Budget. Accordingly, the Committee's professionals should currently be allocated not less than $1.47 million, which, of course, would remain subject to allowance by the Court, subject to an increase in such budgeted amounts by the Court for cause.

5. Furthermore, while the DCA allows for the Committee to incur fees to investigate the Lenders' Prepetition Loan and liens, such fees are limited to those expressly included in the Approved Budget. No specific lien investigation budget is provided. As discussed above, if the cap set forth in the Approved Budget is approved, then the cap for the Committee's professionals should be increased. Moreover, the DCA and Proposed Interim Order should clarify that the Committee is allowed to use the funds budgeted to its professionals to conduct its investigation of the Prepetition Loans and liens. In sum, as the existence and availability of unencumbered assets in these estates is unknown at this time, the Committee's professionals should not be compelled to bear the risk that there will be inadequate or no unencumbered assets at the end of the Case to satisfy the allowed fees and expenses.

6. The budget contains a line item for a wind-down budget, but the amount is blank through the current forecasted period. The DIP Loan budget must ensure that there is adequate funding for a wind-down budget to ensure the estates are administratively solvent following the completion of all sale processes. Any further budgets as it relates to Case costs, including a wind-down budget, should require Committee input and consultation. As with the professional fee budget, these amounts should subject to an increase by the Court for cause.

### L.     <u>The Carve-Out Should Be Modified</u>

The Carve-Out in the Proposed Interim Order includes all allowed professional fees (up to the budgeted amount) and $150,000 allocated to all case professionals following the earliest

of (a) an Event of Default, (b) the termination of the DIP Loan, or (c) the maturity of the DIP Loan. The Committee addressed the amounts budgeted for its professionals above. In addition, given the size of this Case, the Committee is concerned that this $150,000 aggregate figure for what are colloquially known in the trade as "burial expenses" may be insufficient, and suggests that $500,000 is a more realistic figure.

### M. Required Disclosures Have Not Been Updated

Finally, the Committee notes that the Debtors included in the Motion a table with the Required Disclosures under the Guidelines based on the initial Term Sheet and indicated that they would update and include a new set of Required Disclosures when the full DCA was docketed. (*See* Docket No. 12, at 9, fn. 7.) That revised table of Required Disclosures has not yet been filed.

## IV. CONCLUSION

The Committee requests that the Court enter an interim order that fully reserves all of the Committee's rights to raise the issues herein and others and set a final hearing with sufficient time to allow the parties to attempt to reach a consensual resolution of the matters raised in this Objection.

Dated: March 19, 2024

RAINES FELDMAN LITTRELL LLP

By:  */s/ Robert S. Marticello*
Robert S. Marticello
Mark S. Melickian
*Proposed Counsel for the Official Committee of Unsecured Creditors*