1

<u>**Exhibit A**</u>

2

**Purchase and Sale Agreement and Joint Escrow Instructions**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

This Purchase and Sale Agreement and Joint Escrow Instructions (this "**Agreement**"), dated as of [●], 2024 (the "**Effective Date**"), is made by and between [●], a [●], in its capacity as debtor and debtor-in-possession ("**Seller**"), and [●], a [●] ("**Buyer**"). Seller and Buyer are hereinafter sometimes referred to collectively as the "**Parties**" and individually as a "**Party**".

## RECITALS:

A.     Seller is the owner of certain real property located in [●] County, California, consisting of approximately [●] gross acres of farmland.

B.     On or about February 19, 2024, Seller and various affiliates filed voluntary petitions for bankruptcy relief under Chapter 11 of the Bankruptcy Code, jointly administered under Case No. 24-50211 (the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "**Bankruptcy Court**").

C.     Seller believes a sale of the Property (defined below) as provided herein is in the best interests of Seller and its creditors.

D.     [On _____, 2024, the Bankruptcy Court entered an order, docket # _____ (the "**Bid Procedures Order**") governing the sale process for the Property (the "**Bid Procedures**").] [Seller intends to seek entry of an order (the "**Bid Procedures Order**") governing the sale process for the Property (the "**Bid Procedures**").]

E.     Buyer wishes to purchase the Property (as defined below) from Seller, and Seller is willing and prepared to sell the Property to Buyer, subject to the entry of a sale order under Sections 363 and 365 of the Bankruptcy Code, as to which, at the applicable time, no stay pursuant to Bankruptcy Rules 7062 or 8005, or any other applicable rule or statutory provision, is in effect (the "**Sale Order**"), and the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing recitals, subject to each and all of the following terms and conditions, and for good and valuable consideration, the receipt of which is hereby acknowledged, Seller and Buyer hereby agree as follows:

## 1.     PROPERTY

1.1.     **Property**.  Subject to the terms and conditions of this Agreement, and for the consideration set forth in Section 2, Seller agrees to sell to Buyer and Buyer agrees to buy from Seller all of Seller's right, title, and interest in and to the following property (collectively, the "**Property**"):

1.1.1.     Land.  The real property located in [●] County, California, commonly knows as [Ranch Name, Address as applicable],  designated as Assessor's Parcel Numbers [●], and more particularly described on **Exhibit A** attached hereto and made a part hereof, consisting

AFDOCS:199642936.9

of approximately [●] gross acres of farmland, and all rights, benefits, privileges, tenements, hereditaments, appurtenances, rights-of-way and easements belonging or appurtenant to such real property, including all Farm Service Agency Crop Base acreage applicable thereto, if any (collectively, the "**Land**");

    1.1.2.  <u>Improvements</u>.  All improvements, facilities, fixtures, structures and fences located on the Land, including any and all permanently fixed farming equipment, machinery, wind machines, weather stations, moisture monitoring equipment, irrigation equipment (including irrigation and return pumps), pumps, pump houses, motors, water wells, pipelines for water conveyance and filter stations (collectively, the "**Improvements**");

    1.1.3.  <u>Trees and Crops</u>.  All trees and crops growing on the Land (collectively, the "**Crops**");

    1.1.4.  <u>Contracts</u>.  All contracts and leases identified by Seller to Buyer pursuant to Section 3.1 that relate to the operation or management of the Land, which are separate contracts to which Seller is a party and which by their terms will continue in effect following Closing except those contracts which Buyer notifies Seller in writing during the Due Diligence Period that it elects not to assume (collectively, the "**Contracts**");

    1.1.5.  <u>Water Rights</u>.  The following water entitlements, rights and privileges relating to the Land (collectively, the "**Water Rights**"):

    1.1.5.1.  The surface water available to the Land pursuant to any and all water contracts;

    1.1.5.2.  The following rights to subsurface water on, under or pumped from the Land:

    1.1.5.2.1.    All rights and entitlements with respect to the Land, however created, to (A) drill, install and maintain wells, pumps and pipeline systems, (B) use, appropriate, pump, extract, receive, transport, store or transfer groundwater, or (C) inject water into the Land for later recovery.

    1.1.5.2.2.    All groundwater on, under, pumped from or otherwise available to the Land as a result of overlying or other groundwater rights or contractual rights that benefit or are derived from the Land and the right to remove or extract any such groundwater.

    1.1.5.3.  All rights of any type to the development, use and enjoyment of water, whether surface or subsurface, whether riparian, appropriative, prescriptive or otherwise, whether appurtenant or not, whether or not pursuant to historical use, contractual agreement, permit, license or law that benefits or is derived from the Land, whether now or hereafter related to the Land.

    1.2.  **<u>Retained Personal Property</u>**.  Seller's personal property that is not affixed to the Land, including all rolling stock, equipment, quads, gators, tractors and implements, rented

2

equipment, tools and related farm production equipment, or property belonging to third parties, is specifically excluded from the Property and shall be retained by Seller, excepting only those items identified and agreed to by Seller and Buyer during the Due Diligence Period, if any.

1.3. **Retained Litigation Claims**. Buyer acknowledges that the rights of Seller's bankruptcy estate or any assignee or designee to bring avoidance actions pursuant to Sections 544-550 of the Bankruptcy Code or any other potential litigation claim of Seller shall not be conveyed to Buyer.

## 2. DEPOSIT, ESCROW AND PURCHASE PRICE

2.1. **Purchase Price**. The purchase price for the Property shall be $**[●]** (as may be increased pursuant to the Bid Procedures, the "**Purchase Price**").

2.2. **Deposit**.

2.2.1. Within two (2) days after the Effective Date, Buyer shall deliver into Escrow (as defined below) a deposit of $**[●]**, comprising five percent (5%) of the Purchase Price (the "**Deposit**") to be held in trust by Escrow Holder (as defined below) for and on behalf of Buyer pursuant to this Agreement. Unless Buyer has given the Cancellation Notice during the Due Diligence Period, the Deposit shall be considered fully-earned by Seller and shall be nonrefundable to Buyer except as otherwise expressly provided for in this Agreement.

2.2.2. On the Closing Date, if the Closing occurs, the Deposit shall be applied to the Purchase Price. In the event the Escrow is cancelled or terminated as a result of a Party's breach or default under this Agreement, the defaulting Party shall be responsible for all escrow costs.

2.2.3. Within two (2) days after the Effective Date, Buyer shall deposit into Escrow $100 (the "**Independent Consideration**"). The Independent Consideration shall be non-refundable to Buyer and shall not be credited toward payment of the Purchase Price. The Independent Consideration shall constitute separate, independent and good and valuable consideration provided by Buyer to Seller for the rights extended to Buyer under this Agreement.

2.3. **Escrow**. Within two (2) days after the Effective Date, the Parties shall open an escrow (the "**Escrow**") in connection with this Agreement with Old Republic Title Company, 7451 North Remington, Fresno, CA 93711, Donna Brown, 559.440.9249, DonnaB@ortc.com ("**Escrow Holder**" and the "**Title Company**"). This Agreement shall constitute the instructions for the Escrow.

2.4. **Payment of the Purchase Price**. At the Closing, Buyer shall pay the Purchase Price to Seller in United States dollars by wire transfer or other immediately available funds.

## 3. DILIGENCE REVIEW

3.1. **Seller Deliveries**. Within five (5) business days after the Effective Date, Seller shall make available to Buyer via an electronic data site (the "**Data Room**") copies of certain instruments and documents relating to the condition of the Property or otherwise material to the

3

ownership and operation of the Property, to the extent available and in Seller's possession, including property maps, hazardous materials assessments, water, soils, grading and other geo-technical reports and the Contracts. Notwithstanding anything to the contrary contained herein, the materials to be delivered by Seller shall expressly exclude (i) those documents or portions of documents that would disclose Seller's cost of acquisition of the Property or any estimates of costs to repair, replace, remediate or maintain the Property, (ii) any reports, presentations, summaries and the like prepared for any of Seller's committees, partners or investors in connection with its consideration of the acquisition of the Property or sale of the Property, (iii)  Seller's internal memoranda, attorney-client privileged materials, internal appraisals, and (iv) any information which is the subject of a confidentiality agreement between Seller and a third party.

