**RAINES FELDMAN LITTRELL LLP**
Robert S. Marticello (SBN 244256)
rmarticello@raineslaw.com
3200 Park Center Drive, Suite 250
Costa Mesa, CA 92626
Telephone: (310) 400-4001

Mark S. Melickian (IL SBN 6229843)
(*Admitted Pro Hac Vice*)
mmelickian@raineslaw.com
30 North LaSalle Street, Suite 3100
Chicago, IL 60602
Telephone: (312) 704-9400

*Co-Counsel for the Official Committee of Unsecured Creditors*

**HUSCH BLACKWELL LLP**
Michael A. Brandess (IL SBN 6299158)
(*Admitted Pro Hac Vice*)
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Phone: (312) 655-1500
Fax:  (312) 655-1501
michael.brandess@huschblackwell.com

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>TRINTAS ADVANTAGED AGRICULTURE PARTNERS IV, LP, *et al.*,<br><br>Debtor | Case No. 24-50211 (DM) (Lead Case)<br>Chapter 11<br><br>**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO: (1) SALE OF REAL PROPERTY AND RELATED ASSETS; AND (2) PAYMENT OF PROCEEDS TO SECURED LENDER**<br><br>Date:   June 14, 2024,<br>Time:   10:00 a.m. (Pacific Time)<br>Place:  **Tele/Videoconference Appearances Only**<br>           United States Bankruptcy Court, 450 Golden Gate Avenue, Courtroom 17, 16th Floor, San Francisco, CA 94102 |

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................ 1

II.  BACKGROUND ................................................................................................... 3

   A.   The Debtors and Rabo Ag Represented There is Equity in the Portfolio ........ 3

   B.   The Milestones Require the Sale of Only 20% At This Stage ............................ 5

   C.   The "Auction" That Wasn't .............................................................................. 5

   D.   Rabo Ag is Unsecured as to TAAP ................................................................. 9

III. THE MOTION SHOULD BE DENIED .................................................................. 10

   A.   The Sale Does Not Benefit the Estates ............................................................ 10

   B.   The *Lionel* Factors Support Denial of the Motion ........................................... 14

   C.   The Debtors Violated Their Bid Procedures and Chilled Bidding ................... 15

      1.   Failure to Adhere to Bid Procedures: Generally ................................. 15

      2.   Failure to Adhere to Bid Procedures: No Consultation With the
           Committee ............................................................................................ 16

   D.   The Proposed Sale of Ranches for Which There Was No Competitive Bidding
        Fails Under Ninth Circuit Law ....................................................................... 19

IV.  PROCEEDS SHOULD NOT BE PAID TO RABO AG .......................................... 22

   A.   Pre-Plan Distributions Are Not Permitted Absent an Emergency .................. 22

   B.   Rabo Ag Received a Preferential Transfer ...................................................... 23

   C.   Cultural Cost Reimbursements Are Not Collateral Proceeds ......................... 25

   D.   Under The Equities of the Case, Proceeds Should be Made Available for
        General Unsecured Creditors .......................................................................... 26

V.   RESERVATION OF RIGHTS ............................................................................... 28

VI.  CONCLUSION .................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*California Wilderness Coal. v. U.S. Dep't of Energy*,
  631 F.3d 1072 (9th Cir. 2011).................................................................................. 18

*Deutsche Bank Sec., Inc. v. Kendall*,
  2006 WL 335415 (N.D. Cal. 2006)......................................................................... 24

*In re 1121 Pier Vill. LLC*,
  635 B.R. 127 (Bankr. E.D. Pa. 2022)..................................................................... 11

*In re Air Beds, Inc.*,
  92 B.R. 419 (B.A.P. 9th Cir. 1988).......................................................... 3, 22, 23

*In re Conroe Forge & Mfg. Corp.*,
  82 B.R. 781 (Bankr.W.D.Pa.1988) ........................................................................ 22

*In re Encore Healthcare Associates*,
  312 B.R. 52 (Bankr. E.D. Pa. 2004)....................................................................... 12

*In re Endresen*,
  548 B.R. 258 (B.A.P. 9th Cir. 2016)....................................................................... 26

*In re Family Christian, LLC*,
  533 B.R. 600 (Bankr. W.D. Mich. 2015)............................................................... 15

*In re Fitzgerald*,
  428 B.R. 872 (B.A.P. 9th Cir. 2010)....................................................................... 20

*In re Fox*, 229 B.R. 160 (Bankr. N.D. Ohio 1998) ........................................................ 24

*In re Intercontinental Polymers, Inc.*,
  359 B.R. 868 (Bankr. E.D. Tenn. 2005) ................................................................ 24

*In re KVN Corp., Inc.*,
  514 B.R. 1, 5 (B.A.P. 9th Cir. 2014)....................................................................... 11

*In re Lahijani*,
  325 B.R. 282 (B.A.P. 9th Cir. 2005)................................................................. 11, 20

*In re Lionel Corp.*,
  722 F.2d 1063 (2d Cir. 1983)................................................................................... 14

*In re Ludford Fruit Prod., Inc.*,
  99 B.R. 18 (Bankr. C.D. Cal. 1989)....................................................................... 24

*In re McLean Industries, Inc.*,
  70 B.R. 852 (Bankr.S.D.N.Y.1987)........................................................................ 17

*In re Pixius Commc'ns, LLC*,
  No. 19-11749, 2020 WL 1189519, at *1 (Bankr. D. Kan. Mar. 10, 2020)............... 15

*In re Selander*,
   2017 WL 1157101, at \*6 (Bankr. W.D. Wash. 2017) ............................................ 11

*In re Structurlite Plastics Corp.*,
   91 B.R. 813 (Bankr. S.D. Ohio 1988) ..................................................................... 17

*In re Sunland, Inc.*,
   507 B.R. 753 (Bankr. D.N.M. 2014) ....................................................................... 20

*In re TerreStar Networks, Inc.*,
   457 B.R. 254 (Bankr. S.D.N.Y. 2011) ................................................................... 26

*In re Trappers Creek, LLC*,
   2010 WL 797022, at \*3–4 (Bankr. C.D. Ill. 2010) ............................................... 25

*In re Walter*,
   83 B.R. 14 (B.A.P. 9th Cir. 1988) ......................................................................... 14

*In re Wilde Horse Enterprises, Inc.*,
   136 B.R. 830 (Bankr. C.D. Cal. 1991) .................................................................. 10

*Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, LP)*,
   171 F.3d 249 (5th Cir. 1999) ................................................................................. 24

*Millenkamp Cattle, Inc., et al.*
   (Bankr. D. Id. 24-40158) ....................................................................................... 21

**Statutes**

11 U.S.C. § 1103 ........................................................................................................... 3

11 U.S.C. § 1103(c)(1) ........................................................................................... 17, 20

11 U.S.C. § 363 ........................................................................................................... 12

11 U.S.C. § 502(d) .................................................................................................. 3, 24

The Official Committee of Unsecured Creditors (the "**Committee**") of Trinitas Advantaged Agriculture Partners IV, and the affiliated debtors in the above-captioned cases (collectively, the "**Debtors**"), submits this objection (the "**Objection**") to the Debtors' Motion for Orders Authorizing and Approving Bid Procedures and seeking other relief [Docket No. 136] (the "**Motion**"). Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion. This Objection is supported by the *Declaration of Eric Reubel* filed contemporaneously with this Objection.

## I.    PRELIMINARY STATEMENT

The "auction" held June 6, 2024 (the "**Auction**") proved that the Committee's extensive, documented concerns regarding the Debtors' liquidation strategy are well founded. The Debtors and Rabo Ag (together, the "**Rabo Ag Parties**") promised a 14-month orderly and managed sale process designed to reap the substantial equity in the Portfolio, but, instead, have delivered a "fire sale." Less than four months into these cases, they seek to sell *88%* of the Portfolio, *including multiple ranches that were to be excluded from the Auction and that were not the subject of any timely Qualified Bid*. Moreover, as warned by the Committee, Rabo Ag Parties' rushed sales will solidify that the Portfolio is worth **over $100 million** less than represented by the Rabo Ag Parties to this Court. It is simply not believable that purported experts in this industry could miss the mark by that magnitude.