3.2.    **Due Diligence Period**.  The "**Due Diligence Period**" means the period from the Effective Date until 5:00 p.m. Pacific time on [May 17, 2024]. During the Due Diligence Period, Buyer shall have the right to review the suitability of the Property for Buyer's use, including to investigate title and to conduct any feasibility, economic, environmental or other such investigations, studies and tests with respect to the Property as Buyer deems necessary or appropriate to determine the feasibility of purchasing the Property, and to approve or disapprove of such matters in Buyer's sole and absolute discretion. At any time prior to the expiration of the Due Diligence Period, Buyer shall have the right for any reason or for no reason to cancel this Agreement by delivery to Seller of Buyer's written notice of election to cancel (a "**Cancellation Notice**").  Upon Buyer's timely delivery of a Cancellation Notice, this Agreement shall terminate, the Deposit will be released to Buyer, and Buyer and Seller shall have no further obligation to each other hereunder except with respect to those that expressly survive termination of this Agreement. In the event Buyer does not timely deliver a Cancellation Notice prior to the expiration of the Due Diligence Period, the contingency set forth in this Section shall be deemed satisfied and waived by Buyer, Buyer shall have no further right to terminate the Agreement pursuant to this Section, and the Deposit shall be non-refundable to Buyer except as otherwise expressly set forth in this Agreement.

3.3.    **Inspection of Property**.  During the Due Diligence Period, Buyer or its agents shall be entitled to enter onto the Land to perform inspections and non-invasive tests of the Property, including the condition of any Improvements or Crops, any survey of the Property, zoning and other land use controls and a Phase I inspection of the environmental condition of the Property. In connection with any entry by Buyer, or its agents, employees or contractors onto the Property, Buyer shall give Seller reasonable advance notice of such entry of at least one business day and shall conduct such entry and any inspections in connection therewith (a) during normal business hours, (b) so as to minimize, to the greatest extent possible, interference with Seller's business, (c) in compliance with all applicable laws, and (d) otherwise in a manner reasonably acceptable to Seller.  Without limiting the foregoing, prior to any entry to perform any on-site testing, including any air sampling, borings, drillings or other samplings, Buyer shall give Seller written notice thereof, including the identity of the company or persons who will perform such testing and the proposed scope and methodology of the testing.  Seller shall approve or disapprove, in Seller's sole discretion, the proposed testing within three (3) business days after receipt of such notice.  If Seller fails to respond within such three (3) business day period, Seller shall be deemed to have disapproved the proposed testing.  If Buyer or its agents, employees or contractors take any sample

from the Property in connection with any such approved testing, Buyer shall provide to Seller a portion of such sample being tested to allow Seller, if it so chooses, to perform its own testing. Buyer shall permit Seller or its representative to be present to observe any testing or other inspection or due diligence review performed on or at the Property. Upon the request of Seller, Buyer shall promptly deliver to Seller copies of any reports relating to any testing or other inspection of the Property performed by Buyer or its agents, representatives, employees, contractors or consultants. Notwithstanding anything to the contrary contained herein, Buyer shall not contact any governmental authority without first obtaining the prior written consent of Seller thereto in Seller's sole discretion, and Seller, at Seller's election, shall be entitled to have a representative participate in any telephone or other contact made by Buyer to a governmental authority and be present at any meeting by Buyer with a governmental authority; provided, however, the foregoing shall not prohibit Buyer from ordering various due diligence reports from third party vendors who, in the normal course of preparing such reports, will be contacting governmental authorities with respect to the Property. Buyer shall maintain, and shall assure that its contractors maintain, public liability and property damage insurance naming Seller as an additional insured in amounts (but in no event less than Two Million Dollars ($2,000,000) with respect to any liability insurance) and in form and substance adequate to insure against all liability of Buyer and its agents, employees or contractors, arising out of any entry or inspections of the Property pursuant to the provisions hereof, and Buyer shall provide Seller with evidence of such insurance coverage prior to any entry on the Property. Buyer shall indemnify, defend and hold Seller harmless from and against any actual costs, damages, liabilities, losses, expenses, liens or claims (including court costs and reasonable attorneys' fees and disbursements) arising out of or relating to any entry on the Property by Buyer, its agents, employees or contractors in the course of performing the inspections, tests or inquiries provided for in this Agreement, including any release of Hazardous Materials or any actual damage to the Property; provided that Buyer shall not be liable to Seller (a) solely as a result of the mere discovery by Buyer of a pre-existing condition on the Property to the extent the activities of Buyer, its agents, representatives, employees, contractors or consultants do not exacerbate the condition, or (b) to the extent of the gross negligence or willful misconduct of Seller. The provisions of this Section shall be in addition to any access or indemnity agreement previously executed by Buyer in connection with the Property; provided that in the event of any inconsistency between this Section and such other agreement, the provisions of this Section shall govern. The foregoing indemnity shall survive beyond the Closing, or, if the sale is not consummated, beyond the termination of this Agreement. Buyer's right of entry, as provided in this Section, shall continue up through the date of Closing.

3.4.    **[Processing Agreement**. Seller and certain of its affiliates as growers are parties to a Custom Processing and Marketing Agreement (the "**Processing Agreement**") with The Almond Company, a California corporation ("**TAC**"), which covers the sale of almonds grown on the Property for crop years 2023 through 2027. Buyer agrees to assume Seller's obligations under the Processing Agreement applicable to the Crops on the Property as of the Closing Date and to indemnify, defend and hold harmless Seller from any and all liabilities arising thereunder from and after the Closing Date.**]**

AFDOCS:199642936.9

## 4. <u>TITLE TO THE PROPERTY</u>

4.1.   <u>Title</u>. Within five (5) business days after the Effective Date, Seller shall obtain from the Title Company and provide to Buyer a current title report and underlying title documents for the Property and a plat or map showing, all easements, lot lines and other matters affecting title that can be mapped (collectively, the "**Title Report**"). During the Due Diligence Period, and no later than 10 days prior to expiration of the Due Diligence Period, Buyer shall deliver to Seller written notice (the "**Title Objection Notice**") of its objections to matters identified in the Title Report ("**Disapproved Exceptions**"). Buyer's failure to timely deliver the Title Objection Notice shall be deemed Buyer's approval of the Title Report. Seller shall have 5 days after receipt of Buyer's Title Objection Notice to notify Buyer in writing ("**Seller's Title Notice**") that either (a) Seller will cure or remove such Disapproved Exceptions from title prior to Closing (or cause the Title Company to issue an endorsement commercially available and reasonably satisfactory to Buyer insuring Buyer as to such matter), or (b) Seller elects not to cure or cause the Disapproved Exceptions to be removed. Seller's failure to timely deliver Seller's Title Notice shall be deemed Seller's election to proceed under subsection (b) of the preceding sentence. If Seller refuses (or is deemed to have refused) to cure or remove any Disapproved Exceptions, then, on or before the expiration of the Due Diligence Period, Buyer may either (a) notify Seller in writing that it has elected to waive the Disapproved Exceptions and proceed with the purchase contemplated herein, or (b) terminate this Agreement, whereupon the Deposit and all interest accrued thereon shall immediately be released by Escrow Holder to Buyer, and neither Party shall have any further obligation or liability to the other with respect to the transaction contemplated by this Agreement, except for those obligations which expressly survive termination. Buyer's failure to timely terminate this Agreement or deliver written notice waiving its objections to the Disapproved Exceptions shall be deemed Buyer's election to waive its objections to the Disapproved Exceptions. Notwithstanding anything to the contrary contained above or elsewhere herein, Seller shall be obligated to obtain the Sale Order prior to Closing, which shall cause all deeds of trust granted by Seller, tax liens, abstracts of judgments arising from Seller's acts, mechanics' liens arising from work contracted by Seller or similar monetary liens or encumbrances arising from Seller's acts which require any monetary payment to be deemed removed or released, and Seller shall use commercially reasonable efforts to cooperate with Buyer to cause such liens to be removed from title to the Property on or before the Closing, except for non-delinquent real property taxes and assessments (collectively, "**Monetary Liens**"). If Seller elects to cure or remove any Disapproved Exceptions but fails to do so prior to Closing, then Buyer shall have the right to terminate this Agreement and to receive full reimbursement of the Deposit. For purposes of this Agreement, any title matters approved by Buyer (or for which Buyer has withdrawn an objection) pursuant to this Section 4 are referred to herein as the "**Permitted Exceptions**". In no event shall the Permitted Exceptions include any Monetary Liens.

4.2.   If a Disapproved Exception not appearing in the Title Report, appears in any updated title commitment or report subsequently issued by the Title Company or in any survey subsequently prepared by a licensed surveyor retained by Buyer, then Buyer shall have until the later of (i) three (3) business days after notice of such Disapproved Exception, or (ii) ten (10) business days prior to expiration of the Due Diligence Period, to object to it. If Buyer does not notify Seller of its objection to such Disapproved Exception (and provide Seller with a copy of the

updated Title Report or survey) within such time, Buyer shall be deemed to have approved it.