The Debtors are beholden to Rabo Ag. They are not running the orderly process designed to maximize value for the estates for all creditors—instead, **the Debtors are deferring to Rabo Ag and are offloading ranches quickly at the minimum prices Rabo Ag is willing to accept to protect its downside**. The Rabo Ag Parties, together, are choosing a path that benefits only Rabo Ag and that could ensure there is no distribution for general unsecured creditors. Their approach to these cases is an abuse of the bankruptcy system and is contrary to the law in the Ninth Circuit. While Rabo Ag's self-interest is not surprising, the Debtors are fiduciaries for the general unsecured

creditors. The general unsecured creditors, whose materials and services benefited the very ranches being sold for Rabo Ag's benefit, must receive a meaningful distribution in these cases.

The sale process was rushed, its integrity has been impaired, and the results are dismal. As detailed below, the Auction involved virtually no competitive bidding and the prices obtained are not the result of a fair, open, and fulsome process. *See In re Fitzgerald*, 428 B.R. 872, 883 (B.A.P. 9th Cir. 2010). The Debtors brazenly violated their own Bid Procedures and engaged in conduct that likely chilled bidding. The Debtors consistently failed to consult with the Committee. In addition, following the Rabo Ag Parties' successful hearing on June 5, 2024, defeating the Committee's pre-Auction objection (the "**Process Objection**"), *the Rabo Ag Parties were emboldened and decided to accelerate the sale process further*. The Rabo Ag Parties treated the Auction as a pseudo-foreclosure and offered ALL of the ranches, including those that the Debtors previously and publicly identified as not being available at the Auction. Those ranches—the ones that the Debtors expressly represented to the public would not be excluded at this time—were auctioned off without advance notice, at the end of a very long day, and to a very small group of remaining bidders. The Debtors' decision-making and the entire sale process has been undermined and should be closely scrutinized.

Ultimately, the Motion should be denied (except as to a handful of ranches) because: (a) the Debtors cannot carry their burden of demonstrating that all of the proposed sales benefit the estates; (b) the Debtors violated the Bid Procedures, generally, and more specifically by failing to consult with the Committee on many key decisions; and (c) the Rabo Ag Parties' attempted sale of ranches for which there was no competitive bidding falls below the sale approval standards followed in the Ninth Circuit.[1] In one very real respect, these issues, particularly the question concerning consultation rights under both the Bid Procedures and 11 U.S.C. § 1103, implicate the broader role of a creditors' committee in complex chapter 11 cases. A committee cannot adequately discharge its fiduciary duties if it is relegated to a mere observer, as has been the situation in these cases.

---

[1] As discussed below, the Committee does not object to the sale of the following properties Lerde, Johl, Onsum, Jeffrey, Marcucci, and Lamb.

2

In the event that any sales are approved, the Court should prohibit the distribution of sale proceeds to Rabo Ag on account of the Rabo Ag Prepetition Debt.[2]  First, the distribution of sale proceeds outside of a plan is prohibited absent an "immediate need."  *See In re Air Beds, Inc.*, 92 B.R. 419, 422-24 (B.A.P. 9th Cir. 1988).  Second, Rabo Ag received, as an *unsecured* creditor, an approximate $4,000,000 preferential payment and, as such, it does not hold an allowed claim in these cases.  *See* 11 U.S.C. § 502(d).  Third, certain sales included in the consideration to be paid the reimbursement of "cultural costs," *i.e.*, services, materials, and other costs to maintain the crops, which have not been demonstrated to be the proceeds of Rabo Ag's collateral.  Fourth and finally, based on the "equities of the case" doctrine under § 552(b), Rabo Ag should not paid until the cases are adequately funded and there is a meaningful distribution to general unsecured creditors.  Rabo Ag chose this Chapter 11 path and defended it, including by representing to this Court that there was equity in the Portfolio, the Portfolio would be sold through an orderly and lengthy process, and that these cases were not solely for its benefit.  The Rabo Ag Parties should be held to their word.

## II.    BACKGROUND

### A.    The Debtors and Rabo Ag Represented There is Equity in the Portfolio

In his First Day Declaration, Kirk Hoiberg declares that "the Debtors believe their Portfolio has substantial long-term value that is greater than the amount of the Rabo Ag Debt." (*See* First Day Decl. at ¶ 26.)  Mr. Hoiberg stated there would be "an orderly and managed sale process of the Portfolio. . . to pay off the Rabo Ag Debt and satisfy the other outstanding debt." (*See* First Day Decl. at ¶ 33.)

On February 22, 2024, the Court held a hearing on the Debtors' first-day motions.  During that hearing, the Court inquired about value of the Portfolio, the purposes of these cases, and whether there would be a benefit for general unsecured creditors.  In response, the Rabo Ag Parties asserted that Rabo Ag was oversecured—the only question was the amount of Rabo Ag's equity cushion.  Moreover, both the Debtors and Rabo Ag stated that the Portfolio would be sold pursuant

---

[2]   It is not clear to the Committee whether the Debtors are seeking to distribute the sale proceeds at this stage.

to an orderly "fourteen-month process" to maximize the chances of realizing the equity cushion in the Portfolio. Specifically, during the first-day hearings, the following statements were made:

Ms. Kim:

> **We do believe that there is an equity cushion in the assets**. Part of the reason for the Debtors agreeing to do this managed sale process was because **we did think that having this fourteen-month process to try to realize value would maximize our chances of being able to realize that equity cushion. The prepetition debt, the loan-to-value ratio, so basically the amount of the debt to the value of the collateral, was, Mr. Hoiberg, correct me if I am wrong, but I believe it was 65% (Mr. Hoiberg: "correct") such that the amount of the prepetition debt was 65% of what the bank believed the appraised value or the estimated value of their collateral to be. *We actually, the Debtors believe that it is higher*,** obviously the value is whatever people will end up paying for it, right, but the expectation, our belief was that there will be, and we put in our petition, we believe that there will be value for, proceeds available for distribution to unsecured creditors**. We believe that because we think that even with this DIP financing, plus the pre-petition debt, that the value that we should be able to get from the sale of the lots would exceed that and that is certainly our hope and our goal.

(*See* Case No. 24-50210 [Docket No. 31] at 54:17–55:57.)

Mr. Waste:

> Hopefully out over the next 14 months we're going to start to see some continued positive momentum in that direction **and if we manage this liquidation in the kind of somewhat more drawn out and orderly and planned fashion** with the properties being very tended to and well cared for and non-productive orchards becoming productive during the interim **ultimately that is going to benefit everyone. This really isn't just for the bank's benefit. The loan-to-value ratio here right now, and there may be some disagreement with me, but if I am going to ballpark it, I'm going to say about 65% and I doubt the disagreement would be vehement on that point**.

(*See* Case No. 24-50210 [Docket No. 31] at 1:20:47–1:21:02.)

These statements were not "offhand" references as argued by Rabo Ag in response to the Process Objection. (*See* Response [Docket No. 338] at 2, line 25.) They were made directly in response to this Court's questions, including questions about Mr. Hoiberg's opinion of value and

1  whether "this plan is likely to produce anything for unsecured creditors." (*See* Case No. 24-50210

2  [Docket No. 31] starting at 51:38.)[3]

3  **B.    The Milestones Require the Sale of Only 20% At This Stage**

4  Based on the Milestones in the DIP Credit Agreement, the Debtors proposed completing

5  the overall sale process by April 30, 2025. The DIP financing was intended to enable the orderly

6  sale process the Rabo Ag Parties proposed. The Debtors' created and shared budgets indicating

7  funding sufficient to carry the cases to that point. (*See* Notice [Docket No 45], Ex. A-1 at 69, §

8  5.15(l).) The Milestones require an auction to be conducted on at least 20% of the Portfolio by

9  acreage by May 31, 2024. (*See id.* at § 5.15(h).) Auctions on at least 50% of the remaining acreage

10  must occur by December 31, 2024, and on any remaining acreage by March 31, 2025. (*See id.* at

11  70, § 5.15(k)-(m).)