4.3.     **Real Property Conveyance**.  At the Closing, Seller shall convey title to the Property to Buyer by a grant deed in the form attached hereto as **Exhibit B** (the "**Grant Deed**"). By acceptance of the Grant Deed and the Closing of the purchase and sale of the Property, (x) Buyer agrees it is assuming for the benefit of Seller all of the obligations of Seller with respect to the Property from and after the Closing, and (y) Buyer agrees that Seller shall have conclusively satisfied its obligations with respect to title to the Property.  The provisions of this Section 4.3 shall survive the Closing.

## 5.     ESCROW; CLOSING; DELIVERIES TO ESCROW; COURT APPROVAL

5.1.     **Escrow**.  Prior to the Close of Escrow, Seller and Buyer shall each deposit with Escrow Holder such escrow instructions as are necessary to carry out the terms of this Agreement. Neither Party shall submit to Escrow Holder instructions that conflict with, amend or supersede any portion of this Agreement, unless otherwise expressly provided therein and agreed to by Seller and Buyer. If there is any inconsistency between this Agreement and any escrow instruction, the terms of this Agreement shall control.

5.2.     **Close of Escrow**.  The consummation of the sale and conveyance of the Property to Buyer evidenced by the recordation of the Grant Deed and the deliveries to Escrow Holder described in this Section 5 (the "**Close of Escrow**" or "**Closing**") shall occur on a date mutually agreed upon by Buyer and Seller that is on or before the date fourteen (14) days after the entry of a Sale Order by the Bankruptcy Court, but in no event later than June 30, 2024 (the "**Closing Date**").

5.3.     **Deliveries to Escrow Holder by Seller**.  Prior to the Close of Escrow, Seller shall deposit with Escrow Holder the following instruments, funds and documents, the delivery of which shall be a condition to the Closing for the benefit of Buyer:

5.3.1.     A Grant Deed conveying fee simple title to the Property to Buyer, duly executed and acknowledged by Seller;

5.3.2.     A General Assignment conveying the Crops, Contracts and Water Rights to Buyer, in the form attached hereto as **Exhibit C** (the "**General Assignment**"), duly executed by Seller;

5.3.3.     A certification acceptable to Escrow Holder and duly executed by Seller, setting forth Seller's address and federal tax identification number in accordance with the provisions of sections 7701 and 1445, as may be amended, of the Internal Revenue Code of 1986, as amended, and any regulations promulgated thereunder, which indicates that neither Buyer nor Escrow Holder is required to withhold any amounts from the Purchase Price pursuant to such provisions;

5.3.4.     A California form 593 duly executed by Seller, setting forth that Seller is exempt from the provisions of the withholding requirements of the California Revenue and

Taxation Code, as amended, and that neither Buyer nor Escrow Holder is required to withhold any amounts from the Purchase Price pursuant to such provisions;

      5.3.5.  A standard owner's affidavit in a form reasonably acceptable to Seller sufficient to permit the Title Company to remove the standard exceptions (other than those which require a survey) from the Title Policy (as defined below); and

      5.3.6.  Such other funds, documents and instruments as are required under the terms of this Agreement or reasonably requested by Escrow Holder.

    5.4.    **Deliveries to Escrow Holder by Buyer**.  Prior to the Close of Escrow, Buyer shall deposit with Escrow Holder the following instruments, funds and documents, the delivery of which shall be a condition to Closing for the benefit of Seller:

      5.4.1.  The balance of the Purchase Price, and funds sufficient to pay Buyer's obligations hereunder, in immediately available funds;

      5.4.2.  A counterpart of the General Assignment, duly executed by Buyer; and

      5.4.3.  Such other funds, documents and instruments as are required under the terms of this Agreement or reasonably requested by Escrow Holder.

    5.5.    **Bankruptcy Court Filings and Approval**.

      5.5.1.  This Agreement is subject to approval by the Bankruptcy Court and the review and evaluation by Seller of higher or better competing bids, as set forth in other agreements in accordance with the Bid Procedures, in respect of a sale or other disposition of the Property (collectively, "**Competing Bids**") pursuant to the Bid Procedures Order, and Seller's obligations hereunder are contingent upon Buyer's bid (as set forth in this Agreement) being selected as the successful bid pursuant to the Bid Procedures and the entry of the Sale Order. From the Effective Date and until the Sellers have declared a successful bid pursuant to the Bid Procedures, Seller is permitted to, and to cause its Representatives and affiliates to, initiate communication with, and solicit or encourage submission of any inquiries, proposals, or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) (as such terms are defined and used in the Bankruptcy Code) and enter into agreements in connection with any transaction or series of related transactions (whether by asset sale, equity purchase, reorganization, merger, or otherwise) pursuant to which Seller agrees to a sale or sales (to one or more Persons other than Buyer) of some or all of the Property (an "**Alternative Transaction**"), which may include executing multiple purchase agreements for the Property, subject to the Bid Procedures and entry of the Sale Order. In addition, Sellers have the authority to respond to any inquiries or offers with respect to an Alternative Transaction, and to perform any and all other acts related thereto to the extent any such act is not in violation of the Bid Procedures or the Bankruptcy Code.

      5.5.2.  In the event that either (i) Buyer's bid (A) is not selected as the "**Successful Bid**" or "**Back-Up Bid**" (as each term is defined in the Bid Procedures Order) or (B) is selected as a Back-Up Bid (as defined in the Bid Procedures Order) but the sale does not close with Buyer

AFDOCS:199642936.9

(as the Back-Up Bid), in each case pursuant to, and in accordance with the terms of the Bid Procedures Order, or (ii) the Bankruptcy Court does not issue the Sale Order authorizing the sale of the Property to Buyer, Seller may terminate this Agreement, in which event the Deposit shall be returned to Buyer subject to the Bid Procedures and the Bid Procedures Order, without liability to Seller or Buyer.

       5.5.3.   Subject to its obligations under the Bid Procedures Order, Sellers will use commercially reasonable efforts to obtain the entry of the Sale Order and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions provided for in this Agreement on or prior to [June 19, 2024]. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining the entry of the Sale Order.

       5.5.4.   Buyer agrees that it will use commercially reasonable efforts to promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer under each executory Contract to be assumed and assigned to Buyer, including providing admissible evidence to the Bankruptcy Court of same.

       5.5.5.   Seller shall give appropriate notice, and provide appropriate opportunity for hearing, to all persons entitled thereto, of the hearing to approve the Sale and such additional notice as ordered by the Bankruptcy Court including as required by the Bid Procedures Order.

      5.6.    **Assumption and Assignment of Contracts and Payment of Cure Costs**

       5.6.1.   At Closing, to the extent not previously paid, Buyer shall pay or cause to be paid (and shall reimburse or cause to be reimbursed to Sellers on an after-Tax basis any amounts paid after the date hereof in respect of) any and all cash amounts that, pursuant to section 365 of the Bankruptcy Code, will be required to be paid as of the Closing Date to cure any monetary defaults on the part of Sellers under the Contracts, in each case to the extent such Contract was entered into prior to the commencement of the Bankruptcy Cases and as a prerequisite to the assumption of such Contracts under section 365 of the Bankruptcy Code.

       5.6.2.   Nothing in this Agreement shall be construed as an attempt by Seller to assign any Contract to the extent that such Contract is not assignable under the Bankruptcy Code or otherwise without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable.  With respect to any Contract for which the consent of a party thereto to the assignment thereof shall not have been obtained at Closing and any claim, right or benefit arising thereunder or resulting therefrom, prior to the Closing Date, Seller and Buyer shall use their reasonable good faith efforts to obtain as expeditiously as possible the written consent of the other party or parties to such Contract necessary for the assignment thereof to Buyer.  Sellers' obligations under this paragraph shall terminate on the date that is thirty (30 days after the Closing Date.

AFDOCS:199642936.9

## 6. CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS

6.1. **Buyer's Conditions**. The Close of Escrow and Buyer's obligation to purchase the Property from Seller are conditioned upon each of the conditions precedent (which may be waived by Buyer) stated below in this Section 6.1. The failure of any condition precedent stated below shall be governed by Section 8:

6.1.1. Title Policy. The Title Company shall be irrevocably committed to issue an CLTA standard coverage owner's title policy to Buyer in the amount of the Purchase Price, insuring fee simple title to the Property vested in Buyer, subject only to the Permitted Exceptions (the "**Title Policy**");

6.1.2. Sale Order. The Bankruptcy Court shall have entered the Sale Order authorizing the sale of the Property to Buyer, and the Sale Order shall not be subject to a stay pending appeal.