12  Under the DIP Credit Agreement, absent a DIP Termination Event (as defined in the DIP

13  Credit Agreement), Rabo Ag did not have authority to prematurely end its funding commitment.

14  A sale of only 20% of the Portfolio now would avoid a Termination Event and give the Debtors the

15  runway necessary to further market the remaining ranches. The Committee has consistently

16  expressed concerns about the speed of the sale process and the initial arbitrary 20% Milestone, but

17  believed that the Rabo Ag Parties would pursue the sale process in good faith, with sufficient time

18  to fully test the market.

19  **C.    The "Auction" That Wasn't**

20  On May 29, 2024, the Debtors served the Consultation Parties with their *Notice of Qualified*

21  *Bids and Parcels List* (the "**Pre-Auction Bid Notice**"). The Pre-Auction Bid Notice included three

22  exhibits: (1) Exhibit "A" with the seven ranches subject to Qualified Bids (the "**Qualified**

23  **Ranches**") and the Qualified Bidders for each; (2) Exhibit "B" with thirteen ranches subject to

24

---

25  [3]    To the extent that the Rabo Ag Parties made representations based on half-truths, such conduct led to
meaningful damages to the Debtors' estates. Importantly, "California courts have generally provided that there are four

26  circumstances in which a duty to disclose may arise: (1) when the defendant is the plaintiff's fiduciary; (2) when the
defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the

27  defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations
that are misleading because some other material fact has not been disclosed." *Rasmussen v. Apple Inc*., 27 F. Supp. 3d

28  1027, 1033 (N.D. Cal. 2014). These factors apply here.

Case: 24-50211   Doc# 355   Filed: 06/10/24   Entered: 06/10/24 15:58:06   Page 9 of
32

"nonconforming" bids (the "**Nonconforming Ranches**") and the bidders for each (which ranches the Debtors reserved the right to offer for bidding at the Auction); and (3) and Exhibit "C" with eleven remaining ranches "**that the Debtors Do Not Currently Intend to Submit for Bidding at Auction**" (the "**Excluded Ranches**"). (*See* Committee Obj. [Docket No. 329], Ex. 2, (emphasis in original).)

The Bid Notice further stated that Debtors provided the Consultation Parties "all of the bids that are referenced in Exhibit A and B. The Debtors reserve the right to amend the lists included at Exhibits A, B, and C, based on further discussions with bidders and any modifications to the bids received." The Committee did not receive any amendment to the Pre-Auction Bid Notice.

Between Exhibits "A" and "B" to the Pre-Auction Bid Notice, the Debtors indicated that they may proceed to Auction with eighteen ranches, constituting 5,333.17 acres or 62% of the Portfolio. The Committee raised its concern regarding the Debtors selling up to 62% of the Portfolio after only three months of marketing, for very low prices, and without competitive bidding and when the Milestones required only 20% at this stage. (*See, generally*, Committee Obj. [Docket No. 329].)

On June 4, 2024, the Debtors served a *Notice of Minium Opening Bids at Auction* (the "**Minimum Bid Notice**"). The Minimum Bid Notice listed all of the Qualified Ranches and all of the Nonconforming Ranches (excluding Chiala 1, 2, and 3), and set the minimum opening bid for each ranch listed. The Excluded Ranches remained excluded. However, the Minimum Bid Notice stated that "the Debtors may also, in consultation with the Consultation Parties, offer at the Auction additional Properties that are not listed above, which were offered pursuant to the Bid Procedures." The Committee received the Minimum Bid Notice, but was not consulted in advance regarding the minimum prices set forth therein. The Committee's understanding is that the minimum prices were set by Rabo Ag.

On June 6, 2024, the Debtors conducted the Auction. The Auction started at 11:00 a.m. It commenced with approximately 45 minutes of preliminary comments and then broke for lunch, resuming at 1:00 p.m. (*See* Reubel Decl. at ¶ 5.) The next approximately 2 ½ hours were spent on

6

bidding with respect to Marcucci and Lamb to test the individual prices of these ranches against a previously received bulk bid. (*See id.*) This portion was conducted via written bids with a 10 to 15 minute break between the submission of each bid. (*See id.*) There were two bids submitted on each ranch over this 2 ½ hour period. (*See id.*)

The Auction did not involve robust bidding. Rather, there was very little competition. There was competitive bidding on only 4 ranches, Marcucci, Lamb, Johl, and Onsum. For the rest, the bidding closed with no additional bids, with the ranches being offered for sale to the sole bidder on each respective ranch. (*See* Reubel Decl. at ¶ 6.) Furthermore, the limited overbidding on Lamb and Marcucci became irrelevant because the Debtors accepted bulk bid referenced above that included those two ranches and Adobe. There was no competitive bidding on the three-ranch bulk bid or on Adobe individually. The competitive bidding on Johl and Onsum increased the prices to be received by a collective sum of $740,652. (*See id.*) Other than these four ranches, there was no additional bidding submitted during the Auction. Attached to the Reubel Declaration as Exhibit "1" is a chart comparing, for each ranch, the appraised value, the price received, and Rabo Ag's initial minimum price.

Towards the end of the Auction, the Committee's worst fears about the Auction were fully realized. There was a short discussion involving the Debtors' professionals, Rabo Ag and its professionals, and the Committee's professionals in attendance. (*See* Reubel Decl. at ¶ 7.) The Committee's professionals were told that the next steps included offering all of the ranches for which no Qualifying Bid was received and that were not, until that point, to be offered for sale at the Auction. (*See id.*) Other than imparting this information to the Committee' professionals about the Rabo Ag Parties' decision, there was no consultation or solicitation of the Committee's input. After that short dialogue, the Debtors met with Rabo Ag and the Debtors' brokers separately without the Committee and outside of the conference room designated for the Consultation Parties. (*See id.*) Thereafter, the Debtors proceeded to offer for sale each of the Excluded Ranches and Chiala 1, 2, and 3 (collectively, "Chiala"). (*See id.*)

Prior to commencing this last portion of the Auction (the **"Fire Sale"**), the Debtors projected in the Auction room a table with minimum prices for these ranches. The Committee was not consulted about the minimum prices set for the Excluded Ranches (or for Chiala). (*See* Reubel Decl. at ¶ 7.) Certain of the bidders that had attended the Auction prior to the pre-Fire Sale break left the Auction. At some point towards the end of the Fire Sale, the Debtors dispensed with requiring bids at the minimum prices and proceeded to solicit offers in any amount. (*See id.*) The Fire Sale was conducted at the very end of the day when there were only approximately 4 to 5 bidders remaining at the Auction and conference room designated for the Auction. (*See id.*) The Debtors received four bids during the Fire Sale. (*See id.*)

The Fire Sale violated the Bid Procedures in numerous ways. The Committee was not consulted regarding the Debtors' decision to offer the Excluded Properties for sale. The Committee was not consulted regarding permitting a Qualified Bidder on one particular ranch to make bids on the Excluded Ranches. (*See* Bid Procedures at 8 of 11, § i(iii).) The Committee was not consulted regarding any bids the Debtors expected on the Excluded Ranches during the Fire Sale (and it did appear that the Debtors had prior knowledge that certain bid would be received during the Fire Sale). (*See* Reubel Decl. at ¶ 7.) Overall, the Fire Sale seemed orchestrated by the Rabo Ag Parties (and amongst the bidders in attendance) and to the exclusion of the Committee. There was no competitive bidding during the Fire Sale. (*See id.*)