6.1.3. Delivery of Other Documents. Duly executed, and where applicable, acknowledged, original counterparts of the documents identified in Section 5.3 and other documents and agreements required by this Agreement shall have been delivered by Seller to Escrow Holder or to Buyer, as applicable;

6.1.4. Representations and Warranties True and Correct; Performance. All representations and warranties of Seller in Section 9 shall be in all material respects true as of the Closing Date, and Seller shall not be in default and shall have performed in all material respects each of its obligations and covenants hereunder requiring performance prior to the Close of Escrow; and

6.1.5. Seller Authorizations. Seller shall have provided to Escrow Holder such documentation as Escrow Holder may reasonably request demonstrating that Seller has the power and authority to execute, deliver and perform its obligations under this Agreement and has taken all necessary actions to authorize and approve this Agreement and the transactions contemplated hereunder.

## 7. CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS

7.1. **Seller's Conditions**. The Close of Escrow and Seller's obligation to sell the Property to Buyer are conditioned upon each of the conditions precedent (which may be waived by Seller) stated below in this Section 7.1. The failure of any condition precedent stated below shall be governed by Section 8:

7.1.1. Purchase Price. The balance of the Purchase Price shall have been deposited in immediately available funds into Escrow, together funds sufficient to pay Buyer's closing costs and share of prorations hereunder;

7.1.2. Successful Bid. Buyer's bid shall have been selected as the Successful Bid (as defined in the Bidding Procedures Order) or Seller shall be authorized and permitted to close the transactions contemplated herein with Buyer as a Back-Up Bid pursuant to the Bidding

AFDOCS:199642936.9

Procedures Order.

      7.1.3. <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order authorizing the sale of the Property to Buyer.

      7.1.4. <u>Delivery of Other Documents</u>.  Duly executed, and where applicable, acknowledged, original counterparts of the documents identified in Section 5.4 and other documents and agreements required by this Agreement, shall have been delivered by Buyer into Escrow or to Seller, as applicable;

      7.1.5. <u>Buyer Bankruptcy; No Liens</u>.  No action or proceeding shall have been commenced by or against Buyer under the federal bankruptcy code or any state law for the relief of debtors or for the enforcement of the rights of creditors, and no attachment, execution, lien or levy shall have attached to or been issued with respect to Buyer's assets;

      7.1.6. <u>Buyer Authorizations</u>.  Buyer shall have provided to Escrow Holder such documentation as Escrow Holder may reasonably request demonstrating that Buyer has the power and authority to execute, deliver and perform its obligations under this Agreement and has taken all necessary actions to authorize and approve this Agreement and the transactions contemplated hereunder; and

      7.1.7. <u>Representations and Warranties True and Correct; Performance</u>.  All representations and warranties of Buyer in this Agreement shall be true in all material respects as of the Closing Date, and Buyer shall not be in default and shall have performed in all material respects each of its obligations and covenants hereunder requiring performance prior to the Close of Escrow.

## 8.    <u>FAILURE OF CONDITIONS</u>

    8.1.   **Failure of a Condition for the Benefit of Buyer**.  If any of the conditions to Closing set forth in <u>Section 6</u> above are not satisfied in any material respect on the Closing Date, for a reason other than the default of Buyer, provided Seller has been given a reasonable opportunity, and no less than fifteen (15) days, to cure the condition after Buyer delivers written notice of Buyer's intention to exercise Buyer's rights under this section, Buyer shall have the option to: (i) waive the condition and close Escrow, or (ii) terminate this Agreement, in which case the Escrow shall be cancelled, all funds and documents in Escrow shall be returned to the Party having deposited the same, and the Parties shall thereafter have no further rights or liabilities under this Agreement, except as specifically provided herein.

    8.2.   **Failure of a Condition for the Benefit of Seller**.  If any of the conditions to Closing set forth in <u>Section 7</u> above are not satisfied in any material respect on the Closing Date, for a reason other than the default of Seller, provided Buyer has been given a reasonable opportunity, and no less than fifteen (15) days, to cure the condition after Seller delivers written notice of Seller's intention to exercise Seller's rights under this section, Seller shall have the option to: (i) waive the condition and close Escrow; (ii) terminate this Agreement, in which case the Escrow shall be cancelled, all funds and documents in Escrow shall be delivered to Seller, and the

AFDOCS:199642936.9

Parties shall thereafter have no further rights or liabilities under this Agreement, except as specifically provided herein.

## 9. REPRESENTATIONS AND WARRANTIES OF SELLER

9.1. **Representations and Warranties**. Seller hereby makes the following representations and warranties, as of the Effective Date and the Closing Date:

9.1.1. Subject to Bankruptcy Court approval, Seller has the authority to enter into this Agreement and sell the Property, and to otherwise perform its obligations as set forth in this Agreement. Seller has the unrestricted right and power to sell the Property to Buyer under the terms of this Agreement. Seller has duly authorized the execution, delivery and performance of this Agreement.

9.1.2. Seller's execution of this Agreement and performance of its obligations hereunder will not violate any agreement, option, covenant, condition, obligation or undertaking of Seller, nor, to the knowledge of Seller, violate any law, ordinance, statute, order or regulation.

9.1.3. (i) Except to the extent disclosed in writing and either remediated or resolved, Seller has received no written notice from any governmental authority that the Land or the Improvements are in violation of any federal, state or local law, ordinance or regulation relating to environmental conditions on, under or about the Land, including soil and groundwater conditions, and (ii) during the period Seller has owned the Land, Seller has not installed any underground tanks used for the purpose of storing any Hazardous Materials.

9.1.4. Other than the Bankruptcy Case, there are no material actions, suits or proceedings of any kind or nature whatsoever, legal or equitable, pending relating to the Property, or relating to or arising out of the ownership, management or operation of the Property, in any court or before or by any federal, state, county or municipal department, commission, board, bureau, agency or other governmental instrumentality, and Seller has received no written notice thereof.

9.1.5. To Seller's knowledge, neither the Property nor any portion thereof, is subject to or affected by any condemnation, eminent domain, change in grade of public streets, rezoning, downzoning, annexation, formation or disbanding of special districts, or similar proceedings, and Seller has received no written notice thereof.

For purposes of this Agreement and any document delivered at Closing, whenever the phrase "to Seller's knowledge" or the "knowledge" of Seller or words of similar import are used, they shall be deemed to mean and are limited to the current actual knowledge only of Ryon Paton and at the times indicated only, and not any implied, imputed or constructive knowledge of such individual or of Seller or any of the Seller Group (as defined in Section 10.2.1 below), and without any independent investigation or inquiry having been made or any implied duty to investigate, make any inquiries or review the materials delivered pursuant to Section 3.1. Furthermore, it is understood and agreed that such individual shall have no personal liability in any manner whatsoever hereunder or otherwise related to the transactions contemplated hereby.

12

## 10.   REPRESENTATIONS AND WARRANTIES OF BUYER

10.1.   **Representations and Warranties**.  Buyer hereby makes the following covenants, representations and warranties, as of the Effective Date and the Closing:

10.1.1. Buyer has the authority to enter into this Agreement, buy the Property, pay the Purchase Price and to otherwise perform as set forth in this Agreement. Buyer has duly authorized the execution, delivery and performance of this Agreement by Buyer.

10.1.2. Buyer's execution of this Agreement and performance of its obligations hereunder will not violate any agreement, option, covenant, condition, obligation or undertaking of Buyer, nor, to the knowledge of Buyer, violate any law, ordinance, statute, order or regulation.

10.1.3. Neither the sale of the Property pursuant to this Agreement, nor the consummation or completion of any of the transactions contemplated under this Agreement, including the execution and delivery of any Closing documents, will constitute a nonexempt prohibited transaction, as such term is defined in Section 4975 of the Internal Revenue Code or Section 406 of the Employee Retirement Income Security Act of 1974 (as now or hereafter amended, together with any successor statute and any applicable regulations or guidance at any time promulgated thereunder, being referred to collectively herein as "**ERISA**"), that could subject Seller or any other member of the Seller Group to any tax or penalty under Section 4975 of the Internal Revenue Code or Section 502(i) of ERISA.