Pursuant to the *Auction Results Notice* [Docket No. 347] and *Supplemental Notice with Respect to Results of Auction* [Docket No. 351] (the **"Supplemental Notice"**), the Rabo Ag Parties are seeking to sell 25 ranches (referenced below) comprising 88% of the Portfolio by acreage, **including seven Excluded Properties**. Based on the Supplemental Notice, it appears that the Debtors intend to seek the Court's approval of two bids made during the Fire Sale, both of which include Excluded Properties. If the Court is inclined to approve the sale of certain ranches, it should not permit the sale of the Excluded Properties and Chiala. Of the 25 ranches the Debtors seek to sell, **only 4 were subject to competitive bidding (e.g., 2 or more bidders at Auction).** The list is as follows:

| Property | Competitive or Non-Competitive | Successful Bid | Pre-Auction Sale Notice Exhibit |
|---|---|---|---|
| Adobe | Non-Competitive | $35,648,900 | B |
| Lamb Ranch | Competitive | | B |
| Marcucci Ranch | Competitive | | B |
| Lerda Ranch | Non-Competitive | $8,258,217 | A |
| Picanso Ranch | Non-Competitive | $8,024,237 | B |
| Dinuba Ranch | Non-Competitive | $2,960,595 | A |
| Toor West | Non-Competitive | $3,017,475 | A |
| Johl Ranch | Competitive | $6,580,000 | B |
| Onsum Ranch (Dixon East) | Competitive | $2,050,000 | A |
| Jeffrey 17 Ranch | Non-Competitive | $3,600,000 | A |
| Ratto 1 | Non-Competitive | $4,353,920 | B |
| Ratto 2 | Non-Competitive | | B |
| Ratto 3 | Non-Competitive | | B |
| Ratto 4 | Non-Competitive | | B |
| Ratto 5 | Non-Competitive | | B |
| Hall North | Non-Competitive | $40,000,000 | C |
| Hall South | Non-Competitive | | C |
| Rasmussen 150 Ranch | Non-Competitive | | C |
| Rasmussen 277 Ranch | Non-Competitive | | C |
| Rasmussen 315 Ranch | Non-Competitive | | C |
| Chiala 1 Ranch | Non-Competitive | | B |
| Chiala 2 Ranch | Non-Competitive | | B |
| Chiala 3 Ranch | Non-Competitive | | B |
| Turf Ranch | Non-Competitive | | C |
| Fry Road Ranch | Non-Competitive | $7,000,000 | C |

**D.  Rabo Ag is Unsecured as to TAAP**

Rabo Ag is unsecured as to certain Debtors.  Rabo Ag made a loan to TAAP IV, L.P ("**TAAP**"), guaranteed by TAAP's subsidiaries.  The guarantees are secured by the real property of each of the seventeen ranch subsidiary debtors (collectively, the "**Ranch Debtors**").  The remaining subsidiary debtor, Trinitas Farming, LLC ("**Trinitas Farming**"), is not a party to the Prepetition Credit Agreement, and did not schedule Rabo Ag as a creditor.  As between Rabo Ag and TAAP, the loan is unsecured, as recognized in TAAP's Schedules.  (*See* TAAP's Schedules at [Docket No. 176] Schedule E/F, Creditor 3.1 (listing Rabo Ag with an unsecured debt of $161,000,000).)

### E. Rabo Ag is Undersecured as to the Seventeen Ranch Debtors

Due, in large part, to its own hasty rush to the finish line, Rabo Ag is undersecured as to each of the seventeen Ranch Debtors who issued guarantees and pledged collateral to Rabo Ag. Under the Prepetition Credit Agreement, TAAP is listed as the individual "Borrower" and each Ranch Debtor guaranteed TAAP's primary obligation and is deemed to have the obligation of a "primary obligor."  In other words, each Ranch Debtor is jointly and severally liable for the obligation to Rabo Ag.

Based on Rabo Ag Parties' proposed sales—and the estimated value of the remaining ranches—it is clear that Rabo Ag is an undersecured creditor with respect to each case in which it holds collateral, even if the Rabo Ag Prepetition Debt was allocated in specific amounts to each Ranch Debtor.  (*See* Reubel Decl., Ex. 1.)

### F. Rabo Ag Received a Preference

On or about December 28, 2023—within the 90-day preference period—Rabo Ag received a payment of approximately $4,000,000 from TAAP (the "**Preference Payment**").  That transfer is evidenced in part in the Statement of Financial Affairs of Trinitas Farming as a "transfer of cash from TAC to TAAP IV."  (*See* Trinitas Farming SOFA [Docket No. 179] at Sec. 4.61.)  Based on the testimony of Mr. Hoiberg during the § 341(a) meeting of creditors,[4] the Committee's understanding is that Trinitas Farming received $4,000,000 from a vendor, The Almond Company (*i.e.* the "TAC" identified in the SOFA), which it then wired to TAAP, which subsequently wired the majority of the funds received to Rabo Ag as payment toward TAAP's unsecured obligation under the Prepetition Credit Agreement.

## III. THE MOTION SHOULD BE DENIED

### A. The Sale Does Not Benefit the Estates

The Debtors have the burden of demonstrating that a sale "is in the best interests of the estate."  *See In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).

---

[4]  The 341(a) meeting commenced on March 25, 2024 and concluded May 1, 2024.

Benefiting the estate means benefiting the general unsecured creditors. *See In re KVN Corp., Inc.*, 514 B.R. 1, 5 (B.A.P. 9th Cir. 2014). According to the Ninth Circuit, while the debtor's position is afforded deference "where there is no objection[,]" the requirement that § 363 bankruptcy sales be approved by the court "means that the responsibility ultimately is the court's." *See In re Lahijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005)

A bankruptcy sale process cannot be run to effectuate a foreclosure solely benefiting the secured creditor. *See In re 1121 Pier Vill. LLC*, 635 B.R. 127, 141 (Bankr. E.D. Pa. 2022) ("**This is consistent with bankruptcy policy — broadly speaking, the bankruptcy court does not serve as an expedited foreclosure court for the sole benefit of secured creditors**. Chapter 7 trustee sales under 11 U.S.C. § 363 generally must provide some benefit to unsecured creditors." (emphasis added)).

The Ninth Circuit BAP requires that a sale of encumbered property provide a **meaningful recovery for general unsecured creditors**. "It is universally recognized . . . that the sale of a fully encumbered asset is generally prohibited." *See In re KVN Corp., Inc.*, 514 B.R. 1, 5 (B.A.P. 9th Cir. 2014). This is because "there is no benefit for unsecured creditors." *See id.* at 7-8. In fact, in chapter 7 cases, the sale of encumbered property is presumed improper. *See id.* The presumption of impropriety may be rebutted where there will be prospects of "a meaningful distribution to unsecured creditors. . . ." *See id.* at 8; *see also In re Selander*, 2017 WL 1157101, at *6 (Bankr. W.D. Wash. 2017) ("[a] carve-out merely benefitting administrative professionals is improper.").

Courts have applied this same policy in Chapter 11 cases. In the *Encore Healthcare Associates* case, the bankruptcy court held as follows:

> Here the proposed sale not only generates funds solely for the secured creditor which could realize the value of its collateral by foreclosing and selling the assets itself but more significantly advances no purpose of a Chapter 11 proceeding. There is no operating business with employees that is preserved by reason of this sale as the Debtor does not operate a business but merely leases real property. . . . Indeed the Debtor intends to convert to a case under Chapter 7 after the sale is consummated.
>
> Finding no business justification for the proposed § 363 sale in a Chapter 11 proceeding, the Motion is denied.

11

*In re Encore Healthcare Associates*, 312 B.R. 52, 57–58 (Bankr. E.D. Pa. 2004) (internal citations omitted).

The Debtors are running a *sub rosa* foreclosure for the sole benefit of Rabo Ag. To allay this Court's questions about these cases at the outset and before the DIP Credit Agreement had been approved, the Rabo Ag Parties stated that there was substantial equity in the Portfolio that would be realized through an orderly 14-month sale process. Now, the Rabo Ag Parties seek to sell substantially all of the ranches (approximately 88% of the Portfolio) after less than four months for the collective price of $121,493,344. (*See* Docket Nos. 347 and 351.) Upon the sale of the remaining four ranches not currently up for sale,[5] the Portfolio will likely generate total proceeds not exceeding approximately $137 million, or *over $100 million less* than stated by the Rabo Ag Parties and well below the $161 million Rabo Ag Prepetition Debt (without factoring in the DIP loan). (*See* Reubel Decl., Ex. 1.) It is clear—by the proposed sales, the Debtors are choosing a path that ensures the sale proceeds will not exceed the Rabo Ag Prepetition Debt [6]

There is no evidence that Debtors have a strategy to successfully conclude these cases with a plan and provide a meaningful distribution to general unsecured creditors. The Debtors seem to be acting with a complete disregard for the general unsecured creditors. The Committee is concerned that the Rabo Ag Parties intend to complete the sale of the ranches, pay all the resulting proceeds to Rabo Ag, and then to convert the cases leaving behind administratively insolvent estates and no recovery for general unsecured creditors.[7] Because the proposed sale leaves no prospects of a recovery for unsecured creditors, it should not be approved.

---

[5]   Porterville 33, Porterville 34, Toor East, and Phelps.