10.1.4. Neither Buyer nor, to Buyer's knowledge, any affiliate of Buyer, is in violation of, or is subject to sanctions of the government of the United States of America, or any state or municipal authority, that are promulgated or enforced under, any federal, state, municipal or local laws, statutes, codes, ordinances, orders, decrees, rules or regulations (collectively, "**Laws**") relating to terrorism or money laundering, which are in effect as of the Effective Date or as of any subsequent date on which any of Buyer's representations set forth in this Section 10.1 shall be affirmed or reaffirmed, including (as the same may now or hereafter be amended or supplemented): (a) Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) (the "**Terrorism Executive Order**"), (b) any other Executive Orders directed at or relating to terrorism or money laundering (collectively with the Terrorism Executive Order, the "**Executive Orders**"), (c) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the "**Patriot Act**"), (d) the Trading with the Enemy Act, 50 U.S.C. App. 1-44, (e) the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, (f) the Iraqi Sanctions Act, Publ. L. No. 101-513, as well as any other statute, act or resolution adopted or approved by the United States Congress and having the force of law which relates to the imposition, maintenance or extension of sanctions against any foreign nation, foreign group, foreign association, or foreign individual; (g) the United Nations Participation Act, 22 U.S.C. § 287c, (h) the International Security and Development Cooperation Act, 22 U.S.C. § 2349 aa-9, (i) The Cuban Democracy Act, 22 U.S.C. §§ 6001-10, (j) The Cuban Liberty and Democratic Solidarity Act, 18 U.S.C. §§ 2332d and 2339b, and/or (k) The Foreign Narcotics Kingpin Designation Act, Publ. L. No. 106-120.

10.1.5. Neither Buyer, nor to Buyer's knowledge, any affiliate of Buyer, (a) is listed

AFDOCS:199642936.9

on the Specially Designated Nationals and Blocked Persons List (the "**SDN List**") maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, United States of America, and/or on any other similar list (collectively with the SDN List, the "**OFAC Lists**") maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation now or hereafter in effect (collectively, "**OFAC Laws and Regulations**"); or (b) is a person (a "**Designated Person**") either (i) included within the term "designated national" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (ii) designated under Sections 1(a), 1(b), 1(c) or 1(d) of the Terrorism Executive Order, or a Person similarly designated under any related enabling legislation or any other Executive Orders; or (c) is included among, knowingly acting for or on behalf of, knowingly providing assistance, support, sponsorship, or services of any kind to, or otherwise knowingly associated with, any person or entity named on any of the OFAC Lists, or (d) has knowingly conducted business with or knowingly engaged in any business transaction with any person or entity named on any of the OFAC Lists or any person or entity who, to Buyer's knowledge, is included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the persons or entities named on any of the OFAC Lists.

10.2. **Buyer's Acknowledgments**. As a material inducement to Seller to enter into this Agreement and to convey the Property to Buyer, Buyer hereby acknowledges and agrees that:

10.2.1. No Representations. Other than the express representations and warranties of Seller contained in this Agreement, neither Seller, nor any person or entity acting by or on behalf of Seller, nor any partner, officer, director, employee, agent, affiliate, successor or assign of Seller (collectively, the "**Seller Group**") has made, and the Seller Group hereby disclaims, any representation, warranty, inducement, promise, agreement, assurance or statement, oral or written, of any kind to Buyer upon which Buyer is relying, or in connection with which Buyer has made or will make any decisions concerning the Property, including its use, condition, value, compliance with Governmental Regulations, existence or absence of Hazardous Materials, or the permissibility, feasibility, or convertibility of all or any portion of the Property for any particular use or purpose, including its present or future prospects for sale, lease, development, occupancy, or suitability as security for financing. As used herein, the term "**Governmental Regulations**" means any laws (including Environmental Laws), ordinances, rules, requirements, resolutions, policy statements, and regulations (including those relating to land use, subdivision, zoning, Hazardous Materials, occupational health and safety, handicapped access, water (including the Sustainable Groundwater Management Act), earthquake hazard reduction, and building and fire codes) of any governmental or quasi-governmental body or agency claiming jurisdiction over the Property. As used in this Agreement, the following definitions shall apply: "**Environmental Laws**" shall mean all federal, state and local laws, ordinances, rules, and regulations now or hereafter in force, as amended from time to time, and all federal and state court decisions, consent decrees, and orders interpreting or enforcing any of the foregoing, in any way relating to or regulating human health or safety, or industrial hygiene or environmental conditions, or protection of the environment, or pollution or contamination of the air, soil, surface water or groundwater, and includes the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., and the Clean Water Act, 33 U.S.C. § 1251, et seq. "**Hazardous Materials**" shall mean

inflammable explosives, radioactive materials, asbestos, asbestos–containing materials, polychlorinated biphenyls, lead, lead-based paint, radon, mold, under and above ground tanks, hazardous materials, hazardous wastes, hazardous substances, oil or related materials, which are listed or regulated in any Environmental Laws. "**Release**" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, including continuing migration, of Hazardous Materials into or through soil, surface water or groundwater. Buyer acknowledges that much of the Land has been an active working farm for many years. Buyer specifically acknowledges that various petroleum products, fuel, gasoline and chemicals, including fertilizers, herbicides, rodenticides and pesticides, customarily used in farming, some of which may, as of the date hereof, be considered to be hazardous or toxic, may have been used, stored, mixed and applied to the Land the course of the farming activities conducted thereon or on adjacent property. BUYER ACKNOWLEDGES AND AGREES THAT: (i) BUYER SHALL MAKE ITS OWN INDEPENDENT EXAMINATION AND EVALUATION OF THE PROPERTY AND SHALL NOT RELY UPON THE SELLER GROUP, ITS AGENTS OR REPRESENTATIVES, OR ANY OTHER PERSONS FOR ANY DATA WITH RESPECT TO THE PROPERTY EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT; (ii) BUYER SHALL ACQUIRE THE PROPERTY SOLELY ON THE BASIS OF ITS OWN INVESTIGATION OF THE PHYSICAL CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION SUBSURFACE CONDITIONS, IMPROVEMENTS, WATER SUPPLY, AND DEVELOPMENT POTENTIAL; AND (iii) BUYER SHALL ACQUIRE THE PROPERTY IN AN "AS IS,""WHERE IS," AND "WITH ALL FAULTS" CONDITION, AND ASSUMES THE RISKS THAT ADVERSE CONDITIONS MAY NOT HAVE BEEN REVEALED BY ITS INVESTIGATION OR MAY NOT HAVE BEEN DISCLOSED TO BUYER. THE PARTIES COMPRISING THE SELLER GROUP AND THEIR SUCCESSORS, ASSIGNS, OFFICERS, DIRECTORS, OWNERS, AFFILIATES, TRUSTEES, ATTORNEYS AND AGENTS ARE TO HAVE ABSOLUTELY NO OBLIGATION OR LIABILITY TO BUYER OR ITS SUCCESSORS AND ASSIGNS RELATING IN ANY WAY TO THE PROPERTY EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT.

       10.2.2. <u>No Implied Warranties</u>. Excluding any representation or warranty set forth herein, Seller hereby specifically disclaims: (a) all warranties implied by law arising out of or with respect to the execution of this Agreement, any aspect or element of the Property, or the performance of Seller's obligations hereunder including all implied warranties of merchantability, habitability or fitness for a particular purpose; and (b) any warranty, guaranty, or representation, oral or written, past, present, or future, of, as to, or concerning (i) the nature and condition of the Property or other items conveyed hereunder, including the water, soil, and geology, the suitability thereof and of the Property or other items conveyed hereunder for any and all activities and uses which Buyer may elect to conduct thereon, the existence of any environmental hazards or conditions thereon (including the presence of asbestos or other Hazardous Materials) or compliance with applicable Environmental Laws; (ii) the nature and extent of any right-of-way, lease, possession, lien, encumbrance, license, reservation, condition or otherwise; and (iii) the compliance of the Property or other items conveyed hereunder or its operation with any Governmental Regulations.

AFDOCS:199642936.9

10.2.3. <u>Information Supplied by Seller</u>. Buyer specifically acknowledges and agrees that, except as expressly contained in this Agreement, Seller has made no representation or warranty of any nature concerning the accuracy or completeness of any documents delivered or made available for inspection by Seller to Buyer, and that Buyer has undertaken such inspections of the Property as Buyer deems necessary and appropriate and that Buyer is relying solely upon such investigations and not on any of the materials or any other information provided to Buyer by or on behalf of Seller. As to the due diligence materials supplied by Seller, Buyer specifically acknowledges that they have been prepared by third parties with whom Buyer has no privity, and Buyer acknowledges and agrees that no warranty or representation, express or implied, has been made, nor shall any be deemed to have been made, to Buyer with respect thereto, either by the Seller Group or by any third parties that prepared the same, except as expressly contained in this Agreement.