[6]   The Rabo Ag argued that the Committee's concerns in the Process Objection were premature because the Auction had yet to occur. (*See* Response [Docket No. 338] at 3, arguing "But, importantly, that is only a 'might' – the auction will feature competitive bidding that has yet to occur, and nobody at this time knows what the final prices might be.") This was misleading. There was no expectation that the Auction would materially increase the collective purchase price, and it didn't. The Debtors' conducting of the Fire Sale assured there would be no competitive bidding on that portion of the Portfolio.

[7]   The prospects of the Rabo Ag Parties seeking to convert these cases to Chapter 7 after completing the sales is particularly concerning because they could not have accomplished these sales in Chapter 7 in the first instance. *See In re KVN Corp., Inc.*, 514 B.R. 1, 5 (B.A.P. 9th Cir. 2014).

12

The Debtors are not maximizing value for the estates. The Fire Sale is proof of this fact. By the Pre-Auction Bid Notice and the Minimum Bid Notice, the Debtors informed the Committee (and the bidders) that they did not intend to sell the Excluded Ranches. The Debtors had not received either Qualified Bids or "noncomforming bids" on any of Excluded Ranches. Prior to the Auction, the Debtors intended to sell somewhere between 10% and 62% of the Portfolio. The exact amount was unclear. In the Process Objection, the Committee raised its concerns about the Debtors selling upward of 62% of the Portfolio in less than four months for suboptimal values and with no competition (based, in part, on the Debtors' prior representations). Emboldened by the Court's overruling of the Committee's Process Objection, the Rabo Ag Parties decided to accelerate the sale process further by conducting the Fire Sale to offer the Excluded Properties for sale at the Auction. **The Fire Sale is proof that the Debtors are acting for Rabo Ag's benefit—rushing to sell as much of the Portfolio as possible, as quickly as possible, at minimum prices Rabo Ag will accept to lessen Rabo Ag's downside and clear its books of bad debt**.

The Debtors' prior statements demonstrate that the proposed sales are not supported by sound business judgment. The proposed sales are the product of a materially shorter sale process —14 months reduced to 4 months—and at prices that are far below the Debtors' own estimates.

The Rabo Ag Parties engaged in a "bait and switch." To justify the filing of these cases, the Rabo Ag Parties stated that the Portfolio would be sold in an orderly fashion over a 14-month process to realize the substantial value and equity therein. The Debtors incurred the $30,000,000 DIP loan (and granted substantial protections to Rabo Ag) *to fund that very process*. The Milestones were developed expressly to enable an orderly marketing and sale process, requiring only 20% of the Portfolio be sold at this stage.[8] Now, having obtained the "first-day" relief they wanted and the Milestones they wanted, and emboldened by the overruling of the Committee's Process Objection, the Rabo Ag Parties are pursuing approval of a sale of 88% of the Portfolio at "fire sale" prices less than four months into the cases. The Debtors are deviating from the approach that, less than four months ago, *they said* would maximize the value of the Portfolio for the estate.

---

[8] The Committee notes again that it opposed that 20% Milestone as unnecessarily aggressive.

There are no grounds to rush the sale of such a substantial portion of the Portfolio in these chapter 11 cases.

## B. The *Lionel* Factors Support Denial of the Motion

Bankruptcy sales should benefit the debtor and its creditors as a whole, and not only one major creditor. *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (noting that "there must be some articulated business justification, other an appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business"). The *Lionel Corp.* decision articulated the following non-exclusive factors in assessing whether the stated business justification for a sale is sufficient under § 363(b) of the Bankruptcy Code:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most important perhaps, whether the asset is increasing or decreasing in value.

*See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In re Walter*, 83 B.R. 14, 19–20 (B.A.P. 9th Cir. 1988).

In response to the Process Objection, the Debtors argued that the *Lionel* factors supported the proposed sale. The Debtors are incorrect. The Debtors seek to sell the majority of their assets. The cases have been pending for only a short time (less than 4 months). The proposed sale, if approved, will make a chapter 11 plan less likely. The proceeds to be received are far less than the appraised values of the ranches. (*See* Reubel Decl., Ex. 1.) The Debtors have not offered evidence that the ranches are decreasing in value. To the contrary, the Debtors have DIP financing to maintain the ranches. The Debtors stated that the Portfolio was worth $248 million or even "higher" and that a 14-month orderly sale process was necessary to capture that value. Moreover, according to Rabo Ag, a "strong rebound" is expected in the almond prices over the next 12 to 18 months.[9]

---

[9] *See* https://research.rabobank.com/far/en/sectors/fresh-produce/five-year-almond-market-outlook.html.

14

**C.** **The Debtors Violated Their Bid Procedures and Chilled Bidding**

The Debtors filed the Motion on March 29, 2024. The Committee informally communicated certain issues concerning the Bid Procedures with Debtors' counsel. This included the substantial unchecked discretion the Debtors would wield under the Bid Procedures. Instead of objecting at that time, at the Debtors' behest, the Committee agreed to certain negotiated concessions, which were memorialized in revised bid procedures filed on April 25, 2024 [Docket No. 222]. The Committee still thought it worthwhile to file a statement with the Court explaining the negotiated resolution and flagging certain problems that may arise:

> **While the Committee is a "Consultation Party," the Bid Procedures afford the Debtors extraordinary discretion on some of these points and others**. Moreover, the dates and deadlines in the Bid Procedures are driven by the Milestones in the DIP Credit Agreement. As the Committee raised in opposition to the Debtors' motion to approve the DIP Credit Agreement, the Committee is concerned property will be sold prematurely to avoid a default under the DIP Credit Agreement at the expense of the general unsecured creditors.

(*See* Committee's Statement [Docket No. 215] at 2:15-21 (emphasis added).)

**1.** **Failure to Adhere to Bid Procedures: Generally**

As the bankruptcy court noted in *Family Christian, LLC*, "[i]f the court perceives any degree of fraud, unfairness or mistake with the sale, including any flaws with an auction process, the court should assess the impact of these factors on the sale when the offer is compared to the court's finding of valuation of the assets to be sold." *In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015) (denying a sale due to a flawed auction process). Here, the valuations put forth before this Court by the Rabo Ag Parties indicate that the Portfolio is worth significantly more than the amount offered after a truncated sale process. Moreover, the sale process was flawed.

Bankruptcy Courts have near universally held that maintaining the integrity of bid procedures is of principal importance to the integrity of the process. *See In re Pixius Commc'ns, LLC*, No. 19-11749, 2020 WL 1189519, at *1 (Bankr. D. Kan. Mar. 10, 2020) ("Maintaining a level playing field for bankruptcy sale bidders fosters a transparent auction process that insures the

appearance of integrity and trustworthiness of the bankruptcy court system. Applying and enforcing previously-approved bid procedures serves that object.").

The Debtors rendered the deadlines and parameters in the Bid Procedures meaningless. The Debtors consistently noticed that the Excluded Properties would not be offered for sale. According to the Debtors, the Excluded Properties were not subject to either a timely Qualified Bid or a "nonconforming bid" by the Bid Deadline.[10] During the Fire Sale, the Debtors provided minimum pricing for the Excluded Properties and Chiala and then decided to receive offers at any amount including below the minimums. (*See* Reubel Decl. at ¶ 7.) The Debtors' decision (likely at the behest of Rabo Ag) to offer the Excluded Properties at the Auction was without advance express notice to the market or any bidders. The Fire Sale was conducted amongst only the small group of bidders who remained at that stage and it resulted in no competitive bidding. Assuming the Debtors' decision to offer the Excluded Properties for sale did not violate the Bid Procedures, it did not maximize value. Moreover, as detailed further below, the Committee was not consulted on the decision to offer the Excluded Properties for sale or the minimum pricing set for those ranches. Nor did the Committee receive any notice regarding the bids the Debtors expected to receive. (*See id.*)

The wide discretion afforded to the Debtors in the Bid Procedures was to be used to maximize value and to take advantage of offers that would yield a value commensurate with the statements by the Rabo Ag Parties. However, the Debtors' used that wide discretion to render the Committee's consultation rights futile and pursue a sale strategy designed to offload the ranches quickly at the minimum prices Rabo Ag was willing to accept.