10.2.4. <u>General Release of Claims</u>. Except as to claims for breach or default by Seller of its obligations, representations, warranties, promises, covenants, agreements and guaranties under this Agreement, Buyer, on its own behalf, and on behalf of anyone claiming by, through, or under Buyer (collectively, the "**Releasing Parties**"), hereby waives its right to recover from and fully and irrevocably releases each of the parties comprising Seller, and their respective managers and affiliates and all of their respective trustees, partners, managers, officers, agents, representatives, employees and all of their respective successors and assigns (collectively, the "**Released Parties**") from any and all claims that the Releasing Parties, or any of them, may now have or thereafter acquire against any of the Released Parties for any claims, costs, losses, liabilities, damages, expenses, demands, actions or causes of action arising from or in any way related to any property defects, errors, omissions or other conditions, latent or otherwise (including, without limitation, environmental contamination, risks, conditions and matters), related to or affecting the Property (or any portion thereof) and/or any Improvements located on or serving the Property (or any portion thereof). This release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release to Seller. Buyer knowingly, willfully, voluntarily and specifically waives the provisions of California Civil Code §1542, which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY**.

In this connection and to the extent permitted by law, Buyer hereby agrees, represents, and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses, liabilities and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and warrants that the indemnities, waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends to release, discharge, and acquit the Released Parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses, liabilities

and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.

_____
Buyer's Initials

10.2.5. <u>Survival</u>.  The provisions of this <u>Section 10.2</u> shall survive the Closing or earlier termination of this Agreement.

## 11.  <u>CONDEMNATION AND CASUALTY LOSS</u>

11.1.  **Condemnation**.  If, after the Effective Date and before Closing, either Party is notified that any material portion of the Property ("**Taken Property**") is taken or threatened by condemnation, eminent domain or otherwise ("**Taking**"), such Party shall immediately notify the other Party in writing of such Taking. After a Taking, Buyer may elect either (a) to terminate this Agreement as to the entire Property, in which event Escrow Holder shall immediately return all documents, instruments and monies (including the Deposit, not to include the Independent Consideration) to the Party which deposited same in respect of the Closing and this Agreement shall terminate and be of no further force or effect except for those matters that expressly survive the termination hereof, or (b) to consummate Closing as herein provided in which event, the Purchase Price shall be reduced proportionately (i.e. on a 'per acre' basis) to account for the Taken Property. If this Agreement is terminated pursuant to this <u>Section 11.1</u>, neither Party shall have any further rights, duties, obligations or liabilities, at law or in equity, arising out of or relating to this Agreement except for those that specifically survive termination.

11.2.  **Casualty Loss**.  If at any time after the Effective Date and before Closing, any material portion of the Property is damaged or destroyed by a casualty ("**Casualty**"), the Party that discovers such Casualty shall immediately notify the other Party of the portion of the Property damaged or destroyed. After a Casualty, Buyer may elect either (a) to terminate this Agreement as to the entire Property, in which event Escrow Holder shall immediately return all documents, instruments and monies (including the Deposit, not to include the Independent Consideration) to the Party which deposited same in respect of the Closing and this Agreement shall terminate and be of no further force or effect except for those matters that expressly survive the termination hereof, or (b) to consummate Closing as herein provided in which event, the Purchase Price shall be reduced proportionately (i.e. on a 'per acre' basis) to account for the portion materially damaged by the Casualty. If this Agreement is terminated pursuant to this <u>Section 11.2</u>, neither Party shall have any further rights, duties, obligations or liabilities, at law or in equity, arising out of or relating to this Agreement except for those that specifically survive termination.

## 12.  <u>PRORATIONS AND EXPENSES</u>

12.1.  **Prorations and Expenses; Allocations**. All real property taxes and assessments, utilities, all rents, and any other public or governmental charges and public or private assessments against the Property, shall be adjusted and prorated between the Parties as of the Closing Date. Any proration based on an estimate shall subsequently be readjusted promptly upon receipt of a final bill.  All special or supplemental real estate taxes or special assessments that are first assessed

17

after the Closing Date and are applicable to periods on or following the Closing Date shall be paid by Buyer. All Cultural Costs incurred by Seller prior to the Closing Date with respect to the 2024 Crops shall be credited to Seller at Closing, and the Purchase Price shall be increased by the amount of such credit. Seller shall retain the 2023 Crops and Buyer shall be entitled to the 2024 Crops. As used in this Section, "**Cultural Costs**" shall mean the actual cultural costs incurred by Seller in preparing the 2024 Crops in accordance with the Cultural Cost Budget shared with Buyer in the Data Room, including, without limitation, post-harvest irrigation and cleanup costs following prior harvests.

12.2. **Closing Costs**. All escrow fees shall be split between Buyer and Seller. Seller shall pay (i) the cost of an Owner's CLTA standard coverage policy of title insurance for the Land in the amount of the Purchase Price, and (ii) the documentary transfer taxes assessed by the County in which the Land is situated. The incremental cost of title insurance beyond the cost of a standard Owner's CLTA Policy (including but not limited to any extended policy coverage, ALTA coverage or lender's policy and all endorsements to the Title Policy) shall be paid by Buyer. Each Party shall pay its own costs and attorneys' fees in connection with the transactions contemplated hereby. All other closing costs shall be paid by the Parties in accordance with the custom then prevailing in the County in which the Property is located.

## 13. LIQUIDATED DAMAGES

13.1. **Seller's Remedies**. IF THE SALE IS NOT CONSUMMATED DUE TO ANY DEFAULT BY BUYER HEREUNDER, THEN SELLER MAY RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES. RETENTION OF SUCH FUNDS BY SELLER AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369, BUT INSTEAD, IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO SECTIONS 1671, 1676 AND 1677 OF THE CALIFORNIA CIVIL CODE. THE PARTIES HAVE AGREED THAT SELLER'S ACTUAL DAMAGES, IN THE EVENT OF A FAILURE TO CONSUMMATE THIS SALE DUE TO BUYER'S DEFAULT PRIOR TO CLOSING, WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE. AFTER NEGOTIATION, THE PARTIES HAVE AGREED THAT, CONSIDERING ALL THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT, THE AMOUNT OF THE DEPOSIT IS A REASONABLE ESTIMATE OF THE DAMAGES THAT SELLER WOULD INCUR IN SUCH EVENT. BY PLACING THEIR INITIALS BELOW, EACH PARTY SPECIFICALLY CONFIRMS THE ACCURACY OF THE STATEMENTS MADE ABOVE AND THE FACT THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED, AT THE TIME THIS AGREEMENT WAS MADE, THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION. THE FOREGOING IS NOT INTENDED TO LIMIT BUYER'S OBLIGATIONS UNDER OR SELLER'S REMEDIES WITH RESPECT TO (i) ANY INDEMNIFICATION OBLIGATION OF BUYER UNDER THIS AGREEMENT, OR (ii) SECTION 14.3.

BUYER _____        SELLER _____

AFDOCS:199642936.9

13.2. **Buyer's Remedies**. If Seller defaults in any material respect in performing its obligations under this Agreement to close the sale of the Property, then Buyer may as its sole and exclusive remedy, in its sole discretion, (i) proceed to Closing without any reduction in or set-off against the Purchase Price, (ii) sue for specific performance, or (iii) terminate this Agreement, in which case the Escrow shall be cancelled, all funds and documents in Escrow shall be returned to the Party having deposited the same and the Parties shall thereafter have no further rights or liabilities under this Agreement, except as specifically provided in herein. If Buyer either does not file a suit for specific performance within 30 days after the date of Seller's default, or specific performance is not available as a remedy, Buyer shall be deemed to have elected to proceed under (iii) above. In no event shall Seller be liable for consequential, punitive or exemplary damages.

## 14. MISCELLANEOUS

14.1. **Exchange**. The Parties acknowledge that Seller and/or Buyer may elect to sell or buy the Property as part of one or more exchange transactions qualifying for the deferral of gain under Internal Revenue Code Section 1031 and the applicable provisions of the California Revenue and Taxation Code. Each Party (the "**Exchange Party**") shall have the option to substitute a qualified intermediary in place of the Exchange Party to assist the Exchange Party in completing the exchange. In such event, the intermediary shall assume all of the Exchange Party's contractual obligations to sell the Property to the other Party or purchase the Property from the other Party, as the case may be, for the purpose of completing the exchange. This assignment, however, shall not relieve the Exchange Party of any obligation that is to survive the transfer under this Agreement. Neither Party shall be required to incur liabilities, expenses or costs in connection with an exchange(s), in excess of the aggregate sum that such Party would have paid had the Exchange Party completed the sale or purchase of the Property without participating in an exchange. The Exchange Party shall indemnify, defend and hold the other Party harmless from any liabilities, damages or costs (including reasonable attorneys' fees and related costs) that may arise from the Exchange Party's participation in and cooperation with the exchange, other than any liabilities, damages or costs arising from or as a result of actions taken by the other Party without the consent or approval of the Exchange Party.