### 2. Failure to Adhere to Bid Procedures: No Consultation With the Committee

Section 1103(c)(1) codifies a committee's right to consultation. *See* 11 U.S.C. § 1103(c)(1). A committee's consultation rights enable it to discharge its fiduciary duties. Without adequate

---

[10] Under the Bid Procedures Order, a Bid required the following: a list of the property that the bidder sought to purchase; the purchase price; proposed closing date; unconditional and irrevocable nature of the bid; marked purchase agreement; deposit; identity of executory contracts to be assumed; and other important elements that mandated evaluation.

16

information and an opportunity to provide informed input, a committee is sidelined as a mere observer. The provision of timely and accurate information is, accordingly, paramount. The decision whether to approve these sales directly implicates this significant issue.

In *Structurlite Plastics Corp.*, the bankruptcy court reasoned that:

> [P]articipation in the formulation of a plan represents the foremost of a committee's functions. With these principles serving as decisional guideposts, the Court will turn to the instant dispute. Plainly, negotiation concerning the sale of substantially all of the assets of the Debtor is an activity which is more closely akin to plan formulation than the conduct of day-to-day business operations. As such, the Committee should be provided with sufficient information to evaluate and take a position on the potential sale of Structurlite's assets. *See, In re McLean Industries, Inc.*, 70 B.R. 852, 860 (Bankr.S.D.N.Y.1987).

*In re Structurlite Plastics Corp.*, 91 B.R. 813, 819 (Bankr. S.D. Ohio 1988) (finding that a committee was entitled to review sale drafts before a sale can be consummated). In *Structurlite*, the debtors opposed the committee's request to review draft sale agreements. The committee filed a motion to compel, arguing that it could not exercise its fiduciary duties without adequate information. The bankruptcy court ultimately agreed with the committee, noting that the committee's position—that it could not establish an informed view of the proposed sales without vital information—rendered the motion to compel valid. *See id.*

In addition to § 1103, the Bid Procedures provided the Committee with consultation rights. To the extent that the Rabo Ag Parties were interested in deviating from the Bid Procedures, and to the degree they had the authority to do so, the Committee's right to a consultation was iron clad. For instance, the Bid Procedures provide, "[t]he Debtors reserve the right to set and/or adjust any minimum bid amounts with respect to the Property and any portion thereof at any time within their discretion (**in consultation with the Consultation Parties**) in order to maximize the value of the Assets." (*See* Bid Procedures [Docket No. 222] at § (c)(ii) (emphasis added).) Sections (a)(ii) and (iii) of the Bid Procedures provide that consultation with the Consultation Parties is necessary in connection with qualifying bidders and determining financial wherewithal to close on a sale. (*See*

17

*id.* at § (a)(ii) and (iii).)  Section (b) established a firm bid deadline, that could only be extended after consultation with the Consultation Parties.  If the Debtors intended to permit a bidder who submitted a Qualified Bid on one ranch to bid at the Auction on other ranches, they were required to consult with the Committee.  (*See id.* at § i(iii).)  These are merely a few examples of the items the Committee was entitled to be consulted on.

The term "consultation" is not defined in either the Bid Procedures or in the Bankruptcy Code.  Blacks Law Dictionary defines "consultation" as, "[t]he act of asking the advice or opinion of someone (such as a lawyer) . . . [or] [a] meeting in which parties consult or confer." *See* CONSULTATION, Black's Law Dictionary (11th ed. 2019).

In *California Wilderness Coal*, the Ninth Circuit found that the word "consult" inferred a discussion *prior to the action taken*.  *See California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1087 (9th Cir. 2011) ("An ordinary meaning of the word consult is to 'seek information or advice from (someone with expertise in a particular area)' or to 'have discussions or confer with (someone), **typically *before* undertaking a course of action**.' The New Oxford Dictionary 369 (2001) (emphasis added). We conclude that this is the definition that Congress intended when it directed DOE to prepare the Congestion Study 'in consultation with the affected States.' Thus, DOE was to confer with the affected States **before** it completed the study." (emphasis added)).

While the Committee was told about many of the Rabo Ag Parties' decisions, it was not truly consulted.  The Committee was not consulted regarding the decisions by the Debtors reflected in the Pre-Auction Bid Notice (*i.e.*, who submitted Qualified Bids or not).  At 10:09 p.m. PT on June 4, 2024, the Debtors circulated their Minimum Bid Notice.  While the email was directed to the "Consultation Parties," there was no "asking the advice or opinion" of the Committee.  There was no meeting in which the Debtors and the Committee conferred on the contents of the Minimum Bid Notice.  There was no attempt to address any substantive disagreements.  Under no reasonable interpretation was the Committee provided its consultation right before the minimum bid amounts were set and circulated.

1    Likewise, the Rabo Ag Parties did not meaningfully consult with the Committee regarding

2    the Fire Sale.  The Committee was not consulted regarding the minimum pricing for the Excluded

3    Properties.  The Committee was not consulted regarding permitting the few bidders remaining

4    during the Fire Sale to submit bids on the Excluded Properties (*i.e.*, ranches that were not subject

5    to Qualified Bids, including submitted by those bidders).  While, shortly before the Fire Sale, the

6    Debtors told the Committee that it intended to offer up the Excluded Properties for sale, it was not

7    consulted in advance, under any reasonable definition of "consult."  The Debtors made decisions

8    with Rabo Ag and advised the Committee of those decisions after the fact.

9          The distinction between "consultation" and "providing notice of decisions already made" is

10   not meaningless.  A committee is entitled to advanced notice of material decisions and an

11   opportunity to provide input.  By failing to properly consult the Committee on numerous significant

12   matters, including but not limited related to the Fire Sale, the Debtors violated both the terms of

13   their own Bid Procedures as well as 11 U.S.C. § 1103(c)(1).  As such, the sales should be denied.

14   **D.    The Proposed Sale of Ranches for Which There Was No Competitive Bidding**

15   **Fails Under Ninth Circuit Law**

16         The Committee's arguments concerning the expedited, deficient, and confusing sale process

17   were briefed in the Process Objection.  (*See* Docket No. 329).  On June 5, 2024, the Court held a

18   hearing on the Process Objection.  The Committee raised the concern that the Debtors were

19   deviating from the orderly sale process, intending to sell more ranches than necessary at poor prices

20   and without competition.  The Court agreed to allow the Auction to move forward over the

21   Committee's objection.  The Auction was held on June 6, 2024, and the results were expectedly

22   underwhelming.

23         While a disappointing outcome is not, unto itself, grounds for objection, each of the Debtors'

24   decisions leading up to this result, in aggregate, failed to satisfy the requisite standard.  In *Lahijani*,

25   the Ninth Circuit reasoned:

26         The court's obligation in § 363(b) sales is to assure that optimal value
          is realized by the estate under the circumstances. The requirement of
27         a notice and hearing operates to provide both a means of objecting
          and a method for attracting interest by potential purchasers.

28

> Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection. Nevertheless, particularly in the face of opposition by creditors, the requirement of court approval means that the responsibility ultimately is the court's.
> . . .
> The price achieved by an auction is ordinarily assumed to approximate market value when there is competition by an appropriate number of bidders. When competition is constrained, however, the price is less likely to be reliable and should be examined more carefully.

325 B.R. 282, 288–89 (B.A.P. 9th Cir. 2005) (denying the sale of estate assets).

Similarly, the Ninth Circuit BAP has stated "when competition is constrained, the price is less likely to be reliable and should be examined more carefully. . . . Once faced with opposition to the sale, the bankruptcy court had the ultimate responsibility to assure that optimal value was being realized by the estate." *See In re Fitzgerald*, 428 B.R. 872, 883 (B.A.P. 9th Cir. 2010).

While the facts in *Lahijani* and *Fitzgerald* are somewhat distinguishable (the asset sold in both matters was a cause of action), the cases both stand for the same premise—in the face of an objection, the bankruptcy court has the ultimate responsibility to ensure that optimal value is being received. Moreover, if competition is constrained, the prices obtained are less reliable indicators of actual value.

A bankruptcy court enjoys considerable latitude in deciding whether to approve (or not) the results of an auction. *See In re Sunland, Inc.*, 507 B.R. 753, 758 (Bankr. D.N.M. 2014) (finding that a winning bid is not a contract, and that the bankruptcy court has authority to deny a sale even after it has been determined by the debtor to be the winning bid.)