14.2. **Notices**. All notices given or permitted to be given under this Agreement shall be in writing. Notice is considered given either: (a) when delivered in person to the recipient named below; (b) three (3) business days after deposit in the United States mail, in a sealed envelope or container, first class postage and postal charges prepaid, certified mail, return receipt requested and addressed to the Party or person named below; or (c) when delivered by courier or express service to the address shown below, if evidence of delivery is provided:

Notice to Seller:


2055 Woodside Road, Suite 195
Redwood City, CA 94061
Telephone: (650) 549-8097
Attention: Ryon Paton
Email: ryon.paton@trinitaspartners.com

AFDOCS:199642936.9

With a copy to:

     Keller Benvenutti Kim LLP
     425 Market Street, 26th Floor
     San Francisco, CA 94105
     Telephone: (415) 364-6793
     Attention: Jane Kim
     Email: jkim@kbkllp.com

     ArentFox Schiff LLP
     44 Montgomery Street, 38th Floor
     San Francisco, CA 94104
     Telephone: (415) 757-5894
     Attention: M.J. Pritchett
     Email: mj.pritchett@afslaw.com

Notice to Buyer:

     _____
     _____
     _____
     Telephone: _____
     Attention: _____
     Email: _____

Either Party may, by notice given at any time or from time to time, require subsequent notices to be given to another person, whether a Party or a representative, or to a different address, or both.

14.3.  **Attorney's Fees**.  If any Party brings any action or proceeding to interpret or enforce any of the terms, covenants or conditions of this Agreement, the prevailing Party in such action or proceeding shall be entitled to recover from the other Party or Parties thereto reimbursement for all reasonable expenses and costs, including all attorneys' fees incurred in connection with the action or proceeding, including such fees incurred due to any appeal, all as determined by the Bankruptcy Court.

14.4.  **Further Assurances**.  The Parties shall at all times hereafter execute any documents and do any further acts which may be reasonably necessary or desirable to carry out the purposes of this Agreement and to give full force and effect to each and all of the provisions hereof.

14.5.  **Approvals and Consents Generally**.  Whenever in this Agreement the approval or consent of either Party is required or contemplated, unless otherwise specified, such approval or consent shall not be unreasonably withheld and/or delayed nor shall it be conditioned upon the payment of money not otherwise due hereunder. The Parties agree to reasonably cooperate to

20

obtain and deliver any third party consents required in connection with the transactions contemplated hereby.

14.6. **Amendments**. No part of this Agreement shall be amended or modified in any way except by a written instrument signed by all Parties.

14.7. **Severability**. If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect. However, unless such stricken term, provision, covenant or condition goes to the essence of the consideration bargained for by a Party, the remaining terms, provisions, covenants and conditions of this Agreement shall continue in full force and effect, and to the extent required, shall be modified to preserve their validity.

14.8. **Choice of Law; Venue**. This Agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of California shall govern (without regard to conflicts of law). The Bankruptcy Court shall retain exclusive jurisdiction to enforce the provisions of this Agreement. Each of the Parties hereby accepts and consents to, generally and unconditionally, the jurisdiction of the Bankruptcy Court. Each of the Parties hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the Bankruptcy Court and hereby further irrevocably waives and agrees not to plead or claim in such court that any such action or proceeding brought in such court has been brought in an inconvenient forum. **TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAWS, SELLER AND BUYER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN THE EVENT OF ANY PROCEEDINGS.**

14.9. **Article and Paragraph Headings**. The Article and Section headings herein are inserted only for convenience of reference and shall in no way define, limit or describe the scope or intent of a provision of this Agreement.

14.10. **Entire Agreement**. This Agreement (including its recitals, schedules, exhibits and annexes) shall constitute the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all other prior writings and all other understandings of the Parties. Each of the recitals, schedules, exhibits and annexes to this Agreement are incorporated by reference as if fully set forth herein at length, deemed to be the agreement of the Parties, and relied upon by the Parties in agreeing to the conditions, covenants, provisions and terms of this Agreement.

14.11. **Time of Essence**. Time is of the essence regarding each provision of this Agreement.

14.12. **No Waiver**. No waiver by either Party of any provision of this Agreement shall be deemed to be a waiver of any other provision hereof or of any subsequent breach by, or performance obligation of, the other Party.

AFDOCS:199642936.9

14.13. **Counterparts**. This Agreement may be executed and delivered (including by facsimile or electronic mail) in counterparts, which together shall constitute a single instrument binding on each of the Parties. It shall not be necessary for each Party to execute the same counterpart hereof.

14.14. **No Partnership; Representatives**. Nothing contained in this Agreement shall be deemed or construed by the Parties or by any third person to create the relationship of principal and agent, partnership or any other association between the Parties, other than the relationship of a Seller and Buyer as provided for in this Agreement. Buyer and Seller shall each be responsible for the acts and omissions of their respective Representatives and for procuring the performance of each of their respective Representatives with the terms and conditions of this Agreement. "**Representative**" means, for any specified Party, such Party's members, partners, shareholders, managers, directors, officers, managers, agents, employees, contractors, consultants, attorneys, guests, invitees, lenders, investors, trustees, executors, administrators, beneficiaries, brokers, affiliates, predecessors and permitted successors and assigns, representatives, insurers, assignees, agents and all persons acting by, through or in any way on behalf of them.

14.15. **Brokerage Commissions**. Each Party represents to the other that no real estate broker has been involved in the procurement or negotiation of this Agreement other than Graham & Associates (the "**Seller's Broker**") [and [●] (the "**Buyer's Broker**")]. As such, except for the fee due to Seller's Broker, which Seller shall pay pursuant to a separate agreement with Broker, [and the [●] percent [**NOTE: not to exceed 1.5%**] commission to Buyer's Broker, which Seller agrees to pay at Closing, in each case] subject to approval by the Bankruptcy Court of such compensation pursuant to the Bid Procedures Order, neither Party has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment owed in connection with this Agreement, or any documents executed pursuant hereto or in connection herewith, including the Deed and the General Assignment (collectively, the "**Other Documents**") to which they are a party, or the transactions provided for herein or thereby, in all cases for which Buyer is or will become liable. The foregoing provision shall survive Closing or any earlier termination of this Agreement.

14.16. **Interpretation**. Notwithstanding any rule or maxim of construction to the contrary, any ambiguity or uncertainty shall not be construed against either Seller or Buyer based upon authorship of any of the provisions hereof. Seller and Buyer each hereby warrant, represent and certify to the other as follows: (a) that the contents of this Agreement have been completely and carefully read by the representing Party and counsel for the representing Party; (b) that the representing Party has been separately represented by counsel and the representing Party is satisfied with such representation; (c) that the representing Party's counsel has advised the representing Party of, and the representing Party fully understands, the legal consequences of this Agreement; and (d) that no other person (whether a Party to this Agreement or not), has made any threats, promises or representations of any kind whatsoever to induce the execution of this Agreement, other than the performance of the terms and provisions hereof.

14.17. **No Third Party Beneficiaries**. Nothing in this Agreement shall provide any benefit to any third party or entitle any third party to any claim, cause of action, remedy or right of any kind.

Case: 24-50211    Doc# 214-1    Filed: 04/18/24    Entered: 04/18/24 11:33:59    Page 23 of 35

14.18. **Non-Recourse to Constituent Members/Partners**. Notwithstanding anything to the contrary contained in this Agreement or in any other instruments, certificates, documents or agreements executed in connection with this Agreement (the "**Closing Documents**"), no recourse under or upon any of the Closing Documents shall be had against any of the constituent members, partners, shareholders, officers, directors, affiliates, agents, attorneys or related entities of Buyer, nor against any constituent members, partners, shareholders, officers, directors, affiliates, agents, attorneys, or related entities of the foregoing (collectively, "**Recourse Parties**"), and Seller expressly waives and releases all right to assert any liability whatsoever under or with respect to the Closing Documents against, or to satisfy any claim or obligation arising thereunder against, any of such Recourse Parties or out of any of their respective assets.

14.19. **Construction**. Except as otherwise expressly provided herein, (a) all defined terms have the meanings assigned to them in this Agreement, and include the plural as well as the singular, (b) all references in this Agreement to designated "Sections" and other subdivisions, unless otherwise indicated, are to the designated Sections and other subdivisions of the body of this Agreement, (c) "including" and "includes" shall be deemed to be followed by "but not limited to" and "but is not limited to," respectively, (d) "or" is not exclusive, (e) "amended", with reference to an agreement or Law, shall be deemed to be followed by "or superseded from time to time", (f) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section or other subdivision, and (g) the words "will" and "shall" when used in connection with an obligation shall be deemed to be interchangeable.