Here, the question is not necessarily whether there is a higher and better bid for any particular ranch. Instead, the issue is whether a higher and better bid could be procured during the Rabo Ag Parties' originally promised 14-month sale process. The fact that the Portfolio is comprised of a substantial number of ranches covering 8,610 total acres located in five counties covering three different California regions[11] suggests that a longer marketing period would be necessary. The Rabo Ag Parties have constrained competition by deviating from the orderly and

---

[11] *See* First Day Declaration, ¶ 13.

Case: 24-50211   Doc# 355   Filed: 06/10/24   Entered: 06/10/24 15:58:06   Page 24 of 32

managed 14-month sale process they represented was needed to maximize value and rushing to sell as many ranches as possible as quickly as possible. With the exception of two ranches (Johl and Onsum), the sales proposed by the Debtors *are not the product of competitive bidding*. The failure to adhere to any process, whatsoever, tainted the entire Auction and constrained competition. The lack of competition and low bids is proof that the rushed, three-month sale process did not result in optimal value.[12]

The Rabo Ag Parties took steps that constrained competition. For example, as discussed above, the messaging approaching the Auction was that the Excluded Properties would not be sold. Then, without prior notice to the market, the Debtors offered the Excluded Properties for sale. The Fire Sale of the Excluded Properties was conducted at the end of the Auction (after a very long day) amongst a very small group of remaining bidders (*i.e.*, those 4 to 5 bidders that happened to stick around). No competitive bidding occurred during the Fire Sale.

The fact that no bid has arisen within the first three months of these cases that will surpass the *de minimis* bids offered at the Auction cannot be deemed conclusive evidence that no better offer exists. According to the Rabo Ag Parties less than four months ago, the Portfolio was worth $248 million to $268 million. Moreover, the Rabo Ag Parties have materially deviated from the process they said would maximize value. Based on Rabo Ag Parties' representations, a sale process that should have resulted in a material distribution to unsecured creditors missed the mark by over $100 million, and could leave no recovery for unsecured creditors. The Committee is not gambling with Rabo Ag's money. The Rabo Ag Parties are advocating for a bad deal to benefit Rabo Ag and limit its downside, likely due to significant other declining agricultural assets in their portfolio.[13]

The Committee believes that the entire sale process should be questioned. However, the Committee does oppose all of the proposed sales. The Committee proposes that the Court approve the sales of only the following ranches: Lerda, Johl, Onsum, Jeffrey, Marcucci, and

---

[12]   The fact that optimal value has not yet been obtained should not be surprising. Again, both Rabo Ag and the Debtors stated a 14-month process would maximize value.

[13]   For instance, in *Millenkamp Cattle, Inc., et al*. (Bankr. D. Id. 24-40158), Rabo Ag is owed more than $90 million, secured by 20,000 acres of Western U.S. farmland.

Lamb. The prices to be paid for these ranches are the product of competitive bidding at the Auction or are at the higher range of bids received and at least approach the statements of value made to the Court. Furthermore, this collection of ranches meets the 20% acreage threshold in the Milestones, preventing a default under the DIP.

## IV. PROCEEDS SHOULD NOT BE PAID TO RABO AG

### A. Pre-Plan Distributions Are Not Permitted Absent an Emergency

To ensure that the goal of chapter 11—confirmation of a chapter 11 plan—is not short-circuited, the general rule is that a distribution on pre-petition debt should not take place except pursuant to a confirmed plan, absent extraordinary circumstances. *See In re Air Beds, Inc*., 92 B.R. 419, 422 (B.A.P. 9th Cir. 1988); *see also In re Conroe Forge & Mfg. Corp*., 82 B.R. 781, 784-85 (Bankr.W.D.Pa.1988). In *Air Beds*, the bankruptcy court approved a sale of equipment outside the ordinary course. The sale order provided that the sale proceeds would be distributed to the Internal Revenue Service and the California Employment Development Department. *See In re Air Beds, Inc*., at 421. The propriety of the sale itself was not at issue, but on appeal, the debtor's landlord challenged the distribution of proceeds outside of a chapter 11 plan. The Ninth Circuit BAP agreed with the landlord, citing to *Conroe Forge* as well as § 1123(a)(5) and Bankruptcy Rule 3021.

In adopting the reasoning of *Conroe Forge*, the Ninth Circuit BAP established that the pre-plan distribution of proceeds to a creditor could only be justified by something akin to an emergency. *See In re Air Beds*, at 424 (discussing the conclusion in *Conroe Forge* that if a pre-plan sale is "permissible only in the most exigent circumstances, then the distribution of the proceeds would require, at a minimum, a showing of similar immediate need."). A lender's perceived need to benefit from early receipt of the proceeds of its collateral is not an emergency. *See id.* at 423; *see also In re Conroe Forge & Mfg. Corp*., 82 B.R. at 786 (rejecting the argument from a bank that it was entitled to an immediate distribution as a matter of adequate protection because it would "benefit from immediate payment.").

*Air Beds* and *Conroe Forge* stand for the proposition that where property is turned into proceeds in a chapter 11, those proceeds are presumptively necessary to a plan:

> If distribution of assets occurs before confirmation, there will exist no means by which a plan may be implemented, in contravention of 11 U.S.C. § 1123(a)(5). In addition, if distribution is made to creditors in a liquidating Chapter 11 before confirmation of a plan, there will be little incentive for parties in interest to prosecute the case in an expeditious manner, much less to perform the work required to issue and obtain approval of a disclosure statement and plan.

*See In re Air Beds*, 92 B.R. at 423.

Here, the Ninth Circuit BAP's decision in *Air Beds* prohibits the payment of any sale proceeds to Rabo Ag on account of its pre-petition debt. There is no emergency need to distribute any proceeds to Rabo Ag. It is presumed that all sale proceeds are necessary for a plan. Disbursing the proceeds to Rabo Ag would short-circuit confirmation and disincentive the Rabo Ag Parties to proceed with a plan. Moreover, as discussed below, there are a number of disputes with respect to whether Rabo Ag is entitled to the sale proceeds.

### B. Rabo Ag Received a Preferential Transfer

It is black letter bankruptcy law that a preferential transfer recipient is not entitled to an allowed claim and any distribution until the recipient returns the transfer or property of equal value. *See* 11 U.S.C § 502(d). This is to ensure that all creditors are treated equitably and that no single creditor receives more than its fair share of the debtor's assets.

As noted above, Rabo Ag received the Preferential Payment of approximately $4,000,000 from TAAP on December 28, 2023. This transfer is presumptively preferential and subject to avoidance, subject to any defenses Rabo Ag may assert, which have not yet been adjudicated. The Preferential Payment was on account of TAAP's wholly unsecured obligation. Moreover, to the extent it may be deemed to have been made on behalf of the Ranch Debtors, it is still a preference.

Preferential payments to undersecured creditors are recoverable:

> To determine whether an undersecured creditor received a greater percentage recovery on its debt than it would have under chapter 7 the following two issues must first be resolved: (1) to what claim the payment is applied and (2) from what source the payment comes.

Both aspects must be examined before the issue of greater percentage recovery can be decided.

*In re Intercontinental Polymers, Inc.*, 359 B.R. 868, 875 (Bankr. E.D. Tenn. 2005) (quoting *Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, LP),* 171 F.3d 249, 244-45 (5th Cir. 1999)).

In *Intercontinental Polymers*, the bankruptcy court determined that the undersecured creditor received a preference. First, the court presumed that the creditor applied the payments to the unsecured portion of its debt because there was no indication that it released "a corresponding amount of collateral" upon the payments received. *See In re Intercontinental Polymers, Inc.*, 359 B.R. 868, 875 (Bankr. E.D. Tenn. 2005). Second, the court determined that the source of the payment was not the creditor's collateral because it was the proceeds of a loan from another party. *See id.*

Bankruptcy courts *presume* that undersecured creditors apply pre-petition preferences to the unsecured portion of their debts. As stated by the bankruptcy court in *Ludford Fruit Products*:

> Persuasive case law and simple logic dictate that the Payments were apportioned to the unsecured portion of Debtor's debt to Juice Farms. It is difficult to imagine any circumstances in which a partially secured creditor would endanger its secured position by reducing its secured claim rather than its unsecured claim. Further, even if Juice Farms had applied the Payments to its secured claim, Juice Farms would have had to release collateral to the Debtor worth $175,000. Juice Farms does not contend and has not proved that it released any collateral to Debtor. Therefore, I hold that the Payments were apportioned to the unsecured portion of Juice Farms' claim.