14.20. **Telecopier/Facsimile/Email Signatures**. In order to expedite the transaction contemplated herein, telecopied or scanned and emailed signatures and initials or signatures and initials provided by DocuSign or similar electronic method may be used in place of original signatures and initials on this Agreement. Seller and Buyer intend to be bound by the signatures and initials on the telecopied or emailed document or electronic method, are aware that the other Party shall rely on the telecopied or scanned and emailed or electronic signatures and initials, and hereby waive any defenses to the enforcement of the terms of this Agreement based on the form of signature or initialization.

14.21. **Days of the Week**. If any date for performance herein falls on a Saturday, Sunday or holiday, as defined in Sections 6700-6701 of the California Government Code, the time for such performance shall be extended to 5:00 p.m. Pacific Time on the next business day. A "business day" shall mean a day that is not a Saturday, Sunday or legal holiday as described in California Government Code sections 6700-6701.

14.22. **Computation of Time**. The time in which any act is to be done under this Agreement is computed by excluding the first day (such as the Effective Date), and including the last day, unless the last day is a holiday or Saturday or Sunday, in which case the time shall be extended pursuant to Section 14.22.

14.23. **Assignment**. This Agreement shall be binding upon, and inure to the benefit of, Seller and Buyer and their respective heirs, devisees, personal representatives and permitted successors and assigns. Buyer may form or designate another corporation or entity to acquire the

23

Property, provided that Buyer shall not be released from any and all of its obligations under this Agreement arising from and after such assignment. Seller may not assign its rights, or portions thereof, under this Agreement without the prior written consent of Buyer.

14.24. **Survival**.  The provisions of this <u>Article XIV</u> shall survive the Closing Date, expiration or earlier termination of this Agreement and shall remain a binding contract between the Parties.

14.25. **No Survival of Warranties**.   None of the representations and warranties or covenants that require performance prior to the Closing ("**Pre-Closing Covenants**") contained in this Agreement or the Other Documents will survive the Closing or the termination of this Agreement. The Parties acknowledge and agree that: (a) the representations and warranties herein are intended to give effect to the closing conditions set forth in <u>Section 7</u> and <u>Section 8</u>;  (b) the Pre-Closing Covenants are intended to give effect to the closing conditions set forth in <u>Section 7</u> and <u>Section 8</u>; and (c) no claim of any kind based on the failure of any representation or warranty to have been true and correct, or based on the failure of any Pre-Closing Covenant to have been performed or complied with, may be brought at any time after the Closing.  All covenants and agreements contained herein that by their terms are to be performed after the Closing, or that prohibit actions after the Closing, will survive the Closing in accordance with their terms.

14.26. **Seller's Covenants**.  From the Effective Date until the Closing Date, unless this Agreement is earlier terminated pursuant to the terms hereof, Seller shall (i) maintain and operate the Property in the normal course as before the making of this Agreement, (ii) not execute, modify or terminate any leases, contracts or commitments of any kind affecting the Property or any interest therein without Buyer's prior written approval, in Buyer's sole discretion, (iii) not encumber the Property with any liens, encumbrances or other instruments creating a cloud on title, securing a monetary obligation with the Property or otherwise transferring or disposing of all or any part of the Property or any interest therein, unless the same will be removed, discharged or paid in full on or before Closing, (iv) keep its customary property insurance covering the Property in effect until Closing, (v) provide to Buyer, promptly after the receipt by Seller thereof, a copy of all written notices from any governmental authority, insurance company or any other party to any agreement binding upon Seller or the Property, related to or affecting the Property, and (vi) not seek, amend, revise or modify any governmental permits, zoning changes, approvals, entitlements, development rights or similar agreement relating to the Property. Seller shall terminate prior to the Closing, at no cost or expense to Buyer, any and all Contracts exclusively affecting the Property (and no other property) that are designated for termination by Buyer prior to the expiration of the Due Diligence Period.

AFDOCS:199642936.9

14.27.  **List of Exhibits**.  The Exhibits attached hereto consist of the following, each of which is incorporated into and constitutes a part of this Agreement for all purposes:

Exhibit A – Legal Description

Exhibit B – Form of Grant Deed

Exhibit C – Form of General Assignment

[*SIGNATURES FOLLOW ON NEXT PAGE*]

AFDOCS:199642936.9

IN WITNESS WHEREOF, Buyer and Seller have executed and delivered this Agreement as of the date first set forth above.

**SELLER:**

[]

BUYER:

[TBD]

## Acceptance by Escrow Holder

By execution hereof, Old Republic Title Company acknowledges receipt of the foregoing Agreement, accepts the instructions contained herein, and covenants and agrees to be bound by the terms of this Agreement.

**Escrow Holder:**

**OLD REPUBLIC TITLE COMPANY**

By: _____

Donna Brown, Escrow Officer

# **EXHIBIT A**

## **DESCRIPTION OF LAND**

AFDOCS:199642936.9

## EXHIBIT B

## FORM OF GRANT DEED

**RECORDING REQUESTED BY,**
**WHEN RECORDED MAIL TO, AND**
**MAIL TAX STATEMENTS TO:**

_____

_____

_____

---

APNs:           Space Above This Line for Recorder's Use

## GRANT DEED

The undersigned grantor declares under penalty of perjury that the following is true and correct:
DOCUMENTARY TRANSFER TAX: $_____,
(X)   computed on full value of property conveyed, or
(  )   computed on full value less value of liens and encumbrances remaining at time of sale.
(  )   Unincorporated area: _____ or (  ) City of _____.
(  )   There is no Documentary Transfer Tax due (state reason and give Code § or Ordinance
    Number): _____.

    **FOR A VALUABLE CONSIDERATION**, receipt of which is hereby acknowledged, **[●]** ("**Grantor**"), hereby **GRANTS** to **[●]** ("**Grantee**"), that certain real property located in **[**the unincorporated area of/ City of **[●]]**, **[●]** County, State of California, and more particularly described in <u>Exhibit A</u> attached hereto and incorporated herein by this reference (the "**Property**"), together with (i) all improvements located thereon, (ii) all rights, privileges, easements and appurtenances appertaining to the Property, and (iii) all right, title and interest of Grantor (if any) in, to and under adjoining streets, rights of way and easements.

[Signature Page Follows]

**IN WITNESS WHEREOF**, Grantor has caused its duly authorized representatives to execute this instrument as of _____, _____.

**GRANTOR:**

**[ADD SIGNATURE BLOCK]**

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF CALIFORNIA               )
                                           )
COUNTY OF _____      )

On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
Signature of Notary

                                                   (Affix seal here)

4/9/24

# EXHIBIT A TO GRANT DEED

**Legal Description of the Property**

[TO BE INSERTED]

AFDOCS:199642936.9

# EXHIBIT C

## FORM OF GENERAL ASSIGNMENT

## GENERAL ASSIGNMENT

THIS GENERAL ASSIGNMENT (this "**Assignment**") is made and entered into this [●] day of [●] (the "**Effective Date**"), by and between [●] ("**Assignor**"), and [●] ("**Assignee**").

## RECITALS

WHEREAS, on the Effective Date Assignor has sold and conveyed to Assignee the real property located in [●] County, California, together with all improvements, buildings and structures situated thereon and therein, as more particularly described in the Purchase and Sale Agreement and Joint Escrow Instructions dated [●] (the "**Purchase Agreement**"), by and between Assignor and Assignee. All capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Purchase Agreement; and

WHEREAS, Assignor desires to assign and convey to Assignee, and Assignee desires to assume, all of Assignor's right, title and interest in and to certain personal and intangible property pertaining to the Property, as set forth herein.

## AGREEMENT

NOW, THEREFORE, for Ten Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Assignment and Acceptance</u>.  Assignor hereby sells, assigns, conveys, grants and sets over unto Assignee all of Assignor's right, title and interest, if any, in and to, and Assignee hereby assumes and agrees to discharge and perform the liabilities and obligations of Assignor under, the Crops, Contracts, Personal Property and Water Rights pertaining to the Property conveyed to Assignee under the Purchase Agreement (collectively, the "**Assigned Property**").

2.    <u>Successors and Assigns</u>.  This Assignment shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, administrators, executors, successors and assigns.

3.    <u>Applicable Law</u>.  This Assignment shall be governed by and construed under the laws of the State of California. The parties hereto consent to the jurisdiction of the courts of the State of California.

4.    <u>Legal Action</u>.  In the event any party to this Assignment commences a legal action to enforce or interpret the provisions hereof, the prevailing party in such action shall be entitled to recover its reasonable attorneys' fees and costs incurred therein.

AFDOCS:199642936.9

5.　　Counterparts.　This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

*[The remainder of this page is intentionally left blank.  Signature page follows.]*

AFDOCS:199642936.9

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be executed as of the day and year first above written.

**ASSIGNOR:**

[●]


**ASSIGNEE:**

[●]


By: _____
Name: _____
Title: _____