*In re Ludford Fruit Prod., Inc.*, 99 B.R. 18, 23 (Bankr. C.D. Cal. 1989); *see also In re Fox*, 229 B.R. 160, 165 (Bankr. N.D. Ohio 1998) ("Normally, in such a situation prepetition transfers received by the undersecured creditor are deemed preferential as there is a presumption that an undersecured creditor first applies any transfer it receives from the debtor to the unsecured portion of the debt."); *Deutsche Bank Sec., Inc. v. Kendall*, 2006 WL 335415, at *3 (N.D. Cal. 2006) ("In such a situation, pre-petition transfers received by the undersecured creditor are deemed preferential because there is a presumption that an undersecured creditor first applies any transfer it receives from the debtor to the unsecured portion of the debt.").

The Debtors propose to sell 88% of the Portfolio at an aggregate price of approximately $121.4 million, approximately $40 million short of the Rabo Ag Prepetition Debt. The sale of the four remaining properties—if and when they occur—will not close that $40 million gap. (*See* Reubel Decl., Ex. 1.) There is sufficient evidence at this point to demonstrate that the Rabo Ag Prepetition Debt was individually and collectively unsecured at the time the Preference Payment was made. *See e.g. In re Trappers Creek, LLC,* 2010 WL 797022, at *3–4 (Bankr. C.D. Ill. 2010) ("Where the collateral has been liquidated postpetition, the actual outcome of the liquidation, i.e., the proceeds realized, ordinarily satisfies the trustee's burden to produce evidence of what the creditor would realize upon a commercially reasonable disposition of its collateral.").

Rabo Ag is not entitled to a distribution until it returns the Preference Payment or its value. The Preference Payment enabled Rabo Ag to receive more than it would in a chapter 7. The Preference Payment was made from TAAP to Rabo Ag on account of its wholly unsecured debt.

Alternatively, if Rabo Ag is viewed as undersecured (as opposed to unsecured), the Preferential Payment is still a preference. First, it is presumed that Rabo Ag applied the Preference Payment to the unsecured portion of its debt. Second, as with the payment *Intercontinental Polymers*, the source of the payment was not the proceeds of Rabo Ag's collateral. Rather, it was cash from TAAP. Rabo Ag did not hold a perfected security interest in TAAP's deposit account cash. Moreover, the cash in question was from a creditor to Trinitas Farming (who is not an obligor under the Prepetition Credit Agreement). Thus, however viewed, the source of the Preference Payment was not Rabo Ag's collateral.

### C. <u>Cultural Cost Reimbursements Are Not Collateral Proceeds</u>

"Cultural costs" are the costs incurred and by Trinitas Farming to third party providers for services and materials related to maintaining and cultivating the almond orchards. Trinitas Farming is not a party to the Prepetition Credit Agreement. Thus, the cultural costs were, in the first instance, paid by a non-borrower entity from cash that was not encumbered.

Certain of the sales include, in addition to the purchase price, the reimbursement of cultural costs associated with the ranches purchased. Based on information provided by the Debtors, the cultural costs reimbursement for pending sales aggregate not less than $2.2 million (for bids where the costs are expressly delineated). Other bids incorporate cultural costs without delineation although they are clearly included in the bids. The Committee believes that the cultural cost reimbursements may aggregate not less than $4 million of the sales currently proposed by the Debtors. There is no evidence that the cultural cost reimbursements are the proceeds of Rabo Ag's collateral and they should not be paid to Rabo Ag.

**D.** **Under The Equities of the Case, Proceeds Should be Made Available for General Unsecured Creditors**

The "equities of the case" doctrine embodied in Section 552(b) of the Bankruptcy Code is meant to prevent a "'windfall' at the expense of the unsecured creditors[.]" *See In re Endresen*, 548 B.R. 258, 274-75 (B.A.P. 9th Cir. 2016). As described by one court:

> As a general matter, Bankruptcy Code's 'equities of the case' doctrine, which allows court to determine extent to which security interest in proceeds, products, offspring, or profits of prepetition property reaches postpetition proceeds, products, offspring, or profits, is intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing interests of secured creditors against Code's general policy, which favors giving debtors a fresh start.

*In re TerreStar Networks, Inc.*, 457 B.R. 254 (Bankr. S.D.N.Y. 2011).

In *In re Toso*, the Ninth Circuit BAP upheld the bankruptcy court's determination that the bank's lien should not attach to the debtor's crops, stating:

> Based on this evidence, and in light of the purpose of the statute and the case law interpreting "equities of the case" in § 552(b)(1), the bankruptcy court did not abuse its discretion in determining that Bank would receive an inequitable windfall at the expense of the unsecured creditors if its lien attached to the 2005 and 2006 asparagus crop. Freeing up the crop proceeds would allow Debtor to fund the Plan, pay his plan payments to creditors, and continue his operation. In limiting the reach of Bank's security interest, the bankruptcy court struck "an appropriate balance between the rights of secured creditors and the rehabilitative purposes of the Bankruptcy Code."

26

*In re Toso*, 2007 WL 7540985, at *14 (B.A.P. 9th Cir. 2007).

Rabo Ag chose to pursue the sale of the Portfolio in bankruptcy, rather than a piecemeal liquidation that likely would have required multiple state court proceedings. It elected the efficiency of a bankruptcy sale process and increased value that a sale in bankruptcy can provide. Further, Rabo Ag defended the filing by stating that the Portfolio had substantial value and equity, enough to pay all creditors. The Rabo Ag stated that the Portfolio would be sold through a 14-month orderly sale process designed to reap the substantial value. Rabo Ag committed to a $30 million DIP facility to fund that process. Rabo Ag claimed that this case was not solely for its benefit. (*See* Case No. 24-50210, Docket No. 31, at 1:20:47–1:21:02.) Now, having obtained the protections associated with the DIP facility, Rabo Ag is rushing the sale of the Portfolio over a much shorter period and for substantially less value than represented for its sole benefit.

Rabo Ag should not receive a windfall and profit from its statements. By one measure, the windfall is the delta between the value that the Portfolio would have obtained under a non-bankruptcy, piecemeal, multijurisdictional liquidation, and the consolidated, unified process afforded through § 363(b) sales in these chapter 11 cases. If there was no material, quantifiable value to filing these cases to liquidate the Portfolio, these cases would not have been filed and these sales would not have been pursued. It was clear from day 1 that Rabo Ag and the Debtors entered these cases as collaborators—the cases were filed with Rabo Ag's support (and likely at its direction).

The Rabo Ag chose this path and promoted it from day 1 of this case. By electing this path, the Rabo Ag must commit to covering the administrative costs of the estates up and including confirmation of a plan and they must leave material assets on the table for unsecured creditors to ensure that a chapter 11 liquidating plan can be confirmed. In other words, they elected chapter 11, and they must pay the freight. Furthermore, the Court should, at a minimum, deem any crop proceeds and the cultural cost reimbursement components of any sales to be free and clear of Rabo Ag's security interest.

## V. **RESERVATION OF RIGHTS**

The Committee reserves its rights, including the right to amend, modify, or supplement this Objection, to seek discovery, and to raise additional objections at or in connection with any Sale Hearing.

## VI. **CONCLUSION**

**WHEREFORE**, the Committee requests that this Court deny the Motion except with respect to the ranches suggested by the Committee, prohibit the payment of any sale proceeds to Rabo Ag at this time, and grant such further relief as the Court deems just and proper.

Dated:  June 10, 2024                   HUSCH BLACKWELL LLP


By:___/s/ Michael A. Brandess_____
         Michael A. Brandess


Dated:  June 10, 2024                   RAINES FELDMAN LITTRELL LLP


By:___*/s/ Robert S. Marticello*_____
         Robert S. Marticello
         Mark S. Melickian
         Co-Counsel for the Official Committee
         of Unsecured Creditors